1              IN THE UNITED STATE DISTRICT COURT

2             FOR THE DISTRICT OF NEBRASKA

3                    4:22-CV-3039

4

5                  RICHARD D. MYERS,

6                     Plaintiff

7

8                       V.

9

10             GALEN STEHLIK AND

11             STEHLIK LAW FIRM,

12                  Defendants

13

14

15

16

17

18

19

20

21

22

23   DEPONENT:   GALEN STEHLIK

24   DATE:       APRIL 12, 2023

25   REPORTER:   SUMMER MARTINEZ

Great Plains Reporting Company
1299 Farnam Street, Ste. 300
Omaha, NE 68102

GREAT PLAINS
REPORTING
YOUR PATH THROUGH LITIGATION

Phone: 1-402-303-3399
Fax: 502-584-0119
schedule@yourdepositions.com
www.yourdepositions.com

4:22-cv-03039-JMG-MDN   Doc # 65-2   Filed: 11/20/23   Page 2 of 27 - Page ID # 1882
The Deposition of GALEN STEHLIK, taken on April 12, 2023
2..5

Page 2

```
 1                     APPEARANCES
 2
 3   ON BEHALF OF THE PLAINTIFF, RICHARD MYERS:
 4   Diana J. Vogt, Esquire
 5   Sherrets Bruno & Vogt LLC
 6   260 Regency Parkway Drive
 7   Suite 200
 8   Omaha, Nebraska 68114
 9   Telephone No.: (402) 390-1112
10   E-mail: dvogt@sherrets.com
11
12   ON BEHALF OF THE DEFENDANTS, GALEN STEHLIK AND STEHLIK
13   LAW FIRM:
14   Lauren Goodman, Esquire
15   McGrath North Mullen & Kratz PC LLO
16   1601 Dodge Street
17   Suite 3700
18   Omaha, Nebraska 68102
19   Telephone No.: (402) 341-3070
20   E-mail: lgoodman@mcgrathnorth.com
21
22
23
24
25
```

Page 4

```
 1              EXHIBITS (CONTINUED)
 2   EXHIBIT                                     Page
 3   11 - Debtor's First Amended Chapter 12
 4        Plan                                    66
 5   12 - Debtor's Second Amended
 6        Chapter 12 Plan                         80
 7   13 - E-mail Chain Between Galen Stehlik
 8        and Kurt Kroeger - August 28, 2020      92
 9
10   14 - E-mail Chain Between Galen Stehlik and
10        Jeff Galyen - September 1, 2020         93
11   15 - E-mail Chain Between Galen Stehlik and
12        Kurt Kroeger - October 1, 2020          94
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1                     INDEX
 2                                             Page
 3   DIRECT EXAMINATION BY MS. VOGT               6
 4   CROSS-EXAMINATION BY MS. GOODMAN            90
 5   REDIRECT EXAMINATION: BY MS. VOGT          102
 6   RECROSS-EXAMINATION BY MS. GOODMAN         103
 7
 8                    EXHIBITS
 9   EXHIBIT                                     Page
10    1 - Letter to Jeff Galyen from
11        Stehlik Law Firm                       29
12    2 - Bankruptcy Petition #: 20-40305-TLS    31
13    3 - Photocopy of H&M Farms Inc. Checks     34
14    4 - E-mail from Galen Stehlik to
15        Adam Hoesing - September 30, 2020      41
16    5 - Answer to Complaint and Jury Demand    44
17    6 - Letter to Kurt Kroeger from Stehlik
18        Law Firm                               50
19    7 - E-mail from Terri to Mr. Overcash -
20        April 10, 2020                         50
21    8 - Documents prepared by Mr. Patino
22        Regarding Schedule Differences         52
23    9 - Woods Aitken Documents
24        - March 10, 2020                       57
25   10 - Debtor's Chapter 12 Plan               59
```

Page 5

```
 1                   STIPULATION
 2
 3   The deposition of GALEN STEHLIK was taken at REMBOLT
 4   LUDTKE LLP, 3 LANDMARK CENTRE, 1128 LINCOLN MALL, SUITE
 5   300, LINCOLN, NEBRASKA 68508 on WEDNESDAY, the 12TH day
 6   of APRIL 2023 at 10:04 a.m. CT; said deposition was
 7   taken pursuant to Neb. Ct. Rule 6-330. It is agreed that
 8   SUMMER MARTINEZ, being a Notary Public and Court
 9   Reporter for the State of NEBRASKA, may swear the
10   witness.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



Great Plains Reporting Company
1299 Farnam Street, Ste. 300
Omaha, NE 68102

GREAT PLAINS REPORTING
YOUR PATH THROUGH LITIGATION

Phone: 1-402-303-3399
Fax: 502-584-0119
schedule@yourdepositions.com
www.yourdepositions.com

4:22-cv-03039-JMG-MDN   Doc # 65-2   Filed: 11/20/23   Page 3 of 27 - Page ID # 1883
The Deposition of GALEN STEHLIK/Taken on April 12, 2023
6..9

Page 6

```
1              PROCEEDINGS
2        THE REPORTER:  We are now on the record.  At
3    this time, the attorneys would like to stipulate
4    the waiving of the Nebraska read on per Rule
5    30(b)(8)(a).  Is this still correct?
6        MS. VOGT:  Yes.
7        MS. GOODMAN:  Yes.
8        THE REPORTER:  And Mr. Stehlik, would you
9    please state your full name for the record?
10       THE WITNESS:  Galen Edward Stehlik.
11       THE REPORTER:  And would you please raise your
12   right hand?  Do you solemnly swear or affirm that
13   the testimony you're about to give will be the
14   truth, the whole truth, and nothing but the truth?
15       THE WITNESS:  Yes.
16       THE REPORTER:  You may begin.
17            DIRECT EXAMINATION
18   BY MS. VOGT:
19       Q.   Mr. Stehlik, as you know, my name is Diana
20   Vogt, and I'm guessing that you probably don't need me
21   to go through the preliminaries about a deposition.
22       A.   No, probably not.
23       Q.   I will try and ask clear questions.  If I
24   don't, feel free, of course, to ask me to explain or
25   tell me you can't answer it that way or whatever, and I
```

Page 7

```
1    will do my best to give you a better question.
2        A.   Okay.
3        Q.   So would you just start right now, tell us a
4    little bit about your background, starting with where
5    you went to high school?
6        A.   Yes.  I went to Wilbur High School, graduated
7    in 1970, then went into -- then went to the University
8    of Nebraska.  I got a commission through ROTC.  I went
9    into the Air Force for -- for a couple years.  Then I
10   went to law school.  And after law school I worked for a
11   small firm in my hometown of Wilbur called Steinacher
12   and Vosoba.  And thereafter, I came to Grand Island.  I
13   was a trust officer of the Overland National Bank from
14   1978 until 1982.  Then I worked for the Lubes, Dowding,
15   Beltzer, Leininger and Smith law firm from 1982 until
16   1985.  And I've been in private practice since 1985.
17       Q.   In your own firm --
18       A.   Yes.
19       Q.   -- in private practice?  And how many
20   attorneys are in your firm?
21       A.   Two, my son Mitchell and my wife Anna.  And we
22   rent office space in our building to Mary Livingston.
23       Q.   Was there a particular reason or something
24   that got you into representing debtors in bankruptcy?
25       A.   When Chapter 12 was created, I work -- live in
```

Page 8

```
1    a rural area, and I started getting contacted by farmers
2    that were distressed.  That was a particularly good time
3    to deal with Chapter 12 debtors because land values were
4    high, but then they had fallen precipitously.  And so
5    cram downs in Chapter 12 cases were appealing, and so I
6    started representing Chapter 12 debtors.  I think I
7    filed my first Chapter 12 maybe in '89 or '90.
8        Q.   Do you still do primarily Chapter 12, or do
9    you do other kinds of things?
10       A.   No, I've done -- I have three Chapter 11
11   confirmed plans and I do Chapter sevens.  That's really
12   the work that I do in bankruptcy.  Chapter 7, 11, and
13   12.
14       Q.   Do you have any estimate for how many of the
15   Chapter 12 cases have ended up with a confirmed plan?
16       A.   I'm going to say probably 14.
17       Q.   Now, let's talk about the Kroegers a little
18   bit.  How did you come to represent Kurt and Kathy
19   Kroeger?
20       A.   Kurt Kroeger contacted me and he wanted to see
21   if I would represent him in a lawsuit against, I believe
22   it was, Ag Services.  This dealt with -- he believed
23   they misapplied chemicals and additives to his soil and,
24   as a result, sustained damages.  I did not represent him
25   in that case.  He hired Clint Williams. That's how I
```

Page 9

