Richard D. Myers                                                          1 (1)
10/3/2023

```
 1           IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF NEBRASKA
 2
    RICHARD D. MYERS, Trustee,   )      4:22-CV-3039
 3                               )
                 Plaintiff,      )
 4                               )
         vs.                     )     DEPOSITION OF
 5                               )     RICHARD D. MYERS
    GALEN STEHLIK and STEHLIK    )
 6  LAW FIRM,                    )
                                 )
 7              Defendants.      )

 8

 9

10           Deposition of RICHARD D. MYERS taken

11   before Angela M. Ickler, Registered Professional

12   Reporter and General Notary Public within and

13   for the State of Nebraska, beginning at

14   1:33 p.m. on October 3, 2023, at McGill,

15   Gotsdiner, Workman & Lepp, PC, LLO, Omaha,

16   Nebraska 68154, pursuant to the within

17   stipulations.

18

19

20

21

22

23

24

25
```

```
 1                    A-P-P-E-A-R-A-N-C-E-S

 2

 3     APPEARING FOR PLAINTIFF:

 4     Ms. Diana J. Vogt
       Attorney at Law
 5     Sherrets Bruno & Vogt, LLC
       260 Regency Parkway Drive
 6     Suite 200
       Omaha, NE 68114
 7     T:  (402) 390-1112
       F:  (402) 390-1163
 8     dvogt@sherrets.com

 9
       APPEARING FOR DEFENDANTS:
10
       Ms. Lauren R. Goodman
11     Attorney at Law
       McGrath North Mullin & Kratz, PC, LLO
12     First National Tower
       Suite 3700
13     1601 Dodge Street
       Omaha, NE 68102
14     T:  (402) 341-3070
       F:  (402) 341-0216
15     lgoodman@mcgrathnorth.com

16

17

18

19

20

21

22

23

24

25
```

```
 1                  D-E-P-O-S-I-T-I-O-N

 2                      I-N-D-E-X

 3   CASE CAPTION ............................ Page    1
     APPEARANCES ............................. Page    2
 4   INDEX ................................... Page    3
     STIPULATIONS ............................ Page    4
 5   TESTIMONY ............................... Page    4
     REPORTER CERTIFICATE .................... Page  101
 6

 7              E-X-A-M-I-N-A-T-I-O-N

 8
     DIRECT EXAMINATION
 9        By Ms. Lauren R. Goodman .......... Page    4

10

11

12
                    E-X-H-I-B-I-T-S
13
     DESCRIPTION                            MARKED
14
      1.  Notice of Deposition                4
15
      2.  Emails                              20
16
      3.  Complaint                           27
17
      4.  Proof of Claim                      41
18
      5.  Plaintiff's Supplemental Answers
19        to Defendants' First Set of
          Interrogatories to Richard D.
20        Myers, Trustee                      48

21    6.  Supporting Document to Exhibit 5    58

22    7.  Big Iron Auctions                   75

23

24

25
```

```
 1              (Whereupon the following proceedings

 2       were had, to-wit:)

 3                      (Exhibit 1 marked for

 4                      identification.)

 5              THE COURT REPORTER:  (Requested

 6       stipulations for the record.)

 7              MS. VOGT:  Just that she doesn't

 8       have to read --

 9              MS. GOODMAN:  Yeah, I'm fine

10       waiving the reading of the caption.

11              MS. VOGT:  Do you want to reserve

12       objections except for form and foundation?

13              MS. GOODMAN:  That's fine.

14              RICHARD D. MYERS,

15    Being first duly cautioned and solemnly sworn as

16         hereinafter certified, was examined and

17                  testified as follows:

18                  DIRECT EXAMINATION

19    BY MS. GOODMAN:

20         Q.   All right.  Can you state your name

21       for the record?

22         A.   Richard D. Myers, M-Y-E-R-S.

23         Q.   And what is your business address?

24         A.   11404 West Dodge Road, Suite 500,

25       Omaha, Nebraska.
```

Page 5

1  Q.  And, sir, I understand you're an
2  attorney.  So what firm are you with?
3  A.  McGill Gotsdiner Workman & Lepp, PC.
4  Q.  Perfect.  I've handed you what has
5  been marked as Exhibit 1.  This is a copy of the
6  deposition notice.  I assume you received a copy
7  of this?
8  A.  I believe I got one from my attorney.
9  Q.  Perfect.  And you are appearing
10 pursuant to that notice today?
11 A.  I am.
12 Q.  All right.  Sir, if you could, can
13 you start, I guess, with -- well, let's start
14 with college.  Where did you go to college?
15 A.  Midland College, now called Midland
16 University.
17 Q.  All right.  And what was your major?
18 A.  History, minor in English.
19 Q.  And I assume you graduated?
20 A.  I did.  I got a bachelor of arts
21 degree, 1968.
22 Q.  All right.  And then after
23 graduation, did you go to work?
24 A.  No -- well, I went to work for a
25 summer, but at the next commencement of the

Page 6

1  school year, I entered law school at Creighton
2  University.
3  Q.  All right.  What year did you
4  graduate?
5  A.  1971.
6  Q.  And I understand you're a licensed
7  attorney?
8  A.  I am.  I've been since June 28th of
9  1971.
10 Q.  All right.  In what states are you
11 licensed?
12 A.  Nebraska.
13 Q.  All right.  And that's it?
14 A.  That's it.
15 Q.  After you graduated from law school,
16 where did you go to work?
17 A.  Omaha.
18 Q.  And what law firm?
19 A.  Matthews, Kelly, Cannon, and
20 Carpenter.
21 Q.  And how long were you there?
22 A.  Until February of 1974.  So two and a
23 half years.
24 Q.  And then after the Matthews firm?
25 A.  I went to Gene Pieper's firm.  I'm

Page 7

1  trying to remember what the name of that thing
2  was -- Thompson, Crounse & Pieper.
3  Q.  And how long were you there?
4  A.  Until 1980, about June.
5  Q.  All right.
6  A.  And I joined Schmid, Mooney, and I'm
7  trying to remember what the name of the firm
8  then.  It was Schmid, Mooney and Frederick.
9  Q.  Okay.  And how long were you with
10 Schmid?
11 A.  Seventeen years I think.  Until
12 November 14, 1997.
13 Q.  Wow, that's amazing you remember the
14 day and month.
15 A.  It's the day before my birthday.
16 Q.  Okay.
17 A.  I gave myself a birthday present.
18 Q.  Got it.  Got it.  And then after --
19 after that firm, the Schmid firm?
20 A.  Starting on the next Monday morning,
21 which was like the 17th, I joined this firm --
22 of counsel -- where I still am.
23 Q.  Okay.  And what areas of law,
24 generally speaking, have you practiced?
25 A.  For the first two and a half years of

Page 8

1  my practice at Matthews, Kelly, I did
2  plaintiff's personal injury, medical malpractice
3  work, and personal injury work from accidents --
4  trial lawyer.
5  Q.  Okay.
6  A.  Starting when I left that firm and
7  went to Thompson, Crounse & Pieper's, I did
8  creditors' rights work.  Pretty much exclusively
9  representation of the lenders, creditors, and
10 banks --
11 Q.  Okay.  And do I -- I'm sorry, go
12 ahead.
13 A.  And then starting in about 1975
14 or '-6, I started representing trustees in
15 bankruptcy in addition to banks.  So
16 representing trustees as opposed to merely
17 creditors, and then I became an elected trustee
18 on occasion in Chapter 7 liquidations about that
19 same time.
20 Q.  And I'm sorry, what year did you
21 become the panel trustee?
22 A.  That's a different question than what
23 I'm answering.
24 Q.  Okay.
25 A.  There was no such thing as a panel

Richard D. Myers
10/3/2023

6 (9 - 12)

Page 9

1  trustee under the Bankruptcy Code -- Act.
2  That's a function of the Bankruptcy Code, which
3  was adopted in 1978.
4      Q.  Okay.
5      A.  So in 1976, when the act was still
6  around, I was occasionally elected as a trustee.
7      Q.  Okay.
8      A.  There were panel trustees, but they
9  were not exclusive.  So in those days, whenever
10 there was an asset case, the creditors would
11 band together and come to the first meeting of
12 creditors and elect a trustee to do the
13 liquidation.
14     Q.  Okay.
15     A.  So I started doing that on behalf of
16 creditors.
17     Q.  Okay.
18     A.  And then in 1978, when the code was
19 passed --
20     Q.  Right.
21     A.  -- that set up a panel of private
22 trustees for Chapter 7, and I was one of the, I
23 think, three original Chapter 7 trustees for the
24 Omaha court.
25     Q.  Okay.

Page 10

1      A.  And I've been serving in that
2  capacity ever since.
3      Q.  So since about 1978, you've been
4  serving as a panel trustee for Chapter 7 cases?
5      A.  That is correct in Nebraska.  And in
6  addition to that, during most of my career, I've
7  also continued to maintain a practice
8  representing lenders and creditors.  Very
9  occasionally debtors, but mostly creditors until
10 I reached 65 years of age, at which time I
11 started decreasing my bank representation, and
12 now my practice hovers on a much more limited
13 practice, which is Chapter 7 trustee work, a
14 little bit of creditors' rights work for
15 lenders, and some individual clients for estate
16 planning purposes.
17     Q.  Got it.
18         And just so that I'm -- to clarify,
19 with regard to your experience representing
20 creditors, I assume that's inside and outside of
21 bankruptcy?
22     A.  Oh, yes, that's correct.
23     Q.  All right.
24     A.  I represent lenders in loan
25 documentation for ethanol plants that never

Page 11

1  involve bankruptcy, for example.
2      Q.  Gotcha.  Okay.
3         And with regard to Chapter 12 cases,
4  have you ever had any involvement in those?
5      A.  I've never been a trustee in a 12.
6  I've never represented a debtor in Chapter 12.
7  I think several -- maybe two or three times --
8  I've represented unsecured creditors in
9  Chapter 12s.  Very limited involvement.
10     Q.  Okay.
11     A.  Prior to the enactment of Chapter 12,
12 when under the Bankruptcy Act, farmer
13 reorganizations were done under Chapter 10, and
14 then after the enactment of the Bankruptcy Code
15 in '78 until, I want to say, mid '80s when
16 Chapter 12 was -- when Chapter 12 was enacted, I
17 represented a couple farm debtors in Chapter 11
18 reorganizations.
19     Q.  Okay.  Got it.
20         But to be clear, you never
21 represented any debtors in Chapter 12?
22     A.  Correct.  Not that I recall.
23     Q.  Okay.
24     A.  I think I would recall it if I had.
25     Q.  All right.  And is it fair to say

Page 12

1  that with regard to the debtors in this case,
2  Kurt and Kathy Kroeger, you've never met them?
3      A.  I've never seen them nor met them.
4      Q.  Okay.  And have you ever --
5      A.  We conducted their first meeting
6  remotely, and so I did it by telephone.  I've
7  never -- to my knowledge, I've never seen them
8  face to face.
9      Q.  And other than at that first meeting,
10 have you ever had any conversations with them,
11 you personally?
12     A.  I don't think so.  I don't recall
13 any.
14     Q.  Okay.
15     A.  I may have, but I don't think I did.
16     Q.  Okay.
17     A.  It would be more -- much more normal
18 for me to talk to their attorney after they
19 converted -- Mr. Patino -- and it may be that
20 they were present and on a speakerphone once
21 when I talked, but I don't recall that.
22     Q.  Okay.  And is it fair to say that
23 until they file -- converted their case to a
24 Chapter 7, you had never seen, met, or spoke
25 with Kurt or Kathy Kroeger?

Richard D. Myers
10/3/2023

7 (13 - 16)

Page 13

A. That's correct.

Q. And, sir, have you been retained as an expert in this case?

A. No.

Q. And do you intend to offer any expert opinions in this case?

A. If somebody asks me for one, I might.

Q. Okay. But to date, have you been asked to --

A. I have not.

Q. -- provide any expert opinions?

Okay. May I ask this, did you -- you said you've spoken with Patino. Have you had any conversations with Patino with regard to the allegations in the Complaint that you filed against the Stehlik Law Firm?