```
1    first met him, is he had approached me on that.
2        Q.   Do you know how that case ultimately turned
3    out?
4        A.   A defendant's verdict in favor of Ag Services.
5    And -- and I don't know if the defendant was Ag Services
6    or Aurora Co Op, but it was a company that sells and
7    applies soil additives.
8        Q.   So when did you first talk to Mr. Kroeger
9    about a possible bankruptcy?
10       A.   I would say probably four months or five
11   months maybe, or even less than that, before we actually
12   filed.  He was having trouble with BankFirst.
13       Q.   Have you had any other bankruptcies where
14   BankFirst was the primary creditor?
15       A.   No.  Well, if -- if I did, we were able to
16   work with them and get a -- strike a deal.
17       Q.   Now, you filed a single bankruptcy for both
18   the Kroegers and their corporation, I believe is H&M
19   Farms.  Was there a reason you only filed a single
20   bankruptcy?
21       A.   Well, the corporate entity, the sole
22   shareholders were the debtor and his spouse.  And I
23   spoke to the Chapter 12 trustee, Mr. Overcash, and
24   indicated to him that, you know, should I file a Chapter
25   12 and then merge the cases or file a -- a motion to
```

Great Plains Reporting Company
1299 Farnam Street, Ste. 300
Omaha, NE 68102

GREAT PLAINS
REPORTING
YOUR PATH THROUGH LITIGATION

Phone: 1-402-303-3399
Fax: 502-584-0119
schedule@yourdepositions.com
www.yourdepositions.com

Page 10

1  have them jointly administered?  It appeared that all
2  the debt was either debts owed by Kurt Kroeger and his
3  spouse or, if they were corporate debts, and I don't
4  believe they were a lot of those, they were personally
5  guaranteed by Kurt Kroeger and his spouse.
6      Q.    Didn't H&M own property separate from the
7  Kroegers?
8      A.    I don't recall.  If it -- if it did, I would
9  assume it was farm machinery, and the underlying debt
10 was personally guaranteed by Kroeger and his wife and
11 was pledged as security to either the -- the implement
12 company or the bank.
13     Q.    In a recent -- in another bankruptcy that
14 you've filed recently with Dickie Lee Helms and Bonnie
15 Jean Helms --
16     A.    Yes.
17     Q.    -- there were multiple cases filed in that.
18 What were the differences for filing multiple --
19     A.    They had two sons that were involved in the
20 business with them.  The Helms, one of them was they --
21 actually involved land in a different state, Missouri.
22 They were not real crop farmers.  They pretty much were
23 involved in livestock.
24     Q.    And it's my understanding you no longer
25 represent the Helms?

Page 11

1      A.    That's correct.  We got a confirmed plan and
2  then they hired John Hahn from Lincoln, who I believe
3  still represents them.
4      Q.    You know why they changed attorneys?
5            MS. GOODMAN:  And I would just caution, don't
6  -- anything that they discussed with you would be
7  privileged so --
8            THE WITNESS:  Sure.
9            MS. GOODMAN:  -- don't -- I mean, I --
10     A.    I really -- I really don't know.
11 BY MS. VOGT:
12     Q.    And going back to when you first talked to
13 Kurt Kroeger about filing bankruptcy, tell me about
14 those discussions.  I mean, if you discussed a goal or a
15 way to get to the goal, anything like that.
16     A.    Kurt Kroeger was an eternal optimist.  He told
17 me that he actually had -- it wouldn't be a problem, he
18 was going to refinance his debt with the bank done in
19 Kansas.  This would be momentary.  His financing in
20 Kansas never materialized.
21     Q.    There were several entities that he talked to
22 about possible refinancing; is that right?
23     A.    Yes.
24     Q.    Did you talk to him about all -- at all about
25 possibly selling some of his land to pay down some of

Page 12

1  his debt?
2      A.    Yes, I did.  Mr. Kroeger has a son who was
3  just getting involved in farming, and Mr. Kroeger
4  changed the focus of his farming operation from being a
5  row crop farmer to being in the business of actually
6  scraping manure and then selling it as a soil additive.
7  And then he was going to farm -- he was going to rent
8  his farms to his son.  The son would pay him cash rent
9  that would assist him in making payments to services
10 obligations.  He didn't want to sell any land, and the
11 reason he didn't want to sell any land was that would
12 then impact his son's ability to make a living.  This
13 was his son's first year in being his own owner
14 operator.  I think he'd always just maybe assisted his
15 father on the farm.  But this was Kroegers' plan.  He
16 was going to do the scraping of manure, and then he was
17 going to also be involved in selling feed because he was
18 going to use earlage and he was going to bail stocks and
19 those types of things, and then sell that for -- for
20 income as well.  That was his -- that was his plan.
21     Q.    When he gave you his projections for the
22 manure business, did you talk to any financial advisor
23 or expert in the field to see if his projections were
24 realistic?
25     A.    I talked to a loan officer at Five Points

Page 13

1  Bank, who his name is Mike Roth, and he -- and I
2  indicated to him, and he didn't really have a good field
3  for whether -- he told me what the current price was for
4  manure, but he didn't know how many head were going to
5  be on -- in the feedlot.  This is Mr. Kahloff's feedlot
6  and -- so -- but did I get an idea about what the market
7  was and the volatility in the markets and what the
8  current market was?  Yes, I did.
9      Q.    Now, at the time towards the beginning of the
10 bankruptcy, did you talk to him about filing motions to
11 use cash collateral?
12     A.    Well, to use a motion for cash collateral, you
13 have to find a lender that's going to loan you money to
14 put in your crop.  He wasn't a row crop farmer.  And so
15 using cash collateral would -- would have been to find a
16 bank to loan him money.  His projections were such that
17 he was able to generate enough income, according to his
18 statistics, according to his projections, generate
19 enough income or he did not need to borrow money for
20 operating expenses.
21     Q.    For his new business?
22     A.    For his new business, his only business.
23     Q.    Do you know if his son had obtained financing
24 to put in a crop on the rented land?
25     A.    I believe that he did.

Great Plains Reporting Company
1299 Farnam Street, Ste. 300
Omaha, NE 68102



Phone: 1-402-303-3399
Fax: 502-584-0119
schedule@yourdepositions.com
www.yourdepositions.com

Page 14

1    Q.   Going back to your discussions with Kurt, did
2  you ever write to him and say, "Hey, I think you really
3  need to sell some land, and here's why"?
4    A.   Those were discussions that we had in -- in --
5  in -- in person.  Kurt had a bad habit.  He would not
6  call and make an appointment and come in to see me.
7  Occasionally, he did, but the majority of the time he
8  would just show up at my office.  He didn't have an
9  appointment.  If I was able to see him, I would see him.
10 But most of the time, they were brief, intermittent.
11 You know, the -- the real meat of my discussions with
12 him were when he actually had an appointment to come and
13 see me, where we could meet for any length of time.
14 During those discussions, with all my Chapter 12
15 debtors, you say, "Can you downsize your operation?  Can
16 you sell machinery?  Can you sell land?"  And his answer
17 was always he was unable to do that because the
18 commitment he made to his son.
19   Q.   Is it your practice to keep notes of
20 conversations like that or to confirm what you told them
21 with a letter?
22   A.   In many instances, yes.
23   Q.   And it's of course possible that I've missed
24 something, but I have not seen any communications
25 talking to him about selling anything or downsizing

Page 15

1  anything.
2    A.   These would've been conversations that I had
3  with him in person.  As my practice has developed since
4  1989, you just know to talk to clients about -- that's
5  one of the first things you talk about is downsizing.
6  And he was very quick to downplay that possibility.
7    Q.   Even though Mr. Kroeger was against it, did
8  you ever talk to Mr. Galyen about possibly allowing
9  Kroeger's to sell a piece of property to pay down some
10 of the bank debt?
11   A.   I'm sure in my conversations with BankFirst
12 that would've been discussed, yes.
13   Q.   Do you remember what their attitude or
14 position on that was?
15   A.   They did not trust Mr. Kroeger.  They
16 considered him to be not credible.  Not believable. And
17 it was difficult for me to talk to them about
18 Mr. Kroeger because of their intense dislike for him.
19   Q.   Do you remember if you had discussions with
20 any of the other creditors regarding possible sales?
21   A.   Other creditors were usually creditors that
22 had a security interest in other assets, usually
23 machinery.  And I don't -- I do not recall having a
24 conversation with them about Mr. Kroeger could sell land
25 and we'll use that to pay you off.  He always believed

Page 16

1  that his projections were such that he would generate
2  enough income to service the debt on equipment that was
3  secured by those creditors, John Deere Finance as an
4  example.
5    Q.   Do you remember if you ever talked to him
6  about the possibility that if you couldn't get a plan
7  confirmed, they would have to end up with the Chapter
8  7?
9    A.   I told him that if he didn't get a plan,
10 confirmed that the Chapter 7 would probably be his next
11 alternative.  That was his largest creditor -- largest
12 secured creditor, fully -- fully secured, and properly
13 perfected was BankFirst.  They were no fan of
14 Mr. Kroeger.
15   Q.   In fact, BankFirst felt very secure in the
16 value of their collateral; is that right?
17        MS. GOODMAN:  Objection.  Foundation.  You can
18 answer if you know.
19   A.   My understanding was that -- that they felt
20 that their security was close to the debt.
21   Q.   Did you ever talk to Mr. Kroeger about the
22 interest that was accruing on the bank loans?
23   A.   Absolutely.
24   Q.   And tell me kind of the gist of those
25 conversations.

Page 17

1    A.   Well, I -- I would tell him that when you get
2  a confirmed plan, the interest rates are adjusted, and
3  the interest rate on the confirmed plan is how your debt
4  would be amortized.  I said, "If you don't have a
5  confirmed plan or you're in default, interest begins --
6  continues to accrue at the note rate."
7    Q.   And one of the notes was accruing at almost
8  $1,700 a day, wasn't it?
9    A.   I believe he had a note in -- in excess of $8
10 million, yes.  That'd be about right.
11   Q.   Did you have the Kroegers open new bank
12 accounts after they filed bankruptcy?
13   A.   I believe they opened up a debtor and
14 possession account at a bank, and they used that as a
15 basis for filing their operating report.
16   Q.   When you eventually did get the third plan
17 done, and did you have a -- an in-person conversation
18 with Mr. Kroeger about the $100,000 payment that would
19 be due within 10 days?
20   A.   Yes, I did.
21        MS. GOODMAN:  Objection.  Form.
22   A.   Yes.
23   Q.   Tell me about that conversation.
24   A.   Well, again, Kroeger would just show up, and
25 in many instances, I would give him copies of what had

Great Plains Reporting Company
1299 Farnam Street, Ste. 300
Omaha, NE 68102

GREAT PLAINS
REPORTING
YOUR PATH THROUGH LITIGATION

Phone: 1-402-303-3399
Fax: 502-584-0119
schedule@yourdepositions.com
www.yourdepositions.com

Page 18

1  come in.  Kroeger, again, was an eternal optimist.  He
2  said, "No problem.  I can make that work."  Those -- and
3  I remember in particular that was his catchphrase, "No
4  problem."  Did he know about that payment?  Yes, he did.
5      Q.   Did he give you any specifics about how he was
6  going to take care of that payment?
7      A.   Did he give me specifics?  Well, his cash flow
8  indicated that he was going to sell earlage, baled
9  stocks, other feed to Kroeger.  He'd have enough money
10  from scraping manure and selling it as a soil additive.
11  That's how he was going to make that payment.
12      Q.   Had he already started operating the manure
13  business?
14      A.   Yes.
15      Q.   Had you had any actual all returns rather than
16  just projections?
17      A.   No, there wouldn't have been any tax return
18  yet.  I -- he gave me the information from his books and
19  records.
20          MS. GOODMAN:  And I'm actually going to object
21      to that question.  Do you have a time that you're
22      focused on a point in time?
23          MS. VOGT:  Yeah, the point in time is about
24      the time that the issue of the $100,000 payment in
25      10 days after the plan came up.

Page 19

1      A.   Yes, he was operating and actually doing
2  business with Mr. Kahloff and selling earlage and silage
3  and baled stocks, et cetera.  So yes, he was doing
4  business already.
5  BY MS. VOGT:
6      Q.   Did you have him bring in records so that you
7  could verify that what he was earning matched up with
8  his projections?
9      A.   Well, the records that he had were his books
10  of original entry.  I mean, he would -- yes, I mean, he
11  provided a lot of those to me.  We used his projections
12  because this was the first year where he was doing this
13  type of business and changing from row crop farming.  I
14  knew how much his son rent was, how -- when that was
15  supposed to be paid.
16      Q.   Now, the second amended plan was confirmed
17  sometime in November or December 2020.  And then
18  BankFirst filed its notice of default for failure to
19  make that $100,000 payment on December 28th of 2020.  Did
20  Mr. Kroeger contact you after that?
21      A.   Yes.
22      Q.   In -- by phone, in-person?
23      A.   He sent some e-mails, and then he would --
24  he would come in, in -- in -- in-person and it was
25  always, "I can -- I can come up with $100,000."  That

Page 20

1  was always -- so, yes, he did contact me.  We did have
2  discussions.
3      Q.   And in fact, he did it, although not within 10
4  days, but he did pay that $100,000 payment, didn't he?
5      A.   That's what I understand.
6      Q.   Now, the Court granted BankFirst relief from
7  the stay on December 30, 2020, very close to the time
8  that the notice of default was filed.  And the fourth
9  quarter operating reports weren't filed until February.
10  When you filed those, did you know about the default
11  already?
12      A.   Yes.  Mr. Kroeger fills out their quarterly
13  reports and files them.
14      Q.   Do you know about how many contacts you had
15  with the Kroegers between December of 2020 and about
16  April 1st, when I believe is when they hired Mr. Patino?
17      A.   I would say frequent.  I'm sorry, say those
18  dates again.
19      Q.   Between 2020 -- or December 2020 and about
20  April 1st.
21      A.   I would -- Kurt Kroeger probably contacted me
22  weekly.  It was either by e-mail or he would call or
23  typical of -- he would -- he just show up.
24          THE WITNESS:  Excuse me.  It's -- can we take
25      a brief recess so I can move my car?

Page 21

1          MS. GOODMAN:  Oh sure.
2          THE WITNESS:  Thank you.
3          THE REPORTER:  We are off the record.
4              (OFF THE RECORD)
5          THE REPORTER:  We are back on the record at
6      10:30 a.m.
7  BY MS. VOGT:
8      Q.   Do you remember if you had any conversations
9  with Mr. Galyen at the bank after the default was
10  entered?
11      A.   Yes.
12      Q.   Tell me about those.
13      A.   Mr. Kroeger had found a lender who I thought
14  was disreputable, that was going to loan him five and a
15  half million dollars, and -- and that would be used to
16  buy down the debt and to take care of the debt to
17  BankFirst.  And Mr. Galyen's -- that would be almost a
18  two and a half million-dollar reduction, or haircut, so
19  to speak, for that lender, and they were not interested
20  in doing that.
21      Q.   I remember seeing a communication where you
22  asked, I believe, BankFirst if they had ever heard of a
23  particular lender.  Is that the lender you're talking
24  about?
25      A.   I believe so.  And I checked with bank clients

Great Plains Reporting Company
1299 Farnam Street, Ste. 300
Omaha, NE 68102



Phone: 1-402-303-3399
Fax: 502-584-0119
schedule@yourdepositions.com
www.yourdepositions.com

Page 22

1  of mine if they'd ever heard of them, and their point
2  was, "This is not a reputable company."
3      Q.   And was that financing dependent on the bank
4  actually accepting that in settlement rather than he
5  would continue to owe them the difference between what
6  he got financed?
7      A.   It was -- it was presented to me that they
8  would expect a release of the security interest in all
9  of the assets that BankFirst claimed, and this would be
10 a replacement lender.
11     Q.   So the lender itself was demanding that the
12 BankFirst (Inaudible)?
13     A.   You know, the -- the -- the lender, the
14 communication I had with them was by telephone and by
15 e-mail.  They were never definitive on that.  They were
16 always somewhat wishy-washy, so to speak.  Nothing was
17 certain with them, which gave me pause for concern.
18     Q.   Talking about the Kroegers' property, looking
19 at the plan, I noticed that the -- in the banker's
20 deposition, the banker said they were fully secured in
21 all of the property, including where the residence was,
22 but the residence was also, I saw had a mortgage on
23 it --
24     A.   Yes.
25     Q.   -- with a balance.  Do you know who was first

Page 23

1  and who was second or how that came about?
2      A.   The bank?  No, not the bank.  The -- the
3  lender on the home had a purchase money security
4  interest in the first position.  The bank was in second.
5      Q.   Okay.  The bank end up taking that property?
6      A.   I don't know.  They had a second, and if they
7  would've taken it, they would've had to pay off the
8  first.
9      Q.   Did you talk to Mr. Kroeger or suggest that
10 you file a request to modify the plan after the default
11 occurred?
12     A.   Yes, we talked about alternatives.  The
13 request to modify would've been with the BankFirst's
14 consent, and they were at a position where the drop dead
15 clause to them meant what it said.  They were done with
16 Mr. Kroeger, did not want to have a banking relationship
17 anymore.  And if Kroeger could find a lender to take
18 them out, that would -- that would appeal to them.  But
19 in terms of further modifications of extending maturity
20 dates on loans, no, they weren't interested in that.
21 But that was discussed with Kroeger as an alternative.
22     Q.   So you just figured that the bankrupt -- that
23 Judge Saladino would not allow a modification post-
24 default?
25     A.   It's been my experience with Saladino that he

Page 24

1  would not look -- he would expect there to be an
2  agreement with BankFirst.  To do a cram down at this
3  point, in my opinion, Saladino would not have -- would
4  not have been successful at all.
5      Q.   Did your plan -- let's just go back up
6  totally.  Tell me about getting a plan confirmed in
7  Chapter 12.  If there are objections made, how do you
8  have to satisfy those?
9      A.   Well, you deal with the creditor that's
10 subjected and you try to reach an accommodation that --
11 with results in their withdrawing their objections so
12 that your -- your next amended plan will include the
13 language that they've agreed to, that they've approved.
14 And that how -- that's how you resolved their
15 objections.
16     Q.   So is that how you got to the drop-dead clause
17 in the second amended plan?
18     A.   The drop dead clause, yes, that's correct.
19     Q.   Ten days seems like a really short time.  Was
20 that a bank condition?
21     A.   Yes.  And I believe their position was, based
22 upon statements that Kroeger had made, Kroeger clearly
23 had the money from the sale of earlage, stock bales, hay
24 bales, prairie hay bales, you know.  He had enough
25 income generated to make that payment.  And I --

Page 25

1          MS. GOODMAN:  Well, wait, wait, wait.
2  Let's --
3          THE WITNESS:  I'm sorry.
4          MS. GOODMAN:  Let's wait for a question.
5          THE WITNESS:  Okay.
6  BY MS. VOGT:
7      Q.   If he did actually have income, why didn't he
8  pay it within the 10 days?
9      A.   I have no idea.
10     Q.   Is a large single payment like that common in
11 a Chapter 12 plan?
12     A.   I've seen it.  I've seen plans.  John Hahn's
13 plans in many instances will ask for, like, an upfront,
14 so like to prime pump the -- to satisfy the -- the
15 lender and make peace with them.  Yes, I've seen it.
16     Q.   Is the December 30th order granting leave from
17 the stay an appealable order?
18     A.   I don't believe so.  It's not a final order.
19     Q.   What would constitute a final order at that
20 stage, if you know?
21          MS. GOODMAN:  And I'm going to object to form.
22 I mean, this is a --
23     Q.   If you know.
24          MS. GOODMAN:  -- this is a legal -- I mean,
25 you can talk about what your experience is, but

Great Plains Reporting Company
1299 Farnam Street, Ste. 300
Omaha, NE 68102

GREAT PLAINS
REPORTING
YOUR PATH THROUGH LITIGATION

Phone: 1-402-303-3399
Fax: 502-584-0119
schedule@yourdepositions.com
www.yourdepositions.com

Page 26

```
 1    obviously he doesn't -- he's not -- hasn't
 2    researched this and isn't necessarily --
 3            MS. VOGT:  No, I --
 4            MS. GOODMAN:  I mean, I --
 5            THE WITNESS:  Yeah.  Yeah.
 6            MS. GOODMAN:  This is a legal conclusion that
 7    you're asking.
 8    A.    Most of the time, you're able to work with
 9    creditors.  That's been my experience.
10  BY MS. VOGT:
11    Q.    It's my understanding that after the stay was
12    released, then the bank reactivated its replevin action
13    in --
14    A.    Yes.
15    Q.    -- Howard County.
16            THE REPORTER:  I'm sorry, which county did you
17    say?
18            MS. VOGT:  Howard.
19            THE REPORTER:  Thank you.
20  BY MS. VOGT:
21    Q.    And in that action, I believe -- in the Howard
22    County action, I believe you filed a suggestion of
23    bankruptcy.
24    A.    Yes.
25    Q.    Was that appropriate after the relief from the
```

Page 27

```
 1    stay had been granted?
 2    A.    Probably not, no.  My experience, sometimes
 3    with district judges, they are not at all familiar with
 4    bankruptcy.  And so if you file a suggestion of
 5    bankruptcy, that might prompt them to inquire further,
 6    and sometimes that gives you enough time to have the
 7    debtor come up with the payment, reach some sort -- some
 8    sort of accommodation.  The district judge in Howard
 9    County is Karin Noakes and she'd had no training or
10    experience in bankruptcy at all.
11    Q.    So it was just kind of buy -- to buy some
12    time?
13    A.    Yes.
14    Q.    Throughout the Kroegers' bankruptcy, there
15    were several occasions on which somebody filed a motion
16    for relief from the stay or a motion to file a claim out
17    of time and you did not oppose any of those motions.
18    Was there a reason for that?
19    A.    Most of the time, the -- those are routinely
20    granted by the bankruptcy judge.  Asking for leave to
21    file a claim out of time, in many instances, the
22    creditor says, "You didn't give me proper notice because
23    the address that you gave me was, you know, not a proper
24    address."  But my experience is they're going to be
25    allowed to file their claim and -- number one, and,
```

Page 28