A. I had conversations with Mr. Patino about my inquiry of him as to facts that led to the allegations in the Complaint. I don't think since the filing of the Complaint, I've had any discussions with Mr. Patino about such things.

Q. Okay. And were the discussions you had with Mr. Patino, were they over the phone? Via email?

A. I think both.

Page 15

A. That's what generated the contact.

Q. And did -- do you recall what he told you over the telephone?

A. Well, since I don't recall whether it was a telephonic call or an email, no, I don't.

Q. Okay.

A. In general, I got communicated to me several things that I could summarize for you, if you would like me to.

Q. I would. That would be my next question.

A. Mr. Patino believed that the original counsel, the defendant in this case, had done a generally sloppy job of representing the debtor, had failed to do things that reasonable debtor's counsel would do in a reorganization proceeding, and that it resulted in damages to the Kroegers, and that generated a discussion, from my perspective, as to whether those damages to the Kroegers translated to damages to the bankruptcy estate.

Q. Got it. And other than talk to Mr. Patino, did you do anything else to investigate his, we'll call them allegations, against the Stehliks?

Page 14

Q. Okay. And with regard to the discussions over the phone, how many in total do you think you had with Mr. Patino?

A. Telephone conversations on this case with Mr. Patino?

Q. Uh-huh.

A. Three maybe, four. And I believe they all would have been prior to the occurrence of the 341 meeting of creditors.

Q. All right. And what was -- what were -- what was the nature of those conversations? What was discussed?

A. At some point, Mr. Patino made me aware that he believed I should review the case for a potential malpractice claim. And I don't remember whether that was by telephone call, by face-to-face meeting at some occasion, or how it came to be. But in response to that knowledge, I reached out to him, and I believe that might have been by email -- it could have been by telephone. I don't recall -- to ask what do you think of this thing? What -- what makes you believe that there's a malpractice action that I should administer as an asset?

Q. Okay.

Page 16

A. I believe. This is just a belief, but I believe I looked at the docket --

Q. Okay.

A. -- in the Chapter 12, to get a sense of what pleadings had been filed and what actions had been taken in the case. I believe I looked at some of the pleadings that had been filed in response to motions for relief from stay, and I recall noticing with regard to one creditor -- I think it was John Deere -- that there had been a default on a motion for relief from the stay. Meaning no appearance had been made by the defendant.

Other than that, I don't recall any specific actions I took with regard to -- as far as looking at different documents.

Q. So is it fair to say, then, after you spoke with Mr. Patino, reviewed the docket, your next step was to reach out to counsel to pursue a case?

A. Yeah, I think that's correct.

Q. Okay. At any time prior to the lawsuit being filed, did you ever reach out and speak with Jim Overcash?

A. I don't believe so.

Thomas & Thomas Court Reporters
and Certified Legal Video, LLC

Tel: (402) 556-5000 | Fax: (402) 556-2037
www.ttcrs.com

Richard D. Myers
10/3/2023

8 (17 - 20)

Page 17

Q. Okay. Since the lawsuit has been filed, have you spoken with Jim Overcash with regard to the allegations --

A. I don't recall --

Q. -- in the Complaint?

A. -- that I've had any discussions with Mr. Overcash about this case. I've had lots of conversations --

Q. Sure.

A. -- with Mr. Overcash because he's a fellow trustee --

Q. Yeah.

A. -- but I don't recall that I've ever discussed anything with him about this case.

Q. Okay. Have you --

A. -- and I frankly see no reason for it.

Q. Prior to -- well, at any time, have you ever had any conversations with Galen Stehlik?

A. I've had dozens of conversations with Galen Stehlik because he has over the years been counsel for many Chapter 7 debtors where I've been the trustee. I believe that I had a call from Mr. Stehlik at some point after the lawsuit

Page 18

was filed and prior to appearance by his attorneys.

Q. Sure.

A. And my general recollection is he expressed surprise of why hadn't I called him before I filed suit --

Q. Okay.

A. -- something to that extent. I declined to comment, and that ended the conversation.

Other than that, I don't believe I've had any conversation with Mr. Stehlik about the suit since it's been filed.

Q. Okay. And prior to the suit, there would have been no discussion with regard to --

A. I -- I don't --

Q. Hang on. Let me finish the question. Prior to the suit, there would have been no discussion with Mr. Stehlik with respect to any of the allegations in the Complaint?

A. I don't recall any discussion with Mr. Stehlik other than at the 341 meeting of creditors when he appeared with the Kroegers, prior to the filing of the lawsuit.

Q. Okay.

Page 19

A. So let me amplify. After the conversion, the court sets a meeting of creditors separate from the one that was had in Chapter 12, and the Kroegers are required to appear at that Chapter 7 first meeting of creditors. They were, I think, represented by Mr. Patino.

Q. Uh-huh.

A. And I believe that I recall having a discussion where I made inquiry of -- of the defendant after the first meeting of creditors about the facts of whether H & M -- I think that's the right name -- one of the LLCs or the corporate entities that were owned by the debtors were the subject of a separate bankruptcy case, and I believe I called him and asked him that.

Other than that, I don't recall any other discussions with Mister -- with the defendant.

Q. Okay. And to be clear, Mr. Stehlik didn't appear at the 341, did he?

A. Not to my recollection --

Q. Okay.

A. -- I think only Mr. Patino did.

Page 20

Q. Got it. So these would have been conversations you had after or around the time of the 341?

A. Yeah, maybe the same day.

Q. Okay. And the focus of that discussion wasn't necessarily anything in the Complaint but rather --

A. No. I was trying to find out if the entities that are mentioned in the schedules in this case were represented by him in separate bankruptcy cases. It was easier than searching the docket, frankly.

Q. Got it. And do I take it he answered your answer, and that was the end?

A. I believe he answered in the negative.

Q. Okay. All right.

(Exhibit 2 marked for identification.)

BY MS. GOODMAN:

Q. All right. I've handed you what has been marked as Exhibit 2 to the deposition here. As I understand it, this is a -- email chain between you and Mr. Patino. If you could just review this; I've got some questions when you

Richard D. Myers
10/3/2023

9 (21 - 24)

Page 21

1  have a second.
2      A.  I've reviewed the document,
3  Exhibit 2.
4      Q.  Okay.  And you would agree with me,
5  sir, that this is an email communication between
6  you and Mr. Patino?
7      A.  There are several communications
8  referenced here, some of which are between me
9  and Mr. Patino.  One is with my counsel.
10     Q.  Diana.
11         All right.  Perfect.
12         If we could start at the top here,
13  this appears to be an email between you and
14  Mr. Patino.  You write, "If I presume that he
15  messed up" -- presumably referring to Stehlik --
16  "he messed up most of the Chapter 12 case, I'm
17  trying to figure out what damages would be
18  attributable that would inure to the benefit of
19  the BK estate and creditors.  It appears to me
20  that the debtors never had any equity in their
21  assets and a Chapter 12 case was likely never
22  going to succeed.  So if that is true, I'm
23  trying to figure out how filing a Chapter 12 and
24  paying Stehlik hurt creditors or debtors in a
25  way that translates into a claim against

Page 22

1  Stehlik."
2         Okay.  First off, did I read that
3  correctly?
4      A.  You read a portion of the email
5  correctly.
6      Q.  Okay.
7      A.  You left out the first sentence and
8  you left out the last sentence, but other than
9  that, you read it correctly.
10     Q.  Thank you.
11         So the first question I have is when
12  you say, "It appears to me that the debtors
13  never had any equity in their assets"; can you
14  explain?  When you say "equity" how -- what --
15  what does that mean to you?
16     A.  Value of asset minus liens and sale
17  expenses equals equity.
18     Q.  Okay.  All right.  And so when you
19  say, "It appears to me that the debtors never
20  had any equity in their assets," what were you
21  reviewing in order to come to that belief?
22     A.  I think at the time I wrote this
23  email, which was after the first meeting of
24  creditors by about two weeks, what I had in my
25  head was the sale price received by BankFirst

Page 23

1  for real estate, minus their debt, and I came up
2  in that calculation with a zero, and so I was
3  concluding, at least at that point, that there
4  appeared to be no equity in the assets.
5      Q.  Got it.  Okay.
6         And then at some point in time, do I
7  take it that belief changed?
8      A.  Yes.
9      Q.  Okay.  When -- at what point in time
10  did that belief change?
11     A.  I reviewed the various schedules of
12  asset values that the debtors had filed, which
13  showed a much larger aggregate value of real
14  estate at the start of the case than the number
15  that the bank realized when it eventually sold
16  the real estate post Chapter 12 plan.
17         And, secondly, I had learned more
18  information from reviewing the equipment values
19  as opposed to what the various creditors' debt
20  amounts were.  It caused me to believe that
21  there was a likelihood of equity at the start of
22  the case that didn't exist at the end of the
23  case.
24     Q.  Okay.  With regard to the equity
25  values what -- excuse me, the equipment values,

Page 24

1  what were you reviewing that -- that led you to
2  that conclusion?
3      A.  The debtor schedules basically.
4      Q.  Okay.  So all of the information, is
5  it fair to say, came from the debtors' schedules
6  that you relied on in terms of value?
7      A.  At the time of this email string,
8  yes.
9      Q.  Okay.  Okay.  All right.  So down
10  below in the next -- so then in response to your
11  question to Mr. Patino, it appears that he
12  responded to you via email; is that correct?
13     A.  Yes.  And this is -- Exhibit 2
14  contains what I believe the response was.
15     Q.  Okay.  Perfect.
16         And if you look at this, he believes
17  that there's approximately $12 million, and then
18  he says, "this did not include the value of the
19  water and mineral rights."
20         Has the estate recognized or pursued
21  any value related to water or mineral rights?
22     A.  Well -- well, recognized in the sense
23  that it's listed in my Report of Assets of the
24  Chapter 7 estate, and I abandoned the asset.
25     Q.  Okay.

Richard D. Myers
10/3/2023

10 (25 - 28)

Page 25

1    A.  So yeah, I've recognized it, but the
2  estate hasn't pursued it.
3    Q.  And is the reason the estate hasn't
4  pursued it because in your opinion those rights
5  had no value?
6    A.  That is correct.  No recognizable
7  realizable value by the estate.
8    Q.  And can you help me out, is --
9    A.  I didn't think it would be worthwhile
10  to spend attorney fees trying to collect what I
11  would collect because I wouldn't net anything.
12    Q.  Okay.  Thank you.
13    A.  Frankly, let me add that I believe at
14  some point Mr. Patino asked me, perhaps by
15  email, to confirm that I was not pursuing him
16  because the Kroegers wanted to contemplate doing
17  it themselves.  And I think my response -- I
18  think I've seen an email where I responded,
19  which is what's refreshing my recollection,
20  where I've said, I've abandoned that, so you're
21  free if you want to.
22        Because my -- my indication of when I
23  determined that I wasn't going to pursue mineral
24  rights, water rights claims was shortly after
25  the first meeting of creditors.