```
 1    number two, filing for -- objecting to relief from the
 2    automatic stay, we did -- usually, you do file
 3    resistances if the resistance is meritorious.  The fact
 4    that your client doesn't have the money and doesn't have
 5    a good explanation for it is probably not a meritorious
 6    reason.
 7    Q.    So it was your belief that Mr. Kroeger didn't
 8    have enough money to offer adequate protection?
 9    A.    No.  You're making reference to people that
10    ask for relief from the stay.  I believe these were
11    implement dealers and they're implement dealers or impro
12    and finance, John Deere Finance as an example.  And you
13    can routinely make deals with those people.  And I --
14    and -- and that's the first question that I ask to a
15    lender that's asked for relief from stay, can we make a
16    deal?  I mean, can -- when we stretch -- stretch these
17    payments out.
18    Q.    People seem to have stapled things together
19    that are not actually part of the same document.
20            MS. GOODMAN:  What's the Bates number, Diana,
21    just so I can get ready?
22            MS. VOGT:  On the one that I'm actually going
23    to use or --
24            MS. GOODMAN:  Yeah.  Yes.  Yes.
25            MS. VOGT:  -- or any of the others?
```

Page 29

```
 1            MS. GOODMAN:  On the one that you want to use?
 2            MS. VOGT:  One of the one is -- 45 is the one
 3    that I'm pulling out of this whole set of stuff.
 4            MS. GOODMAN:  Okay.
 5            MS. VOGT:  I'll give you the (Inaudible).
 6    Would you mark that as Exhibit -- should we just
 7    start at 1 again?
 8            MS. GOODMAN:  Yeah, let's just do that.  Makes
 9    sense.  That's the letter dated August 7th --
10            (EXHIBIT 1 MARKED FOR IDENTIFICATION)
11            MS. VOGT:  Correct.  We have all new staff
12    right now except for the office manager.
13            MS. GOODMAN:  Okay.  We'll read into that what
14    we will.
15  BY MS. VOGT:
16    Q.    Mr. Stehlik, you've been handed what we've
17    marked as Exhibit number 1.  Do you recognize that
18    document?
19    A.    Yes.
20    Q.    Now, in that document, you talked to -- or
21    it's to Mr. Galyen at BankFirst.  You talked about
22    preparing a motion to file with the Court seeking
23    ratification of the Kahloff contract.  Did you file that
24    motion with the Court?
25    A.    No.
```



Great Plains Reporting Company
1299 Farnam Street, Ste. 300
Omaha, NE 68102

GREAT PLAINS
REPORTING
YOUR PATH THROUGH LITIGATION

Phone: 1-402-303-3399
Fax: 502-584-0119
schedule@yourdepositions.com
www.yourdepositions.com

4:22-cv-03039-JMG-MDN   Doc # 65-2   Filed: 11/20/23   Page 9 of 27 - Page ID # 1889
The Deposition of GALEN STEMLIK, taken on April 12, 2023
30..33

Page 30

1    Q.   Why?
2    A.   I don't recall, because I would assume that
3  Mr. Galyen contacted me after August 7th and we reached
4  a resolution.
5    Q.   Did you ever go to the Court and ask them to
6  abate the interest on BankFirst's claim?
7    A.   No.
8    Q.   Do you know why you didn't ask for that relief
9  from the Court?
10   A.   The only thing that I can think of is Mr.
11 Galyen and I reached an agreement of some kind.
12   Q.   And going back to the motions for relief from
13 the automatic stay, you say you didn't file a resistance
14 to them because --
15   A.   Which ones are you referring to?
16   Q.   I believe one was C.H. Brown, one was Deere
17 and Company.
18        MS. GOODMAN:  And, Diana, if you have a copy
19 of the docket, just so that he's -- because --
20        MS. VOGT:  I think you should have one.
21        MS. GOODMAN:  Okay.
22        MS. VOGT:  It might have been the one on top.
23        MS. GOODMAN:  Ah, here it is.  Yeah, just so
24 we can --
25        MS. VOGT:  Yeah.

Page 31

1        MS. GOODMAN:  -- orient ourselves here,
2  because it's hard to remember all the --
3        MS. VOGT:  Let me see if I have a third one
4  somewhere.
5        MS. GOODMAN:  -- dates.  I'm sorry, we can --
6  he and I can share.
7        MS. VOGT:  Okay.
8        MS. GOODMAN:  That's fine.
9  THE WITNESS:  Oh.
10        MS. VOGT:  Okay.  Here it is right on top.
11        MS. GOODMAN:  All right.  We can mark that as
12 Exhibit 2.
13        (EXHIBIT 2 MARKED FOR IDENTIFICATION)
14 BY MS. VOGT:
15   Q.   Ag-Co Finance was another one.  That's
16 Document, well, 31.  And then it filed again, Document
17 38.  And then Deere and Company.  I see Document 55, you
18 did file a resistance to the motion for relief from the
19 stay by Ag-Co Finance.  Do you know why you resisted
20 that one?
21   A.   No, I don't recall.  Yeah, it looks like Entry
22 58 was a -- there was a stipulation with -- with respect
23 to C.H. Brown, and their objection -- the objection by
24 BankFirst was withdrawn.  Fifty-nine was an order
25 indicating that the relief from stay motion had been

Page 32

1  settled.
2    Q.   Mr. Overcash, the trustee, objected to the
3  first plan.  Do you remember what his reasons for his
4  objection were?
5    A.   No, I don't recall.  That's not uncommon for
6  Mr. Overcash, and his predecessor Richard Lydick, to
7  object to right out of the -- right out of the chute.
8  That's not uncommon.
9    Q.   And just if you would look at Entry 4,
10 Document number 133, talking about the Court is
11 suggesting they are going to not do anything on the plan
12 until the certification by debtor is filed.  Is that the
13 one dealing with family support?
14   A.   Yes.
15   Q.   Okay.
16   A.   And that certificate was filed the next day.
17   Q.   Does a debtor have to certify anything other
18 than that they owe no family support of any kind?
19   A.   Well, they -- when they filed the -- their
20 schedules, they certified that the schedules are true
21 and correct, that they've read them, understand them,
22 and that same question is posed by the Chapter 12
23 trustee at the 341 hearing.  And then they -- the same
24 thing is true, the certification with respect to their
25 plan, that they read the plan, understand its terms, and

Page 33

1  agree to -- and believe they can meet all the
2  obligations contained within the plans.
3    Q.   Did you talk to Mr. Patino at all before he
4  entered his appearance?
5    A.   No.
6        MS. GOODMAN:  And I'm going to object.  That
7  assumes that's not in the record in terms of him
8  entering his appearance.
9  BY MS. VOGT:
10   Q.   Now, at some point, the Kroegers apparently
11 retained Patrick Patino; is that correct?
12   A.   Yes.
13   Q.   Did they contact you before they retained
14 Mr. Patino?
15   A.   No.  The first I knew of his appearance, it
16 appeared on my screen as a motion filed by the debtors
17 and their attorney was Mr. Patino.  He didn't enter his
18 appearance and he didn't seek Court permission to be --
19 represent the debtors either.
20   Q.   I do not recall finding an application or an
21 affidavit of disinterest filed by you either.
22   A.   True.
23   Q.   Why not?
24   A.   I filed a motion to withdraw because prior to
25 his entering -- his filing that motion, I didn't even

Great Plains Reporting Company
1299 Farnam Street, Ste. 300
Omaha, NE 68102

GREAT PLAINS
REPORTING
YOUR PATH THROUGH LITIGATION

Phone: 1-402-303-3399
Fax: 502-584-0119
schedule@yourdepositions.com
www.yourdepositions.com

4:22-cv-03039-JMG-MDN   Doc #:65-2   Filed: 11/20/23   Page 10 of 27   Page ID #
1890
The Deposition of GAYLEN STEHLIK, taken on April 10, 2023
34..37

Page 34

1  know he existed.  And I called him as soon as I saw
2  that.
3      Q.    Well, going back to the beginning, why did you
4  not file your application to represent the debtors?
5      A.    At the beginning of the case?
6      Q.    Yeah.  Or is that not necessary at the
7  beginning of a case?
8      A.    No one objected.  The -- the one -- the one
9  that would typically object would be Mr. Overcash, the
10  trustee.  Seems to me I did file an application early
11  on.  No one objected; let's -- let's put it that way,
12  but --
13      Q.    Did you receive any payments from Mr. Kroeger
14  while you were representing him?
15      A.    Yes.
16      Q.    What did you receive?
17      A.    I think he paid a retainer of $15,000.
18      Q.    Anything else?
19      A.    There may have been a small payment at the
20  very end.  That's all my -- that's all I believe that he
21  paid.
22      MS. VOGT:  Would you mark that as 3?
23      (EXHIBIT 3 MARKED FOR IDENTIFICATION)
24  BY MS. VOGT:
25      Q.    You've been handed what's marked as Exhibit 3.

Page 35

1  Does that refresh your recollection as to payments made
2  by Mr. Kroeger?
3      A.    Yes.
4      Q.    On the docket sheet, I do not find any
5  application for payment of your fees.
6      A.    That's correct.
7      Q.    Are there circumstances where you are not
8  required to file an application before taking money from
9  a debtor?
10      A.    Well, I had a new paralegal, Melissa Hixson,
11  and that was an oversight on my part.  And when we filed
12  the Chapter 12 plan, there's language in it allowing
13  payment of attorneys' fees for the debtor. Now, with
14  respect to that, Mr. Overcash, the Chapter 12 trustee,
15  never raised the issue with me at all.  And every month,
16  Mr. Kroeger received an itemized statement from me
17  showing every action that I had taken on his behalf and
18  how much of the $15,000 retainer was used for that
19  purpose.
20      Q.    But doesn't the bankruptcy court require you
21  to file that anyway?
22      A.    Yes.
23      Q.    I mean, isn't that just --
24      A.    Yeah.
25      Q.    Because I believe there are cases in which the

Page 36

1  courts have required disgorgement of any fees received
2  without --
3      A.    Uh-huh.
4      Q.    -- an application.
5      MS. GOODMAN:  So I'm going to object to form.
6      Mr. Stehlik, I actually printed off a list of
7  all the cases that you have handled as representing, I
8  believe, the debtor.  I didn't look at every file. But,
9  consistently, in every representation, from beginning
10  with about June -- no, beginning in about May of 2019,
11  none of these cases have a fee application or an
12  application to represent the debtor.  Is there a reason
13  for that?
14      MS. GOODMAN:  Well, I'm going to object.
15  Diana, if you want to go, like, case by case, I
16  mean, I don't know what you're looking at.  And,
17  you know, it's 2023; asking him -- he represents a
18  lot of clients. Asking him to go back and just make
19  generalizations when you're not referring to a
20  specific case, I think, is unfair.
21      MS. VOGT:  Okay.  We can go case by case.
22  Although, I mean --
23      MS. GOODMAN:  And he doesn't -- and I want it
24  just for the record: He doesn't have the Court file
25  for any of these cases in front of him, so --

Page 37

1  BY MS. VOGT:
2      Q.    There is a bankruptcy for Justin and Louise
3  Herbig?
4      A.    Yes, confirmed plan.
5      Q.    Didn't they convert or get it dismissed after
6  they lost in an adversary proceeding?
7      A.    No.
8      Q.    Is there any reason why you didn't file a fee
9  application in the Herbig matter?
10      A.    I don't recall.
11      Q.    I have no idea how to pronounce this guy's
12  name, something like Szatko Timothy.
13      A.    Oh, yes.
14      Q.    It's spelled S-Z-A-T-K-O.
15      A.    Correct.
16      Q.    There is no fee application in Mr. Szatko's
17  case.
18      A.    Right, that is --
19      MS. GOODMAN:  Objection to form.  Go ahead.
20      A.    That case involved a complete sale of his --
21  of the collateral of the bank.
22      Q.    And were you paid the Herbigs for your
23  representation?
24      A.    Yes.
25      Q.    And were you paid by Mr. Szatko for your

Great Plains Reporting Company
1299 Farnam Street, Ste. 300
Omaha, NE 68102

GREAT PLAINS
REPORTING
YOUR PATH THROUGH LITIGATION

Phone: 1-402-303-3399
Fax: 502-584-0119
schedule@yourdepositions.com
www.yourdepositions.com

4:22-cv-03039-JMG-MDN    Doc #:65-2    Filed: 11/20/23    Page 11 of 27    Page ID #
1891
The Deposition of GALEN STEHLIK, taken on April 12, 2023

38..41

Page 38

1  representation?
2      A.    Yes.
3      Q.    So is it your position that because the plan
4  references the ability to pay attorneys' fees, that you
5  didn't need to file fee applications?
6      A.    The plan that was confirmed in all these cases
7  did have that language in it.
8      Q.    Is that an exception to --
9      A.    No.
10     Q.    -- the bankruptcy rule?
11     A.    It's not.
12     Q.    In the bankruptcy of the -- Jacquots?
13  Jacquots?
14     A.    Jacquots.
15     Q.    Jacquots.  Okay.  In that case, there was no
16  fee application.  Is there a reason in that case?
17     A.    That case was dismissed, I believe.
18     Q.    And do you recall filing a fee application in
19  the bankruptcy of the Klingenhoffers?
20     A.    I don't even remember that case.
21     Q.    I -- it was one that -- it ended up being
22  dismissed.
23     A.    Right, by the debtor, okay, because we had
24  reached an accommodation with the primary lender and no
25  longer needed the bankruptcy.

Page 39

1          MS. GOODMAN:  And I want to just remind you,
2  Galen, let's not get into any discussions that you
3  had with the debtors.  I mean, if there's
4  information that's privileged --
5          THE WITNESS:  Okay.
6          MS. GOODMAN:  -- that's -- this is obviously
7  way outside of anything to do with the Kroeger
8  here, so --
9  BY MS. VOGT:
10     Q.    And the same question with the Lech, James and
11  Christina Lech, L-E-C-H.
12     A.    Yes.
13     Q.    Do you recall filing a fee application in that
14  bankruptcy?
15     A.    I don't recall.
16     Q.    Were you still representing the Kroegers in
17  December of 2020?
18     A.    I don't know if -- when did Mr. Patino file
19  their motion, his motion?
20     Q.    Going to be sometime around April.
21     A.    April 1st of '21.
22     Q.    Is that the date on which -- is that the date
23  on which you believe your representation ended?
24     A.    Yes.
25     Q.    All right.  On that same day, April 1st, there

Page 40

1  is an entry setting an evidentiary hearing for April
2  15th of '21.  Did you not appear at that hearing because
3  of Mr. Patino's appearance?
4      A.    Yes.  I wasn't asked to.
5      Q.    Have you ever listened to or read the
6  transcript in that hearing?
7      A.    Yes.
8      Q.    Do you know why Judge Saladino expected you to
9  have been there?
10         MS. GOODMAN:  Objection.  Form and foundation.
11     A.    I don't think that was --
12     A.    I -- well, I -- he said something like,
13  "Mr. Stehlik hadn't withdrawn yet."  And had I been
14  there, I wouldn't have participated in the motion
15  because I didn't file it.  And based upon the text of
16  the motion, the -- the Kroegers made unfounded
17  allegations against me personally, so my participation
18  in that hearing would have been unnecessary.
19     Q.    What is your recollection of the allegations
20  they made against you in that motion?
21     A.    That I didn't appear at hearings and I
22  didn't -- Mr. Patino drafted that, and it sounds like he
23  drafted the complaint pending against me now.  Some of
24  the same allegations are contained in both.
25     Q.    Did you later continue representing the

Page 41

1  Kroegers in the state court replevin actions?
2          MS. GOODMAN:  Objection to form.  Can we get a
3  time?  As of what time?
4      Q.    It was like May 2021.
5      A.    I don't believe that I did anything for the
6  Kroegers after I was notified that Mr. Patino
7  represented them.
8      Q.    That's --
9          THE REPORTER:  This will be 4.
10         (EXHIBIT 4 MARKED FOR IDENTIFICATION)
11  BY MS. VOGT:
12     Q.    You've been handed what's marked as Exhibit
13  number 4.
14     A.    Uh-huh.
15     Q.    Do you recognize that document?
16     A.    Yeah.
17     Q.    Right at the very top, you indicate that
18  you're not opposing a motion because Mr. Kroeger has no
19  defense.  Tell me what you meant by that.
20     A.    I'm not even certain what this case involved.
21  C.H. Brown.  And in this Exhibit 4, I state, quote, "I
22  would like your client to consider the following:
23  Kroeger would confess judgment in the sense that he
24  doesn't object to your client having a temporary order
25  entered, allowing them to have possession of the

Great Plains Reporting Company
1299 Farnam Street, Ste. 300
Omaha, NE 68102

GREAT PLAINS
REPORTING
YOUR PATH THROUGH LITIGATION

Phone: 1-402-303-3399
Fax: 502-584-0119
schedule@yourdepositions.com
www.yourdepositions.com

4:22-cv-03039-JMG-MDN   Doc #:65-2   Filed: 11/20/23   Page 12 of 27   Page ID #
1892
The Deposition of GALEN STEHLIK, taken on April 12, 2023
42..45

Page 42

1 collateral, but they would delay taking possession until
2 October 20th.  For this concession, Kroeger would
3 immediately pay C.H. Brown the sum of 20,000.  We think
4 that the financing to pay off your client is -- in full
5 is probable."  This is dated September of 2020.  When
6 was the Patino document file?
7      Q.    April 1st of 2021.
8      A.    Yeah, So your question is did I -- I think
9 your threshold question was, did I represent them on any
10 replevins after Patino filed his motion.  The answer is
11 no, this --
12      Q.    And that doesn't have anything to do with that
13 actually.
14      A.    Okay.  Exhibit 4 is for --
15      MS. GOODMAN:  She -- she's jumping around.
16 She's jumping around with her questions, Galen.
17      THE WITNESS:  Oh, okay.  All right.  Sorry.
18      MS. GOODMAN:  So this is --
19      MS. VOGT:  Yes.
20      MS. GOODMAN:  This is something totally
21 separate than --
22      THE WITNESS:  Right.
23      MS. GOODMAN:  -- what she was after.
24      MS. VOGT:  Yes.  There is not --
25      THE WITNESS:  Okay.

Page 43

1      MS. VOGT:  A single thread.
2      MS. GOODMAN:  So Diana, can you repeat your
3 question so he can answer it?
4 BY MS. VOGT:
5      Q.    I think it was, what did you mean by
6 Mr. Kroeger has no defense?
7      A.     Well, a replevin is an action on a note, and
8 the secured creditor is attempting to gain possession of
9 the underlying collateral.  And to that action,
10 non-payment, Mr. Kroeger had no defense.  A defense
11 that, "I don't have the money," is not a defense.
12      Q.    So that was actually referring to the state
13 replevin action and not an issue in the bankruptcy?
14      A.    It's unclear from this if it refers to the
15 replevin in state court or in the bankruptcy.
16      MS. VOGT:  I forgot to tell you the Bates
17 number.  Did you find --
18      MS. GOODMAN:  I did, yeah.  Thank you.
19 BY MS. VOGT:
20      Q.    Okay.  Yeah, it's September of 2020.  I don't
21 remember all the dates.  I'm checking to see when C.H.
22 Brown got relief from the state.  It appears they
23 obtained relief from the state in August of 2020.  Does
24 that refresh your recollection about whether that might
25 refer to the state?

Page 44

1      A.    Yes, it refreshes my recollection so that the
2 September 30th e-mail from me to Mr. Hoesing, who is
3 counsel for this creditor, dealt with the bankruptcy.
4      Q.    And so in the context of bankruptcy, what did
5 he mean by, has no offense -- defense?
6      A.    He has no defense to their motion for relief
7 from stay, because their motion went to the fact that he
8 wasn't making his payments.
9      Q.    I believe I don't have copies of them, but are
10 you aware that shortly before the plan was confirmed,
11 Mr. Kroeger filed various interest in the land involving
12 mineral rights?
13      MS. GOODMAN:  Objection to form.
14      A.    No, I wasn't aware of that.  I -- the only
15 thing I was aware of was -- were some leases that he
16 filed.
17      Q.    Was it your advice to file those leases?
18      A.    No, I was surprised that he even alleged that
19 I had.
20      Q.    You happen to know if those leases caused any
21 problems for the bank when it was liquidating its
22 collateral?
23      A.    I don't.  I -- I don't know.  I don't believe
24 that it would have, no.
25      Q.    You've been handed what's been marked as

Page 45

1 Exhibit number 5.  Are you familiar with this document?
2           (EXHIBIT 5 MARKED FOR IDENTIFICATION)
3      A.    Yes.
4      Q.    Did you participate in formulating the
5 responses?
6      A.    I had discussions with the attorney that filed
7 it, yes.
8      MS. VOGT:  Going to page 15.
9      MS. GOODMAN:  Actually they're all page 15, at
10 least on my copy.
11      THE WITNESS:  Yeah.
12      MS. VOGT:  Oh.
13      MS. GOODMAN:  I don't know.
14      THE WITNESS:  Okay.  So never mind.
15      MS. GOODMAN:  Which paragraph?
16      THE WITNESS:  It -- at the top it says page 2
17 of 12.
18      MS. GOODMAN:  Perfect. N of 12.
19 BY MS. VOGT:
20      Q.    Both per -- both affirmative defense number
21 two and number three assert that the trustee lacked
22 standing, first to bring this suit, and second to
23 recover any fees paid by the debtors.  Do you know what
24 the basis is for paragraph 2, that the trustee lacked
25 standing to bring the claims?

Great Plains Reporting Company
1299 Farnam Street, Ste. 300
Omaha, NE 68102

GREAT PLAINS
REPORTING
YOUR PATH THROUGH LITIGATION

Phone: 1-402-303-3399
Fax: 502-584-0119
schedule@yourdepositions.com
www.yourdepositions.com

4:22-cv-03039-JMG-MDN   Doc #:65-2   Filed: 11/20/23   Page 13 of 27 - Page ID #
1893
The Deposition of GALEN STEHLIK, taken on April 13, 2023                    46..49

Page 46