Page 26

1    Q.  Okay.
2    A.  In July of '21.
3    Q.  Got it.  Okay.
4      All right.  Other than review the
5  docket, have discussions with Patino with
6  regards to his view of potential malpractice
7  claim, did you do anything else to investigate
8  the claim prior to filing suit?
9    A.  Not that I recall.
10    Q.  Okay.  And did you do anything
11  else -- I assume this is encompassed in your
12  answer, but did you do anything to review the --
13  or independently verify the values that were
14  listed on the bankruptcy schedule?
15    A.  I haven't done anything to
16  independently determine the value at any point
17  in time of the real estate.  Whether my counsel
18  has, I'm -- I'm not aware as we sit here --
19    Q.  Okay.
20    A.  -- whether -- I -- I -- at some
21  point, I've reviewed an appraisal that predates
22  the bankruptcy, so I guess in that sense I've
23  done something to look at the values of the real
24  estate.  I calculated with my calculator the per
25  dollar acre amounts that were reflected in the

Page 27

1  schedules to see if they were in my judgment
2  generally realistic, but I don't think I've done
3  anything else personally to review the real
4  estate values.
5    Q.  Okay.  And you haven't engaged -- you
6  personally, as trustee, have not engaged any
7  third parties to review the values?
8    A.  I frankly know not what my attorney
9  has done.  I have done nothing.
10    Q.  Okay.  And at trial, you don't
11  intend, do you, sir, to offer any opinion or
12  evidence with regard to the value of any of the
13  assets?
14    A.  I have no plan to do anything at
15  trial other than be the plaintiff.  My attorney
16  could answer better.  Whether she expects me to
17  testify as an expert, I don't know.
18    Q.  But to date, you haven't been asked
19  to testify as an expert?
20    A.  That's correct.
21    Q.  All right.
22        (Exhibit 3 marked for
23        identification.)
24  BY MS. GOODMAN:
25    Q.  Sir, I've offered you what has been

Page 28

1  mark as Exhibit 3 to this deposition, and to
2  confirm, is this a copy of the Complaint that
3  was filed by you in connection with the Kroeger
4  Chapter 7 bankruptcy case against Stehliks?
5    A.  I have no idea.  I presume that
6  you've copied it correctly.  I have no reason to
7  doubt it.
8    Q.  Okay.  Did you review the Complaint?
9  Well, strike that.
10        Did you have any role in drafting the
11  allegations in the Complaint?
12    A.  I was asked to look at a draft of the
13  Complaint by my counsel.
14    Q.  Okay.
15    A.  I responded with some suggestions I
16  think by email, perhaps orally.  Then I looked
17  at a revised -- at least one revised Complaint
18  and eventually indicated to my counsel that I
19  thought it was acceptable from my perspective
20  all prior to filing.
21    Q.  Okay.  Sir, if you can turn to
22  Page 14 of this document.
23    A.  Referring to Exhibit 3, I gather?
24    Q.  Correct.  I'm focused on Paragraph 54
25  where it says, "As a result of the actions set

Richard D. Myers
10/3/2023

11 (29 - 32)

Page 29

1 forth above, BankFirst acquired real property
2 worth approximately twice the amount of the debt
3 owed by the debtors, depriving debtors of any
4 benefit from their assets." Do you see that?
5    A.  I do.
6    Q.  Okay.  Do you know what facts this
7 paragraph is based on?
8    A.  I believe it's based upon a set of
9 several facts.  One is the values that the
10 debtors and defendant placed in the bankruptcy
11 schedules.
12        Second is a calculation of a
13 prebankruptcy appraisal valuation, plus what
14 I've perceived to be market increase from the
15 time of appraisal until the time of liquidation
16 of real estate by the bank.
17    Q.  This market increase from the time of
18 the bankruptcy to the point of liq- --
19    A.  No, the time of the appraisal until
20 the time of liquidation by the bank.
21    Q.  Okay.
22    A.  In other words, that two or three
23 years between the appraisal and the liquidation.
24 Farmland in my judgment in Nebraska was probably
25 going up slightly, so that the appraised value

Page 30

1 would represent a low ebb in the valuation of
2 the time between the appraisal, the bankruptcy
3 filing, and post-plan when the real estate was
4 sold.  I think it was worth more, not less, by
5 the time the bank sold it than it was at the
6 time of the original appraisal.
7    Q.  Okay.  So a couple of questions.
8 First off, this appraisal that you're referring
9 to that was done prebankruptcy, was the
10 appraisal done by BankFirst?
11    A.  Yeah, I believe it was commissioned
12 by BankFirst.
13    Q.  Commissioned by BankFirst?
14    A.  Yes.
15    Q.  So and that would have been --
16    A.  That's the only one I'm aware of.
17    Q.  Okay.  And I just want to make sure
18 there aren't any others other than that one?
19    A.  Not that I'm aware of.
20    Q.  Okay.  And, I guess, sir, what
21 experience do you have in terms of, you know,
22 believing that -- well, what's your basis for
23 saying the market went up from that point of
24 that appraisal to the time --
25    A.  I've --

Page 31

1    Q.  -- hang on -- to the time that the
2 bank -- to the time that the bank sold the
3 property?
4    A.  I represented First National Bank of
5 Omaha's ag lending department for about
6 25 years --
7    Q.  Okay.
8    A.  -- which encompassed most of the time
9 we're talking about.  It was then, and I think
10 may still be, one of the largest ag lenders in
11 Nebraska, including farm real estate.
12        I've represented Jack Nitz &
13 Associates land brokers and auctioneers for
14 30 years, which is in the principal business of
15 selling farm real estate in Nebraska.
16        I've represented Norwest Bank and now
17 Wells Fargo.  I've represented U.S. Bank in ag
18 lending for 25 years prior to the time of this
19 bankruptcy.
20        My father owned a -- or was manager
21 of a farm management company in Fremont called
22 Pathfinder Company that managed farm real estate
23 for his entire career during my youth.
24        And based upon all of those things,
25 I've gained a general knowledge of the market

Page 32

1 fluctuations in farm real estate.
2        But based upon all of those examples
3 of my experience, I've concluded that during the
4 period 2018 to 2020, generally farm real estate
5 went up, not down, in value, and that's the
6 basis for my statement earlier.
7    Q.  Okay.  To be clear, have you ever
8 been employed by your father's company?
9    A.  No.
10    Q.  Okay.
11    A.  Which company was the Pathfinder
12 Company, which is now owned by First National
13 Bank of Omaha.
14    Q.  Okay.  With regard to -- so is it a
15 fair characterization to say that the experience
16 that you're relying on in connection with
17 your -- your belief that the market increased
18 from 2018 to 2020 is really through your
19 experience as an attorney representing creditors
20 in the ag center --
21    A.  Absolutely.  Absolutely.
22    Q.  Ag sector?
23    A.  Absolutely.
24    Q.  Okay.  Other than that experience, do
25 you have any other experience you're relying on

Page 33

1   in connection with this -- with your belief that
2   the value increased from 2018 to 2020?
3       A.  With regard to Paragraph 54, no,
4   that's the extent of it.
5       Q.  Okay.  Incidentally, do you have --
6   with regard to the Complaint and the allegations
7   in it, do you have personal knowledge of any of
8   the allegations in here?
9       A.  Yes, I guess I do in the sense that
10  as trustee, I reviewed some of the pleadings,
11  and so some of the allegations are alleging
12  omissions or actions by the defendant, which
13  I've observed by reviewing the docket and the
14  pleadings.  So to that extent, yes, they're
15  based upon some things that are in my personal
16  knowledge.
17      Q.  Got it.  And with regard to this
18  personal knowledge, would you say this is --
19  your knowledge is really based on more of a
20  hindsight perspective?  In other words, you
21  reviewed these facts after they occurred?  You
22  weren't involved in the facts as they occurred;
23  is that fair?
24      A.  That's absolutely true.
25      Q.  Okay.

Page 34

1       A.  My knowledge of this case started
2   with the conversion of the case to Chapter 7,
3   shortly thereafter, and I had no knowledge of
4   any of the actors or the facts prior to the
5   conversion date certainly.
6       Q.  And is it a fair statement, sir, that
7   any knowledge you do have now would either come
8   through reviewing the bankruptcy filings that
9   were made in the Chapter 12 case, talking to
10  Patrick Patino -- and talking to Patrick Patino?
11      A.  No, that's not true.
12      Q.  Okay.
13      A.  In addition, I've reviewed much of
14  the discovery in this case, including
15  depositions of Mr. Peiffer, deposition of
16  Mr. Stehlik, and I've reviewed pleadings that
17  have been filed in the case.  So all of those
18  things contribute to my present knowledge.
19      Q.  Okay.  All right.  But other than
20  those things, there's nothing else?
21      A.  Other than all of the pleadings in
22  the case, all of the discovery in the case, my
23  knowledge of the case since May 25, 2021, that's
24  what I base my knowledge on.
25      Q.  Excellent.

Page 35

1       All right.  If we look at
2   Paragraph 55 on the next page, the allegation
3   starts with "By the time a plan was confirmed,
4   Debtors' financial position had deteriorated to
5   the point where they could not leverage their
6   assets to offset debts and were forced to
7   liquidate all non-exempt assets."
8       The next sentence is "If debtors had
9   been advised to sell certain assets to reduce
10  their debts, they would have been able to
11  finalize the Chapter 12 reorganization with some
12  remaining assets and would have been able to
13  continue doing business as H & M Farms and
14  Performance Crops, LLC."
15      Do you see that?
16      A.  I do.
17      Q.  Okay.  What asset, sir, are you
18  referring to?  Because you say "to sell certain
19  assets," what assets are you referring to here
20  in that allegation?
21      A.  It's not intended to refer to a
22  specific asset but rather of the failure of the
23  defendant to advise the debtors to pick out
24  assets to sell.  So I would have worded
25  Paragraph 55 differently than saying "if debtors

Page 36

1   had been advised to sell," and simply said, "if
2   debtors had sold certain assets, they would have
3   been able to do this."  And the malpractice
4   allegation, I suppose, is that they weren't
5   advised to or pushed more strongly to do it.
6       Q.  Okay.
7       A.  The problem from the debtors'
8   perspective is that they failed to accomplish a
9   sale earlier of some of their assets, and that
10  would have avoided, I suspect, the result that
11  actually occurred.
12      Q.  Okay.  So sitting here today, you
13  can't pinpoint certain assets that you were
14  referring to with regard to that allegation?
15      A.  I probably could, but what I'm trying
16  to tell you is I don't think it's necessary that
17  I identify a particular asset for the conclusion
18  I reached.  The conclusion I reached is they
19  should have picked some assets to sell.  It
20  didn't matter which ones.  Some of them being
21  sold could have alleviated the eventual bad
22  result.
23      Q.  Okay.  And then at the end here, you
24  say, "A money judgment in an amount to be proved
25  at trial of at least $4,000,000."

Richard D. Myers
10/3/2023

13 (37 - 40)

Page 37

1    Do you see that?
2    A.  I do.
3    Q.  And how did you calculate the four
4 million dollars?
5    A.  I didn't calculate that number.
6    Q.  Who did?
7    A.  I presume my counsel.
8    Q.  Okay.  Do you have any understanding
9 where that number came from?
10    A.  I don't have any understanding of
11 where the four million came from, no.
12    Q.  And do I understand, sir, that you
13 are no longer seeking that amount in this case?
14    A.  I don't want to give you a conclusion
15 like that because I don't want to give you what
16 lawyers call an omission against interest.  My
17 belief is that my ability to prove damages is
18 less than that but greater than one million.
19    Q.  Okay.  Would you agree with me, sir,
20 that with regard to Paragraph 55 that we just
21 talked about, the debtors -- where you say, "If
22 debtors had been advised to sell certain assets
23 to reduce their debt, they would have been able
24 to finalize the Chapter 12 reorganization," that
25 presumes, does it not, that the debtors were

Page 38

1 interested in selling some of the assets; is
2 that a fair statement?
3    A.  No, it presumes whether or not the
4 fact of the sale would have occurred.  It
5 doesn't matter what they were interested in
6 doing.  It's a question of whether it was done
7 or not.
8    Q.  Okay.  But if the debtors refused to
9 sell assets --
10    A.  That's different than what they were
11 interested in, isn't it?
12    Q.  Okay.
13    A.  Every -- every client I've ever had
14 in a reorganization --
15    Q.  Yeah?
16    A.  -- and most of the debtors that have
17 been on the other side when I've represented
18 secured creditors have expressed reluctance to
19 get rid of anything.
20    And if you allow me to, let me tell
21 you what I've always suggested every
22 reorganization debtor be told when I've
23 represented reorganization debtors.
24    Q.  Before you do so, how many total
25 reorganization debtors have you represented?