```
 1    A.   I don't recall.
 2    Q.   Do you recall the basis for paragraph number
 3 3, that the trustee lacks standing to recover fees paid
 4 to the defendants?
 5    A.   I don't recall.
 6    Q.   In what way have the debtors failed to
 7 mitigate their damages?
 8    A.   Their conduct.
 9         MS. GOODMAN:  And I'm going to object to form.
10 Again, calls for a legal conclusion.  But to the
11 extent you've got -- you know facts, Galen, you can
12 certainly share with us.
13    A.   Okay.  Their failures to -- to diligently
14 pursue their business in order to raise the money to
15 make the payments that were due.
16 BY MS. VOGT:
17    Q.   And what facts do you have that indicate that
18 they were not diligently pursuing their business?
19    A.   My observations of Mr. Kroeger, the number of
20 times he came to my office when he should have been
21 working, and his overall comments to me that he spent a
22 lot of his time trying to find ways out of paying his
23 obligations instead of diligently doing his work.
24    Q.   Do you ever counsel him about the negative
25 effect on his ability to retain his property would be
```

Page 47

```
 1 affected by his failure to fulfill those obligations?
 2    A.   Yes.
 3    Q.   Do you know if you ever gave him, or had that
 4 discussion or put him on notice of that in writing?
 5    A.   I don't know if I ever wrote him a letter to
 6 that effect, but on his numerous visits in my office,
 7 it -- it occurred to me that he seemed to have a lot of
 8 free time.
 9    Q.   And the next one, you indicate that the
10 trustees' claims are barred as a result of debtor's
11 consent to all actions taken or not taken.  And as your
12 attorney cautions you, I'm not looking for a legal
13 conclusion.  I'm looking for the fact that you believe
14 demonstrate the debtor's consent.
15    A.   The fact that he was copied in on nearly all
16 correspondence, the fact that he was hand delivered by
17 me every plan that we ever submitted on his behalf.
18    Q.   Do you remember if Mr. Kroeger asked you to
19 delay filing the second amended plan to allow him time
20 to come up with a hundred thousand dollars within 10
21 days of confirmation?
22    A.   I don't recall that he ever ask that.
23    Q.   The plan -- the second amended plan was
24 confirmed after a period of just about a month, is that
25 average for bankruptcy?
```

Page 48

```
 1         MS. GOODMAN:  Objection to form.
 2    A.   That's bankruptcy rule.  There is a notice
 3 given that creditors have a certain number of days to
 4 file objections, and if they do not file objections,
 5 then you are to submit an order of confirmation.  So
 6 it's by rule, not by Judge Saladino's fiat.  It was
 7 just -- it's by rule.
 8    Q.   And then if there had been objections, you
 9 would go through the process of --
10    A.   Yes.
11    Q.   -- dealing with them or trying to negotiate a
12 new plan?
13    A.   Correct.
14    Q.   Can a plan in Chapter 12 bankruptcy be
15 confirmed over objections?
16    A.   Yes.
17    Q.   Do you believe that a plan could have been
18 confirmed without the hundred thousand dollars payment
19 over BankFirst's objection?
20         MS. GOODMAN:  Objection.  Calls for
21 speculation.
22    A.   In my opinion, no.  And that's based upon my
23 numerous discussions with bank's counsel, Mr. Galyen,
24 and their lack of faith in the truthfulness and
25 credibility of Mr. Kroeger.
```

Page 49