Page 39

1    A.  Represented?  Probably 20.
2    Q.  In a Chapter 7?
3    A.  No.  There's not such thing as
4 reorganization in 7.
5    Q.  You're right.  You're right.  You're
6 right.
7    A.  Chapter 10, Chapter 11, and
8 Chapter 13.  But I'm talking about the 10 and 11
9 debtors that I've represented.
10    Because when you owe multi-million
11 dollars and you have multi-million dollar assets
12 is what I'm talking about.
13    Q.  Uh-huh.
14    A.  I've always told my clients directly,
15 and I think every good layer does, that if
16 you're going to file a reorganization, it's
17 going to cost you a bundle of money, and I won't
18 take the case and you shouldn't pay me to take
19 the case unless you agree to do one of the
20 following three things.  One is find a way to
21 make a profit to pay your creditors because you
22 can't do it now, or, two, liquidate sufficient
23 assets on your terms to pay the debt, or pray
24 for a miracle because that's the only way you're
25 going to get out of this case.

Page 40

1    And every debtor wants to pray for a
2 miracle, and I say, "If you want to do that,
3 great, but you've got 90 days for the miracle to
4 happen, and then we're going to do one of the
5 other two, which is sell some assets or make a
6 profit, and you can't continue to sit on all of
7 these assets and let the debt increase forever."
8    And I agree with Mr. Pfeiffer's
9 conclusion in the deposition you took of him,
10 sitting on this stuff cost them $1,700 a day in
11 interest, and it's -- it's almost criminal that
12 the case continued on and on and on without
13 anything happening that could have saved them
14 several hundred thousand dollars of remaining
15 assets, could have solved the problem and
16 reorganized them without the terrible result
17 they ended up having.
18    Q.  Okay.  But you would agree, would you
19 not, that selling assets is one thing, making a
20 profit, another scenario, is generating a profit
21 that's sufficient enough to pay creditors?
22    A.  Yeah, either one of which is a
23 solution.
24    Q.  Okay.
25    A.  Doing nothing is not a solution.

Thomas & Thomas Court Reporters
and Certified Legal Video, LLC

Tel: (402) 556-5000 | Fax: (402) 556-2037
www.ttcrs.com

Page 41

1    (Exhibit 4 marked for
2    identification.)
3  BY MS. GOODMAN:
4    Q.  Sir, I've handed you what has been
5  marked as Exhibit 4 to your deposition.  This is
6  a Proof of Claim, I'll represent, that was filed
7  in connection with the Kroegers' Chapter 12 case
8  by BankFirst.  Have you seen this Proof of Claim
9  before?
10    A.  I don't know that I have.
11    Q.  Okay.
12    A.  I mean, I think I knew that it was
13  filed.  I don't think I've ever reviewed it.
14    Q.  Okay.  And to be clear, when we've
15  seen references to about eight million dollars
16  of loans, was it your understanding that was
17  about the total that was owed to BankFirst in
18  connection with the loans they had with the
19  Kroegers?
20    A.  I think I had a lower number in my
21  mind.  At the time the bankruptcy was filed, I
22  was thinking it was seven.
23    Q.  Seven million?
24    A.  At the time of the bankruptcy filing,
25  yeah.

Page 42

1    Q.  Okay.
2    A.  That's at least what's in my mind.
3    Q.  Sure.  Sure, sure, sure.
4    So if you flip to what is Page -- and
5  this is double -- I'm sorry, sir, this is
6  double-sided too just so that it wasn't huge --
7  yep, that's it.
8    A.  I'm looking at Exhibit A to the claim
9  called Itemization to Claim --
10    Q.  Yep.
11    A.  -- which is about Page 4 or 5 of the
12  claim -- of the exhibit.
13    Q.  Okay.  And you can see here, sir,
14  there's about 7.7 million dollars that BankFirst
15  is claiming is owed as of February 28th of 2020?
16    A.  Which is the date of filing of the
17  Chapter 12.  I see that.
18    Q.  Okay.  And, obviously, that claim
19  amount involves some -- some interest -- accrued
20  interest at the time and some penalties.
21    Do you have any reason to dispute,
22  sitting here today, that that was the amount
23  owed as of the bankruptcy filing by BankFirst?
24    A.  I don't have any understanding at all
25  as to whether this is the amount owed by the

Page 43

1  Kroegers or H & M or the other entity that
2  Kroegers owned or all three.  I just have no
3  knowledge.
4    Q.  Okay.  But I guess my question was a
5  little different.  You don't have any reason to
6  dispute that what they filed was the amount
7  owed by the Kroegers or their businesses?
8    A.  I have no reason to doubt the
9  veracity of the claim.
10    Q.  Okay.  All right.  And you'll see
11  here, sir, that these -- there's four total
12  notes that add up to the 7.7 million.  Do you
13  see those listed?
14    A.  I do.
15    Q.  Okay.  And was it your understanding,
16  sir, that all of these notes were
17  cross-collateralized?
18    A.  I don't know that I had an
19  understanding.  I've assumed that that was the
20  case.
21    Q.  Okay.  And just so I'm clear, with
22  regard to cross-collateralized notes, if you
23  attempt to sell one piece of property by virtue
24  of the loan agreement and the security
25  agreement, the proceeds of that collateral all

Page 44

1  go to pay down the bank -- the lender,
2  correct --
3    A.  No.
4    Q.  -- unless the lender consents?
5    A.  No, not at all.
6    Q.  Okay.
7    A.  That's not true.
8    Q.  Okay.  And why isn't that true?
9    A.  You just described what happens in a
10  non-bankruptcy context.  That's not a -- that's
11  not a requirement of any bankruptcy proceeding.
12  You can propose to pay less, some, all, or none;
13  propose to pay other creditors; propose to
14  retain for operating needs.
15    All of those requirements go out the
16  tube when you ask for an order of the court.  An
17  alternative would be to get the bank's consent,
18  but if the creditor is shown to be over-secured,
19  it's regularly and customarily not the case that
20  all of the proceeds go to the
21  cross-collateralized legal.
22    Q.  Okay.  And that's by virtue of the
23  bankruptcy, the debtor being in bankruptcy?
24    A.  Yes, ma'am.  So -- and that -- that
25  goes to the heart of the Complaint is that no

Page 45

1  attempts apparently were ever made to use the
2  Bankruptcy Code to provide that advantage and
3  that possibility to the debtor.  It was they get
4  it all, and we'll give you a drop dead clause,
5  or we'll pay you the whole amount.
6       And for the whole time of Chapter 12,
7  nothing else occurred.  The whole reason they
8  were there was to take advantage of the
9  Bankruptcy Code, and in my judgment, they didn't
10 do it.
11     Q.  Okay.  But there was a Chapter 12
12 plan confirmed, correct?
13     A.  Yes.
14     Q.  All right.
15     A.  Not one that really was
16 well-designed, but it got it confirmed, yeah.
17     Q.  Okay.  And I just want to make sure,
18 you don't have any dispute the bank had a
19 security interest in all of the land or had a
20 lien on the land and then a security interest in
21 all of the farm equipment, correct?
22     A.  I'm not in a position to agree or
23 disagree.  I was never -- I've never been in a
24 position where it would have been any ability of
25 me to take a different position because it was

Page 46

1  already accomplished.  The liquidations had
2  already been done by the time I became trustee
3  in this case.  So my -- all I would be doing is
4  wasting my time trying to come up with an
5  opinion.  I have no knowledge of anything that
6  would cause me to doubt their -- their
7  perfection and validity of their security
8  interest, but I've never really looked at it to
9  examine it and conclude.
10     Q.  Got it.  And that's what I'm getting
11 at.
12       And assuming the bank -- just to be
13 clear, assuming the bank is secure with regard
14 to its claim, it would be entitled to default
15 interest after bankruptcy along with attorney's
16 fees, correct?
17     A.  Not necessarily.
18     Q.  Okay.
19     A.  To get attorney fees and
20 post-bankruptcy interest, it's required that
21 there be value in excess of their debt.  And so
22 the whole idea of charging interest and attorney
23 fees post-bankruptcy, it's only allowed if there
24 is available value in the real estate.  If the
25 bank did that, which this bank did, to me that's

Page 47

1  tantamount to admitting by the bank that there
2  was equity in the real estate.  It was being
3  used up daily by the accrual of interest and
4  default interest and attorney fees.
5       Q.  Okay.
6       A.  So that's why I didn't bother to go
7  further in trying to determine equity.  The fact
8  that BankFirst, as best I can tell, never sought
9  relief from the stay and claimed post-petition
10 interest and attorney fees, my conclusion is
11 they agreed there was equity in the real estate
12 during the Chapter 12.
13     Q.  Okay.
14     A.  Otherwise, they would have been
15 seeking relief.
16     Q.  But assuming there is equity in the
17 real estate, they can assess default interest?
18     A.  Absolutely.
19     Q.  Okay.
20     A.  And the debtor has the right to sell
21 real estate, as we discussed before, and use the
22 proceeds for other than all payment to the bank.
23     Q.  And to the extent the bank objects,
24 it would need to -- the debtors would need to
25 overcome that objection in order to get their

Page 48

1  plan confirmed?
2       A.  Absolutely.  Well, in order to get an
3  order of sale.
4       Q.  Right.
5       A.  The problem isn't the plan.  The
6  problem that I'm talking about is that the
7  defendant didn't attempt to sell a portion of
8  the real estate of the debtor, and that would
9  have been a question he could have confronted is
10 in litigating with the bank whether some
11 property could be sold and some money retained
12 for the use of other creditors.  He never tried
13 it.
14     Q.  And had he tried it, there's no
15 guarantee, you'd agree with me, that that would
16 have worked?
17     A.  There's very little that's guaranteed
18 in bankruptcy, and that's one of the things that
19 isn't guaranteed.  It depends on the talent of
20 the advocate in many cases and facts as well.
21     Q.  Got it.  Okay.
22          (Exhibit 5 marked for
23          identification.)
24 BY MS. GOODMAN:
25     Q.  All right.  Sir, I've offered you

Richard D. Myers
10/3/2023

16 (49 - 52)

Page 49

1  what has been marked as Exhibit 5 to your
2  deposition.  This is Plaintiff's Supplemental
3  Answers to Defendants' First Set of
4  Interrogatories to Richard D. Myers, Trustee.
5  Do you see that?
6      A.  I do.
7      Q.  And the first thing I want to ask
8  here, I did not see that these interrogatories
9  responses, which were served on September 15th,
10  were verified, and as I understand that
11  verification is forthcoming?
12          MS. VOGT:  Right.
13  BY MS. GOODMAN:
14      Q.  Okay.  But what I want to just make
15  sure is that it is, in fact, coming, and that
16  this is the set of answers that the -- that you
17  as plaintiff are going to verify and confirm is
18  true?
19      A.  Let me say this, and I recognize I'm
20  under penalty of perjury, my counsel provided me
21  at least one draft of the Supplemental Answers
22  to Interrogatories.  We had discussion.  She
23  revised, I believe, the Answers to
24  Interrogatories pursuant to my request and
25  suggestions, and the document that she sent to

Page 50

1  me, which is, I presume, the one that was filed,
2  is to the best of my knowledge true, complete,
3  and accurate, and I do so swear.
4      Q.  Okay.  And is this that document?
5      A.  I don't know.  I could go look at my
6  email and see if it is.  I have no reason to
7  doubt it.
8      Q.  Okay.
9      A.  But if she wants to present me with
10  one that she says is a true copy of what I
11  reviewed, I'm happy to be notarized.
12      Q.  Perfect.  No.  That's good.
13          MS. VOGT:  And I will send you
14  the written verification.  There's actually one
15  saved in the folder under it.  It's just sitting
16  there in the folder.
17          MS. GOODMAN:  Okay.
18  BY MS. GOODMAN:
19      Q.  Okay.  So I guess --
20      A.  Well, let me do this.
21          THE WITNESS:  Can you affirm to
22  me that this is, in fact, the document that I
23  approved?
24          MS. VOGT:  Yes.
25          THE WITNESS:  This Exhibit 5?