```
 1    Q.   Then number seven alleges that the trustee's
 2 damages were caused by the debtor's contributory
 3 negligence and or the negligence of persons or entities
 4 other than defendants.  Can you tell me what acts you
 5 believe constitute contributory negligence or
 6 negligence?
 7    A.   I don't recall, other than Mr. Kroeger's
 8 failure to perform contributed to his own plight.
 9    Q.   Did you ever meet with Mrs. Kroeger
10    A.   Once.
11    Q.   Do you remember what the occasion of that was?
12    A.   She came in to meet with me, and we went over
13 the terms of the plan.  It was probably the first
14 amended plan.
15    Q.   Was that without Mr. Kroeger?
16    A.   He was there also.
17    Q.   Did you ever have any discussions with
18 Mr. Kroeger about his concern that the bank was
19 overstating his debt?
20    A.   Yes.
21    Q.   Tell me about those conversations.
22    A.   He said, "There's no way I can owe the bank
23 that much."  And the bank provided us statements as to
24 how they arrived at the amount owed, and Mr. Kroeger
25 could never specify anything in particular that gave
```

Great Plains Reporting Company
1299 Farnam Street, Ste. 300
Omaha, NE 68102

GREAT PLAINS REPORTING
YOUR PATH THROUGH LITIGATION

Phone: 1-402-303-3399
Fax: 502-584-0119
schedule@yourdepositions.com
www.yourdepositions.com

Page 50

1  rise to his belief that the debt was overstated.
2      Q.   You've been handed what's been marked as
3  Exhibit number 6.  Do you recognize that document?
4           (EXHIBIT 6 MARKED FOR IDENTIFICATION)
5      A.   Yes.
6      Q.   In the body of the letter it talks about not
7  using prevent payments for something, and that BankFirst
8  admitted something that Mr. Kroeger didn't do, something
9  they suspected he had, but disapproved of the way C.H.
10  Brown secured their collateral.  Could you tell -- could
11  you explain that whole thing to me?
12      A.   Was a couple -- well, we filed the bankruptcy
13  on the 28th, this letter's dated May 13th, and there was
14  a hearing on a motion for relief from stay.  We reached
15  the stipulation with C.H. Brown, apparently BankFirst
16  objected.  And I know that we were able to -- he
17  withdrew his objection then, this is BankFirst's lawyer,
18  and BankFirst objected to the method used by C.H. Brown
19  to protect their security interest.  And other than the
20  text of this letter, I don't recall the specifics.
21      Q.   You've been handed Exhibit number 7, which is
22  an e-mail communication between the attorney for Western
23  Equipment Company and Mr. Overcash's office.
24           (EXHIBIT 7 MARKED FOR IDENTIFICATION)
25      A.   Yes.

Page 51

1      Q.   And it is complaining about what they consider
2  deficiencies in the bankruptcy schedules.  One of them
3  was the failure to claim the stock as an asset of the
4  estate.  Did you later change the schedules to include
5  that?
6      A.   Yes.
7      Q.   Does anything in there change your
8  recollection of why you didn't file separate
9  bankruptcies?
10      A.   No, my recollection was it dealt with my -- my
11  conversation with Mr. Overcash, and the fact that the
12  corporate entity had as its shareholders the Kroeger,
13  who were joint debtors in a Chapter 12, and they had
14  personally guaranteed all corporate debt.
15      Q.   In a situation like that, where the
16  corporation owns property, even though the debt's
17  guaranteed by the individuals who own the company, does
18  not having a separate bankruptcy, can that cause
19  problems with the discharge or getting rid of the
20  debtor's interest in it?
21      A.   No.  Usually if you have a corporate and a
22  personal bankruptcy, you file a motion to combine them
23  and have them administered as one case, and those types
24  of requests are routinely granted.
25      Q.   So was there a reason, other than what you've

Page 52

1  already told me, that you did not file two bankruptcies?
2      A.   No.
3           MS. GOODMAN:  Okay?
4           MS. VOGT:  Yeah, that's fine.
5      Q.   I'm handing you what's been marked as Exhibit
6  number 8 and -- can you -- oh -- and I don't know if you
7  have ever seen this document before.  Do you know if
8  you've ever seen it?
9           (EXHIBIT 8 MARKED FOR IDENTIFICATION)
10           MS. GOODMAN:  I'm going to object.  Just
11  anything that we've discussed --
12           MS. VOGT:  Right.
13           MS. GOODMAN:  -- doesn't get shared.
14      A.   I don't recall.  I'm looking at it now.
15  BY MS. VOGT:
16      Q.   Well, I will represent to you that this is a
17  document that was prepared by Mr. Patino to show
18  Mr. Myers, who was the Chapter 7 trustee, the
19  differences between the schedules that were filed in the
20  Chapter 12 and the schedules he was filing in the
21  Chapter 7.
22      A.   The upper one third of page 1 reflects the
23  foreclosures.
24      Q.   Right.
25           MS. GOODMAN:  So -- hang on, do you have a

Page 53

1  question?
2           MS. VOGT:  Yes.  I'm trying to see where the
3           other stuff --
4           MS. GOODMAN:  Okay.
5  BY MS. VOGT:
6      Q.   Starting with household goods and furnishings,
7  the original schedules apparently started out claiming
8  $200,000, went to $20,000, and then on Chapter 7 they
9  valued it $2,250.  Do you know why it was originally
10  claimed as $200,000?
11      A.   I would imagine that it included the value of
12  the house, and we amended the schedule May 26th of 2020
13  to lower it to 20,000.
14      Q.   Then looking at items eight through 12 -- I'm
15  sorry, let's start with number seven.  Number seven
16  through 12 lists several different assets.  Do you
17  recall why there was a significant difference between
18  the first two schedules and the later schedules?
19      A.   The values we adopted were values provided to
20  us by Mr. Kroeger.  Some of these things are uniquely
21  personal.  Paragraph collectible -- they have a
22  paragraph, collectibles, paintings done by debtor's
23  daughter.  A lot of these things, I don't know what
24  value it has.  It sure doesn't have any value to the --
25  to a security creditor, but I do know that we amended

Great Plains Reporting Company
1299 Farnam Street, Ste. 300
Omaha, NE 68102

GREAT PLAINS REPORTING
YOUR PATH THROUGH LITIGATION

Phone: 1-402-303-3399
Fax: 502-584-0119
schedule@yourdepositions.com
www.yourdepositions.com

4:22-cv-03039-JMG-MDN   Doc #:65-2   Filed: 11/20/23   Page 15 of 27   Page ID #
1895
The Deposition of GALEN STEHLIK, taken on April 12, 2023          54..57

Page 54

1    the schedules on collectibles to value -- value them a
2    thousand dollars.  The $20,000 value would've been given
3    to me by Mr. Kroeger.
4        Q.    Now going to the second page of Exhibit number
5    8, there is a large list of things that -- well first
6    let's look at 19 through 44.  Those are items that were
7    not listed on any of the schedules filed in the Chapter
8    12 bankruptcy.  Was there a reason that they were not
9    originally listed?
10       A.    Are you referring to stock in H&M Farms?
11       Q.    No.  Starting right below that, with
12   performance crops.
13       A.    I believe performance crops was something
14   created by Kirk Kroeger that had no assets, had no
15   value, and it was dissolved by the Nebraska Secretary of
16   State on June 16, 2021.  Term life insurance policy has
17   no cash value.  Number 33, breach of contract for land
18   lease with Kellen Greenwald, that was a completely
19   unsubstantiated claim by Mr. Kroeger that I advised him
20   has no value.  Don't even pursue it.  The facts were
21   against him.  He indicated to me that he was more
22   interested in getting a confirmed plan than pursuing a
23   claim against Kellen Greenwald.
24       Q.    Aren't you supposed to list everything,
25   whether it has value or not?

Page 55

1        A.    Not necessarily.
2        Q.    Under what circumstances do you not have to --
3        A.    Term insurance, as an example.  It would be
4    one.  And a claim for a potential inheritance would be
5    another.  For instance, "I'm going to inherit something
6    from my father."  It would be something that is a
7    inchoate, it's not a vested property right.  That
8    shouldn't be listed on the bankruptcy schedule.
9        Q.    Do you know what they are even talking about
10   with the thousand certified irrigated acres?  That's
11   probably Natural Resources District.
12       A.    I have no idea what that means.  If he owned
13   real estate, it would have been listed in the schedules.
14   To say that, in addition to the value of the real
15   estate, somehow the natural resources district assigning
16   a value between 1,500 and $3,500 an acre, the value of
17   $1,500,000 is entirely speculative.  And I would imagine
18   that the Chapter 12 trustee would have objected to that.
19   BankFirst would have objected to that.  That would have
20   been included in the schedule.
21       Q.    And then without going into them individually,
22   there is a huge number of individual items of what
23   appears to be equipment or farm tools.  It shows that on
24   your original schedules, you had a value for them, and
25   then they were not listed on the later schedules in the

Page 56

1    Chapter 12.  Is that because it had been repossessed?
2        A.    Yes, it was gone.  The original schedule,
3    these items, which according to Mr. Kroeger were owned
4    by H&M Farms, Inc., were listed on the collateral of
5    BankFirst as owned by the debtors, Mr. Kroeger.  They
6    were repossessed.
7        Q.    On the final page, looking at items number
8    49 -- oh, they're all numbered 49.  Okay.  The vehicles,
9    the Chevy 1500 pickup, the Honda Pilot, it indicates
10   that you had advised them to sell the vehicles to their
11   children during the bankruptcy.  Is that advice you gave
12   them?
13       A.    No.  I would have told them, if you're going
14   to sell an asset during the (Inaudible) of a bankruptcy,
15   you have to give notice and a hearing.  That would've
16   triggered an immediate objection from BankFirst.
17       MS. GOODMAN:  Going for about an hour and a
18   half.  Do you need a break, or are you good?
19       THE WITNESS:  I'm okay.
20       MS. GOODMAN:  All right.  Diana, in terms of
21   lunch, or do you think you're going to need to stop
22   for lunch, or are you --
23       MS. VOGT:  I don't usually, but --
24       MS. GOODMAN:  Okay.
25       MS. VOGT:  Well, I -- you know, we might take

Page 57

1    a short break --
2        MS. GOODMAN:  Okay.
3        MS. VOGT:  -- so that I can get the papers
4    that are not in order in --
5        MS. GOODMAN:  Fair enough.  All right.
6        MS. VOGT:  Well, why don't we take a short
7    break now?  I can take a short break.
8        MS. GOODMAN:  Okay.  Nice.
9        THE WITNESS:  Okay.
10       THE REPORTER:  Off the record.
11           (OFF THE RECORD)
12       THE REPORTER:  We are back on the record at
13   12:17.
14       MS. VOGT:  Would you mark that?
15           (EXHIBIT 9 MARKED FOR IDENTIFICATION)
16   BY MS. VOGT:
17       Q.    Mr. Stehlik, I've handed you a letter from
18   Woods Aitken, Mr. Overcash, and on the back page, it
19   does show that at least you were sent an e-mail copy of
20   this.
21       A.    Uh-huh.
22       Q.    Going back to the issue of -- for permission
23   to take these, on the very first page, paragraph number
24   3 starts, and it's very specific about their -- the
25   ability of a debtor to retain a professional without the

Great Plains Reporting Company
1299 Farnam Street, Ste. 300
Omaha, NE 68102

GREAT PLAINS
REPORTING
YOUR PATH THROUGH LITIGATION

Phone: 1-402-303-3399
Fax: 502-584-0119
schedule@yourdepositions.com
www.yourdepositions.com

4:22-cv-03039-JMG-MDN   Doc #:65-2   Filed: 11/20/23   Page 16 of 27  Page ID # 1896
The Deposition of GAYLE STRECKER, taken on April 12, 2023

58..61

**Page 58**

1  application and without an application for fees.
2     A.   Uh-huh.
3     Q.   Do you believe that having the mention of fees
4  in the plan relieves you of the statutory responsibility
5  to file a fee application?
6     A.   I'm not sure.
7     Q.   Do you believe that the lack of objection to
8  your participating as attorney for the debtor relieves
9  you of the duty under the statutes to file an
10 application to be employed?
11    A.   All I can tell you is that I was the attorney
12 for the debtors during all phases and that issue was
13 never raised by anyone, including Mr. Overcash.
14    Q.   But if it's required by the statute, lack of
15 objection shouldn't make any difference, should it?
16    A.   You would think that the trustee in bankruptcy
17 would've had ample opportunity at all times prior to
18 planned confirmation to raise that issue, and he didn't.
19       MS. GOODMAN:  And I'm going to object to the
20    form of the question and ask that proceed the
21    question.  The answer.
22 BY MS. VOGT:
23    Q.   Are you still holding the Kroeger's check in
24 your trust account?
25    A.   No.

**Page 59**

1     Q.   Okay.  We're going to start going through
2  them, but off the top of your head, what are the
3  differences between the chapter -- or the plans that you
4  filed under Chapter 12 for the Kroegers?  If you recall.
5     A.   I recall that most of it dealt with the
6  treatment of BankFirst, and I believe there were some
7  secured creditors on farm implements that we may have
8  changed some terms.  That's my recollection.
9     Q.   Okay.  Here is the original plan.  It says
10 Debtors Chapter 12 Plan.
11       MS. GOODMAN:  Are you going to mark it, or --
12       MS. VOGT:  Yeah, I should have a third copy
13    here.  Okay.  Why don't we just go ahead and mark
14    these --
15       THE REPORTER:  Okay.
16       MS. VOGT:  -- at the same time?
17       THE REPORTER:  You want all of this?
18       MS. VOGT:  No, just this part.
19       THE REPORTER:  Okay.
20          (EXHIBIT 10 MARKED FOR IDENTIFICATION)
21 BY MS. VOGT:
22    Q.   Before we start talking about the plan itself,
23 who prepared the cash flow statement that was attached
24 to the plan?
25    A.   Mr. Kroeger.

**Page 60**

1     Q.   And did you have anyone look at it to make
2  sure the numbers matched with what he wanted to do?
3        MS. GOODMAN:  Objection to form.
4     A.   Yes.  I looked at it, and -- and I'm sure that
5  I may have made suggestions to him that led up to the
6  preparation of the final cash flow that was attached to
7  the initial Chapter 12 plan.
8        MS. GOODMAN:  And, Diana, for the record, I
9     don't mean to interrupt, but are these the plans
10    that were actually filed?  Because I don't see the
11    ribbon at the top.
12       MS. VOGT:  You know, yeah, they are, and I
13    don't know --
14       MS. GOODMAN:  And I don't see a Bates number,
15    so that's why I'm --
16       MS. VOGT:  I -- is in fact, that would be a
17    good question.
18 BY MS. VOGT:
19    Q.   Is there something in bankruptcy where the
20 plan does not get the files down from --
21    A.   No.
22       MS. GOODMAN:  No (Inaudible).
23    A.   The upper right-hand corner would show the
24 filing information.
25       MS. GOODMAN:  Or along the top.

**Page 61**

1        THE WITNESS:  Along the -- I'm sure.  I'm --
2  I'm --
3        MS. VOGT:  Yeah.
4        MS. VOGT:  In a federal court, it'd be
5     along the top.
6        MS. VOGT:  Yeah, we're in federal court.
7     A.   In state court, it's the upper right-hand
8  corner, but in federal court, it's along the top.
9        MS. GOODMAN:  As long as you're representing
10    that these are --
11       MS. VOGT:  Yes.
12       MS. GOODMAN:  -- were in fact the filed plans,
13    then I'm fine.  I just don't want to -- if these
14    were drafts, then we need to call that out.
15       MS. VOGT:  (Inaudible).  Yeah.  These are the
16    actual plans or they should be that were filed --
17       MS. GOODMAN:  Yes.
18       MS. VOGT:  -- with the Court.
19 BY MS. VOGT:
20    Q.   Okay.  First turning, just -- they don't have
21 any page numbers.  The page that starts with Number 11.
22 Yeah, reading Roman numerals.
23    A.   Okay.
24    Q.   On Tract 1 where it shows the value of 1.8
25 million value, is that the tract that the residence was



Great Plains Reporting Company
1299 Farnam Street, Ste. 300
Omaha, NE 68102

Phone: 1-402-303-3399
Fax: 502-584-0119
schedule@yourdepositions.com
www.yourdepositions.com

Page 62

1  on?
2          MS. GOODMAN: Objection. Foundation. You can
3  answer if you know.
4      A.   I don't know.
5      Q.   Do you know if the value of the house was
6  declared separately from the value of the tract it was
7  on?
8      A.   I believe it was.
9      Q.   On -- in paragraph 15, the claim of BankFirst,
10 it gives a number of 7.74 million and approximately,
11 that is the balance of the bank. Now, I believe that
12 the bank filed an objection to this based on the fact
13 that the amount of their debt was wrong. Do you
14 remember if you corrected that?
15     A.   The second amended plan uses the same dollar
16 amount.
17     Q.   The second amended or the first amended?
18     A.   The third amended -- the second amended plan
19 shows an amount of $8,077,709.54. So your question was,
20 did I change the amount of the claim from the initial
21 Chapter 12 plan to the first amended Chapter 12 plan for
22 BankFirst, and the answer is no.
23     Q.   Okay. Turning to paragraph 31, the local
24 3015-1 requirement.
25     A.   Okay.

Page 63

1      Q.   In the compliance -- sorry. In the compliance
2  statement under number three, it says that the
3  historical experience is one of the things that supports
4  the financial assumptions. In May of 2020, Mr. Kroeger
5  didn't have any experience in the manure business, did
6  he?
7      A.   No. Any projections we would've used came
8  from him.
9      Q.   And was it -- is it the typical thing to do to
10 cite historical experience even if you don't have any?
11         MS. GOODMAN: Objection to form.
12     A.   I would disagree that he had none. He had
13 been involved in manure scraping, collection of manure
14 and spreading it upon farm. He'd been doing that as a
15 sidelight to his rope-out farming operation for several
16 years. He did have historical experience.
17     Q.   Do you know if BankFirst had a security
18 interest in the proceeds of his manure operation?
19     A.   Yes.
20     Q.   Going to the, let's see, second page of the
21 cash flow statement on the first plan that was filed.
22     A.   Yes.
23     Q.   All right. My note makes no sense to me, but
24 one of the things that he was going to engage in was
25 online seed sales. Do you know what he was selling and

Page 64

1  for who, for whom?
2      A.   I don't recall. No. That -- Mr. Kroeger
3  prepared that paid -- that's -- that's captioned
4  Assumptions and Sources 2020 Cash Flow Income.
5      Q.   And so would that be the same answer for the
6  proforma crop year 2020 and 2022, in addition to 2021?
7      A.   Yes.
8      Q.   There's a list Exhibit B of all of the tax
9  sales certificates of --
10     A.   Yes.
11     Q.   -- people holding tax liens. And then there's
12 Exhibit B2 that shows an amortization of an amount about
13 $80,000?
14     A.   Yes.
15     Q.   Is that an amortization of the amount on the
16 tax liens?
17     A.   Yes.
18     Q.   And then do you know -- strike that. On the
19 cash flow sheet, are the expenses intended to show what
20 they were before or what they will be after the plan?
21         MS. GOODMAN: Objection foundation. He's
22 already testified he didn't prepare this. You can
23 answer if you know.
24     A.   Let me look at where that compliance statement
25 is referenced.

Page 65

1          MS. GOODMAN: I think that's 31 or paragraph
2      number 31.
3      A.   This would be for the year post-confirmation.
4  BY MS. VOGT:
5      Q.   Well, I am not finding in the expenses an
6  amount equal to what the payment to the bank would have
7  been under the plan.
8      A.   Okay. Could you -- I don't understand the
9  question.
10     Q.   Oh, okay. Sorry. I'm trying to find the
11 right plan paragraph again. Okay. In paragraph 15, it
12 shows that there will be annual payments of
13 approximately $518,220. Although the first payment
14 won't begin until after the first year, which would be
15 either 2021 or 2022. But I do not see on either cash
16 flow, 2021 or 2022, any payment in the amount of
17 500,000.
18     A.   Well, the amortization schedule shows a
19 payment of 516,220.26.
20     Q.   Right. But I don't see that included in the
21 cash flow statement.
22     A.   Well, Exhibit A1 is income.
23         MS. GOODMAN: And I think she's just looking
24     at Exhibit A there.
25     A.   Oh. Well, interest would be 394,541, and then

Great Plains Reporting Company
1299 Farnam Street, Ste. 300
Omaha, NE 68102

GREAT PLAINS REPORTING
YOUR PATH THROUGH LITIGATION

Phone: 1-402-303-3399
Fax: 502-584-0119
schedule@yourdepositions.com
www.yourdepositions.com

Page 66

1  the balance, I think is probably shown as other.  38
2  secured.
3     Q.   So the principal at that point would only be
4  -- he's allowing 81,000 for it?
5     A.   I don't know.
6     Q.   Did you go through the cash flow statements
7  with Mr. Kroeger at all to --
8     A.   Yes, I did.
9        MS. VOGT:  Okay.  Let's go to the first
10     amended plan, Exhibit number 11.
11         (EXHIBIT 11 MARKED FOR IDENTIFICATION)
12  BY MS. VOGT:
13     Q.   Okay.  The first amended plan is dated
14  July 27, 2020, and in paragraph 8 it shows that the
15  schedule of assets and liabilities and a statement of
16  financial affairs were filed on -- actually, I think
17  that's a wrong date.  Yes, the schedules were amended on
18  May 28, 2020.  Did you make any amendments to the
19  schedules or calculations after May 28th but before
20  July 27th?
21     A.   I don't recall.  I really don't.  I do note in
22  the first amended plan, the third paragraph indicating
23  that we had made an offer to BankFirst for a payment of
24  adequate protection payments to the bank, and that's
25  essentially the monthly payment he was -- he was making.

Page 67

1  And the bank's counsel, Gaylen, had not yet responded as
2  of the day that I filed this plan.
3     Q.   So if I understand that, are you saying that
4  the paragraph describing the debt to BankFirst is the
5  same as the original plan because you had not heard from
6  BankFirst?
7     A.   I would have to say that's true, yes.
8     Q.   Okay.  Given the length of time between your
9  making the adequate protection offer, and the bank's
10  failure to respond, and then your filing the first
11  amended plan, why didn't you file a motion to have the
12  bank compelled to respond at least?
13        MS. GOODMAN:  Objection to form.
14     A.   I don't recall, but I had a good enough
15  working rapport with Mr. Gaylen that I don't know if he
16  had a personal issue, illness, et cetera.  But before we
17  concluded the plan, he did respond.  By the time the
18  second amended plan was filed, in that interim, he had
19  responded.
20     Q.   Going to the second amended Chapter 12 plan,
21  which was dated October 15, 2020.  You know, right
22  before we start the second amended plan, we can --
23        MS. GOODMAN:  We can -- no.  Let's -- we can
24     keep going.  Let's keep going.  Yeah, we can take a
25     break after this.

Page 68

1  BY MS. VOGT:
2     Q.   Okay.  Now, in the second amended plan,
3  looking at paragraph 35 -- or 15, it shows that you did
4  increase the amount due to the bank to --
5     A.   Yes.
6     Q.   -- something shortly -- or something a little
7  bit above $8 million with the interest continuing to
8  accrue at a slightly over $1,700 a month.
9     A.   A day.
10     Q.   Oh, that's what I -- sorry.  Per day.  That's
11  what I meant.  Now, in addition to -- under this --
12  sorry, strike that.  New question is with the addition
13  of the $18,000 per month, the plan was still going to be
14  amortized over 30 years with the annual payments due
15  annually.  I don't see a calculation setting forth what
16  the payments would've been under the amortization.  Is
17  that in the -- and the amortization schedule that's
18  attached to the second amended plan shows the same
19  balance as the original plan of 7.74 million.  So was
20  the new amortization payment calculized and -- or
21  calculated and submitted anywhere?
22     A.   Yes.  That would've been something that we
23  negotiated with Mr. Gaylen, and I think attached to the
24  plan is the -- is the amortization scheduled for the
25  prior payment of 7.744 million.

Page 69

1     Q.   But how can anybody looking at this tell
2  without just doing their own math?  I mean, shouldn't
3  the amortization schedule show what the new payment
4  amount is going to be with the effect of the $18,000
5  additional per month?
6     A.   Yes.
7        MS. GOODMAN:  Objection to form.
8     A.   Yes.  And I'm sure Mr. Gaylen prepared that.
9  He didn't object to the plan.  BankFirst did not object
10  to the plan.
11     Q.   If the plan had actually gone into effect
12  without a default, would that have caused an issue that
13  the amortization schedule shows payments different from
14  what the plan calls for?
15        MS. GOODMAN:  Objection calls for speculation.
16     Objection to form.
17     A.   It could have been easily remedied by a
18  stipulation between debtor's counsel and the bank's
19  counsel.
20     Q.   Now, when you originally proposed the
21  drop-dead clause, and I -- if you want to see it, I can
22  show you the letter in which it was proposed.  Would you
23  like to see that?
24     A.   No.
25     Q.   Okay.  You suggested 60 days.  Could you tell

Great Plains Reporting Company
1299 Farnam Street, Ste. 300
Omaha, NE 68102

GREAT PLAINS
REPORTING
YOUR PATH THROUGH LITIGATION

Phone: 1-402-303-3399
Fax: 502-584-0119
schedule@yourdepositions.com
www.yourdepositions.com

4:22-cv-03039-JMG-MDN   Doc #:65-2   Filed: 11/20/23   Page 19 of 27   Page ID #
1899
The Deposition of GALEN STEHLIK, taken on April 12, 2023
70..73

Page 70