Page 51

1          MS. VOGT:  Yes.
2          THE WITNESS:  Okay.
3  BY MS. GOODMAN:
4      Q.  All right.  Sir, so with regard to
5  the first interrogatory, which asks you to
6  "Identify each and every asset that plaintiff
7  contends defendants should have advised Kurt and
8  Kathy Kroeger to sell or to reduce their debts,
9  as alleged in Paragraph 55 of the Complaint,"
10  there's a response and then there's a
11  supplemental response.  So, I guess, just -- I
12  assume that the supplemental response is meant
13  to build on the initial response as opposed to
14  superseding, but I wanted to confirm that.
15      A.  I don't know that I can answer your
16  question.  My attorney used her legal expertise
17  to develop this format, and I'm unable to
18  conclude that I'm able to answer your question.
19      Q.  Okay.  Well, I guess then can --
20          MS. VOGT:  Let me just say this.
21          MS. GOODMAN:  Yeah.
22          MS. VOGT:  If I thought that
23  anything in the supplemental responses
24  contradicted what was in the original response,
25  I would have taken it out or said something.

Page 52

1          MS. GOODMAN:  Okay.  So it's
2  meant to build on?
3          MS. VOGT:  Yes.
4          MS. GOODMAN:  We can make that
5  assumption?
6          MS. VOGT:  Uh-huh.
7          MS. GOODMAN:  Fair enough.
8  BY MS. GOODMAN:
9      Q.  All right.  So with regard to the
10  response to No. 1, down below, the second
11  sentence says, "Rather, plaintiff alleges that
12  given the value of debtors' assets compared to
13  the amount of their debts, all as shown in the
14  filings in the Chapter 12 Bankruptcy Court
15  filings," and I'll stop there.
16      The bankruptcy court filings, there
17  were original schedules and then amended
18  schedules.  Which schedules were you relying on,
19  sir?
20      A.  All.
21      Q.  All of them?
22      A.  Yeah, there's more than one
23  amendment.  I think there were three or four,
24  maybe five, amendments to the schedules.
25      Q.  Okay.

Richard D. Myers
10/3/2023

17 (53 - 56)

---

Page 53

1    A.  Not all of which changed the value of
2  the assets.  Some of the amendments dealt with
3  other matters.
4    Q.  Got it.  All right.  It goes on to
5  say, "Defendants failed to inform the debtors
6  that the sale of some assets with permission of
7  the bankruptcy court could reduce their debts."
8  And I think we just talked about that some
9  assets -- can't identify any specific assets --
10 the idea is though that, in your opinion, the
11 assets, some things should have been sold via
12 sale motion in order to reduce the debt load?
13   A.  Yes, but in addition to reducing the
14 debt load, it would have, I believe, changed the
15 relationship to the debtor between BankFirst and
16 the debtors.
17   Q.  And how so?
18   A.  Banks like payments.  Banks like
19 action.  The last thing my bank clients ever
20 wanted was to have to foreclose and sell real
21 estate and manage it in the meantime.  So any
22 proposal that gets them cash without diminishing
23 their ultimate ability to get paid in full is
24 thought to be a good thing by a bank.
25    So when you do good things instead of

---

Page 54

1  slamming the door in their face, you get better
2  results.  So yeah, they could have -- my
3  conclusion is they could have and should have
4  sold some things to pay down the debt, that
5  would have decreased the interest accrual, which
6  Mr. Peiffer dealt with brilliantly in his
7  deposition.
8    It would have also changed the
9  relationship between a bank that didn't want to
10 deal with these debtors, I think for the better.
11 And finally, it would have converted the
12 attitude of the debtors to one that made them
13 more compliant for the suggestions that should
14 have been made.
15   Q.  And when you say it would have
16 changed the relationship with the bank, you seem
17 to speak in certainty, and I just want to be
18 clear; have you talked to the bank at all?
19   A.  Not at all.
20   Q.  Okay.  So you've never talked to
21 anybody at BankFirst with regard to these?
22   A.  No.  My -- my comment was made based
23 upon representation of banks and thousands of
24 transactions.
25   Q.  Okay.  So it was --

---

Page 55

1    A.  And I believe BankFirst probably is
2  like every other bank I've ever dealt with.
3    Q.  Okay.  But you're assuming that,
4  correct?
5    A.  I sure am.
6    Q.  All right.  So when we go, sir, down
7  on the second page of Exhibit 5, there's a
8  supplemental response.  Do you see the "Second
9  Supplemental response"?
10   A.  I do.
11     MS. GOODMAN:  Okay.  And, Diana,
12 just to be clear here, I just noticed this
13 "Second Supplemental response."  Was there a
14 first?
15     MS. VOGT:  Yes.  I think it was
16 the same thing but less detail in terms of how I
17 got the numbers.
18     THE WITNESS:  A different
19 pleading.
20     MS. VOGT:  I'll have to find it.
21     MS. GOODMAN:  Okay.
22     MS. VOGT:  Sorry.
23     MS. GOODMAN:  No problem.
24 BY MS. GOODMAN:
25   Q.  Well, let's stick with the second

---

Page 56

1  supplemental for now here.  A proposal should
2  have been made to the bank and permission
3  requested from the court to allow the Kroegers
4  to sell Tracts 6, 8, and 9 of the real property.
5  Do you see that?
6    A.  I do.
7    Q.  All right.  And I just want to be
8  clear because you said earlier it wasn't
9  necessary to define -- or to necessarily pick
10 any specific assets out in order to determine
11 to --
12   A.  I think you're mischaracterizing my
13 testimony --
14   Q.  Let me --
15   A.  -- and I object to it.
16   Q.  Okay.  Let me finish my question
17 please, and then you can jump in.
18    So you said earlier that it wasn't
19 necessary, and this is what I heard, maybe I
20 heard it wrong, that certain assets be picked
21 out in order to determine damages here.  But
22 here it seems like you are picking out certain
23 assets.  So with that, did I misunderstand
24 something?
25   A.  I think you've mischaracterized -- I

---

Thomas & Thomas Court Reporters
and Certified Legal Video, LLC

Tel: (402) 556-5000 | Fax: (402) 556-2037
www.ttcrs.com

Richard D. Myers
10/3/2023

18 (57 - 60)

Page 57

1 don't have any idea whether you understood
2 correctly or not, but you've mischaracterized, I
3 believe, what I said.
4     Q.  Okay.
5     A.  What I said was I've concluded that
6 the defendant in this case failed to advise and
7 failed to accomplish a sale of some of the
8 debtor's assets, and that failure to accomplish
9 a sale of some assets doesn't require the
10 determination as to which assets would have been
11 sold.  But the failure to sell any or to
12 accomplish the sale of any is what the problem
13 is.
14          In this supplemental answer, there
15 are conclusions mentioned about selling
16 particular tracts.  Those are not from me.  I
17 don't know where the idea came from to sell
18 Tracts 6, 8, and 9, but it didn't come from me.
19 I didn't choose them.
20     Q.  Okay.
21     A.  I've never made a decision in my own
22 mind as to which assets ought to be sold.  I
23 read the deposition of Mr. Peiffer, and I saw a
24 reference to things that would cause the ability
25 of the Kroegers to retain their homestead, and

Page 58

1 so maybe that's where it comes from.  I just
2 didn't ever relate which tracts were the
3 homestead and which tracts weren't.
4     Q.  Okay.  And just to be clear here, I
5 guess, is it your understanding from everything
6 that you've looked at, sir, that the bank did,
7 in fact, have a lien on, again, all farm
8 equipment, personal property, and real estate?
9     A.  I've no reason to doubt that
10 conclusion.
11     Q.  Okay.
12          MS. GOODMAN:  Okay.  Can I get
13 this marked?
14     A.  Whether it's a first lien or a second
15 lien, I don't know, but I have no doubt that
16 they had valid perfected liens on all of the
17 assets of the debtors that were farm related as
18 well as the non-debtor LLCs and corporations.
19          (Exhibit 6 marked for
20 identification.)
21 BY MS. GOODMAN:
22     Q.  Sir, I've handed you what has been
23 marked as Exhibit 6 to the deposition -- oh, and
24 we're still going to use 5 --
25     A.  Okay.

Page 59

1     Q.  -- so they go together.
2          It is my understanding, sir, that
3 this exhibit relates to and is meant to support
4 the Answers in the Interrogatory responses.
5 Have you seen this chart before?
6     A.  I think I have seen this chart or one
7 similar to it as an exhibit to Mr. Peiffer's
8 deposition.
9     Q.  Huh.
10     A.  Or maybe it was his report, but I
11 think I've seen this chart or something like
12 that.  In fact, if you hang on a second, I
13 copied it for myself today in reviewing and
14 getting ready for this deposition.
15     Q.  Okay.
16     A.  Let me see what I copied here.  I
17 thought I had it anyway.
18          Well, let me just say it that way.  I
19 think I've seen something similar to it, and I
20 thought it was in response -- I thought I
21 reviewed it in connection with the deposition of
22 Mr. Peiffer.
23     Q.  Well, let me -- because I just found
24 the reference, if you go to Page 5 of Exhibit 5,
25 the Supplemental response in response to

Page 60

1 Interrogatory No. 2 says, "See chart attached as
2 Exhibit A."
3     A.  Is that Exhibit 6?
4     Q.  That was going to be my question to
5 you, yeah.
6     A.  Okay.  What's your question to me?
7 You are asking me if you've prepared a true copy
8 of the exhibit?
9     Q.  No.  I'm asking if that is, in fact,
10 Exhibit A to your Interrogatory Answers?
11     A.  Well, you didn't -- you didn't attach
12 them in the copy you furnished me as Exhibit 5,
13 so I'm unable to answer the question.
14     Q.  Okay.  Because it wasn't -- that was
15 sent in a separate email.  That was served at --
16     A.  Not by me, ma'am.
17     Q.  No, I understand.  I'm talking to
18 Diana now.
19     A.  You can ask her then.
20     Q.  I will.  That's what I'm going to do.
21          MS. GOODMAN:  Exhibit A was in a
22 separate email to what was served.  So do the
23 two go together is my question.
24          MS. VOGT:  Yes, because it
25 accidentally didn't get attached --

Page 61

1    MS. GOODMAN:  Okay.
2    MS. VOGT:  -- when you got the
3  first responses.
4    MS. GOODMAN:  Okay.  So these two
5  go together, the two documents?
6    MS. VOGT:  Yes.  And we didn't
7  realize it wasn't attached until you called and
8  said this makes no sense.
9    MS. GOODMAN:  Okay.  Gotcha.
10  BY MS. GOODMAN:
11    Q.  All right.  Sir, so with regard to
12  Exhibit A, which is marked as Exhibit 6 to your
13  deposition, the 2018 appraisal numbers, do you
14  see that column?
15    A.  I do.
16    Q.  All right.  Is that the appraisal
17  that you referenced earlier that was
18  commissioned by the bank?
19    A.  I believe it is.
20    Q.  Okay.
21    A.  The BankFirst appraisal from 2018, I
22  believe so.
23    Q.  Okay.  All right.  And do you intend
24  to rely at all at trial on any of these values?
25    A.  That's not a judgment for me to make.

Page 62

1  That's for my attorney to decide.
2    Q.  Okay.
3    A.  I'm merely the plaintiff.
4    Q.  Okay.  Well, the -- with regard to
5  your Answers, which are going to be verified,
6  that are set forth in Exhibit 5, it does
7  reference these values, but yet it doesn't use
8  these values.  So that's what I'm wondering is
9  will these values be used at all?
10    A.  Counsel, your question to me was will
11  I rely on them at a trial?  That's a strategic
12  question for my lawyer to decide.
13    Do I believe them to be accurate and
14  evidentiary of the damages sustained by the
15  defendants' malpractice, yes, I do.
16    Q.  Okay.  So let me ask a different
17  question then.
18    With regard to the values in that
19  column, I don't see them referenced in any of
20  the answers in Exhibit 5.  So I guess I'm
21  wondering how you intend to use them with regard
22  to these answers?
23    MS. VOGT:  Can we go off the
24  record?
25    MS. GOODMAN:  Sure.