```
 1  me how it came about to end up being shortened to 10
 2  days and then 15 days to cure?
 3       A.   That was at the bank's insistence and it had
 4  to do with their prior experience with the debtor,
 5  Mr. Kroeger.
 6       Q.   In all the documents I saw, I did not see any
 7  communication from you to Mr. Kroeger saying something
 8  like, "This is 10 days.  You have to meet this or you're
 9  done," or anything like that.  Do you recall sending him
10  any written communications like that?
11       MS. GOODMAN:  Objection to form.
12       A.   I'm sure I would've.  He was hand-delivered a
13  copy of the -- the second amended plan that was
14  confirmed.  And I believe there was e-mail traffic
15  between he and -- between me and him that had that drop
16  dead clause in there verbatim.  In fact, I believe I've
17  seen that e-mail from me to Mr. Kroeger.
18       Q.   Okay.  Going to paragraph 21, talks about C.H.
19  Brown there.  I just noticed that, from the first two
20  plans to the second amended plan, this 1993 Bar-bell
21  Trailer was added.  Did he always have that, and he just
22  forgot to put it down, or did he manage to acquire that
23  during the pendency of the bankruptcy, if you know?
24       A.   I don't believe he acquired anything during
25  the pendency of the bankruptcy.  I believe this was
```

Page 71

```
 1  brought to my attention by counsel for C.H. Brown that
 2  they had a security interest in a 1993 Bar-bell Trailer.
 3       Q.   Now, going to paragraph 31 again, where it
 4  begins addressing the local rule requirement.  Number 1,
 5  under the compliance statement, it says, "There has been
 6  no change in real and personal property since the filing
 7  of the petition except for the surrender to John Deere
 8  of their collateral."  Hadn't Mr. Kroeger's liabilities
 9  changed significantly between the date of filing the
10  petition in February of 2020 and October of 2020?
11       A.   Well, this says -- the compliance statement
12  says, "There's been no change in real and personal
13  property except for the surrender of the John Deere
14  to -- of its collateral."  Did -- and I think it goes
15  saying, liabilities obviously would've continued --
16  would've accrued.  And that is shown in the bankruptcy
17  plan on the treatment of -- of the bank.  And I believe
18  we also updated it on the claim of Home Federal Bank,
19  Giltner State Bank, Deere and Company, the US Bank
20  National Association.
21       THE REPORTER:  I'm so sorry.  Can you repeat
22       that second name you just stated?
23       THE WITNESS:  US Bank National Association
24       or --
25       THE REPORTER:  Right before.
```

Page 72

```
 1       THE WITNESS:  Giltner.  G-I-L-T-N-E-R.  Giltner
 2       State Bank.
 3       THE REPORTER:  Thank you.
 4  BY MS. VOGT:
 5       Q.   But isn't there supposed to be a compliance
 6  statement showing any change in assets or liabilities
 7  according to the rule?
 8       A.   Yes.
 9       Q.   Was there a reason you did not include that in
10  the compliance statement?
11       A.   I don't -- I don't recall, but I do know that
12  no one objected, including the Chapter 12 trustee,
13  Mr. Overcash.
14       Q.   Now, on page -- oh, there's no pages.  On
15  paragraph number 9 under the local rules, it's on the
16  next page, it says that the plan is a three-year plan,
17  except for payments to holders of tax sale
18  certification.
19       A.   Yes.
20       Q.   Is there a technical reason or some reason why
21  the extended payments on the real property to Bank First
22  are not included there?
23       A.   Well, the tax certificate holders, we are
24  required by local rule to include that language.  The
25  plan provides that the debt owed to the bank is
```

Page 73