Page 63

1    (Discussion off the record.)
2  BY MS. GOODMAN:
3    Q.  All right.  Sir, so if we can look at
4  Page 2 here of this -- of Exhibit 5.
5    All right.  "So a proposal should
6  have been made" -- in the second paragraph of
7  the Second Supplemental response it read, "A
8  proposal should have been made to the bank and
9  permission requested from the Court to allow the
10  Kroegers to sell Tracts 6, 8, and 9 of the real
11  property."
12    When we say "6, 8 and 9," I assume
13  that corresponds to Exhibit A, does it not,
14  Tracts 6, 8, and 9?
15    A.  I don't know either, but I will share
16  your assumption.
17    Q.  Okay.  "That sale would have resulted
18  in approximately" 2.5 -- "$2,528,000 to the
19  Kroegers."
20    Do you see that sentence?
21    A.  Yes.
22    Q.  Okay.  So how do we get to the 2.5
23  million number?  What numbers do we add up?
24    A.  Great question.  I don't know.
25  Perhaps we could ask my counsel off the record.

Page 64

1  What did you -- let me do that.
2    (Discussion off the record.)
3    THE WITNESS:  Back on the record?
4    MS. GOODMAN:  Sure.
5    THE WITNESS:  I think I'm
6  prepared to answer your question in a way that
7  you might find helpful.
8  BY MS. GOODMAN:
9    Q.  Okay.
10    A.  I believe that the Second
11  Supplemental response to Interrogatory shown on
12  Page 2 of Exhibit 5 is erroneous.
13    Q.  Okay.
14    A.  I believe that what I'm trying to
15  convey in answering your question about what
16  would have been realized is that if Tracts 6, 8,
17  and 9 had been sold in a way that I think the
18  defendants should have gotten accomplished, they
19  would have received -- the estate would have
20  received something in the neighborhood of
21  $3,255,000.
22    Q.  And how do you get to that number?
23    A.  I used the numbers shown on
24  Exhibit A of -- excuse me, Exhibit 6 in the
25  third column sale price, plus 10 percent.

Richard D. Myers
10/3/2023

20 (65 - 68)

Page 65

Q.   And why -- where did the 10 percent come from?

A.   It's a judgment that I think comes from Mr. Peiffer and is in line with my experience that a farmer sale auction tends to bring more -- in the neighborhood of 10 percent more traditionally -- than a bank foreclosure sale.

And so the third column, "Sale price plus 10 percent" is intended to reflect a 10 percent premium over the price the bank actually got when it did its sale.

Q.   Other than your opinion that 10 percent is a -- the appropriate percentage to apply here, do you have any other authority that I can rely on, or that you rely on, to come up with the 10 percent?

A.   Not really.  Everything in this case is a guess because it wasn't sold.  So we're talking about when would it have been sold?  Would it have been sold in June?  You'd get a whole different number per acre than if it was sold in March.  It's a question of seasonality, and it's all guesswork because it wasn't done.

Q.   Okay.  Out of the -- the next

Page 66

sentence, so out of the 2.5 -- I can't say this -- "out of the $2,528,000 the Kroegers could have paid $2,324,583, which includes interest and principal to BankFirst, to retire two of the four outstanding loans."

Do you see that?

A.   I do.

Q.   Okay.  When you say "could have," does that assume that BankFirst would have accepted an amount less than the total value of collateral proceeds?

A.   No.

Q.   Why not?

A.   As I indicated to you before, the fallacy in your question suggests that you can't do things without the bank's approval.  That's not true in Chapter 12 or any other form of bankruptcy.  It's a question of what you can accomplish with a court order.

Q.   Right.

A.   We have -- we have here a creditor, by its own actions, has indicated that it doesn't dispute that it was over-secured.  And an over-secured creditor is not entitled in a bankruptcy proceeding to receive all of the

Page 67

proceeds of a sale.  It only is entitled to receive what the bank is allowed to receive based on the Court's order.

But the gravamen of what we alleged that defendants did wrong is they failed to ask the Court to take advantage of those legal possibilities to say, let us sell some assets -- this is an example -- and split the proceeds between payment to the lienholder and other uses, either other lienholders or operational expenses.

And since they were over-secured, and I've talked about that before, I don't know that they'd have had any logical legal argument that could have defeated that argument to the Court, but nobody tried.

Q.   And the bank could have objected had the debtors attempted to do what you're proposing here, correct?

A.   Yes.  So the question is what I think that would've happened had they gone to court and tried it.

Q.   Uh-huh.

A.   Nobody tried.

Q.   Okay.  All right.  So then it says,

Page 68

"Retiring those two loans would have left a balance owing the bank of $5,419,050 and real estate to secure the remaining loans of $5,582,749, leaving equity for the Kroegers of 163,699."

Do you see that?

A.   I do.

Q.   All right.  Where does the 5.582 number come from?

A.   I don't know.

Q.   Okay.

A.   Let me -- let me try to explain this in a way that will make sense to whoever reads this deposition because I don't think my answer is -- fully answers your question.

Q.   Well, I just want to ask a question here because I'm trying to understand, sir, where these numbers are coming from, and so if you don't have the answers, you don't have the answers.  But it sounds like you don't know where that number is coming from, so that is the answer, correct?

A.   I didn't do the calculations that resulted in the exhibit.

Q.   Okay.

Richard D. Myers
10/3/2023

21 (69 - 72)

---

Page 69

1    MS. VOGT:  And did you see the
2  footnote?
3    MS. GOODMAN:  I did, and I'm
4  following the footnote.
5    My question relates to where that
6  (indicating) number came from.
7    A.  But the use of the number is
8  dependent upon which property is selected to be
9  sold, the date of the sale in relation to the
10  then bank balance.  The bank balance -- the
11  balance due on the notes is an ever-changing
12  number, increasing daily by interest accrual.
13    So to fix a number at any particular
14  point in time depends upon which property was
15  sold, what the price was, and what day it was
16  sold.  And so you're looking at a period of a
17  year and a half, and those numbers change every
18  day.
19    So for a particular result, it
20  depends upon picking particular items for sale.
21  Nobody did it during the case.  It depends upon
22  a sale.  Nobody did it during the case.  And it
23  depends on an assumption as to what the price
24  would have been.  That is all guesswork because
25  nobody did the sale.

---

Page 70

1  BY MS. GOODMAN:
2    Q.  Let's do this.  Let's look at Page 4.
3    A.  Of Exhibit 5?
4    Q.  Of Exhibit 5, yeah.
5    Middle of the page there, it says,
6  "The damage to the Kroegers is as follows," and
7  then it lists four categories.  Do you see that?
8    A.  I do.
9    Q.  Okay.  I need to understand how we're
10  arriving at these four categories of amounts.
11  Do you know?
12    A.  As to some of them, I do.
13    Q.  Okay.  Which ones do you know?
14    A.  Let me start with one I'm positive
15  about, which is the $15,000 "Fees to Stehlik
16  without Court Approval."
17    Q.  Got it.  Okay.
18    With regard to the other three, do
19  you know?
20    A.  I believe the "Equity in farm
21  equipment" is a calculation of resulting debt to
22  be paid to bank after you would have paid real
23  estate proceeds, plus debt to non-real estate
24  lienholders, like AGCO and John Deere and other
25  equipment financiers, minus -- and decreasing

---

Page 71

1  those from the original scheduled values of the
2  equipment.
3    Q.  Okay.  So --
4    A.  I think that's just arithmetic
5  calculation.  It assumes that you could have
6  sold real estate, decreased bank -- BankFirst --
7  debt, which was because the
8  cross-collateralization income bring farm
9  equipment, and it recognizes that there were
10  other purchase money security interest
11  lienholders on farm equipment that were
12  different than BankFirst.
13    Q.  Got it.  Okay.  So when we started
14  the deposition, you said that equity to you is
15  essentially the value less the debt --
16    A.  And sale expenses.
17    Q.  -- and sale expenses?
18    A.  Yes, ma'am.
19    Q.  So what value in farm equipment are
20  you relying on to determine the equity here?
21    A.  I believe that in response to this
22  particular interrogatory, the value we're using
23  is the value shown in the original schedules of
24  the debtors filed in the case.
25    Q.  Okay.  Perfect.

---

Page 72

1    So rather than mark all of these, can
2  you, sir, just point to me what -- what value
3  you're relying on in terms of the farm
4  equipment.  Here, I'll just show you.  There's
5  all of the schedules.
6    A.  Well, let me do it my way.
7    Q.  Okay.  Yeah, that's fine.
8    A.  Because I've got them separate.
9    Q.  Yep.
10    A.  In the original debtors' schedules,
11  filed March 11, 2020, in the Chapter 12 case,
12  there is a schedule for real property and
13  there's a separate schedule for personal
14  property.
15    Q.  Okay.  Hang on, sir.  What filing
16  number is that -- 13?
17    A.  Yes, ma'am.
18    Q.  Okay.  So what page are you on?
19    A.  Well, I'm going through it because
20  when you get to Page 8, you start the personal
21  property schedules, and included in the personal
22  property schedules are various things that may
23  or may not be called farm equipment.  For
24  example, a Dodge, a Toyota, that sort of thing.
25    Q.  Uh-huh.

---

Richard D. Myers
10/3/2023

22 (73 - 76)

---

Page 73

A. And then there are furniture, paintings, that sort of stuff.

Q. And you're not including that in farm equipment?

A. You are correct in that response.

Q. Okay.

A. And then if you get to Page 13 of 34 of those original schedules, you find Item No. 49, farm and fishing equipment --

Q. Uh-huh.

A. -- and there's a list of -- of that equipment that continues for several pages.

Q. Okay.

A. And totals I think is -- the total here is the total of those items.

Q. Okay.

A. And it appears to be 1,461,750.

Q. Okay.

A. And that should not include, and I presume does not include, farm products like the hay bales that are shown at the start of that schedule.

Q. Okay.

A. Those are farm products not farm equipment.

---

Page 74

Q. Gotcha. All right.

So this is the value, this 1.4 million dollars?

A. I believe that's the value that was used in the calculation of the damage stuff in the Supplemental Interrogatory you're referring to.

Q. Okay. Then what debt amount then was decreased? Because the amount is only 200,000, so what debt amount was decreased?

A. I believe that what was used -- and I didn't do the calculation. My counsel did or Mr. Peiffer did -- but I believe that what was used, what I think should have been used in the calculation was the debt of any purchase money security interest holder --

Q. Okay.

A. -- in the farm equipment and the debt of BankFirst in its entirety.

Q. Okay.

A. Because it would be either first or second on the farm equipment.

Q. Okay. And, sir, at any point in time, have you ever inspected visually any of the farm equipment listed in -- in document --

---

Page 75

A. No, I have not.

Q. -- 13?

A. As previously answered, I didn't get involved in this case until after it was sold.

Q. And for the record, the document you were just looking at with regard to the schedules was Bankruptcy filing 13 --

A. That's correct. That's correct.

Q. -- in the case?

(Exhibit 7 marked for identification.)

BY MS. GOODMAN:

Q. All right. Sir, I'm handing you Exhibit 7 here, and with regard to the personal property, have you seen this document before?

A. No, ma'am.

Q. Okay. This was a document I'll represent that was subpoenaed from BankFirst. If you turn to the page Bates stamped "BankFirst-Subpoena_000367."

A. Okay. I'm there.

Q. Okay. You'll see total proceeds --

A. 702 --

Q. -- 702 --

A. -- 015.

---

Page 76

Q. Correct. Less commissions, then you get around 636.

A. Uh-huh.

Q. Okay. Do you see that?

A. I do.

Q. All right. And this was -- and I'll just represent, this was an auction that was conducted by Big Iron Auctions and commissioned by BankFirst in connection with the replevin that occurred of the Kroegers' farm equipment.

So I guess, sitting here today, sir, do you have any evidence or anything to dispute that this was the value of the Kroegers' farm equipment as of August 11, 2021?

A. Well, I have no idea if Big Iron sold all of their farm equipment or only that which BankFirst was first upon. So I don't have any way to answer your question.