```
 1  amortized according to the terms of this treatment in
 2  the plan.  And so I think that kind of goes without
 3  saying.
 4       Q.   Oh, let me clarify --
 5       A.   It looks like the last sentence of the first
 6  paragraph of the treatment of the claim of Bank First
 7  paragraph XV says that.
 8       Q.   Going back to paragraph number 9 though, it
 9  says, "Specifying the need for plan payments."  So were
10  the payments to Bank First outside of the plan payments?
11       A.   No, they were pursuant to the plan.  The tax
12  certificate holders, people that bought tax sale
13  certificates because Mr. Kroeger wasn't paying his real
14  estate taxes, they are treated in XIV.  And we amortized
15  that over a longer term, longer than three years.  And I
16  worked out that language with the Howard County
17  Treasurer.
18       Q.   Well, if it's not just referencing three-year
19  plan periods, I -- shouldn't this have addressed the
20  length of time over which the payments to Bank First
21  were going to be amortized, which was 30 years?
22       A.   I believe that it says in Article 15 that the
23  payment of the claim that pursuant to the terms of an
24  amortization shift.
25       Q.   Right.  But shouldn't it be consistent
```

Great Plains Reporting Company
1299 Farnam Street, Ste. 300
Omaha, NE 68102

GREAT PLAINS REPORTING
YOUR PATH THROUGH LITIGATION

Phone: 1-402-303-3399
Fax: 502-584-0119
schedule@yourdepositions.com
www.yourdepositions.com

Page 74

1   throughout?  I mean, I'm hoping, at least, that there's
2   a reason that there is a local rule requesting specific
3   information such as extended plan payments, and this
4   does not include that.
5           MS. GOODMAN:  Objection, asked and answered.
6       Q.   So is there a reason why it doesn't include
7   it?
8           MS. GOODMAN:  Same objection.
9       A.   The reason would be my experience in working
10  with Mr. Overcash, the Chapter 12 trustee, who would be
11  the proper entity, normally, to find that discrepancy.
12      Q.   So compliance with the local rules is not
13  necessary if Mr. Overcash does not object?  Is that your
14  position?
15          MS. GOODMAN:  Objection to form.
16      A.   Normally, Mr. Overcash's input on those
17  questions is of utmost importance.
18      Q.   Is the trustee allowed to give you exceptions
19  from rule requirements?
20          MS. GOODMAN:  Objection.  Foundation and form.
21      A.   I don't know the answer to that.
22      Q.   Going back to -- or going to the cash flow
23  statements, cash flow statement appears to be the
24  identical one that was filed with the original plan. You
25  asked Mr. Kroeger to submit an updated cash flow

Page 75

1   statement?
2       A.   I'm sure I did.  And did you secure copies
3   of these plans from the bankruptcy website or from
4   Mr. Kroeger?
5       Q.   These came from you, I believe.
6           MS. GOODMAN:  Well, but they're not -- I'm not
7       sure they did, because they're not --
8           MS. VOGT:  I -- because I didn't go in and --
9           MS. GOODMAN:  Sta --
10          MS. VOGT:  -- move it on every page, because
11      they -- it was -- the ones that are separate, I did
12      go in and edit every one and move it up so I
13      printed.
14          MS. GOODMAN:  Well, and Galen, we've been
15      operating under the representation from Diana that
16      all of these were the plans that were in fact
17      filed, notwithstanding the fact we don't have a
18      file stamp on top.
19          THE WITNESS:  Yeah.
20          MS. GOODMAN:  So that's her representation and
21      so we're answering subject to that.
22  BY MS. VOGT:
23      Q.   Oh, I forgot.  Okay.  Going back to the con --
24  the cash flow statement, Mr. Kroeger has identified
25  $100,000 approximately for taxes.  Do you know what

Page 76

1   taxes those are designated for?
2       A.   I would assume those are real estate taxes.
3   And the plan would've provided that not only does he
4   have to pay current year taxes before they become
5   delinquent, he has to pay the amortized portion to the
6   tax -- the holders of tax sale certificates.
7       Q.   And I believe that part was addressed in the
8   plan, the outstanding tax sale certificates?
9       A.   Yes.
10      Q.   Does the cash flow statement include anywhere
11  amounts for income taxes?
12      A.   That would probably be included, paragraph 34
13  as well.
14      Q.   So that would be all of the taxes included?
15      A.   Yes.
16      Q.   Did you do any analysis of what the taxes
17  would be, based on a sale of the equipment that he had?
18      A.   I would've analyzed if any income tax
19  liability he would've had, had he been able to his cash
20  flow projections on the sale of ryelage, haylage,
21  manure, et cetera.  And then he has a huge deduction for
22  interest on his indebtedness and a huge deduction for
23  the payment of real estate taxes.  So yes, I would've
24  done an analysis of tax liability.
25      Q.   And --

Page 77

1       A.   My recollection is that he -- he personally, I
2   think, short of loss just about every year that we --
3   for the -- that when we've attached the tax returns.
4       Q.   Now, the liquidation analysis, according to
5   the rule, needs to have a statement of a qualified tax
6   accountant or attorney regarding the tax liabilities. I
7   did not find one.  Did you have one prepared?
8           MS. GOODMAN:  Objection.  Form.
9       A.   Which --
10      Q.   I'm looking at Exhibit D, the liquidation
11  analysis.
12      A.   Exhibit D?
13      Q.   Yeah.
14      A.   Did I have one done?  I don't recall.
15      Q.   I believe it's a -- it's -- Compliance
16  Statement number 11 says, "A liquidation analysis
17  sufficient," blah, blah, blah.  And then it says,
18  "Including a statement from a qualified tax accountant
19  or attorney as to tax liabilities from liquidation, if
20  any?"
21      A.   If one was done, it was done by me as -- as
22  the attorney for the debtor.  But it's not reflected on
23  Exhibit D, that's correct.
24      Q.   And the amount of tax liabilities under the
25  liquidation analysis is just about equal to the annual

Great Plains Reporting Company
1299 Farnam Street, Ste. 300
Omaha, NE 68102

GREAT PLAINS REPORTING
YOUR PATH THROUGH LITIGATION

Phone: 1-402-303-3399
Fax: 502-584-0119
schedule@yourdepositions.com
www.yourdepositions.com

Page 78

1 taxes that he -- that were put in Mr. Kroeger's cash
2 flow statement?
3          MS. GOODMAN:  Is that a question?
4     Q.    Yes.  Is that your understanding?
5     A.    The liquidation analysis shows tax liability
6 estimate, 100,000.
7     Q.    And is that for -- what taxes is that for?
8     A.    I would assume that would've been income
9 taxes.
10    Q.    Did you work out a plan under which you could
11 utilize Section 1232 to change the tax treatment?
12    A.    No.
13    Q.    Looking at the cash flow analysis, and based
14 on my very, very rough mathematics, it appears that once
15 the $18,000 monthly payment was added, with the
16 exception of year 2020, which is almost already over by
17 the time the second plan was submitted and confirmed, in
18 both 2021 and 2022, it appears Mr. Kroeger would not
19 have had sufficient funds to pay an additional
20 $136,000?
21    A.    Is 130 -- is that 18 times 12?
22    Q.    Yes.
23    A.    Yeah.  Okay.  Again, the projections came from
24 Mr. Kroeger, and his projections were based on the first
25 year, and his -- his projections were obviously

Page 79

1 understated.
2     Q.    Did you have concerns about filing the second
3 amended plan without an updated cash flow?
4     A.    Without a what?
5     Q.    Updated cash flow.
6     A.    I believe that what I did -- I did updated
7 cash flows.  Why they're not attached to the exhibits
8 offered in this deposition, I don't know.  And I would
9 have the check to see what actually was filed.  And if
10 these discrepancies would've come to the attention of
11 Mr. -- Mr. Overcash and then, at a minimum, Mr. Galyen,
12 they would've objected.  So I'm not so sure that -- what
13 has -- we have in this deposition actually is what was
14 filed.  I don't -- I don't know.
15         MS. VOGT:  Well, why don't we take our lunch
16    break right now and I'll figure it out?
17         MS. GOODMAN:  Oh, you want to take a break?
18         MS. VOGT:  Yeah.
19         MS. GOODMAN:  We can take a break.
20         MS. VOGT:  All right.
21         THE REPORTER:  We are --
22         MS. VOGT:  There's supposed to be a card with
23    the Wi-Fi password.
24         THE REPORTER:  Oh yes.  We are off for record.
25             (OFF THE RECORD)

Page 80

1         THE REPORTER:  We are back on the record.
2     A.    Okay.  I have reviewed, from the bankruptcies
3 website, the -- as filed, it's Docket 63, filed
4 May 29, 2020.  And I have compared the condensed cash
5 flow to what was filed, and they are identical to what I
6 looked at today.
7 BY MS. VOGT:
8     Q.    In Exhibit 10?
9     A.    Yes, in Exhibit 10.
10    Q.    All right.  And the first amendment plan is
11 Doc 93.  All right.  I've pulled up Doc 93 on the --
12 from the Court's website.
13    A.    And I have confirmed the Docket 93, filed July
14 27, 2020, is identical to -- identical to the condensed
15 cash flow that I looked at in Exhibit 11.
16    Q.    Second one is Documents 122.
17    A.    Okay.  And I have reviewed Docket 122, filed
18 October 15, 2020, from the official website for the
19 bankruptcy court.  And the condensed cash flow that
20 appears in Exhibit 12 is the same that appears in the
21 bankruptcy records as to what was filed.
22         (EXHIBIT 12 MARKED FOR IDENTIFICATION)
23         MS. VOGT:  All right.  Perf -- we're done with
24    the computer.  Thanks, ma'am.
25         THE REPORTER:  I'm glad to know I wasn't just

Page 81

1 making up things.  Okay.  Cool.
2 BY MS. VOGT:
3     Q.    All right.  Okay.  Before we go back to the
4 plan, I'm just filling in a couple of things.  I did not
5 see, I don't believe, any copies of your time records
6 for the work you did for the Kroegers.  Do you keep time
7 by hour for bankruptcy cases?
8     A.    Yes.
9         MS. GOODMAN:  And I'll represent they were
10    produced.
11         MS. VOGT:  Oh, they were?
12         MS. GOODMAN:  Yeah.
13 BY MS. VOGT:
14    Q.    Okay.  They're in there somewhere.  Was there
15 any reason at all, other than your perceived -- was
16 there any reason at all, besides Mr. Kroeger's alleged
17 position that he didn't want to sell anything, that you
18 did not try and sell assets to pay down some of his
19 debt?
20    A.    Well, when you're --
21         MS. GOODMAN:  Objection to form.
22    A.    When you're retained by somebody and you'll
23 ask them, "That is one way that you could reduce your
24 debt," and -- and we -- you present that proposal to him
25 and his answer is no and his reason is, "I want to keep

Great Plains Reporting Company
1299 Farnam Street, Ste. 300
Omaha, NE 68102

GREAT PLAINS
REPORTING
YOUR PATH THROUGH LITIGATION

Phone: 1-402-303-3399
Fax: 502-584-0119
schedule@yourdepositions.com
www.yourdepositions.com

Page 82

1  the farm ground so I can rent it to my boy." That was
2  his consistent answer. And it's built into the cash
3  flow, the rent his son pays.
4      Q.    And that's fine, but just what I'm getting at
5  is if there is any provision in the bankruptcy code or
6  any other thing that made it not a good idea, other than
7  he said he wouldn't do it. That that's what I want to
8  know.
9      A.    Uh-uh.
10         MS. GOODMAN: Objection to form.
11     A.    No.
12         MS. VOGT: Okay. (Inaudible). Could you read
13  back the last question before the break?
14         THE REPORTER: Yes. (Inaudible).
15         (REPORTER PLAYS BACK REQUESTED TESTIMONY)
16         THE REPORTER: Apologies. I played the
17  answer.
18         (REPORTER PLAYS BACK REQUESTED QUESTION)
19         MS. VOGT: Okay.
20         THE WITNESS: Okay.
21         MS. GOODMAN: And I'm going to object to asked
22  and answered. They played his answer.
23         MS. VOGT: Oh.
24         MS. GOODMAN: So you're asking the exact same
25  question.

Page 83

1  BY MS. VOGT:
2      Q.    But the question was: did he have concerns
3  about it?
4         MS. GOODMAN: Okay.
5      A.    You know, I don't recall if I had a concern.
6  If I would've had a concern, I probably wouldn't have
7  filed it.
8      Q.    In the plan, it shows that the tax lien
9  certificates are going to be paid down through
10  amortization, giving security as a deed of trust. Don't
11  property tax liens have to be paid in full?
12     A.    As they are accrued on an annual basis, yes,
13  but if you put a chapter -- if you put a plan on a
14  Chapter 12 plan, you can amortize it over a longer term.
15  Some counties are easier to deal with than others.
16  Howard County was easier.
17     Q.    So amortizing them over a long term, that has
18  to be with the agreement of the county? It's not
19  something out of the bankruptcy code?
20     A.    That's correct.
21     Q.    Okay. Have you ever tried to get Douglas
22  County to do that?
23     A.    Yes, unsuccessfully.
24     Q.    We were talking about a statement of a
25  qualified tax accountant or an attorney regarding tax

Page 84

1  liabilities, but did you have anybody go through the tax
2  returns and the cash flow figures provided by
3  Mr. Kroeger and see if they were realistic even with
4  his -- just with his projections?
5      A.    Well, his account -- his tax return preparer
6  is an accountant from St. Paul, Nebraska. And I did
7  have conversations with her early on to make sure that
8  she provided me copies of his tax returns. But other
9  than that, no. A -- again, in -- in fairness to
10  Mr. Kroeger, he was starting a brand-new venture and --
11  and he didn't have row crop income and nor did he have
12  row crop expenses. He was leasing this ground, and then
13  he was going to ramp up and do more work on his going
14  out into the fields with the silage and earlage and
15  bales, and then selling his manure that, that was going
16  to be more of a full-time job. So some of these were
17  good-faithed estimates that -- that -- that he made.
18     Q.    Did you look at the cash flow sheets compared
19  to what his expenses were going to be under the plan and
20  decide if you thought it was feasible?
21         MS. GOODMAN: Objection. Form, vague as to
22  feasible.
23     A.    Did I analy -- is that part of the analysis
24  that a debtor's counsel does? Yes. A lot of the times
25  you have to rely on your client's projections,

Page 85

1  especially under the circumstances presented by the
2  Kroeger case.
3      Q.    And just so we have it in the record, what
4  circumstances are those?
5      A.    He was starting a brand-new venture, getting
6  out of row crop farming, getting into handling --
7  you know, severing from the harvested fields. So he
8  bound -- he would bale the hay, he would bale the
9  stocks. Earlage, he would -- that was something that he
10  would have to do on land of his own a -- arrangement
11  with he and his son. And they had an arrangement of
12  that nature. This is father-son. The -- so his
13  circumstances were such that he was in a certain -- sort
14  of a startup, except, though, he was able to give me
15  good-faith estimates based upon his work that he'd done
16  before with the manure and the bales and things of that
17  nature. Those were -- according to Mr. Kroeger, those
18  were accurate.
19     Q.    And the reason he was not going to do row crop
20  farming is because Bank First would not finance him for
21  the next crop year?
22         MS. GOODMAN: Objection. Foundation, and
23  asked --
24     A.    I believe that's one reason, but his -- his
25  son wanting to get involved in farming was another one.

Great Plains Reporting Company
1299 Farnam Street, Ste. 300
Omaha, NE 68102

GREAT PLAINS
REPORTING
YOUR PATH THROUGH LITIGATION

Phone: 1-402-303-3399
Fax: 502-584-0119
schedule@yourdepositions.com
www.yourdepositions.com

Page 86

And I think Mr. Kroeger looked at his history and just
wasn't making any money.  Thought he could make more
money scraping manure and spreading it and the other
types of activities I've described.

Q.    And if you know, the manure business, once he
had equipment, would not require the annual infusion of
cash that --

A.    That's right.

Q.    -- planting would; is that right?

A.    That's correct.

Q.    Oh, I'm just going back to the sale of assets.
Have you used sale of assets successfully in other
Chapter 12 bankruptcies?

A.    Yes.

Q.    Did you do any kind of analysis on what could
be sold in order to pay assets down with Mr. Kroeger? Or
once he said he wasn't going to do it, did you just
leave it alone?

A.    Well, no, I -- we -- BankFirst did appraisals
in 2018, and those appraisals formed the basis of the
values we put into the -- the treatment of their --
their claim.  There was one tract of land, which is a
half section, section -- track six shown in the plan,
and that would've helped out a lot.  That was valued by
the bank at $2.4 million.

Page 87

Q.    In your experience, does farm ground bring
more if sold by the Chapter 12 debtor versus sold by the
bank after foreclosure?

MS. GOODMAN:  Objection. Foundation.

A.    In my experience anymore, it seems like that
sales by secured creditors at forced sales, for
instance, like a trustee under a data trust, sell almost
as well as the debtor trying to sell them themselves.

Q.    Mr. Stehlik, you recently got an opinion out
of the Nebraska Supreme Court in a case called Speihs v.
City of Grand Island.

A.    Yes.

Q.    The Court was rather harsh about your not
filing a separate statement of undisputed facts.  Is
there a reason you did not do that?

A.    Absolutely.

MS. GOODMAN:  Objection. Form.

A.    If you read my brief in that case, you will
see that the attorney for the City of Grand Island, when
he filed his motion for summary judgment, made reference
to Mr. Kroeger deposition, to which there were 13
exhibits attached.  I referred to those exhibits in my
argument in opposition to the motion for summary
judgment.  The Supreme Court said that I couldn't have
relied upon what was received by the district judge with

Page 88

13 exhibits.  I objected to that.

Q.    But those would just be the exhibits
themselves.  They were also critical because you did not
write out a statement -- a separate statement of
undisputed facts.  Was there a reason why you did not do
that?

MS. GOODMAN:  Objection to form.

A.    I believe that I did.  I believe the
transcript on appeal shows that, too.  It's in the
District Court -- the district judge is Andrew Butler.
Judge Butler is maybe 36 years old.  He's been on the
bench a couple of years.  I'm not so sure that he
decided that decision correctly, and I don't believe the
Court of Appeals decided it correctly either.

Q.    Right, I misspoke.  It was Court of Appeals.
It's not the Supreme Court.

A.    Right.

MS. VOGT:  Can we take like another ten-minute
break and then I'll see if I'm done?

MS. GOODMAN:  Okay.  Yeah, that's fine.

THE REPORTER:  We are off the record.

(OFF THE RECORD)

BY MS. VOGT:

Q.    In your experience representing Chapter 12
debtors, what are some of the difficulties in getting a

Page 89

plan confirmed?

A.    One of the issue is -- I think in many
instances, is the debtor's overestimation of their
earning capacity.  And then the biggest problem is, if
you have a lender or a secured party that's at all
sympathetic with your client's position, that goes much,
much better.  That's been my experience.

Q.    Did you ever talk to BankFirst about
negotiating cash collateral?

A.    I'm sure -- I'm sure I would've because
remember Mr. Kroeger was going to use his net income --
his gross income net of expenses to pay a payment to --
and that's what BankFirst called adequate protection
payments.  So did I talk to them about those issues?
Yes, I did.

Q.    Did you ever recommend to them at any time
that they just filed Chapter 7 after the default?

MS. GOODMAN:  Objection to form.

A.    You mean did I ever advise Kroegers of that?

Q.    Yes.

A.    I believe he knew that that was one of the
alternatives, but did I ever advise him to do it?  No.
He always -- he being Kurt Kroeger always held out the
prospect that he was going to be -- be able to refinance
his debt always.

Great Plains Reporting Company
1299 Farnam Street, Ste. 300
Omaha, NE 68102

GREAT PLAINS REPORTING
YOUR PATH THROUGH LITIGATION

Phone: 1-402-303-3399
Fax: 502-584-0119
schedule@yourdepositions.com
www.yourdepositions.com

4:22-cv-03039-JMG-MDN   Doc #:65-2   Filed: 11/20/23   Page 24 of 27   Page ID # 1904
The Deposition of GALEN STEHLIK, taken on August 12, 2023
90..93

Page 90

```
 1      Q.    Oh.  What was your billing rate at the time
 2  you were representing the Kroegers?
 3      A.    I believe it was either $190 an hour or $200
 4  an hour.  It's reflected in the billing statements.
 5          MS. GOODMAN:  Which were produced.
 6      Q.    Back to the application for employment, when
 7  you filed the application for employment, it's my
 8  understanding it requires an affidavit of disinterest?
 9      A.    Yes.
10      Q.    Did you have anything that would've had been
11  disclosed if you had filed an affidavit of this
12  interest?
13      A.    No.  I don't believe I had any conflict with
14  any of Kroeger's creditors, landlords, tenants.
15          MS. VOGT:  Okay.  That's all I have until --
16      unless I have something.
17              CROSS EXAMINATION
18  BY MS. GOODMAN:
19      Q.    Mr. Stehlik, I've got just a few questions
20  here.  You were asked a question about the
21  communications that you had with Mr. Kroeger from
22  December of 2020 through April of 2021.  Do you recall
23  those?
24      A.    Yes.
25      Q.    And I believe your answer was that Mr. Kroeger
```

Page 91

```
 1  contacted you weekly during that time period or about
 2  there?
 3      A.    Prior to when Mr. Patino filed the motion?
 4  Yes.
 5      Q.    Okay.  Was there -- did Mr. Kroeger's daughter
 6  die during that time period?
 7      A.    Yes, tragically she did.
 8      Q.    And did that event cause communications with
 9  Mr. Kroeger to at least slow to some degree, for obvious
10  reasons?
11      A.    Quite a bit, yes.
12      Q.    You were asked some communications -- you
13  asked some questions regarding communications you had
14  after Mr. Kroeger had defaulted -- the Kroegers had
15  defaulted on their plan.  Now, during that time period,
16  you also had communications with Mr. Galyen from
17  BankFirst, correct?
18      A.    Yes.
19      Q.    And in fact, in those communications, did you
20  attempt to work something out with the bank with regard
21  to this default?
22      A.    Yes.
23      Q.    And what was the bank's response?
24      A.    They were not interested in working with
25  Mr. Kroeger because there was lack of trust, and they
```

Page 92