Q. Okay. Fair enough.

A. I -- I have no dispute that this is the value of what the bank got for it when the bank auctioned it off after foreclosure for the items shown in Exhibit 7, whether that is all of the assets that were originally there. I had the impression that some purchase money

---

Richard D. Myers                                                        23 (77 - 80)
10/3/2023

Page 77

1  creditors -- like John Deere and AGCO and
2  others -- had other equipment that this exhibit
3  doesn't refer to, that is included in the damage
4  calculation.
5      Q.  And have you done any sort of
6  independent analysis to determine whether with
7  regard to those other creditors whose equipment
8  weren't sold by BankFirst, whether there was any
9  equity in that equipment at all?
10     A.  I have done no analysis of the sales.
11 I have no knowledge of the prices received, and,
12 therefore, I have no knowledge of whether the
13 equity was realized by their sales.
14     Q.  Okay.  Got it.  And to be clear here,
15 with regard to the $200,000 in farm equity, we
16 talked about what you believed the beginning
17 value of that equity was, which was around 1.4
18 million.  You don't have a specific --
19 obviously, we can back into it if we had to --
20 but do you have any basis or idea of what debt
21 was deducted from that value in order to arrive
22 at the 200,000?
23     A.  I only have assumptions in what
24 Mr. Peiffer and my attorney did.
25     Q.  Okay.

Page 78

1      A.  No other knowledge.
2      Q.  Okay.  All right.  With regard to the
3  equity and real property, do you -- do you know
4  how this range was determined?
5      A.  Not specifically.
6      Q.  Okay.
7      A.  I only have guesses.
8      Q.  All right.  Other than -- so your
9  guesses are just pure assumption --
10     A.  No.
11     Q.  -- and speculation --
12     A.  No.
13     Q.  -- or do you generally have an idea?
14     A.  Based upon my reading of
15 Mr. Peiffer's deposition and my discussions with
16 my counsel, I believe that they used values that
17 were based upon the appraisal numbers that are
18 shown in Exhibit 6.
19     Q.  Okay.
20     A.  Minus the debt that was existent or
21 perhaps it was column three or column one, I'm
22 not sure, in Exhibit 6, and the debt that was
23 represented in the bank's claim as of bankruptcy
24 commencement date, and the claims of the other
25 purchase money security holders as represented

Page 79

1  by their pleadings and claims.
2      Q.  Okay.  But just to be clear, the
3  money that was represented by the other purchase
4  money security holders, that wouldn't be a lien
5  on real estate, right?
6      A.  That's correct.
7      Q.  Okay.
8      A.  That's correct.
9      Q.  Okay.
10     A.  But it would affect the amount of
11 money that would be paid to BankFirst, which
12 would affect the lien on real estate.
13         In other words, if there was equity
14 in a particular hay baler, that money would have
15 gone to BankFirst and reduced what amounted to
16 BankFirst's lien on real estate.
17     Q.  Okay.
18     A.  So it's all tied together because of
19 the cross-collateralization.
20     Q.  Okay.  And to be clear, you don't --
21 sitting here today, you don't know whether any
22 of that equity had any equity in it that was --
23     A.  I don't know any of the sales of
24 those pieces of equipment.
25     Q.  Okay.  Or the debt amount for that

Page 80

1  matter?
2      A.  I don't know them as I sit here
3  today.  The calculations are based upon things
4  that were evidence by scheduled values and
5  scheduled claim amounts and perceived that the
6  sales would equate to the values that were
7  scheduled --
8      Q.  Okay.
9      A.  -- as to farm equipment.
10     Q.  All right.  So with regard to -- just
11 so I'm clear, with regard to the equity in real
12 property, the values that you intend to rely on
13 would be from the 2018 appraisal?
14     A.  And the schedules filed by the
15 debtor.
16     Q.  Okay.
17     A.  And then when you say "rely on" in
18 determining what I think the damages are to the
19 Chapter 7 estate and to the Kroegers, you also
20 have to consider -- I also have to consider how
21 much those numbers were understating what could
22 have been resulted from a farmer-based sale.
23     Q.  Okay.
24     A.  In other words, column three of
25 Exhibit 6.

Richard D. Myers                                    24 (81 - 84)
10/3/2023

Page 81

1  Q.  But I just want to be clear here,
2  sir, column three is less than what's in --
3  A.  Yes, ma'am.
4  Q.  Okay.  So you -- you think these
5  numbers may be overstated to some degree?
6  A.  The appraisal numbers don't represent
7  what I think the values would have been realized
8  by a farmer sale at 2020, that's correct.
9  Q.  Okay.  So you actually think in 2018
10  then, the total value was greater than what
11  would have been realized by a farmer sale in
12  2020?
13  A.  Yes, that's a fair assessment.
14  Q.  Okay.
15  A.  Because no sale occurred other than
16  the bank foreclosures, it's all guesstimates.
17  How much would it have been sold had a sale
18  happened?  Well, it's just all guesswork because
19  no sale was ever done by this bankruptcy, and
20  the defendants didn't cause a sale to occur.
21     So it's guesswork as to what would
22  have been realized had one happened, and the
23  best way I can figure to do that is to say,
24  well, it would have been at least as much as the
25  bank got, and I believe it's -- 10 percent is a

Page 82

1  reasonable estimate.  More than the bank got is
2  what would have happened had the farmers sold
3  the real estate on the same day the bank did.
4  Q.  Okay.
5  A.  Actually what I think the defendant
6  should have done was had the sale occur in the
7  first few months of the case, long before the
8  bank got the real estate, and then I think the
9  price would have been higher, and the debt would
10  have been far lower.
11  Q.  And since we've been talking about
12  hypotheticals, if the bank is successful in
13  stopping or preventing the debtor from selling
14  part of its assets as opposed to, you know -- if
15  they're successful with their objection to a
16  motion to sell, it's likely then the case
17  results in a liquidation immediately, correct?
18  A.  With hindsight, yes.  Because the
19  debtor didn't have sufficient income to pay the
20  ongoing increases in debt and its operational
21  expenses.
22     That gets back to the comment I made
23  earlier about the three things one needs to
24  impress upon one's client.  You either make it a
25  by profit or you liquidate, and the folly of

Page 83

1  continuing on for a year and a half while the
2  interest increases and nothing happens is that
3  you end up getting rid of any perceived equity
4  in the assets, which is what happened here.
5  Q.  Okay.  Okay.  Well, in your opinion
6  of course?
7  A.  I believe that to be a fact.  I think
8  it's true in every case I've ever seen.
9  Q.  Okay.  All right.  So with regard to
10  moving off the equity and remaining real
11  estate -- or real property category, let's go up
12  to the interest that could have been avoided,
13  which you say is around -- well, it is $197,618.
14  Do you see that?
15  A.  I do.
16  Q.  All right.  Do you know how that
17  interest is calculated?
18  A.  I do not.  I know how I would
19  calculate it.
20  Q.  Okay.
21  A.  Because it's dependent upon when you
22  have the sale and when you have the application
23  of the proceeds to determine what the daily
24  accrual is.  It changes every day.  And how many
25  days went by determines the amount of interest

Page 84

1  that one had to pay instead of save.
2  Q.  Do you know whether that calculation
3  includes the default --
4  A.  I do not.
5  Q.  -- interest rate?
6  A.  I do not.
7  Q.  Okay.
8  A.  And it wouldn't matter to me either
9  way.
10  Q.  Let me ask this.  With regard to the
11  interest in the equity in real property,
12  seeking a -- both of those components as damages
13  here, doesn't that seem like that's double
14  counting?
15  A.  Which two?
16  Q.  To some degree?  The interest and the
17  equity.
18  A.  Not at all.
19  Q.  Well, the sooner you sell the
20  property, in your opinion, which is what I've
21  heard multiple times today, as soon as you sell
22  the property, you are going to then recognize
23  more equity, but you avoid the interest, don't
24  you?
25  A.  There are two components to what the

Richard D. Myers
10/3/2023

25 (85 - 88)

Page 85

1  debtor could have saved by having a sale earlier
2  than letting it go until the bank foreclosed.
3      Q.  Uh-huh.
4      A.  One is by an earlier sale, you have
5  less accrued interest to pay.
6      Q.  Right.
7      A.  So that saves the accrual of
8  interest.
9      Q.  Right.
10     A.  That's one element.
11     Q.  And that would reduce your interest
12  accrual here that's stated in your damage
13  category?
14     A.  That's a way to reduce interest, yes.
15     Q.  Okay.  Great.
16     A.  And secondly, when you sell it, you
17  have a lower debt amount because of the
18  application of that, and so you have less
19  interest accruing because there's a lesser
20  principal.
21     Q.  And a greater equity amount?
22     A.  Exactly.
23     Q.  Right.
24     A.  And how much you save in equity
25  depends upon how much you avoid it by if you

Page 86

1  waited a year, you've got that much more
2  interest, maybe the prices fluctuate, and
3  remember that when the bank sells it, most
4  people in this field, including me, believe you
5  get a less sale price than if the debtor farmer
6  would have sold it on his own.
7          So you put all of those things
8  together, and a sale would have avoided interest
9  accrual that did accrue because it wasn't done,
10  and you probably would have realized more for
11  the real estate, which is the reason for the
12  third column of Exhibit 6.
13     Q.  So maybe put differently, you would
14  have -- selling property early in the case would
15  have resulted in lower interest but perhaps more
16  equity.  Waiting later on in the case would have
17  perhaps resulted in lower equity, more interest,
18  that they would have had to pay?
19     A.  I don't see that those two tie
20  together.  I don't follow your logic.
21          Equity doesn't change based upon when
22  you sell the property.  It only changes based
23  upon the sale price and the debt that you're
24  paying.  So if you decrease the debt you're
25  paying, you get more equity.

Page 87

1      Q.  Okay.  Right.  But I guess the
2  interest accrual does depend on the timing?
3      A.  It certainly does.
4      Q.  All right.
5      A.  The longer you wait, the more
6  interest accrues.  That's precisely the point.
7      Q.  Okay.  Let me ask you.  With regard
8  to your chart on Exhibit A --
9      A.  Which is Exhibit 6?
10     Q.  Exhibit 6, thank you.  Exhibit A to
11  the Interrogatory but Exhibit 6 to the
12  deposition.
13          Could you look at what has been
14  marked as Exhibit 7 here.
15     A.  (Witness complies.)
16     Q.  And if you go to
17  "BankFirst-Subpoena_00036" of Exhibit 7, I want
18  to just --
19     A.  I'm sorry, 0036?
20     Q.  000 -- let's actually do 371, if we
21  could?
22     A.  (Witness complies.)
23     Q.  Okay.
24     A.  The Seller's Statement.
25     Q.  Yes.