```
 1  believed that Kroeger was not credible.
 2      Q.    Is it a fair characterization, Mr. Stehlik,
 3  that BankFirst was done with Mr. Kroeger after he
 4  defaulted on that plan?
 5      A.    That sentiment was communicated to me, yes.
 6      Q.    I want to go ahead and -- well, strike.  Let's
 7  go ahead and mark exhibit.  I think this was one in
 8  your --
 9          MS. VOGT:  Yeah, I've got it.
10      Q.    All right.  I've handed you, Mr. Stehlik,
11  what's been marked as Exhibit 13.  And this is a
12  document, is it not, dated August 28th from Mr. Galyen
13  to you?
14              (EXHIBIT 13 MARKED FOR IDENTIFICATION)
15      A.    Yes.
16      Q.    And does this - if that set forth the bank's
17  proposal with -- as you understand it, as of
18  August 28, 2020?
19      A.    Yes.
20      Q.    And you'll see as paragraph number 2 here, it
21  shows a $100,000 payment on or before October 1, 2020,
22  or -- correct?
23      A.    Yes.
24      Q.    And October 1st would've been about a month
25  out from the date this e-mail was sent; is that correct?
```

Page 93

```
 1      A.    Yes.
 2      Q.    And it shows up the top that this e-mail was
 3  forwarded by you to Mr. Kroeger --
 4      A.    That's correct.
 5      Q.    -- correct?  So Mr. Kroeger was in fact aware
 6  of the bank's proposal as of this date, correct?
 7      A.    Yes.
 8      Q.    And in fact, you write to Mr. Kroeger, "Please
 9  review and call me," right?
10      A.    Yes.
11      Q.    And do you recall whether Mr. Kroeger called
12  you?
13      A.    I don't recall.
14      Q.    All right.  And I don't have copies of this
15  right here, so just let me see what it is.  All right.
16  Mr. Stehlik, I've handed you what's been marked as
17  Exhibit 14, and this is an e-mail between -- sent by you
18  to Mr. Galyen on September 1, 2020; is that correct?
19              (EXHIBIT 14 MARKED FOR IDENTIFICATION)
20      A.    Yes.
21      Q.    And you can see towards the bottom of the
22  e-mail it reads -- or you write to Mr. Galyen with
23  BankFirst, "Kurt thinks he can come up with $100,000
24  from silage, earlage, et cetera, sales.  I will be able
25  to report back to you later this week."  Do you see
```

Great Plains Reporting Company
1299 Farnam Street, Ste. 300
Omaha, NE 68102

GREAT PLAINS REPORTING
YOUR PATH THROUGH LITIGATION

Phone: 1-402-303-3399
Fax: 502-584-0119
schedule@yourdepositions.com
www.yourdepositions.com

Page 94

1  that?
2      A.    Yes.
3      Q.    Does that line refresh your memory that in
4  fact you and Mr. Kroeger did indeed talk about the
5  bank's proposal and Mr. Kroeger told you that he
6  believes he can come up with that $100,000 by
7  October 1?
8      A.    Yes.
9      Q.    All right, last one.  Sir, I've handed
10 you what's been marked as Exhibit 15, and this is an
11 e-mail -- it starts with an e-mail from Mr. Galyen to
12 you dated September 21, 2020.  So roughly about three
13 weeks after the last communication.
14              (EXHIBIT 15 MARKED FOR IDENTIFICATION)
15     A.    Yes.
16     Q.    And Mr. Galyen writes, "Galen, I spoke with
17 the bank.  Per prior disclosures, Kroeger should have,"
18 and he list four items that amount to about -- or should
19 have amounted to about $365,000 in revenue.
20     A.    Yes.
21     Q.    And then he says, "The bank will accept
22 monthly payments of $18,000 as proposed, but with
23 $100,000 payment now."  In the -- do you see that?
24     A.    Yes, I do.
25     Q.    Okay.  In addition to that, he includes with

Page 95

1  it the planned payments that he's proposing with the
2  planned treatments, the amortization table.
3      A.    Yes.
4      Q.    If you look at the second e-mail or on the top
5  here, that e-mail ultimately gets forwarded by you with
6  the attachment of the planned payments to Mr. Kroeger,
7  correct?
8      A.    That's correct.
9      Q.    It gets forwarded about October 1, 2020?
10     A.    That's right.
11     Q.    So you were asked some questions earlier about
12 the amortization table that was included with the second
13 amended plan, correct?
14     A.    Yes.
15     Q.    But there's no dispute, is there, sir, that
16 Mr. Kroeger knew what his payment obligations were in
17 connection with the treatment of the BankFirst claim,
18 correct?
19     A.    That's correct.
20     Q.    Because in fact, you provided them to him on
21 October 1, 2020; is that correct?
22     A.    Yes.
23     Q.    And in fact, it had on there the dates when
24 the annual payments were coming due and it reflected the
25 $18,000 payments that were due each month, correct?

Page 96

1      A.    Yes.
2      Q.    Now, you were asked some questions about the
3  reasonableness of the $100,000 payment and whether
4  that was common to have that amount of money due at a
5  certain -- you know, immediately, correct?  Do you
6  recall whether or not Mr. Kroeger was paying the bank
7  through the pendency of his bankruptcy since the time he
8  filed bankruptcy through the date that plaintiff was
9  confirmed whether the -- Mr. Kroeger had made any
10 payments to the bank at all?
11     A.    Yeah, one of the earlier exhibits was my
12 e-mail to Galyen complaining that those payments that
13 Kroeger had made hadn't been credited.
14     Q.    Hadn't been credited.
15     A.    They later were credited.  And -- and this
16 e-mail makes reference to something about Hixon or
17 something?
18     Q.    Dixon, maybe?
19     A.    Dixon, yeah.  It's in the prior -- well --
20     Q.    Let me ask this, does the $100,000 -- well,
21 strike that.  Do you know whether or not, or do you
22 recall sitting here today whether or not the --
23 Mr. Kroeger and his wife were making adequate protection
24 payments to the bank?
25     A.    Yes.  And if they wouldn't have been, I'm sure

Page 97

1  I would've heard about it from the bank.
2      Q.    Okay.  So they were.  All right.
3  Notwithstanding that, the bank was certainly past due on
4  the amount it was owed --
5      A.    Yes.
6      Q.    -- on its note, correct?
7      A.    That's correct.
8      Q.    And so in a situation like that, it's not
9  uncommon for the -- for a secure creditor such as the
10 bank to require a substantial down payment on, correct?
11     A.    That's correct.
12     Q.    Questions about C.H. Brown, I want to reach in
13 here for a second.  You touched on this earlier, but
14 with regard to C.H. Brown, if you pull up Exhibit -- is
15 that the docket?  Is that three?  Oh, there it is.
16     A.    Yeah.
17     Q.    That one there.  Is that Exhibit 3?
18     A.    2.
19     Q.    Okay.  If you pull it up Exhibit 2, I want to
20 just kind of refresh the record here in terms of the
21 timeline of the C.H. Brown motion for relief from the
22 automatic stay.  So if you take a look at motion -- C.H.
23 Brown filed a motion for relief from the automatic stay,
24 correct?
25     A.    Yes.

Great Plains Reporting Company
1299 Farnam Street, Ste. 300
Omaha, NE 68102



Phone: 1-402-303-3399
Fax: 502-584-0119
schedule@yourdepositions.com
www.yourdepositions.com

4:22-cv-03039-JMG-MDN   Doc #:65-2   Filed: 11/20/23   Page 26 of 27 - Page ID #
1906
The Deposition of GALEN STEFKA, taken on August 2, 2023       98..101

Page 98

1    Q.    And the basis for the motion was that they
2  were not receiving adequate protection payments from
3  Mr. Kroeger; is that correct?
4    A.    Yes.  They were not receiving the -- the
5  payments that he had agreed to pay during the pendency
6  pre-plan confirmation.  Yes.
7    Q.    Okay.  And in fact, in response to that
8  motion, you assisted the Kroegers in negotiating a
9  stipulation with C.H. Brown that provided for certain
10  payments to be made at certain times.  And if those
11  payments weren't made, then a drop-dead clause was
12  included -- would be in effect?
13    A.    Yes.
14    Q.    And in fact, C.H. Brown would get immediate
15  relief from the automatic stay, correct?
16    A.    That's correct, yes.
17    Q.    All right.  And if you take a look, sir, at
18  docket entry 101 --
19    A.    Yes.
20    Q.    -- it shows that August 7, 2020, Mr. Adam
21  Hoesing filed an affidavit in support of default.  Do
22  you see that?
23    A.    Yes.
24    Q.    Does that refresh your memory that in fact
25  Mr. Kroeger didn't make the payments and C.H. Brown

Page 99

1  proceeded with filing their affidavit of default to get
2  relief from the automatic stay?
3    A.    Yes.
4    Q.    And indeed three days later, the next entry,
5  docket number 102, C.H. Brown did in fact get relief
6  from the automatic stay Yes.  As a result of
7  Mr. Kroeger's default, correct?
8    A.    That's correct.
9    Q.    All right.  Upon the grant -- obtaining relief
10  from the automatic stay, is it your memory, sir, that
11  C.H. Brown then proceeded with its replevin action in
12  state court?
13    A.    That's my recollection, yes.
14    Q.    Okay.  And in fact, if you look at Exhibit 4
15  that you were offered to -- that was offered today -- or
16  marked today --
17    A.    Yes.
18    Q.    -- this is dated September 30, 2020, so
19  roughly a month later.  And at that point you tell Adam,
20  "Call me on the hearing tomorrow, I have no evidence.
21  And as I told Kurt earlier, he has no defense."  And I
22  just want to be clear, the reason he has no defense is
23  because he didn't make his payments under -- pursuant to
24  the stipulation, correct?
25    A.    Yes, that's correct.

Page 100

1    Q.    And in fact, he hadn't -- didn't have the
2  money or couldn't cure the default rather as of this
3  date?
4    A.    Correct.
5    Q.    And in fact, you then negotiated a --
6  basically one last ditch attempt to allow him to keep
7  this collateral by him making a certain amount -- making
8  a certain payment by a certain date --
9    A.    Correct.
10    Q.    -- or else they could come pick it up,
11  correct?
12    A.    Yes.
13    Q.    Sir, could you pull Exhibit 10 here?
14    A.    Yes.
15    Q.    You were asked some questions about the
16  compliance statements in connection with Local Rule
17  3015.  Do you recall that?
18    A.    Yes.
19    Q.    And one of the questions you were asked,
20  related to paragraph 3, where you state that the cash
21  flow is based upon the historical experience of the
22  debtor, do you see that?
23    A.    Which number is that?
24    Q.    3.
25    A.    I see that, yes.

Page 101

1    Q.    Okay.  If you look at the cash flows that were
2  included with this plan, it lists a number of different
3  sources of revenue.  And I just want to be clear, one of
4  the sources of revenue came from manure, correct?
5    A.    Yes.
6    Q.    But many other came from other sources, which
7  Mr. Kroeger did have some experience with, correct?
8    A.    Yeah.
9    Q.    In other words, there -- do you know, was
10  there historical information that was relied upon in
11  terms of the silage and ryelage?
12    A.    Yes, there was.
13    Q.    Yeah.  And same thing with government
14  payments?
15    A.    Yes.
16    Q.    And likewise, cash rent would've been a --
17  that's something that's fixed and really doesn't require
18  historical justification, correct?
19    A.    That's correct.
20    Q.    All right.  I think those are all my
21  questions.
22    Q.    Go back to, I think it's the September 30th
23  e-mail to C.H. Brown.
24    MS. GOODMAN:  Sure.  Four?
25    MS. VOGT:  I don't remember what number that

Great Plains Reporting Company
1299 Farnam Street, Ste. 300
Omaha, NE 68102

GREAT PLAINS
REPORTING
YOUR PATH THROUGH LITIGATION

Phone: 1-402-303-3399
Fax: 502-584-0119
schedule@yourdepositions.com
www.yourdepositions.com

4:22-cv-03039-JMG-MDN Doc #:65-2 Filed: 11/20/23 Page 27 of 27 Page ID # 1907
The Deposition of GAREN STEHLIK , taken on April 7, 2023
102..105

Page 102

1    was.
2         MS. GOODMAN:  Yeah.
3         THE WITNESS:  Four.
4         REDIRECT EXAMINATION:
5    BY MS. VOGT:
6         Q.    Okay.  When you said to Mr. Hoesing, or
7    however you pronounce his name, that Kurt had no
8    defense, was that just no defense if they wanted relief
9    from the state?  Or did you question his ability to make
10   payments to C.H. Brown?
11        A.    No, it was his inability to make the payments
12   to C.H. Brown.  Kurt had excuses, explanations as to,
13   not uncommon for farmers, drought.  "I didn't get my
14   payment in time.  The guy from Ag Services didn't come
15   out and apply fertilizer, et cetera, et cetera."  So
16   Kurt might have had explanations or excuses, but no
17   technical defense, no.
18        Q.    Did his excuses in reference to the debt owed
19   to C.H. Brown raise any concerns with you about his
20   ability to make the $100,000 payment?
21        A.    I, again, relied on Kirk's assurance that he
22   could make that payment.  A lot of it was the timing of
23   the income that he was scheduled to receive in order to
24   make that payment.
25        Q.    Was one of the things that he was counting on

Page 103

1    to make that payment a payment from the United States
2    government?
3         A.    Yes.
4         Q.    Was that payment actually received late?
5         A.    It was.
6         RECROSS EXAMINATION
7    BY MS. GOODMAN:
8         Q.    I have one very quick -- I just want to
9    clarify for the record.  At the time that C.H. -- you
10   sent this e-mail to C.H. Brown, they had already
11   obtained relief from the automatic stay because
12   Mr. Kroeger defaulted on the stipulation, correct?
13        A.    Yes.
14        MS. GOODMAN:  No further questions.
15        THE REPORTER:  Okay.  Mr. Stehlik, would you
16   like to read and sign your transcript, or would you
17   like to waive that?
18        THE WITNESS:  I'll waive that.  Just provide a
19   copy to counsel.
20        THE REPORTER:  Okay.  And Ms. Vogt, how would
21   you like your transcript?
22        MS. VOGT:  Just an E-Tran and a condensed with
23   exhibits.
24        MS. GOODMAN:  Same with me.
25        THE REPORTER:  Okay.  We are off the record at

Page 104

1    2:30 p.m.
2         (DEPOSITION CONCLUDED AT 2:30 P.M. CT)

Page 105

1         CERTIFICATE OF REPORTER
2         STATE OF NEBRASKA
3
4    I do hereby certify that the witness in the foregoing
5    transcript was taken on the date, and at the time and
6    place set out on the Title page here of by me after
7    first being duly sworn to testify the truth, the whole
8    truth, and nothing but the truth; and that the said
9    matter was recorded digitally by me and then reduced to
10   typewritten form under my direction, and constitutes a
11   true record of the transcript as taken, all to the best
12   of my skill and ability.  I certify that I am not a
13   relative or employee of either counsel, and that I am in
14   no way interested financially, directly or indirectly,
15   in this action.
16
17
18
19
20
21
22   SUMMER MARTINEZ,
23   COURT REPORTER/NOTARY
24   COMMISSION EXPIRES:  12/02/2026
25   SUBMITTED ON:  05/01/2023

GENERAL NOTARY
STATE OF NEBRASKA
SUMMER MARTINEZ
MY COMMISSION EXPIRES DEC. 2, 2026

Great Plains Reporting Company
1299 Farnam Street, Ste. 300
Omaha, NE 68102

GREAT PLAINS REPORTING
YOUR PATH THROUGH LITIGATION

Phone: 1-402-303-3399
Fax: 502-584-0119
schedule@yourdepositions.com
www.yourdepositions.com