Page 88

1      A.  Okay.
2      Q.  And as I understand it, and as I've
3  been told by the bank, these are the Seller's
4  Statements with regard to each of the parcels
5  that were sold in the foreclosure sale.  Okay?
6      A.  Okay.
7      Q.  All right.  On your chart here, so --
8  and these don't coordinate by tracts, but you
9  can see the purchase price sold was 56,703.  Do
10  you see that?
11     A.  Which is the same number as shown as
12  "Bank Sale" in column two of Exhibit 6 for
13  Tract 4.
14     Q.  Okay.  However, that number doesn't
15  include all of the closing costs, which are
16  generally born by the seller in Nebraska,
17  correct?
18     A.  Depending upon the contract.  It
19  doesn't include in this case $2,000 of costs.
20     Q.  Costs.  Okay.
21          So I guess my question is, is there
22  any reason why on your chart, which is Exhibit A
23  to the Interrogatories, you include the purchase
24  price as opposed to the actual net proceeds that
25  incorporates the closing costs and attorney

Page 89

1  fees?
2      A.  A reason is because perhaps at the
3  time of the preparation of the chart, no one had
4  furnished the document which you're referring to
5  as Bates stamp 371.
6      The other reason is because it's
7  probably consistent with the appraisals, which
8  don't decrease by sale cost, nor does the third
9  column decrease for sale cost.  So to be
10  consistent in comparison, it wouldn't make sense
11  to put a net price on one and not on the other
12  two.
13      Q.  Okay.  But you would agree in terms
14  of the net recovery to creditors in this case,
15  any land -- or to the Kroegers -- any land that
16  was sold would have been decreased --
17      A.  Subject --
18      Q.  -- to closing costs?
19      A.  Absolutely.
20      Q.  Okay.
21      A.  And that's why earlier I said equity
22  is value minus proceeds and sales cost.
23      Q.  Yeah.  Exactly.  Okay.
24      A.  Sure.
25      Q.  So, in fact, if we were trying to get

Page 90

1  to the true value of what would have been
2  received by the Kroegers or the creditors in
3  this action, you should, in fact, deduct the
4  closing costs from the purchase price?
5      A.  I certainly agree.
6      Q.  Okay.  Great.
7      A.  And if it -- and if it would have
8  been listed with a realtor as opposed to
9  auction, it might have been a totally different
10  sale cost.  I just don't know.
11      Q.  Yeah.  Gotcha.
12      A.  I don't know what the bank paid when
13  it auctioned off the property, so I don't know
14  whether they sold it at 3 percent or 4 percent
15  or 15 percent.  I just have no clue.
16      Q.  Yeah.
17      And actually on the closing, just in
18  case you were wond- -- just in case you were
19  wondering, on the closing statement, it shows
20  they paid 2.5 percent?
21      A.  Yeah, and that's -- that's a
22  reasonable -- that's a normal kind of auction
23  commission, yeah.  It doesn't surprise me.
24      Q.  Okay.  Great.
25      Other than the interest that could

Page 91

1  have been avoided, this equity in real property,
2  equity in farm equipment, and the $15,000 in
3  fees paid to Stehlik, are there any other
4  components of damages that you're seeking in
5  this lawsuit?
6      A.  I believe the only components that
7  I'm aware of that my attorney has advised me are
8  recoverable are the ones you've just described.
9      Q.  You say in here under your
10  Supplemental Response here to Interrogatory 1 in
11  bold on Page 4, do you see that?  You say, "The
12  maximum damages that will be requested at trial
13  will be $1,135.592."  Do you see that?
14      A.  Yes, ma'am, I see that.
15      Q.  Okay.  Is that a true statement?
16      A.  Is it a true statement?  I don't know
17  how to -- I don't know how to answer your
18  question.  Do you want me to admit that we will
19  not seek more than $1,135,592 --
20      Q.  Correct.
21      A.  -- you have by admission of that.
22  Whether it's true or not is an interesting way
23  to characterize it.
24      Q.  Okay.  Well, we got there in the end.
25      A.  My attorney and I have discussed what

Page 92

1  I believe will be the maximum we will seek in
2  trial and that's the answer.
3      Q.  Okay.  Excellent.
4      A.  And if the facts change, I'll change
5  my answer, but based upon what I presently know,
6  that's the number.
7      Q.  Okay.
8      A.  And I would like to offer an
9  additional explanation, if I might?  It will
10  help you, I think, not hurt you.
11      Q.  Okay.  Okay.
12      A.  The fee issue with regard to
13  Mr. Stehlik, no one has asked why I didn't
14  pursue a turnover order as opposed to --
15      Q.  I wasn't going to ask that.
16      A.  Okay.  Then I won't bother to offer
17  anything to you.
18      Q.  No problem.
19      A.  You asked it of the expert, and you
20  didn't ask it of me; that's what I was getting
21  at.
22      Q.  No problem.
23      All right.  Can we look at Page 6?
24      A.  Of Exhibit 5?
25      Q.  Exhibit 4.

Page 93

1    MS. VOGT:  Is that the
2    Supplemental Interrogatory?
3         MS. GOODMAN:  I'm sorry.  I'm
4    sorry.  I'm getting tired.  No, it's Exhibit 5.
5    I apologize.
6         It's Interrogatory No. 4 of
7    Exhibit 5.  My apologies.
8      A.  Page?
9    BY MS. GOODMAN:
10     Q.  Six.
11     A.  Okay.
12     Q.  Okay.  You say -- I ask, "Identify
13   each asset plaintiff contends the debtors lost
14   when their bankruptcy case was converted to a
15   case under Chapter 7 of the Bankruptcy Code that
16   they otherwise would have retained through the
17   successful completion of the Debtors' Second
18   Amended Chapter 12 Plan."
19        You provide some -- in your
20   Supplement response, you provide kind of an
21   explanation with some calculations, and then you
22   put in bold here, "However plaintiff is not
23   asserting these calculations as the damages."
24        I just want to confirm that, in fact,
25   you are not looking to recover those damages --

Page 94

1    those calculations as damages, or those amounts
2    as damages in this case?
3      A.  They are not additional to the other
4    answer we just talked about --
5      Q.  Perfect.
6      A.  -- if that's what you're asking.
7      Q.  That is what I'm asking.  That's
8    fine.
9         There has been a lot of press time
10   spent on Helen Greenwald.  I note in the
11   Chapter 7 case that you did not pursue a claim
12   against Ms. Greenwald for wrongful termination
13   of a lease of agricultural land; is that
14   correct?
15     A.  You are right.  I abandoned the
16   claim.
17     Q.  Okay.  And did you abandon it because
18   you determined it had no value?
19     A.  I abandoned it, as I earlier said,
20   because I thought it had no realizable value
21   after the costs of pursuit.
22     Q.  Got it.
23        MS. GOODMAN:  All right.  Can we
24   go off the record?
25        (Discussion off the record.)

Page 95

1    BY MS. GOODMAN:
2      Q.  I just want to make sure that I'm
3    understanding this correctly.  The mere fact
4    that the debtor continued to hold this property,
5    and I understand interest was accruing on the
6    loans, I get that; however, it was
7    income-producing property from the standpoint of
8    hay bales and farm products and other things
9    coming from the land.
10     A.  I have no knowledge of that.
11     Q.  Okay.
12     A.  I would assume --
13     Q.  Okay.
14     A.  -- that there were products, but I
15   haven't reviewed any of the financial reports
16   filed in the case.
17     Q.  Okay.  So to the extent the operating
18   reports show that there was income being
19   received off the land, that would have all been
20   a benefit to the Kroegers, correct?
21     A.  And the bank because they had a lien
22   on the farm -- well, it might not have benefited
23   the bank because I don't believe I've seen that
24   the bank had a post-petition lien on anything,
25   and if they didn't receive a post-petition lien

Page 96

1    on post-petition farm products, they were
2    unsecured as to those farm products.
3      Q.  Okay.
4      A.  Which would have enabled the debtor
5    to use them for any purpose, and I have no clue
6    what the debtor did with those proceeds.
7      Q.  Got it.  So assuming the bank didn't
8    have a lien --
9      A.  Clearly.
10     Q.  -- the debtor would have had the
11   benefit of those products and the proceeds from
12   them?
13     A.  Clearly.
14     Q.  Okay.  There was -- Mr. Peiffer
15   mentioned in his report, a tax -- some taxes.
16   There could have been some tax savings in the
17   Chapter 12 case.  Are you aware of any taxes
18   that the estate has had to pay?
19     A.  Which estate?
20     Q.  The bankruptcy estate has had to
21   pay --
22     A.  The one I'm trustee of?
23     Q.  Correct.
24     A.  The Chapter 7 bankruptcy estate has
25   not had to pay any taxes because the Chapter 7

Richard D. Myers
10/3/2023

28 (97 - 100)

Page 97

1  estate has not received an income event.  The
2  taxes Mr. Peiffer talked about were the
3  Chapter 12 estate and/or the Kroegers
4  individually.  It wouldn't affect the Chapter 7
5  estate.
6      Q.  Right.  So any taxes that remained or
7  resulted from the Chapter 12 case had no impact
8  on the Chapter 7 case because they're not
9  responsible for those taxes, correct?
10     A.  By "they," you mean the Chapter 7
11  estate?
12     Q.  Yes.
13     A.  The Chapter 7 estate isn't -- it's
14  not a first priority claim if such taxes accrue.
15  The Chapter 7 bankruptcy estate has not incurred
16  income taxes, but if the Chapter 12 bankruptcy
17  estate did or does accrue an income tax event,
18  that would be a junior priority claim in
19  Chapter 7.
20         I'm not aware that any such taxes
21  have been asserted by the taxation authorities,
22  and I'm also not aware as to whether Kroegers
23  have reported the gain that resulted from the
24  foreclosure sale, which was what Mr. Peiffer was
25  referring to.

Page 98

1      Q.  Got it.
2      A.  I'm not their counsel, so I don't
3  know what they did or not.
4         MS. VOGT:  And at least at this
5  point, according to the Kroegers' accountant,
6  there is no tax debt, so that's why we're not
7  claiming anything.
8  BY MS. GOODMAN:
9      Q.  And that was going to be -- so you're
10  not seeking any damages in this case related to
11  tax liability?
12     A.  That's a correct statement at this
13  point in time, we're not, and I know of no such
14  claim at this point in time that exists.
15     Q.  Perfect.
16         With regard to the Chapter 7 case,
17  just offhand, and I can look online too, what's
18  the total value of assets that have been, I
19  guess, recovered by the estate?
20     A.  The only asset I have sold was a
21  parcel of real property in Lincoln, which was
22  scheduled for 200,000, and I sold it for
23  $187,000 after payment of liens and sale
24  expenses, the net proceeds received by the
25  estate -- I got that printed out here somewhere.

Page 99

1  Okay.  Hang on a second.  I printed that in case
2  you asked.  Here we go.  I received a net amount
3  of the sale of a 5801 Locust Street in Lincoln,
4  I received a net $58,984.08, and then I received
5  several under 3- or 400 dollars apiece --
6  refunds from overpayment of various utility
7  things, and ended up with approximately $43,000
8  of net proceeds being deposited into my
9  accounts, and that's the only asset that I
10  liquidated.
11     Q.  Okay.  All right.
12     A.  So the only two assets that I'm aware
13  of that will result in payment to creditors are
14  that prior sale of that property and this
15  instant action.
16     Q.  Okay.
17         MS. VOGT:  That was where his
18  daughter lived.
19         THE WITNESS:  Yeah, that's all
20  contained in my Form 1 that's filed in court
21  that I think is available for everybody to look
22  at.
23         MS. GOODMAN:  Okay.  Mr. Myers,
24  as always -- Rick -- Mr. Myers, sir --
25         THE WITNESS:  Thank you, ma'am.

Page 100

1         MS. GOODMAN:  -- it's always good
2  to see you.  I appreciate your time.  That's all
3  I have for right now.
4         THE COURT REPORTER:  (Requested
5  transcript orders.)
6         MS. GOODMAN:  E-Tran would be
7  great.
8         MS. VOGT:  E-Tran.
9         (3:39 p.m. -- Adjournment.)

Richard D. Myers                                                    29 (101)
10/3/2023

```
 1                    C-E-R-T-I-F-I-C-A-T-E

 2    STATE OF NEBRASKA    )
                           ) ss.
 3    COUNTY OF SAUNDERS   )

 4              I, Angela M. Ickler, Registered

 5    Professional Reporter and General Notary Public

 6    within and for the State of Nebraska, do hereby

 7    certify that the foregoing testimony of RICHARD

 8    D. MYERS was taken by me in shorthand and

 9    thereafter reduced to typewriting by use of

10    Computer-Aided Transcription, and the foregoing

11    one-hundred (100) pages contain a full, true,

12    and correct transcription of all the testimony

13    of said witness, to the best of my ability;

14              That I am not kin or in any way

15    associated with any of the parties to said cause

16    of action, or their counsel, and that I am not

17    interested in the event thereof.

18              IN WITNESS WHEREOF, I hereunto affix

19    my signature and seal this 14th day of October,

20    2023.

21

22                    _____
                      ANGELA M. ICKLER, RPR
23                    Registered Professional Reporter
                      General Notary Public
24
      My Commission Expires:  July 17, 2026
25
```