1              UNITED STATES DISTRICT COURT

2                      FOR THE

3                DISTRICT OF NEBRASKA

4            CIVIL ACTION NO. 4:22CV3039

5

6                RICHARD D. MYERS,

7                    Plaintiff

8

9                        V.

10

11         GALEN STEHLIK AND STEHLIK LAW FIRM,

12                    Defendants

13

14

15

16

17

18

19

20

21

22

23   DEPONENT:  KURT KROEGER

24   DATE:      FEBRUARY 17, 2023

25   REPORTER:  SARHA BUZI

Great Plains Reporting Company
1299 Farnam Street, Ste. 300
Omaha, NE 68102

GREAT PLAINS
REPORTING
YOUR PATH THROUGH LITIGATION

Phone: 1-402-303-3399
Fax: 502-584-0119
schedule@yourdepositions.com
www.yourdepositions.com

Page 2

1               APPEARANCES

2

3  ON BEHALF OF THE PLAINTIFF, RICHARD D. MYERS:

4  Diana J. Vogt, Esquire

5  Sherrets Bruno & Vogt, LLC

6  260 Regency Parkway Drive

7  Suite 200

8  Omaha, Nebraska 68114

9  Telephone No.: (402) 390-1112

10 E-mail: dvogt@sherrts.com

11

12 ON BEHALF OF THE DEFENDANTS,

13 GALEN STEHLIK AND STEHLIK LAW FIRM:

14 Lauren R. Goodman, Esquire

15 McGrath North Mullin & Kratz, PC LLO

16 First National Tower

17 1601 Dodge Street

18 Suite 3700

19 Omaha, Nebraska 68102

20 Telephone No.: (402) 341-3070

21 E-mail: lgoodman@mcgrathnorth.com

22

23 Also Present: Kathy Kroeger, Deponent's Wife; Galen

24 Stehlik, Defendant

25

Page 4

1            EXHIBITS (CONTINUED)

2  Exhibit                              Page

3  48 - Documents Related to Bankruptcy    68

4  49 - Chapter 12 Proceeding Case No. BK

5       20-40305; 3rd Operating Report Quarter

6       of 2020                          78

7  50 - Chapter 12 Proceeding Case No. BK

8       20-40305; 4th Operating Report Quarter

9       of 2020                          78

10 51 - Case No. BK 20-40305 Chapter 7

11      Proceeding                       113

12

13            FORMAL REQUESTS

14 1 - Documents Confirming Amount Paid to Mr. Patino for

15     his Services

16 2 - 2019 and 2020 Income Statements

17 3 - Document from the Government Confirming Incoming

18     October Payment

19 4 - 2020 Tax Return

20 5 - Email Sent to Mr. Stehlik by Deponent in December

21     of 2020

22

23

24

25

Page 3

1                INDEX

2                                       Page

3  PROCEEDINGS                            6

4  DIRECT EXAMINATION BY MS. GOODMAN      7

5  CROSS EXAMINATION BY MS. VOGT        125

6

7               EXHIBITS

8  Exhibit                              Page

9  39A - Email to Dana Korosi from Galen E.

10      Stehlik                          7

11 40 - Limited Motion to Modify Confirmed

12      Chapter 12 Plan Nunc Pro Tunc    13

13 41 - Defense Arguments                24

14 42 - Kroeger - Motion for Preliminary

15      Injunction Email Thread          31

16 43 - BankFirst and Kroeger Email Thread 37

17 44 - John F. Zimmer Forwarded Message to

18      Kurt Kroeger Subject: Additional

19      Information for Settlement Discussion,

20      H&M Farms-Windmill Acres         39

21 45 - Attached Letter to Jerry Milner from

22      John F. Zimmer                   44

23 46 - Asset List47 - Email Thread       51

24 47 - Email Thread Subject: BankFirst/Kroeger

25      with Attached Loan Payoff Statements 62

Page 5

1            STIPULATION

2

3  The deposition of KURT KROEGER was taken at POWERS LAW,

4  411 SOUTH 13TH STREET, SUITE 300, LINCOLN, NEBRASKA

5  68501, on FRIDAY the 17TH day of FEBRUARY 2023 at 10:42

6  a.m. (CT); said deposition was taken pursuant to the

7  FEDERAL Rules of Civil Procedure.

8

9  It is agreed that SARHA BUZI, being a Notary Public and

10 Court Reporter for the State of NEBRASKA, may swear the

11 witness.

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Great Plains Reporting Company
1299 Farnam Street, Ste. 300
Omaha, NE 68102

GREAT PLAINS REPORTING
YOUR PATH THROUGH LITIGATION

Phone: 1-402-303-3399
Fax: 502-584-0119
schedule@yourdepositions.com
www.yourdepositions.com

4:22-cv-03039-JMG-MDN   Doc # 65-9   Filed: 11/20/23   Page 3 of 33 - Page ID # 1974
The Deposition of KURT KROEGER, taken on February 17, 2023

6..9

Page 6

1           PROCEEDINGS
2      COURT REPORTER:  Okay.  My name is Sarha Buzi.
3  I'm representing Great Plains Reporting, located at
4  1299 Farnam Street, Suite 300, Omaha, Nebraska.  We
5  are located at Powers Law for the deposition of Kurt
6  Kroeger.  Today is February 17, 2023.  The current
7  time is 10:42 a.m.  Will all parties except for the
8  witness please state your appearance, how you are
9  attending, and your location.
10     MS. GOODMAN:  Lauren Goodman on behalf of
11  defendants Stehlik Law Firm, PC LLO and Galen
12  Stehlik.
13     MS. VOGT:  I'm Diana Vogt.  I'm representing
14  the plaintiff, Mr. Myers, as trustee.
15     COURT REPORTER:  And Kurt, I'll go ahead and
16  swear you in.
17     THE WITNESS:  Okay.
18     COURT REPORTER:  I'll have you -- first I'll
19  have you state your full name for the record.
20     THE WITNESS:  Kurt Elmer Kroeger.
21     COURT REPORTER:  And then I'll have you raise
22  your right hand.  Do you solemnly swear or affirm
23  that the testimony you're about to give will be the
24  truth, the whole truth, and nothing but the truth?
25     THE WITNESS:  Yes.

Page 7

1           COURT REPORTER:  You may begin.
2                DIRECT EXAMINATION
3  BY MS. GOODMAN:
4      Q    And I just want to -- actually, while we go on
5  the record here, Mr. Kroeger, do I understand, sir, that
6  you are currently unrepresented by counsel?
7      A    Yes.
8      Q    Okay.  And you're appearing here without
9  counsel?
10     A    Yes.
11     Q    At this deposition.  All right.  All right,
12  sir, as I indicated to the court reporter, this is a
13  continuation of your previous deposition.  So for the
14  sake of time, I won't go through the same ground rules.
15  But just as a reminder, if you do need a break, don't
16  hesitate to let us know and we can certainly take one.
17  All right?  Let me -- I want to just jump in here with
18  one item.  If I could mark this as a deposition exhibit.
19          COURT REPORTER:  Do you know what number?
20          MS. GOODMAN:  I do.  That'll be 39.
21          COURT REPORTER:  39.
22          (EXHIBIT 39A MARKED FOR IDENTIFICATION)
23  BY MS. GOODMAN:
24     Q    All right, sir, I handed you what's been
25  marked as Exhibit 39, and first I'll give you a chance

Page 8

1  to look through that and if you could just let me know
2  if you are familiar with that document.
3      A    Yes.
4      Q    Okay.  And how are you familiar with this
5  document?
6      A    It says I was copied in.
7      Q    Okay.  And sir, did -- were you aware that
8  during the time frame of -- in December of 2020,
9  Mr. Stehlik on your behalf was assisting you in trying
10  to find a refinancing for the BankFirst debt?
11     A    I found Ms. Korosi.
12     Q    Okay.  But do you -- would you agree, sir,
13  that Mr. Stehlik was working with you in connection with
14  trying to find some sort of refinancing for the
15  BankFirst debt?
16     A    Well, he would be the only liaison to confer
17  with the BankFirst.
18     Q    Okay.  So do you -- I guess do you have any
19  reason to dispute, sir, that Mr. Stehlik sent this
20  letter to Ms. Korosi at Riverstone Capital Consultants?
21     A    Would I dispute it?
22     Q    Yes.
23     A    I would have no idea whether he sent it or
24  not.
25     Q    Okay.  And you were aware though, sir, that he

Page 9

1  was assisting you at that time in trying to find either
2  refinancing -- well, refinancing of the BankFirst debt,
3  he was assisting you?
4      A    He was just -- just doing the bankruptcy.  I
5  had to do some of this on my own.
6      Q    Okay, sir.  It's a -- so are you saying he
7  wasn't assisting you?
8      A    He was assisting me in the bankruptcy.  And
9  this is just information to give to Dana Korosi on what
10  the buyout possibly would be.
11     Q    That he sent to Ms. Korosi, correct?
12     A    That I don't know.  It looks like he sent it,
13  but --
14     Q    Okay.
15     A    -- I wouldn't have access to Dana's records.
16     Q    Okay.  Sir, I want to go down here and look at
17  number three if we could.  It says, "I know BankFirst.  I
18  know Kurt thought he can offer $6 million to the bank,
19  but that would involve the bank taking a discount of
20  over $2 million."  Do you see that?
21     A    I do.
22     Q    All right.  And I would suggest that if they
23  take your 15 percent reduction, that would mean an offer
24  of $6.8 million to $7 million would be more likely to
25  appeal to the bank.  Do you see that?

Great Plains Reporting Company
1299 Farnam Street, Ste. 300
Omaha, NE 68102

GREAT PLAINS
REPORTING
YOUR PATH THROUGH LITIGATION

Phone: 1-402-303-3399
Fax: 502-584-0119
schedule@yourdepositions.com
www.yourdepositions.com

Page 10

```
 1    A   I do.
 2    Q   During this time period, sir, had you offered
 3  the bank $6 million to refinance its debt?
 4    A   Again we proposed it to Mr. Stehlik, not to
 5  the bank.  So Mr. Stehlik was the liaison to talk to the
 6  bank.
 7    Q   Okay.  So you, sir, is it your testimony you
 8  never proposed directly to the bank any amount of money
 9  to refinance its debt?
10    A   Well, we asked Mr. Stehlik to do it, so
11    Q   It's a yes or no.  Did you, sir, at any point
12  in December of 2020 reach out directly to the bank to
13  try to refinance the debt?
14    A   Not directly to the bank.
15    Q   Okay.  Sir, how did you become connected with
16  Patrick Patino?
17    A   I think I asked a few other lawyers some
18  questions of who they would recommend and his name
19  popped up.
20    Q   All right.  And do you recall about what time
21  you reached out to Patrick Patino?
22    A   Towards the end of the bankruptcy.
23    Q   Okay.  Was it around March of 2021, do you
24  think?
25    A   I wouldn't have an idea unless I saw
```

Page 11

```
 1  documents.
 2    Q   What was Mr. Patino retained to do?
 3    A   To see if we could salvage what was left of
 4  the farm in the bankruptcy suit.
 5    Q   Okay.  And do you recall the first
 6  communication you had with Mr. Patino?
 7    A   That would be like asking a conversation that
 8  happened over two years ago without seeing documents.
 9  No, I don't.
10    Q   Okay.  And you don't -- so you don't remember
11  what was discussed during that initial conversation?
12    A   Just that we would -- he would represent us
13  and basically, "Here's some documents, what do you
14  think?"
15    Q   Uh-huh.
16    A   Just basic stuff.  That's what I recall.  I
17  mean, I can't swear to these actual facts without seeing
18  documents.
19    Q   Did he -- and I'm just -- I'm not worried
20  about the documents, I want to know what's in your
21  memory.  All right?  Did he tell you his opinion with
22  regard to the case when you initially met with him?
23    A   He said it would be -- he said it would be a
24  stretch because Mr. Stehlik really had bungled it up
25  pretty bad.
```

Page 12

```
 1    Q   Those were his exact words?
 2    A   Not exact words.
 3    Q   Okay.  So --
 4    A   I don't recall it over two years ago, no.
 5    Q   What did he say with regard to -- I guess,
 6  what were the next steps that he recommended you take in
 7  connection with the bankruptcy?
 8    A   Well, like I said, without seeing the
 9  documents, I think we filed motions to not have
10  Mr. Stehlik as my attorney and he represents me.  And I
11  think there was just some paperwork involved with that,
12  just to get it started.
13    Q   Okay.  So sitting here today, sir, you don't
14  remember what action Mr. Patino took with regard to your
15  bankruptcy case?
16    A   Like I said, there's a bazillion documents out
17  there.  If I saw them, I would recall it instantly, but
18  I don't have them sitting in front of me.
19    Q   How much did you agree to pay him for his
20  services?
21    A   I don't recall.
22    Q   All right.  Where would you have to look to
23  find that information?
24    A   I don't know.  I'd have to ask.  I mean, when
25  we moved, a lot of our paperwork has been shredded,
```

Page 13

```
 1  destroyed or whatever.  I'd have to search some files, I
 2  guess.
 3    Q   Could you look at your bank statements?
 4    A   We've moved.  I don't know.
 5    Q   You don't know -- you don't know if your bank
 6  would have an indication of how much you paid Mr. Patino
 7  --
 8    A   Correct.
 9    Q   -- to pursue the services?
10    A   I don't know.
11    Q   Okay.  But would you be willing to check?
12    A   I will check.
13    Q   What bank were you using at that time?
14    A   I don't recall.
15    Q   Okay.  What bank do you currently bank at?
16    A   Archer Credit Union.
17    Q   All right.  All right, sir, I'm going to hand
18  you -- I guess just mark this.
19        COURT REPORTER:  Mark it.
20    Q   Sir, I hand you what's been marked as Exhibit
21  40.  This is A Limited Motion to Modify Confirmed
22  Chapter 12 Plan nunc pro tunc.  Can you see that?
23        (EXHIBIT 40 MARKED FOR IDENTIFICATION)
24    A   Okay.  Yes.
25    Q   Okay.  Have you seen this document before?
```

Great Plains Reporting Company
1299 Farnam Street, Ste. 300
Omaha, NE 68102


GREAT PLAINS REPORTING
YOUR PATH THROUGH LITIGATION

Phone: 1-402-303-3399
Fax: 502-584-0119
schedule@yourdepositions.com
www.yourdepositions.com

4:22-cv-03039-JMG-MDN   Doc # 65-9   Filed: 11/20/23   Page 5 of 33 - Page ID # 1976
The Deposition of KURT KROEGER, taken on February 17, 2023

14..17

Page 14

```
1      A    Yes.
2      Q    Okay.  And when have you -- I guess tell me
3  about how you came about to see this document.
4      A    Well, this was I believe filed before we had
5  had a meeting with the judge.
6      Q    Okay.  And you would agree sir, that
7  Mr. Patino was your -- had entered an appearance with
8  the Court to represent you and your wife in connection
9  with this motion?
10     A    Correct.
11     Q    And is this, sir, one of the motions that you
12  recall discussing with Mr. Patino when you first met
13  with him?
14     A    Yes.
15     Q    And what -- do you recall what Mr. Patino told
16  you with regard to the merits of this motion in court?
17     A    No, I would not recall that.
18     Q    Did he believe that this motion was going to
19  be successful and was going to be granted by the judge?
20     A    That I would not recall.
21     Q    Could we go off the record for a second?
22          COURT REPORTER:  Sure.  We're off the record.
23  The current time is 10:55 a.m.
24          (OFF THE RECORD)
25          COURT REPORTER:  We're back on the record for
```

Page 15

```
1   the deposition of Kurt Kroeger being conducted.  My
2   name is Sarha Buzi.  Today is February 17, 2023.
3       The current time is 10:55 a.m.
4  BY MS. GOODMAN:
5       Q    Okay.  And all right sir, so sitting here
6   today, you can't recall -- your testimony is you don't
7   know whether Mr. Patino told you or not that this was
8   going to be successful or not?
9       A    Well, like I said, he said because of the
10  bungling we had a shot, but it might be like a 50-50.
11      Q    Okay.  Sir, attached to this motion, if you
12  look at Exhibit B.
13      A    How far back do I got to go?
14      Q    It's about six --
15      A    Exhibit what, did you say?
16      Q    B.  B.  Yeah, you're there.  That's it.
17      A    I'm there.
18      Q    Yeah.  Attached to this exhibit is a list of
19  collateral.
20      A    Okay.
21      Q    And I just want to confirm sir, that this --
22  you would agree that this list of collateral was indeed
23  BankFirst collateral.  So the items on here were
24  BankFirst collateral.  Can you agree with me on that?
25      A    Nope.  I cannot agree with you on that.
```

Page 16

```
1       Q    Okay.  And why not?
2       A    Because like I said, the John Deere S670
3   Combine was owned by John Deere Financial.
4       Q    Okay.
5       A    Like I said, there's more things on here that
6   would be subject to other financial institutions.
7       Q    Okay.  And when you say the John Deere, so are
8   you saying all the John Deere equipment would've --
9       A    No.
10      Q    No?
11      A    The John Deere Combine.
12      Q    Okay.
13      A    A corn head, the W235 Windrower.  There's
14  probably some things that I'm missing like the -- it's
15  supposed to be a 560M Baler, but the Rotary Disc
16  Windrow, the 5004 instead of an S.  So yes, there are
17  several anomalies on here that aren't BankFirst
18  collateral.
19      Q    Is it just with regard to the John Deere
20  property though, sir, that you just identified?
21      A    Nope.
22      Q    Okay.  What other collateral shouldn't be on
23  this list?  In your opinion.
24      A    Premier 605 Baler.  I didn't even own a
25  Premier Baler, so that's weird.
```

Page 17

```
1       Q    Okay.
2       A    A 510 -- a 5010 Wheatland tractor.  Didn't own
3   one of those either, so
4       Q    Okay.
5       A    So no, this is a -- I don't know where the
6   list came from, but --
7       Q    Okay.
8       A    -- this is not a accurate list.
9       Q    But other than the John Deere and the items
10  you just identified, is everything else consistent with
11  your memory as to what BankFirst had an interest in?
12      A    Nope.  Another John Deere 7810, my son owned
13  that tractor, and he paid for it and everything.  So
14  yeah, this is a -- there are quite a few things on here,
15  but not everything.
16      Q    And I understand that.  So I'm saying we've
17  identified some John Deere equipment and we've
18  identified a few other items that you said you never
19  owned.  Other than those items, the John Deere and the
20  items that you never owned, is there anything else on
21  here that you would contend in your opinion was not the
22  BankFirst collateral?
23      A    I don't know what a John Deere Rogator is.
24  That's an anomaly.  They don't make a Rogator.  I have
25  no idea what that even means.  An Ag-Systems AG800 VRT
```

Great Plains Reporting Company
1299 Farnam Street, Ste. 300
Omaha, NE 68102

GREAT PLAINS
REPORTING
YOUR PATH THROUGH LITIGATION

Phone: 1-402-303-3399
Fax: 502-584-0119
schedule@yourdepositions.com
www.yourdepositions.com

4:22-cv-03039-JMG-MDN    Doc # 65-9    Filed: 11/20/23    Page 6 of 33 - Page ID # 1977
The Deposition of RORY KROEGER, taken on February 17, 2023
18..21

Page 18

1  Dry Spreader, didn't have one of those.  I don't know.
2      Q      Okay.
3      A      There's a lot of different anomalies in here,
4  so it's hard to say.
5      Q      All right.  And you've just identified those
6  anomalies, any better?
7      A      A lot of it, yes is part of what I --
8  BankFirst collateral, but I would really have to dig in
9  to understand what would not be considered BankFirst
10 collateral.
11     Q      Based on your memory sitting here today, have
12 you identified all the items now that you don't believe
13 were BanFirst collateral from -- that are listed on this
14 figure here.
15     A      No, I have not identified all of them.  I
16 can't tell you sitting here today if they had a lien on
17 a IH 2275 Tender Truck or not.
18     Q      All right.  So --
19     A      I don't know.
20     Q      Well, how would you find out?  In other words
21 --
22     A      You would have to go back to the BankFirst
23 files and dig through them and see all that legal
24 language, what they had marked on their inventory, and
25 as well as if they had -- I don't remember, I don't

Page 19

1  think that they had any on any titled vehicles or
2  trailers, so I don't know without looking at documents.
3      Q      Okay, sir.  So is it fair to say that
4  BankFirst should have in its files, in its loan
5  documents, should accurately reflect what it had an
6  interest in?  Would you agree with --
7      A      if this -- if this came from BankFirst, then
8  this is not an accurate reflection, no.
9      Q      Okay.  My question was different.  You would
10 agree with me, sir, that the documents that BankFirst
11 has that outlined the collateral that it -- that it took
12 in connection with your loans, that is an accurate
13 listing, what is in the BankFirst file?
14     A      I wouldn't know unless I saw the listing.
15     Q      Okay, so you wouldn't know.  And if, sir, did
16 you, independent of BankFirst, did you maintain any
17 record of the collateral that BankFirst had a lien on?
18     A      Yes.
19     Q      Okay.  And what document is that list
20 reflected on?
21     A      You tell me.  It's somewhere in here,
22 probably.
23     Q      Nope, sir, you need to answer my question.  I'm
24 looking for a document that lists all the collateral
25 that BankFirst had a lien in, okay?  Do you have that

Page 20

1  document?  Do you have a document?
2      A      I would not have that document anymore, no.
3      Q      Okay.  And how -- did you have it at one
4  point?
5      A      When I was with BankFirst, yes, but I switched
6  computers, I've moved, a lot of stuff has been in boxes.
7  I have no idea.
8      Q      So sir, your testimony here today is that you
9  had a document or documents that reflected the
10 collateral that you had with BankFirst, but you no
11 longer had those?
12     A      I don't believe so, no.
13     Q      And you can't remember sitting here today
14 without looking at a document what interest BankFirst
15 had in any of your personal property?
16     A      I said, that she can attest to, there are
17 plenty of items on this list that BankFirst does have,
18 it's just not an accurate list.
19     Q      Okay. So some of the items, your testimony are
20 reflected in Exhibit 1 of Exhibit B of Exhibit 40 --
21     A      Some of the items, correct.
22     Q      Okay.
23     A      Not all.
24     Q      All right, sir, let's move on.  Actually
25 before we move on, sorry.  Whose idea was it to file

Page 21

1  this motion?  Exhibit 40?
2      A      That would be Patrick.
3      Q      And at any point, sir, did you discuss the
4  filing of Exhibit 40 with Mr. Stehlik?
5      A      With Mr. Stehlik?
6      Q      Yes.
7      A      If I retained Patrick Patino and no longer
8  retaining Mr. Stehlik, there would be no reason to do
9  that.  So I would think no.
10     Q      All right, sir.  So just to be clear, without
11 the preface, you did not consult Mr. Stehlik prior to
12 filing Exhibit 40; is that correct?
13     A      I don't know.
14     Q      All right, sir, you knew -- you -- you strike
15 that.  Did you or did you not, it's a yes or no
16 question, speak with Mr. Stehlik regarding the filing of
17 Exhibit 40?
18     A      Patrick would've done it maybe.
19     Q      Sir, I'm asking if you did, not if Patrick did
20 it, did you consult with Mr. Stehlik?
21     A      I don't know when I terminated and went to
22 Mr. Stehlik, I don't know when the last date I talked to
23 him was, if it was before this or after this, I wouldn't
24 have a clue unless I looked at some documents.
25     Q      So your testimony sitting here today is you

Great Plains Reporting Company
1299 Farnam Street, Ste. 300
Omaha, NE 68102

GREAT PLAINS
REPORTING
YOUR PATH THROUGH LITIGATION

Phone: 1-402-303-3399
Fax: 502-584-0119
schedule@yourdepositions.com
www.yourdepositions.com

Page 22

1  don't know whether you discussed 40 with Mr. Stehlik
2  prior to filing it?
3      A    I discussed it with him?
4      Q    Yes.
5      A    I said probably not.
6      Q    Thank you.  Other than filing Exhibit 40, did
7  you discuss with Mr. Patino any other options with
8  regard to your bankruptcy case?
9      A    Options as far as what?
10     Q    Did you discuss with Mr. Patino selling
11 property at that time?
12     A    The property was basically already seized.
13     Q    So the answer is no, you didn't discuss it
14 with him?
15     A    I think -- I think Patrick tried to call
16 Mr. Galyen and say, "Hey, you know, we'd like to remedy
17 something like this," but Mr. Galyen, I think, I don't
18 know, was unresponsive.
19     Q    Okay.  So other than contacting Mr. Galyen and
20 filing Exhibit 40, were there any other options with
21 regard to your bankruptcy case that you discussed with
22 Mr. Patino?
23     A    Well, yeah, we wanted to try every option.
24     Q    Okay.  So what were the other options?
25     A    Like you just said, selling land, machinery,

Page 23

1  whatever it took to reserve some of the -- what was
2  left.
3      Q    You discussed selling land with Mr. Patino?
4      A    Yes.
5      Q    And what was his advice with regard to selling
6  land?
7      A    That it was a good idea.
8      Q    Okay.  And did he or you take any actions then
9  in March of 2020, in the spring of 2021, to sell any
10 property?
11     A    Given the -- what was -- when -- since you
12 have the documents, I don't know when we met with the
13 Court.  I think there was only like days away from
14 meeting with the court after I went there, got him
15 retained, did something like this, and then we went to
16 court, and then it was over.  And if you can't talk with
17 the other attorney or the bank, I don't believe there
18 was any other options on the table.
19     Q    Why couldn't you talk with the other attorney
20 or the bank?
21     A    Like I just said, they were unresponsive.
22     Q    So you attempted to make contact with the bank
23 and with the bank's attorney?
24     A    Mr. Patino did, yes.
25     Q    All right.  And other than filing this motion

Page 24

1  and trying to reach out to the bank, you're not aware of
2  any action that Mr. Patino took in the spring of '21
3  with regard to your bankruptcy case?
4      A    I don't believe there was time enough allowed.
5      Q    All right, sir, I want hand you --
6           COURT REPORTER:  41.
7           MS. GOODMAN:  Exhibit 41.  Yeah, thank you so
8  much.
9           (EXHIBIT 41 MARKED FOR IDENTIFICATION)
10          THE WITNESS:  Excuse me, Sarha?
11          COURT REPORTER:  Yes.
12          THE WITNESS:  Where would you like these?
13          COURT REPORTER:  You just keep them and I take
14 them at the end.
15          THE WITNESS:  Okay.
16          COURT REPORTER:  In case you need them again.
17          THE WITNESS:  Yep.  Thank you.  I'll just pile
18 them up right here.
19          COURT REPORTER:  Thank you.
20 BY MS. GOODMAN:
21     Q    All right, sir, if you could please read
22 through this document.  Let me know when you've had a
23 chance to review it.
24     A    Okay.
25     Q    All right, sir, who prepared this document?

Page 25

1      A    Me.
2      Q    Okay.  And what was the -- for what reason did
3  you prepare this document?
4      A    I just wanted it all on paper for Patrick.
5  Just noting what -- it's always confusing.  Galen and
6  Jeff, what I've -- what we've tried to accomplish and
7  what was happening, and this is what I told him what was
8  occurring right at the moment so that we -- he would be
9  up to speed.
10     Q    Okay.  And do you recall what date you
11 prepared this?  About what date?
12     A    It's not listed on here, so, no, I don't
13 recall.
14     Q    Well, if you look at the first question for
15 Patrick on the second page, it says, "Due to the bank
16 contacting our renters, Dixson Farms Inc, to not pay
17 rent because the land will be sold they are uncertain
18 what to do about the rent due April 1st."  Do you see
19 that?
20     A    Oh, okay.  Yep.
21     Q    So would you agree, sir, that this document
22 was prepared prior to April 1st?
23     A    I think so, yes.
24     Q    And sir, this document seems to outline a
25 number of items that I think you would characterize were

Great Plains Reporting Company
1299 Farnam Street, Ste. 300
Omaha, NE 68102



Phone: 1-402-303-3399
Fax: 502-584-0119
schedule@yourdepositions.com
www.yourdepositions.com

4:22-cv-03039-JMG-MDN   Doc # 65-9   Filed: 11/20/23   Page 8 of 33 - Page ID # 1979
The Deposition of RORY KROEKER, taken on February 23, 2023

26..29

Page 26

1   misconduct on the bank's part; is that correct?
2       A    Correct.
3       Q    And prior to April 1, 2021, did you fault the
4   bank for causing your business to fail?
5       A    Did I what?
6       Q    Fault the bank.
7       A    Fault the bank?
8       Q    Fault the bank.  In other words did you
9   believe --
10      A    Can -- can you explain that?
11      Q    -- did you believe the bank -- I'll rephrase.
12  So prior to April 1, 2021, did you believe it was the
13  bank's fault for your bank -- for your business failing?
14      A    In part, yes.
15      Q    Okay.  And why did you believe it was the
16  bank's fault?
17      A    Just as is stated in this document.
18      Q    So your testimony, sir, would be consistent
19  with the item set forth in Exhibit 41 as to why you
20  believed the bank was responsible in part for your
21  business failing?
22      A    Correct.
23      Q    Were there any other reasons with regard to
24  that you believed why your business failed?
25      A    Business failed?

Page 27

1       Q    Your business failed.
2       A    Huh.
3       Q    And your business being H&M Farms, correct?
4       A    Yes.
5       Q    All right.
6       A    I hired a different attorney, so I would
7   assume -- I would've thought at that time that Mr. Galen
8   Stehlik would've been part cause of it.
9       Q    What role did Mr. Stehlik play in your
10  business operations?
11      A    He -- we were in a bankruptcy at the time and
12  trying to create a plan so we could keep moving forward.
13  That was not done timely, it wasn't done efficiently.  A
14  lot of people weren't contacted properly.
15      Q    I'm going to move to strike.  The response is
16  non-responsive.  I'm asking simply what role did
17  Mr. Stehlik play in the operations of H&M Farms?
18      A    Oh, nothing other than representing it for
19  bankruptcy.
20      Q    Okay.  Thank you, sir.  All right.  All right,
21  let's go through -- ah, look at this.  Sorry.  Okay,
22  sir, if we could look at Exhibit 41 here.
23      A    The same one?
24      Q    Can I have the copy I gave you?  I didn't give
25  you a copy, I'm sorry.

Page 28

1       A    The same one?
2       Q    Yes.  Exhibit 41.  And I've just got some
3   questions on this.  I just -- a quick question under
4   Number 2, H&M Farms paid the replevin bill on time
5   according to records.  Do you see that?
6       A    Yes.
7       Q    Okay.  What's the replevin bill?
8       A    Just -- this one.
9       Q    So the $100,000 payment is what you --
10      A    It's right there.  It says a hundred thousand.
11  I'm thinking that is there, I think.
12      Q    Okay.  So --
13      A    The replevin bill, I must have mistyped
14  something.  I don't know what a bill -- the replevin
15  action would probably have been a better word for it.
16      Q    Okay.  So your understanding of what that
17  meant is just that you paid the $100,000?
18      A    Correct.
19      Q    Okay.  Sir, if you go down to Number 9, you
20  list some mineral and certified irrigation acre rights
21  that are not included in the loan documents.  Do you see
22  that?
23      A    Yep.
24      Q    All right.  Did the -- what is the value of
25  the mineral and certified irrigation rights, do you

Page 29

1   believe with regard to -- well, first off, what are
2   those rights?  Where are they --
3       A    Mineral rights, back in the 1960s, one of the
4   farm pieces, I would call it Alex's, in the 1960s, they
5   actually -- maybe it was 50s.  I don't know.  My dad
6   passed away.  I don't have access to those records.  They
7   drilled for oil.
8       Q    Okay.
9       A    They didn't have enough technology at that
10  time to -- to do it the right way or whatever.  So we've
11  always kind of reserved the mineral rights in our
12  ledgers, but it was never filed on time, I guess.  And
13  certified irrigation acres, when you're the owner of the
14  wells, me personally and H&M Farms, you have to have
15  those acres certified within those well rights.  And that
16  was never -- that was always in our H&M Farms ledger,
17  but never filed within record.  Galen told me to get
18  those filed, and so we did, but it was filed late and
19  untimely and -- and I guess it didn't make any
20  difference.
21      Q    Okay.  And are those -- when the land was
22  foreclosed on, essentially, when you lost possession of
23  the land, I assume that these mineral and irrigation
24  rights went with the land; is that correct?
25      A    They were in the -- what do I want to say?  In

Great Plains Reporting Company
1299 Farnam Street, Ste. 300
Omaha, NE 68102

GREAT PLAINS
REPORTING
YOUR PATH THROUGH LITIGATION

Phone: 1-402-303-3399
Fax: 502-584-0119
schedule@yourdepositions.com
www.yourdepositions.com

4:22-cv-03039-JMG-MDN   Doc # 65-9   Filed: 11/20/23   Page 9 of 33 - Page ID # 1980
The Deposition of RORY KROEGER, taken on February 23, 2023
30..33

Page 30

1  Howard County's register of deeds, they were recorded.
2  But according to Mr. Galyen at the day of the sale, when
3  I tried to bring it up to him, it means nothing. They're
4  gone.  Doesn't -- shouldn't even have done it. You had a
5  bad attorney.
6      Q    All right.
7      A    I talked to him.  That's what he said.
8      Q    Okay, sir.  I'm going to move to strike the
9  question -- or the response is non-responsive.  I -- I'm
10 just asking, did these mineral and irrigation rights, do
11 you still have these today or are -- did they get
12 transferred with the land?
13     A    They transferred, yes.
14     Q    They transferred with the land?
15     A    Yes.
16     Q    Okay.  And at any point, sir, had you done any
17 re -- research as to the value of what those rights were
18 prior to the time that they were transferred to the
19 bank?
20     A    No.
21     Q    Sir, on Exhibit 41, again, this is a document
22 you drafted.  Is this -- I just want to be clear.  Is
23 everything in this document true and accurate to the
24 best of your belief?  For the sake of time.
25     A    To the best of my belief.

Page 31

1      Q    All right.  Sir, I've handed you what's been
2  marked as Exhibit 42.  Please review and then let me
3  know when you've completed it.
4          (EXHIBIT 42 MARKED FOR IDENTIFICATION)
5      A    Okay.
6      Q    All right, sir.  I want to focus on the second
7  page of this document and the e-mail from Patrick Patino
8  to you.  Do you see that?
9      A    Yes.
10     Q    And do you -- do you recall receiving this
11 e-mail?
12     A    Yes.
13     Q    Okay.  It's dated April 1, 2021.  Patrick
14 writes, "If we were throwing a Hail Mary, thought I'd
15 also include this motion.  Review and let me know what
16 you think.  If good to go, I will include this when I
17 send to Jeff and we'll file along with the other
18 motion."  Do you see that?
19     A    Yes.
20     Q    Did you discuss the filing of the motion which
21 is on Exhibit 40 as essentially being a Hail Mary
22 approach?
23     A    Like I said, it was a 50-50.  I would consider
24 that a Hail Mary.
25     Q    So sitting here today, you -- it's your

Page 32

1  understanding that a Hail Mary is a 50-50 shot.
2      A    If you got a good quarterback.  You never
3  know.
4      Q    And in fact, was the motion -- reflecting to
5  Exhibit 40, was that successful?
6      A    No.
7      Q    And it's your understanding, sir, the court
8  actually denied Exhibit 40?
9      A    That, I don't know.
10     Q    But you know it was unsuccessful.
11     A    Correct.
12     Q    All right.  Let's see here.  All right.  Sir,
13 I've got -- I don't have an extra copy of this.  This is
14 a previous -- prior exhibit.
15          COURT REPORTER:  Do you want to go off the
16 record?
17          MS. GOODMAN:  Let's go off the record for a
18 second.  Yeah.
19          COURT REPORTER:  We're off the record.  The
20 current time is 11:23 a.m.
21          (OFF THE RECORD)
22          COURT REPORTER:  We're back on the record. The
23 current time is 11:23 a.m.
24          MS. GOODMAN:  I need to find this.
25 BY MS. GOODMAN:

Page 33

1          COURT REPORTER:  Do you want me to mark his
2  copy?
3      Q    I need to find this.  Oh, I'm sorry.  Let's
4  mark that copy.  Could you give that copy to Diana? All
5  right, sir.  Please go ahead and review this document
6  and then let me know if -- when you have a chance.
7      A    Yes.  Okay.
8      Q    Okay, sir, I want to start with the first
9  e-mail here in the third paragraph.  And I'm focused on
10 this -- the third sentence of that third paragraph where
11 it says, "The Kroegers have also provided me with
12 information regarding financing that they've lined up to
13 take out BankFirst."  Do you see that?
14     A    Uh-huh.
15     Q    All right.
16          COURT REPORTER:  I'm so sorry about that. Thank
17 you.
18     Q    This e-mail is dated March 31st of 2021.  Do
19 you see that?
20     A    Yes.
21     Q    Okay.  Which -- what financing had you lined
22 up to take out BankFirst as of March 31st of 2021?
23     A    I don't remember his name right off the top of
24 my head.  It was somebody that Patrick knew that I
25 contacted and he was willing to help us.  I don't

Great Plains Reporting Company
1299 Farnam Street, Ste. 300
Omaha, NE 68102

GREAT PLAINS
REPORTING
YOUR PATH THROUGH LITIGATION

Phone: 1-402-303-3399
Fax: 502-584-0119
schedule@yourdepositions.com
www.yourdepositions.com

Page 34

1 remember his name.

2    Q   And how was he willing to help you?

3    A   Just as it states.

4    Q   So he was willing to pay off the BankFirst

5 debt; is that correct?

6    A   He wanted to facilitate a meeting so we could

7 discuss what -- what that would be like. But yes.

8    Q   Okay. And did that meeting ever occur?

9    A   You read it here. No.

10    Q   And so did he -- was it an individual or was

11 it a -- an actual bank, an institution, that was willing

12 to pay out the BankFirst debt?

13    A   It was an individual.

14    Q   And did the -- individual work through a

15 company, do you know?

16    A   It was -- it'll come to me. I -- I apologize.

17 I can't remember his name or the company's name. Yes,

18 there was a company.

19    Q   Okay. And was there any sort of signed

20 commitment to pay the money to pay off the BankFirst

21 debt, do you know, with this individual?

22    A   The individual wanted to talk to BankFirst to

23 get them to see what all of it entailed. I don't know

24 if they ever got communicated -- or communicated

25 together or not.

Page 35

1    Q   Okay. The answer, though, is no, there was no

2 signed commitment that the money would be used -- the

3 money would -- they would come up with the money to pay

4 BankFirst off.

5    A   Yes, there was a commitment, but with the

6 contingent, "We got to know what it is what BankFirst is

7 actually asking."

8    Q   Was the commitment in writing, sir?

9    A   I'm pretty sure it was.

10    Q   Would you have a copy of that written

11 commitment?

12    A   If I did, it'd be buried somewhere. I don't

13 know.

14    Q   Who else -- other than the individual,

15 Mr. Patino, and you, who else would have known about the

16 -- this individual wanting to pay this BankFirst debt

17 off?

18    A   I think we discussed it a little bit at the

19 auction with Clark Froehlich. I did.

20    Q   What auction?

21    A   When it went to auction to say, "Hey, at the

22 last minute, this guy is still interested. What do you

23 think?"

24    Q   And I'm going to -- did this individual come

25 with you? And what auction are you referring to, the

Page 36

1 auction of the land or --

2    A   The auction of the land.

3    Q   And so the trustee sale?

4    A   The trustee sale.

5    Q   And did this individual come -- well, did you

6 attend the trustee sale?

7    A   I did.

8    Q   Did this individual come along with you?

9    A   He did not because Mr. Froehlich did not

10 return his calls.

11    Q   And at the trustee sale, sir, did you bid on

12 any of the land that was for sale?

13    A   I couldn't because I didn't have -- the two

14 individuals did not talk, so I didn't have the financing

15 in place to make it happen.

16    Q   And do I assume then, sir, that you also

17 didn't have the money to bid? You personally didn't

18 have the money to bid at the trustee sale?

19    A   I was in bankruptcy. The answer would be no.

20    Q   And sir, is it fair to -- is it accurate to

21 say that BankFirst, as of early April of 2021, was not

22 willing to postpone the trustee sale for a period of 60

23 days, as Mr. Pino -- Patino requested?

24    A   If you can make that work out of that

25 sentence, I'll buy it. It says, "Unfortunately, we have

Page 37

1 a conflict. The court requested that I ask you -- ask

2 if you are amendable to another possibly earlier hearing

3 date to my filing for another date. Please let me know

4 at your earliest convenience." Didn't say -- if it says

5 we have a conflict, it didn't say that they were not.

6    Q   Sir, I'm asking a different question. Can you

7 look on page 3 of Exhibit 43?

8      (EXHIBIT 43 MARKED FOR IDENTIFICATION)

9    A   Okay.

10    Q   In the final communication on this page, it

11 appears that Mr. Patino is asking Mr. Galyen to postpone

12 the foreclosure sale and the replevin for a period of 60

13 days.

14    A   Oh, got you.

15    Q   Do you know whether or not BankFirst agreed to

16 postpone the foreclosure sale and replevin action as

17 requested here?

18    A   I would say that would be, obviously, no.

19    Q   And it is your recollection, sir, that during

20 this time period in March and April of 2021, BankFirst

21 was not interested in negotiating with you to resolve

22 the debt; is that correct?

23    A   I don't know.

24    Q   Okay, sir. Let me ask it again. Did you --

25 let me ask it a different way. Did you, sir, during the

Great Plains Reporting Company
1299 Farnam Street, Ste. 300
Omaha, NE 68102

GREAT PLAINS REPORTING
YOUR PATH THROUGH LITIGATION

Phone: 1-402-303-3399
Fax: 502-584-0119
schedule@yourdepositions.com
www.yourdepositions.com

4:22-cv-03039-JMG-MDN   Doc # 65-9   Filed: 11/20/23   Page 11 of 33 - Page ID #
1982
The Deposition of KURT KROEGER, taken on February 10, 2023
38..41

Page 38

1 spring of 2021, attempt to reach out to BankFirst to
2 negotiate a resolution of this debt?
3      A    States it right here.  "With the Kroegers
4 exploring selling the land and machinery and equipment
5 to third party to refinance debt, would the bank be
6 agreeable?"
7      Q    So you attempted to.  The answer is yes.
8      A    Yes.
9      Q    Okay.  And were they willing to negotiate?
10     A    There's no response after that.  I don't know
11 if Clark Froehlich was ever notified at all.  I wouldn't
12 have any idea.  Mr. Galyen was kind of a - a-- a very
13 difficult attorney.
14     Q    But suffice it to say, sir, you were never
15 able to negotiate a resolution of the debt with
16 BankFirst in the spring of 2021; is that correct?
17     A    No.
18     Q    That's not correct or you were not able to?
19     A    Not able to.
20     Q    Okay.  Sir, did you ever reach out directly to
21 Mr. Stehlik and ask him to participate in the April 15th
22 hearing on the motion to modify the plan?
23     A    No.
24     Q    During the trustee sale in April of 20 --
25 well, you recall, sir, that the trustee sale of the land

Page 39

1 that was owned by you, your wife, and H&M Farms that was
2 held on April 19th of 2021; is that correct?
3      A    Yes.
4      Q    And you attended?
5      A    Yes.
6      Q    Did you -- did anybody else attend with you?
7      A    No.  Not with me, but there was a lot of
8 people there.
9      Q    And of the individuals that were there, do you
10 recall whether anybody bid on this land?
11     A    BankFirst did it in such a way where it made
12 it almost impossible for anybody to own any individual
13 piece of land.  They put it all into one big lump sum
14 and wanted an enormous amount of money, so it was
15 impossible for anybody in that community to bid on
16 something of that price.
17     Q    So to answer your question, there was nobody
18 else that bid on the land at the trustee sale, to your
19 knowledge.
20     A    Nobody.
21     Q    So I want to switch gears here.  I've handed
22 you what's been marked as Exhibit 44.  And I just want
23 to be clear.  It appears that your e-mail address,
24 kurt@husker.net, is listed on the top of this e-mail; is
25 that correct?

Page 40

1         (EXHIBIT 44 MARKED FOR IDENTIFICATION)
2      A    Yes.
3      Q    Okay.  Do you recall receiving this e-mail?
4      A    I read through it.  Repeat your question.
5      Q    Do you recall receiving this e-mail?
6      A    Yes.
7      Q    All right.  And do I understand, sir, that
8 Cline Williams was representing you in connection with
9 the claim against Helen Greenwalt?
10     A    Yes.
11     Q    And sir, is it my understanding that the claim
12 with Helen Greenwalt, the amount of damages that you
13 were seeking with respect to that -- with respect to
14 that claim was around the $9,600 and $2,900; is that
15 correct?
16     A    No.  There was more.
17     Q    There was more?
18     A    Yep.
19     Q    Okay.  I don't see more in this e-mail, and so
20 I guess I'm wondering --
21     A    There was previous talks and discussion
22 because they terminated my contract prematurely just
23 because they didn't like me.  And so I already had
24 soybeans contracted and all that kind of stuff.  So it
25 was bigger than that.  We were just trying to, in this

Page 41

1 e-mail, collect, "Hey, this is what I have in it."
2      Q    Okay.  So I want to make sure I understand
3 because I'm -- I've got -- it looks like this dispute
4 with Ms. Greenwalt dates back to 2018.
5      A    Yep.
6      Q    But then in connection with Exhibit 36 of a
7 previous deposition exhibit, there's also an affidavit,
8 I'll just show this to you, of that Lauren Greenwalt
9 offer.
10     A    Two separate -- two separate entities.
11     Q    And that's what I'm trying to understand.
12     A    Yep.
13     Q    So let's start with -- well, let me ask this.
14 There's been some discussion in this lawsuit that there
15 wasn't a claim against Ms. Greenwalt listed in
16 connection with your bankruptcy schedules.  Do you -- do
17 you remember that -- this allegation?
18     A    There was a claim.
19     Q    There was a claim?
20     A    There was a claim.  I -- I told -- okay, let's
21 skip that.  I don't know.
22     Q    Okay.  I'm trying to figure out which claim
23 that is because it appears there may be two claims.
24 There's a claim from 2019 and a claim from 2018, and I'm
25 trying to understand which claim you're -- you contend

Great Plains Reporting Company
1299 Farnam Street, Ste. 300
Omaha, NE 68102

GREAT PLAINS REPORTING
YOUR PATH THROUGH LITIGATION

Phone: 1-402-303-3399
Fax: 502-584-0119
schedule@yourdepositions.com
www.yourdepositions.com

Page 42

```
 1    should have been pursued in connection with your
 2    bankruptcy case.
 3        A    Helen Greenwalt.
 4        Q    Okay.  And is the Helen Greenwalt claim, was
 5    Cline Williams representing you with regard to that
 6    particular claim?
 7        A    Correct.
 8        Q    Okay.  All right.  So getting back, then, to
 9    Exhibit 44.  There are some damages listed in this
10    letter, but they appear to amount to, again, roughly
11    $12,000.  Would you agree with that?
12        A    Yes.
13        Q    Okay.  Is that the total value of the claim
14    against Ms. Greenwalt, is the $12,000.
15        A    No.
16        Q    All right.  What other damages did you believe
17    were recoverable in connection with the claim against
18    Ms. Greenwalt that Cline Williams was assisting you
19    with?
20        A    If you've already -- from my understanding
21    from Mr. Stehlik and Cline Williams, if you've already
22    had a contract, you offered to pay the money for the
23    contract, they said, "No, we don't like you," and they
24    booted you off, even though you've already grid sampled,
25    ag lined, repaired the pivots, you've already have your
```

Page 43

```
 1    soybeans contracted, you already have everything in
 2    place, the soybeans bought for the property, then I had
 3    to return stuff.  So this was just the -- these damages
 4    were just for the repairs in the ag line, the physical
 5    money that I had spent, not what I would've made that I
 6    had one year left on the lease.
 7        Q    Yeah.  Got you.  Okay.  So these were the
 8    costs that were essentially out as a result of this
 9    termination by Ms. Greenwalt?
10        A    Correct.
11        Q    And those total costs amounted to around
12    $12,000?
13        A    Correct.
14        Q    All right.  And then it sounds like there's
15    another component of damages that you believed you were
16    entitled to, and that related to lost income?
17        A    Because I was booted off, terminated without
18    any reason other than she didn't like me.
19        Q    And did you discuss that lost income with
20    Cline Williams when they were assisting you with this
21    claim in 2018?
22        A    I did.
23        Q    And what did they tell you with regard to
24    whether those damages were recoverable?
25        A    I did not pay them.  I filed bankruptcy and
```

Page 44

```
 1    then he was supposed to take it over.
 2        Q    Sir, I want you to answer my question.  What
 3    did Cline Williams tell you about whether or not the
 4    damages for lost income were recoverable in connection
 5    with this claim against Ms. Greenwalt?
 6        A    They said yes, a couple 100,000.
 7        Q    100,000, okay.  I do not see, sir, in this
 8    communication to Ms. Greenwalt's counsel, Mr. Milner, I
 9    do not see any sort of claim for the $200,000 damages.
10    Would you agree with that?
11        A    Not on this e-mail, no.
12        Q    Okay.  Why, sir, were -- weren't those damages
13    pursued by Cline Williams?
14        A    Because this attorney wasn't going to be the
15    real attorney.  This was her son-in-law.  Jerry Milner
16    is her son-in-law, so there would be a conflict of
17    interest.  So we needed to -- we said, "Hey."  We told
18    him over the phone couple 100,000 type of stuff.  "Hey,
19    we'd really like to have this."  She wouldn't pay it.  We
20    threatened to sue even more and I filed bankruptcy, then
21    this occurred.
22        Q    All right, sir.  This letter went out in 2018.
23    And in fact --
24            (EXHIBIT 45 MARKED FOR IDENTIFICATION)
25        A    Yeah, it was the beginning of 2018 probably.
```

Page 45

```
 1        Q    All right.  Let's go ahead and read this.  We
 2    got to get this done.  Do you remember this demand
 3    letter, sir?
 4        A    Yes.
 5        Q    What's that?
 6        A    Yes.
 7        Q    Okay.  And do you agree, sir, this demand
 8    letter was sent May 3rd of 2018, correct?
 9        A    Yes.
10        Q    And this demand letter, sir, is, again, sent
11    in connection with the Helen Greenwalt claim, correct?
12        A    Correct.
13        Q    And it demands the total amount of $90 --
14    $9,969.  Do you see that?
15        A    On what page?
16        Q    First page.
17        A    Okay.
18        Q    Okay.  So sir, this is now May 3 of 2018.  And
19    just for context, you filed bankruptcy in March of 2020,
20    correct?
21        A    Correct.
22        Q    Okay.  So this is almost two years prior to
23    your bankruptcy filing, correct?
24        A    Correct.
25        Q    What did you do in those two years to pursue
```

Great Plains Reporting Company
1299 Farnam Street, Ste. 300
Omaha, NE 68102

GREAT PLAINS REPORTING
YOUR PATH THROUGH LITIGATION

Phone: 1-402-303-3399
Fax: 502-584-0119
schedule@yourdepositions.com
www.yourdepositions.com

4:22-cv-03039-JMG-MDN    Doc # 65-9    Filed: 11/20/23    Page 13 of 33 - Page ID #
1984
The Deposition of KURT KROEGER, taken on February 17, 2023
46..49

Page 46

```
1  your claim of $200,000 for lost revenue?
2      A    This was just the beginning demand letter. I
3  mean, we -- I had several communications with Cline
4  Williams. This was not the only -- this was like the
5  beginning of the claim.
6      Q    Okay. So your under --
7      A    Because I mean -- okay. To dig in it
8  factually, I was just booted off. I had 2018 -- if this
9  was dated May 3rd, I mean, that was right before the
10 next tenant was going to farm it. So this was the
11 beginning. I mean, we just found out like in March.
12 That was only -- yeah, March. Right there. Or whatever
13 it said. I thought I saw it somewhere.
14     Q    And sir, you knew in March of 2018, did you
15 not, that you were not going to realize the income from
16 this rental arrangement, correct?
17     A    Correct.
18     Q    All right. And the damage with regard to that
19 lost revenue is not included in this letter, correct?
20     A    Correct.
21     Q    Other than this letter, did you do anything
22 between the years May 3 of '18 and March of 2020 to
23 pursue your supposed claim for lost income from Helen
24 Greenwalt?
25     A    Yes.
```

Page 47

```
1      Q    What'd you do?
2      A    I continued to be in contact with Cline
3  Williams. They were handling it.
4      Q    And sir, if the documents from Cline Williams
5  show that they did not pursue any sort of lost revenue
6  from Ms. Greenwalt during that time period, would you
7  have any reason to dispute that?
8      A    Yes.
9      Q    Okay. What would -- what would you have to
10 dispute that?
11     A    Because we did discuss it.
12     Q    You discussed it, but what was done about it?
13     A    They had a stack of documents about that
14 thick. I -- this is a very small portion of that.
15     Q    So sitting here today, sir, you don't know
16 what, if anything, Cline Williams did to pursue your
17 claim for lost revenue between the time periods of March
18 -- May 3 of 2018 and March of 2020, correct?
19     A    Yes. I do know. They had communications with
20 Mr. Milner over the phone. What we can do, what we
21 can't do. He just flat out said, "We're not going to do
22 anything. We're not going to do anything." And it just
23 kept going back and forth.
24     Q    And so you're telling me sitting here today
25 that Cline Williams was charged by you to get more than
```

Page 48

```
1  this $9,969 from Ms. Greenwalt?
2      A    My bill with them, if you look at it, is
3  $50,000. So obviously, I needed more than that to get
4  them paid.
5      Q    And did that bill relate to the Helen
6  Greenwalt or did that --
7      A    Yes.
8      Q    That was only related to Helen Greenwalt?
9      A    Only related to Helen Greenwalt.
10     Q    Okay. And to your knowledge, sir, they never
11 filed a lawsuit, did they? Against Ms. Greenwalt. Cline
12 Williams. On your behalf.
13     A    I didn't have the money at that time to make
14 it go forward even further. I relied upon Mr. Stehlik
15 to do that.
16     Q    All right. And sir, just so I'm clear, on
17 Exhibit 36, this affidavit --
18     A    36?
19     Q    It's the affidavit. You don't have it. It's
20 a previous exhibit. This affidavit from Ms. -- from
21 Lauren Greenwalt. I just want to be abundantly clear.
22 This is something different. This is not -- this has
23 nothing to do with the -- your claim against Helen
24 Greenwalt.
25     A    It has nothing to do with Helen Greenwalt.
```

Page 49

```
1      Q    Okay. That's -- and I assume you told
2  Mr. Patino about your claim against Ms. Greenwalt,
3  correct?
4      A    Yes.
5      Q    And do you know whether he took any action to
6  pursue that claim?
7      A    He would have if it would've went farther. But
8  like I said, it was only -- what? We just looked at the
9  documents. It was only just a couple days. From April
10 1st to April 15th.
11     Q    Okay. So what makes you believe that
12 Mr. Patino would have pursued it had the case gone
13 further?
14     A    Because then after the case -- after we lost
15 the case, I filed a Chapter 7, meaning I wouldn't have
16 enough money to go after Helen Greenwalt to properly
17 pursue that.
18     Q    And it's true, sir, is it not, that the
19 primary reason that you didn't pursue Ms. Greenwalt is
20 you didn't -- between the time period of May of 2018 and
21 March of 2020, is you didn't have the money to pursue
22 the claim, correct?
23     A    I paid it -- I owed them $50,000. It wasn't
24 going to go much further until I paid them off or did
25 something else.
```

Great Plains Reporting Company
1299 Farnam Street, Ste. 300
Omaha, NE 68102

GREAT PLAINS
REPORTING
YOUR PATH THROUGH LITIGATION

Phone: 1-402-303-3399
Fax: 502-584-0119
schedule@yourdepositions.com
www.yourdepositions.com

Page 50

1    Q    So that's a yes.  You didn't have the money to
2  pay -- to pursue the claim against Ms. Greenwalt during
3  that time period.
4    A    Yes, I had the money, but I was trying to
5  manage a loss.
6    Q    Okay.  So but differently, you didn't want to
7  pay the money to pursue that claim, isn't that correct,
8  sir?  During that time period?
9    A    I would've liked to, but I didn't.
10   Q    All right.  Sir, at some point -- well, on
11 May 3 of 2021, Mr. Patino filed a motion to convert your
12 Chapter 12 case to a Chapter 7.  Would you agree with
13 that?
14   A    Yes.
15   Q    All right.  And he did that at your direction,
16 correct?
17   A    Correct.
18   Q    And whose idea was that to file?
19   A    Mutual.  Both of us.
20   Q    Okay.  And tell me about that decision.
21   A    Well, we filed a Chapter 7 because I owed -- I
22 would've still owed money to all the individuals and
23 BankFirst took everything and I had no resources or any
24 money to pay them.  So we filed a Chapter 7 to liquidate
25 what was left, and that way, it was over with.

Page 51

1    Q    And did you, sir, consult with any other
2  attorneys with regard to your decision to file a Chapter
3  7, other than Patrick Patino?
4    A    I don't recall.  I may have asked some other
5  attorneys, but I don't recall.
6    Q    Okay.  So I'm going to show you -- no, that
7  one's mine.  It's got my highlight on it.  I apologize.
8         COURT REPORTER:  That's okay.
9    Q    This is going to be 46.  All right, sir, I've
10 handed you what's been marked as Exhibit 46.  Have you
11 seen this document before?
12        (EXHIBIT 46 MARKED FOR IDENTIFICATION)
13   A    No.  No.
14   Q    Okay.  So this is not a document you created?
15   A    Nope.
16   Q    Okay.  All right.  All right.  Sir, I'm going
17 to ask -- I'm going to go back and ask quickly just for
18 my own information.  Let me go back to Exhibit 4
19 quickly.  This is a listing that we looked at the
20 previous -- at the initial part of the deposition that
21 listed the property that you and Kathy owned.
22   A    Okay.
23   Q    Do you recall this exhibit at all?
24   A    Yes.
25   Q    Okay.  Could we go through here, because it

Page 52

1  appears there's a total of 12 tracts of land, correct?
2    A    Yep.
3    Q    And all of which amount to around 1,735 total
4  acres, correct?
5    A    Correct.
6    Q    Okay.  Can we just go through and on each one
7  of these, I just want to understand what this land was
8  used for in connection with your business.
9    A    Okay.
10   Q    Okay.  And then I'm also going to ask a few
11 other questions regarding to the income, but let's start
12 with the Home Place.  And if I identify them by these
13 names, will you -- will you know what --
14   A    Yes.
15   Q    Okay.  All right.  So let's start with Home
16 Place.  What was that property used for?
17   A    That's where I lived.  We had a shop, grain
18 bins, and just as it says, it had hay meadow and pivot
19 irrigated ground.
20   Q    Did that property, sir, generate any income
21 for you?
22   A    Yes.
23   Q    All right.  And what -- about on an annual
24 basis, how much income did that generate?
25   A    I'd have to do a bunch of calculations.  I

Page 53

1  wouldn't know the exact amount.
2    Q    Okay.  And I guess I'm looking for more of a
3  range.  On an annual basis, did it generate 50 to a
4  100,000 of income?  Or --
5    A    Oh, I would --
6    Q    Just a range?
7    A    I wouldn't have a range.  I wouldn't want to
8  guess at it.
9    Q    The -- and the hay -- or the acres there, do I
10 assume those were used to produce hay?
11   A    Some of them were hay and some of them were
12 pivot irrigated.
13   Q    Okay.
14   A    Which were corn ground.
15   Q    Okay.  All right.  What about Richard's?
16   A    Two center pivots that were primarily corn
17 ground.
18   Q    Okay.  What about Fry's?
19   A    Two center pivots, is -- majority of it was
20 corn ground.
21   Q    And just to be clear, you're not willing here
22 today to give me a range with regard to the income that
23 each of these parcels generated for you?
24   A    I'd have to go back to earlier documents and
25 just kind of calculate it out.

Great Plains Reporting Company
1299 Farnam Street, Ste. 300
Omaha, NE 68102

GREAT PLAINS REPORTING
YOUR PATH THROUGH LITIGATION

Phone: 1-402-303-3399
Fax: 502-584-0119
schedule@yourdepositions.com
www.yourdepositions.com

Page 54

1    Q    How would you calculate it out?
2    A    Income minus expenses.
3    Q    Okay.  And what documents would you look at to
4  calculate it?
5    A    Tax returns, balance sheets, all kinds of
6  stuff.
7    Q    All right.  Balance sheets.  And let's take a
8  break because I'm interested in those.  Do you have
9  those available for the time periods 2018, '19, '20?
10   A    That would be a BankFirst question.  I don't
11  have those available anymore.
12   Q    Do -- is it your testimony here today, you
13  believe from BankFirst has them?
14   A    I had to give them to them so they would have
15  them.
16   Q    All right.  And did you prepare income
17  statements on an annual basis?
18   A    You mean for tax returns?
19   Q    Well, tax returns or just for your own
20  bookkeeping purposes?
21   A    Yes.
22   Q    All right.  And would you have those income
23  statements for years '19, '20 and --
24   A    Nope.
25   Q    Where would those be?

Page 55

1    A    Just with the tax returns.
2    Q    Okay.  Were those documents destroyed, sir?
3    A    We moved, like I told you before.  I don't
4  know.  It might be in a box, in a warehouse.  I have no
5  idea.  I'd have to look.
6    Q    Okay.  And if, sir, I asked you to go back and
7  look for income statements related to those time
8  periods, would you be willing to do so?
9    A    Yes.
10   Q    And give those to Ms. Vogt?
11   A    Yep.
12   Q    All right.  All right.  So what about the
13  Bales property?  What was that property used for?
14   A    Bales property was mainly pasture.  It had one
15  pivot on it and some dry land.
16   Q    Okay.  So was that used then for -- with the
17  pivot, was that used for row crops?
18   A    Row crop.
19   Q    And --
20   A    Dry land was row crop.  Pasture was pasture.
21   Q    Okay.  What about a Alex's?
22
23   A    Alex's had a small center pivot on it, a
24  30-acre pivot, and then the rest was some years pasture,
25  some years we mowed it all for hay bales.

Page 56

1    Q    Okay.  So Alex's, that was primarily hay bales
2  or --
3    A    Pasture.
4    Q    Pasture.  And Fudd's property, what about
5  that?
6    A    Corner machine, center pivot, all corn ground.
7    Q    So all row crops?
8    A    Row crops.
9    Q    What about the golf course?
10   A    That was all hay bales.
11   Q    So no crops were on the golf course?
12   A    Other than hay bales.
13   Q    And Albert's?
14   A    That was a grass meadow.  It was all hay
15  bales.
16   Q    Fry's?
17   A    Which one?  Or no -- that would be Burgers.
18  Never mind.  Fry's would be all two pivots, all corn
19  ground.
20   Q    Burger's?
21   A    There was a 86 acres that was all corn ground
22  and there was a 13 acres that was just a grass meadow of
23  hay bales.
24   Q    And Alex's?
25   A    We've already stated that one.

Page 57

1    Q    That's on here twice?
2    A    Part of it's on there twice.  Some of it was
3  for hay bales, some of it was for that.  I owned part,
4  H&M owned the other part.
5    Q    Okay.  Sir, we talked last time about your
6  interest in getting out of row crops in the summer of
7  2020.  Do you recall that?
8    A    I had an interest in it.  I never was
9  interested in it.  I was -- because the machinery was
10  being sold, I had no choice but to rent it out.
11   Q    Rent what out?
12   A    The farm ground.
13   Q    Okay.  So as I understand it then, in the
14  summer of 2020, did you rent out the parcels that had
15  row crops on them?
16   A    I don't want to say something that's untrue.  I
17  don't remember what day it got rented out.
18   Q    Well, the parcels that had row crops, sir, did
19  you plant in the spring of 2020?  Did you plant crops in
20  the parcels that had row crops?
21   A    What year did I file bankruptcy?
22   Q    March of 2020.
23   A    Then no.  It was rented out.
24   Q    So all your parcels in the summer of 2020 that
25  had ground for row crops were rented out?  Is that

Great Plains Reporting Company
1299 Farnam Street, Ste. 300
Omaha, NE 68102

GREAT PLAINS REPORTING
YOUR PATH THROUGH LITIGATION

Phone: 1-402-303-3399
Fax: 502-584-0119
schedule@yourdepositions.com
www.yourdepositions.com

4:22-cv-03039-JMG-MDN    Doc # 65-9    Filed: 11/20/23    Page 16 of 32 - Page ID #
1987
The Deposition of RUDY KROESER, taken on February 10, 2023
58..61

Page 58

1  correct, sir?
2      A    Oh, my gosh.  I don't recall.  It's either '20
3  or '21.  I don't remember.
4      Q    Well, in '20 and '21 -- 2021.  Remember
5  there's a trustee sale held in the spring?
6      A    Yes.  So then yes, I -- I rented them out for
7  one year.
8      Q    For one year, you rented everything out?
9      A    Not everything, just the row crop.
10      Q    The row crop land.  Okay.  So what income
11  then, sir, in 20 of '20 -- 2020 after you filed
12  bankruptcy, what income were you counting on to fund
13  your farming operation?
14      A    As it stated in the previous documents -- I
15  can't remember which document you presented from the
16  list.  I had a sources of income and it would've stated
17  that what I would've counted on.
18      Q    Okay.  So what sources, just based on your
19  memory, would you have had?
20      A    The hay bales, the cash rent, a manure
21  business, trucking business, all of it.  There's a lot
22  of it.
23      Q    And were the sources of those income, sir,
24  enough to allow you to make your required payments to
25  BankFirst?

Page 59

1      A    More than enough.
2      Q    Okay.  And were the sources of those incomes
3  enough to allow you to make your payments on the
4  equipment?
5      A    More than enough.
6      Q    Okay.  So why didn't you pay BankFirst if you
7  had the money?
8      A    Like I told you in the past deposition, some
9  of the timings were not happening the way that they
10  should.
11      Q    Okay.  And why -- what was it about the
12  timings that caused them to not happen the way they
13  should?
14      A    As we just saw in a document in here, COVID
15  happened.  He wasn't talking to Galen.  I paid them
16  money.  They were sitting on checks.  Things weren't
17  happening the way that they should.  They -- he was
18  allowing stuff -- machinery to be taken away.
19      Q    Is it -- is it -- and I'm going to -- I'll
20  strike that as nonresponsive.  There wasn't a current
21  pending -- or question pending.  Sir, is it -- is it
22  fair to say that at the time the payments for -- were
23  due to BankFirst, you didn't have enough money to pay
24  them?
25      A    I had that in material but not converted into

Page 60

1  money yet.
2      Q    Sir, in August of 2021, there was a -- an
3  auction held for your -- auctioning off your personal
4  property.
5      A    Okay.
6      Q    Did -- actually strike that.  That's a bad
7  question.  Did you ever receive any money back from
8  BankFirst with regard to the auction of your personal
9  property?
10      A    No.
11      Q    We talked a little bit, I think last time
12  about appraisals.  There were some appraisal.  Do you
13  recall when appraisals were done of your land?
14      A    The -- I think we saw it in the last
15  deposition.  There was -- I can't remember his name.  Cy
16  Tanny with Agri-Businesses Associates, he updated his
17  appraisal and you showed me that at the last deposition.
18  That's the last one that would've been done.
19      Q    Okay.  So other than the appraisals we talked
20  about last time, you're not aware of any others that
21  were done?
22      A    No.
23      Q    Okay, sir.  With regard to your -- now, I just
24  -- one other question I thought of with regard to the
25  row crops.  Was your son farming during the summer of

Page 61

1  2020?
2      A    Yes.
3      Q    And what land was he farming?
4      A    He has his own property.
5      Q    And --
6      A    Plus he rented some of mine.
7      Q    Okay.  And the equipment that your son was
8  using in the summer of 2020, was it equipment that
9  belongs to H&M Farms or was that his own equipment?
10      A    Some own equipment, some he was renting from
11  H&M Farms as a part of the bankruptcy to help pay for
12  some of the plan.
13      Q    So your testimony is, your son was actually
14  paying for the equipment he was using from H&M Farms?
15      A    Yes.
16      Q    All right.  How much do -- I guess, what
17  records would exist that would show how much he was
18  paying for that equipment?
19      A    I think it would've been what you showed me at
20  the last deposition, the sources of income.
21      Q    And we'll talk about that.  Let's go off the
22  record here.
23          COURT REPORTER:  Okay.  We're off the record.
24      The current time is 12:08 p.m.
25          (OFF THE RECORD)

Great Plains Reporting Company
1299 Farnam Street, Ste. 300
Omaha, NE 68102

GREAT PLAINS
REPORTING
YOUR PATH THROUGH LITIGATION

Phone: 1-402-303-3399
Fax: 502-584-0119
schedule@yourdepositions.com
www.yourdepositions.com

Page 62

```
 1        COURT REPORTER:  Okay.  We're back on the
 2   record with the deposition of Kurt Kroeger being
 3   conducted.  My name is Sarha Buzi.  Today is
 4   February 17, 2023.  The current time is 12:17 p.m.
 5   Central Standard Time.
 6   BY MS. GOODMAN:
 7        Q    Okay, sir, in the -- in the initial deposition
 8   here, the first part of the deposition, we talked a
 9   little bit about the amount that was owed to BankFirst.
10   Do you recall that?
11        A    Yes.
12        Q    Okay.  In your understanding, sir, was it that
13   prior to the bankruptcy you owed BankFirst around 6
14   million?  Is that what your understanding was?
15        A    Yes, we had documents stating that.
16        Q    All right.  I may not have -- oh, I do have a
17   third copy.  There it is.  So I've handed you what's
18   been marked as Exhibit 47.
19             (EXHIBIT 47 MARKED FOR IDENTIFICATION)
20             COURT REPORTER:  Yep.
21        A    Okay.
22        Q    So first question I have is, as of the
23   bankruptcy filing, sir, is it your recollection you had
24   four loans with BankFirst?
25        A    I thought there were only three.  I don't
```

Page 63

```
 1   recall what this one is for, this 183,000.  I'd have to
 2   go back in some records and look.
 3        Q    Okay.  Well, sir, I --
 4        A    I just remember the -- the first one.  The
 5   second and third one were for like, land.  And then this
 6   one might have been for operating.
 7        Q    All right.  Sir, I have here the loan
 8   documents.
 9        A    Okay.
10        Q    Do you want to look at them to confirm that in
11   fact you did have that fourth loan.  Would that be
12   helpful?
13        A    Sure.
14        Q    All right.  I'll do this, I'll give you what's
15   been previously marked as Exhibit 3.  And if you could
16   go through -- and I think the promissory notes are
17   first.  They're right after the --
18        A    Oh, okay.  That first?
19        Q    Well, I think they're -- yeah, they start
20   about three pages in, four pages in.
21        A    Tell me the loan number.
22        Q    Ends in 558.
23        A    Oh yes, it does.  Perfect.  Okay.  Those are
24   that one.
25        Q    I think it's -- is that a new one?  Oh, no,
```

Page 64

```
 1   that's the same one.  Sorry.  Trying to be helpful but I
 2   wasn't.
 3        A    No, you're fine.  You know where they're at.
 4   More than I know.  Okay.  Okay.
 5        Q    Okay.  So does this refresh your memory that
 6   there were in fact four loans with BankFirst?
 7        A    Yes.
 8        Q    Okay.  And sir, with regard to these four
 9   notes, if I add up the principle, the interest and the
10   late charges, these balances, I get to around $8
11   million.  So I guess my question is, would you agree
12   with me that as of October 7, 2020, you indeed owed
13   BankFirst the sum total of these four loans?
14        A    No.
15        Q    Why not?
16        A    In September -- this is October.  September, I
17   believe I had another document that showed only about 6
18   million.
19        Q    Where's that document?
20        A    You had it before in the previous deposition.
21        Q    Can you identify what that document would've
22   been?
23        A    I gave it to Mr. Stehlik.  I -- in September,
24   I asked BankFirst what I owed the bank.
25        Q    Uh-huh.  And --
```

Page 65

```
 1        A    This is not it.
 2        Q    Okay.
 3        A    I got it -- I got it for myself.
 4        Q    Okay.  Sir, you don't dispute, however, you
 5   had four loans with BankFirst, correct?
 6        A    Correct.
 7        Q    And in fact, you just took the opportunity to
 8   go through the actual loan documents which you signed,
 9   correct?
10        A    Correct.
11        Q    And confirm the loan numbers tie out to what
12   the payoff balances are on Exhibit 47, correct?
13        A    No, the loan balances don't.
14        Q    Loan numbers, I said.
15        A    Loan numbers, yes.
16        Q    Tie out.  Perfect.  Okay.  Excellent.  And you
17   don't dispute, do you, sir, that any of the principal
18   amounts of the notes that you looked at in Exhibit
19   3 weren't actually lent to you?  Correct.
20        A    Say that one more time?
21        Q    You don't dispute that any of the principal
22   amounts on any of the loan balances contained within
23   Exhibit 3 weren't actually lent to you by BankFirst,
24   correct?
25        A    Weren't actually lent to me?
```

Great Plains Reporting Company
1299 Farnam Street, Ste. 300
Omaha, NE 68102

GREAT PLAINS REPORTING
YOUR PATH THROUGH LITIGATION

Phone: 1-402-303-3399
Fax: 502-584-0119
schedule@yourdepositions.com
www.yourdepositions.com

4:22-cv-03039-JMG-MDN   Doc # 65-9   Filed: 11/20/23   Page 18 of 33 - Page ID # 1989
The Deposition of RUDY KROEGER, taken on February 17, 2023
66..69

Page 66

1  Q   Right.  You can't dispute that they weren't?
2  A   Oh, I thought you meant that they weren't lent
3  to me.
4  Q   No, no, no.
5  A   They were.
6  Q   You would agree with me, sir -- I'll ask it
7  without the negatives.  You would agree with me, sir,
8  that the principal balances on the loans contained
9  within Exhibit 3 were in fact lent to you by BankFirst?
10  A   Correct.
11  Q   All right.  Sir, I want to go back or ask
12  about equity.  You understand, sir, do you not, what
13  equity -- what does equity mean to you in terms of the
14  equity in a -- in a piece of property?
15  A   The difference between what you owe and what
16  it's worth and what you sold it for and what you could
17  gain or realize the gain.
18  Q   Sitting here today, sir, how much equity did
19  you have in your -- all of your property, land, and
20  personal property in March of 2020?
21  A   Probably in excess of 12 million.
22  Q   That's your equity that you had after --
23  A   No, not equity.  Sorry.
24  Q   I'm just looking at that equity.
25  A   That -- that I don't know.

Page 67

1  Q   And --
2  A   I'd have to actually calculate it.
3  Q   And what would you look at to calculate that?
4  A   The difference is what I owed people like we
5  just discussed and the valuations that were placed on
6  the real property.
7  Q   Different question.  I understand how you
8  would calculate it.  I'm asking what you would actually
9  physically look at in order to calculate it.  What would
10  you need to calculate that?
11  A   The appraisal and machinery values.
12  Q   Okay.  And with regard to the machinery
13  values, what would you look at to determine those?
14  A   Auction prices.
15  Q   And sir --
16  A   And dealership prices.
17  Q   In or around March of 2020, did you do any
18  analysis to determine what those values -- the values of
19  your machinery was?
20  A   March of 2020, probably not.
21  Q   And we've already talked about appraisals last
22  time, correct?
23  A   Okay.
24  Q   All right.
25  A   Yes.

Page 68

1  Q   All right.  In November of 2020, would you
2  have any idea, sitting here today, what your equity in
3  the property that you owned was?
4  A   Not without calculating it, no.
5  Q   And to calculate it, what would you have to
6  look at for November of 2020?
7  A   Again, appraisals and what machinery values
8  were worth at that time.
9  Q   And do I assume, sir, that in November of 2020
10  you didn't do any sort of calculation in regards to your
11  equity?
12  A   I was in the midst of bankruptcy.  Correct?
13  Q   I mean, I ask -- I ask the questions.  I'm
14  sorry.
15  A   If -- if I was in the midst of bankruptcy, I
16  would've had to done some sort of calculation or help
17  Galen with it.
18  Q   Okay.  Do you see --
19  A   I don't remember the timeline exactly.
20  Q   Okay.
21  A   But you have in front of you.
22  Q   Let's do this then.  48?
23  COURT REPORTER:  Yep.
24  Q   All right, sir.  I handed you a packet of
25  documents that I believe relate to your bankruptcy.

Page 69

1  (EXHIBIT 48 MARKED FOR IDENTIFICATION)
2  A   Okay.
3  Q   And I want to go through these and maybe we
4  just do it together in terms of the pages here.  On the
5  very first page, sir, is this a document you've seen
6  before?
7  A   No.
8  Q   Does the document itself reflect information
9  that you believe you would've provided to Mr. Stehlik's
10  office?
11  A   I would assume yes.  If he's the one that
12  produced it, I would've had to give him some information
13  to come up with these numbers.
14  Q   Okay.  If we go to the second page, which has
15  a label five -- STL5551, three 5's and 1.  Is this your
16  handwriting, sir?
17  A   I am not that neat.  Nope.
18  Q   Okay.  So you don't recognize the handwriting
19  on this document?
20  A   Nope.
21  Q   Same question with 5552.
22  A   Nope, that's a legal pad.  It looks like it
23  would've been Mr. Stehlik's office because we don't --
24  Kathy and I, we don't have anything that has these holes
25  on the top of anything like that.  Ours would be more

Great Plains Reporting Company
1299 Farnam Street, Ste. 300
Omaha, NE 68102

GREAT PLAINS REPORTING
YOUR PATH THROUGH LITIGATION

Phone: 1-402-303-3399
Fax: 502-584-0119
schedule@yourdepositions.com
www.yourdepositions.com

Page 70

1   like a notebook.
2       Q    And I'm going to move to strike is non-
3   responsible.  I'm just asking, is this your handwriting
4   or not?
5       A    I'm not on any of what I see.
6       Q    Okay.  So 5552 and 5553 here, that is not your
7   handwriting?
8       A    Correct.
9       Q    All right.  Let's look at STE6290.  Is that
10  your handwriting?
11      A    Nope.
12      Q    What about -- on -- going back on 6290?  Is
13  that your wife's handwriting?  Do you know?
14      A    No, it is not.
15      Q    Let's look at STE590.  Is this your
16  handwriting?
17      A    No.
18      Q    Okay.  Is this your wife's handwriting?
19      A    This looks more like my wife's handwriting.
20      Q    Sir, did you -- do you believe your wife
21  completed this document?
22      A    Not without help.
23      Q    And who would she have relied on to help?
24      A    Me.
25      Q    All right.  Do you believe you helped her in

Page 71

1   completed this document?
2       A    If she, in fact -- if this is her handwriting,
3   then yes, I would've had to.  She would've known -- she
4   wouldn't have known any of these numbers.
5       Q    All right, sir, I want you to turn to page
6   STE592.
7       A    Okay.
8       Q    The -- first off, I want to start with, up at
9   the top it says, "Current or proposed farming season."
10  Do you see that?
11      A    Uh-huh.
12           COURT REPORTER:  I'm sorry.  Is that a yes?
13      Q    Is that a yes?
14      A    Yes.  Yep.
15      Q    Under Subpart A, crops, you see it listed hay
16  bales, alfalfa bales, bales, cornstalk bales, silage,
17  ryelage --
18      A    Yes.
19      Q    -- and manure.  You see that?
20      A    Yes.
21      Q    All right.  Who came up -- well, strike that.
22  Number of acres planted, did you come up with the
23  numbers in that column?
24      A    Yes.
25      Q    And then the estimated yield, did you come up

Page 72

1   with those numbers?
2       A    Yes.
3       Q    Okay.  And then same thing with estimated
4   price per unit?
5       A    Correct.
6       Q    And then total proceeds?
7       A    Yes.
8       Q    So as of the date that this schedule was
9   completed, was it your estimation that your farming
10  operation was going to yield, from crops, roughly
11  $800,000?
12      A    Correct.
13      Q    All right, sir.  Going down, it says, "Other
14  income, agronomy work."  Do you see that?
15      A    Yes.
16      Q    Can you just describe what that was?
17      A    I'm a certified crop advisor.  I'm a
18  commercial applicator.  I'm a certified chemigator, and
19  I have three honorary doctorates of agronomy.  I am an
20  agronomist.
21      Q    Okay.  So notwithstanding your status as an
22  agronomist, do you do that type of work to perform those
23  types of services?
24      A    Yes.
25      Q    And where did you obtain your doctorate of

Page 73

1   agronomy?
2       A    They're honorary.
3       Q    Or honorary.  Okay.
4       A    Yep.  One -- two of them from Dr. Dale
5   Flowerday, from the University of Nebraska, and one from
6   Tracey Carrillo with New Mexico State.
7       Q    What are the circumstances by which a
8   university confers an honorary agronomy degree?
9       A    I don't know.  They just -- these individuals
10  that are working professors gave them to me.  Just a
11  piece of paper.  It probably means nothing in your
12  world.
13      Q    Do I understand, sir, then they just reached
14  out of the blue and said, "We want to confer this degree
15  on you?"  Or --
16      A    Correct.
17      Q    Okay.  And there was -- did you have a
18  preexisting relationship with any of these professors?
19      A    Yes.
20      Q    And what was the nature of your relationship?
21      A    Dr. Dale Flowerday and I are fairly close
22  people.  So much in fact that he says, "If anybody
23  doesn't believe this piece of paper, I actually have his
24  doctorate of agronomy, he gave it to me when he passed
25  away."

Great Plains Reporting Company
1299 Farnam Street, Ste. 300
Omaha, NE 68102

GREAT PLAINS REPORTING
YOUR PATH THROUGH LITIGATION

Phone: 1-402-303-3399
Fax: 502-584-0119
schedule@yourdepositions.com
www.yourdepositions.com

Page 74

1  Q  Okay. So in other words, I guess, would you
2  characterize your relationship as you're friends with
3  him?
4  A  Yes.
5  Q  Okay. And is -- this individual, I take it
6  he's no longer living?
7  A  Correct.
8  Q  When did he pass away?
9  A  Maybe five years ago.
10  Q  Okay. And so who do you do agronomy work for?
11  A  When I was working for Wilbur Ellis, I was the
12  applicator and I did agronomy work for them and with
13  them.
14  Q  So in the March of 2020 time frame, did you
15  have contracts to do this work -- this agronomy work?
16  A  Not a contract, but I had contacts that were
17  going to pay me this. Yes.
18  Q  And I apologize, I'm just not familiar with
19  this type of business and how this works operationally.
20  Are these -- is this the type of work you go out and bid
21  and then they --
22  A  No. I -- what I do is I scout the fields. I
23  tell them whether they need to irrigate water. It's
24  like a per acre basis. I had a larger farmer that
25  offered me that amount at that time to go scout his

Page 75

1  fields for him.
2  Q  Got it. So this had been an amount -- this
3  $100,000, this had been an amount that was actually
4  offered to you at the time that you --
5  A  Correct.
6  Q  -- included it? And did you perform that work
7  that year for him?
8  A  No.
9  Q  And why not?
10  A  Because of all the other things that were
11  happening, and we're trying to save machinery and
12  everything. It just didn't happen.
13  Q  Got it. Rent ground crop. Do I take that
14  from just the renting of the row?
15  A  Correct.
16  Q  And who were some of your tenants for those
17  crops?
18  A  The Dixson's and -- oh, I just -- Steve
19  Roeder.
20  Q  And did your son rent ground from you?
21  A  Yes. My son. Sorry.
22  Q  Your son Jeremy. In terms of percentages, so
23  -- can you just give me an idea of how much land the
24  Dixson's would have rented from you?
25  A  Just in a percentage? About half.

Page 76

1  Q  About 50 percent? What about Steve?
2  A  Steve rented it from Jeremy.
3  Q  Got it. So do I take it then Jeremy would've
4  rented the other half of your ground?
5  A  Correct.
6  Q  And did -- were the leases with Jeremy written
7  or verbal?
8  A  Because of the bankruptcy everything had to be
9  written.
10  Q  Okay. Because I haven't seen any leases
11  produced. Do you have copies of those leases between
12  you and Jeremy?
13  A  He had copies of those leases.
14  Q  Okay. And did the payments -- did Jeremy make
15  his payments on a timely basis under those leases?
16  A  Yes.
17  Q  Okay. All right. I want to --
18  A  And because the leases got taken away from
19  Jeremy, that's why there is money owed to Jeremy.
20  Q  By who?
21  A  BankFirst. BankFirst took away the lease.
22  Q  I -- who owes the money to Jeremy?
23  A  Jeremy is still in this bankruptcy. There is
24  money that was due to him.
25  Q  Okay. His -- well --

Page 77

1  A  Sorry, I --
2  Q  No.
3  A  -- I said too much.
4  Q  All right. I want to -- do you -- do you
5  recall, sitting here today, about what the timing of the
6  payments that Jeremy owed for the ground that he was
7  renting? Do you recall when those were due?
8  A  No.
9  Q  Was it monthly?
10  A  No, it was semi-annually.
11  Q  Semi-annually.
12  A  So it would've been like March or April. And
13  then you know, like after harvest, October, November.
14  Q  October, November.
15  A  I don't know the constitution of the lease.
16  Q  And do you recall -- well, right here. So is
17  it safe to assume, sir, that out of the $268,000 that
18  you anticipated from the rent of the ground crops, 50
19  percent of that amount was going to be paid by Jeremy?
20  A  Correct.
21  Q  Okay. And you think just generally speaking -
22  - not holding you to it, but generally speaking, the
23  first payment would've been due sometime in the spring
24  and the second --
25  A  Correct.

Great Plains Reporting Company
1299 Farnam Street, Ste. 300
Omaha, NE 68102

GREAT PLAINS
REPORTING
YOUR PATH THROUGH LITIGATION

Phone: 1-402-303-3399
Fax: 502-584-0119
schedule@yourdepositions.com
www.yourdepositions.com

Page 78

```
 1      Q    -- payment in the fall?  Okay.  Let's move on
 2 from this.  All right.  Sir, I've handed you what's been
 3 marked as Exhibits --
 4           COURT REPORTER:  I think 49?
 5      Q    -- 49 and 50?
 6      A    And 50?
 7           COURT REPORTER:  I don't -- oh, this is your
 8 50.
 9           MS. GOODMAN:  Oh, I'm sorry.
10           COURT REPORTER:  Okay.
11 BY MS. GOODMAN:
12      Q    All right, sir.  All right.  I want you to
13 take a look, sorry, at 49 in -- Exhibit 49, which is the
14 third quarter operating report.  Do you see that?
15           (EXHIBIT 49 MARKED FOR IDENTIFICATION)
16           (EXHIBIT 50 MARKED FOR IDENTIFICATION)
17      A    Okay.
18      Q    And if you go to the fifth page of this
19 document, it appears it was signed by you and your wife.
20 But I'll ask, just with regard to your signature, is
21 that your signature?
22      A    Yes.
23      Q    Okay.  And sir, as I understand it, this is a
24 document that you prepared in connection with your
25 bankruptcy case; is that correct?
```

Page 79

```
 1      A    Correct.
 2      Q    All right.  Sir, I want to turn to the second
 3 page here of this document.  And it shows that there's
 4 farm ground rents received from Jeremy Kroeger on August
 5 of -- August 19 in the amount of $80,000; is that
 6 correct?
 7      A    Correct.
 8      Q    Okay.  So I'm wondering, is this the first
 9 payment that your son made during the year or is this
10 the second payment?
11      A    Oh, August.  Sorry.  That would've had to been
12 the second payment, I believe.
13      Q    You think the second payment.  Okay.  And so
14 the report of this -- the date of this report in terms
15 of the timing that it reflects isn't in here, but if you
16 go to the -- what would be the sixth page up at the top
17 of this report, it shows that this is for the third
18 quarter, and it shows the profit and loss detail of July
19 through September.  Do you see that?
20      A    Yes.
21      Q    Okay.  So does this refresh your memory that,
22 I guess, this report was prepared to capture the time
23 period July of 2020 through September of 2020?
24      A    It appears that way.  Correct.
25      Q    Okay.  And you believe then, sir, that this
```

Page 80

```
 1 would've been the second payment, this --
 2      A    Correct.
 3      Q    -- 80,000?
 4      A    Right, because it's already in August.
 5      Q    Okay.  In August of -- in August of any
 6 calendar year, just with regard to farming, the crops
 7 would still be in the ground at that point, correct?
 8      A    Correct.
 9      Q    Is it -- is it unusual to have a rent payment
10 being made when the crops are still in the ground?
11      A    Not necessarily, no.
12      Q    Okay.  And your testimony sitting here today
13 is that there would've been another $80,000 payment made
14 by Jeremy Kroeger that would've occurred in the spring
15 of 2020?
16      A    Correct.
17      Q    And you feel confident sitting here today that
18 that payment was in fact made?
19      A    Yes.
20      Q    Okay.  Do you then, sir, with regard to this
21 $268,000 going back to Exhibit -- oh, I -- it's around
22 here.  I'm jumping around because I wanted to cover
23 that.  If you could go back to Exhibit 48.  And I'm not
24 done yet.  I want to go to 592.
25      A    This one?
```

Page 81

```
 1      Q    Yeah.
 2      A    Okay.
 3      Q    If you go to 592 at the bottom here, and it's
 4 about halfway through.  It's --
 5      A    Oh.
 6      Q    -- it's the same page we just looked at.
 7      A    590?
 8      Q    So this 268,000, did -- was that -- did
 9 you actually receive 268,000 in calendar year 2020 for
10 ground crop rent?
11      A    I would've had to, yes.
12      Q    Okay.  What about with regard to rent pasture?
13 You have $24,000.  Who are you renting pasture to?
14      A    Dominick Helgoth.
15      Q    And was that under a written lease?
16      A    Yes.
17      Q    The lease -- the rent was paid under a written
18 lease?
19      A    I believe so, yes.
20      Q    All right.  And did --
21      A    It would've had to been.
22      Q    -- did you actually receive the $24,000?
23      A    Yes.
24      Q    All right.  Now down below here it says, "One
25 time 2019 additional income not yet received."  Do you
```

Great Plains Reporting Company
1299 Farnam Street, Ste. 300
Omaha, NE 68102

GREAT PLAINS
REPORTING
YOUR PATH THROUGH LITIGATION

Phone: 1-402-303-3399
Fax: 502-584-0119
schedule@yourdepositions.com
www.yourdepositions.com

4:22-cv-03039-JMG-MDN    Doc # 65-9    Filed: 11/20/23    Page 22 of 33 - Page ID #
1993
The Deposition of KURT KROESER, taken on February 21, 2023

82..85

Page 82

1  see that down at the bottom?
2     A    Yes.
3     Q    And sir, was this something that you inserted
4  into this document?
5     A    No, I did not insert -- all -- all the work
6  that we did is we hand -- this is -- Mr. Stehlik.
7     Q    Okay.  I'm confused because if you look at the
8  side, there's a little arrow that goes and points up.  Do
9  you see that?  That little arrow?
10    A    Okay.  Yes.
11    Q    And that appears to be in the same pen as --
12    A    Well, it's a copy --
13    Q    -- your handwriting.
14    A    -- it's a copy paper.  And no --
15    Q    So you're --
16    A    -- Kathy and I wouldn't have done that.
17    Q    Okay.  Well, one time 2019, with regard to how
18  this information got here, I want to talk to you about
19  the actual information.
20    A    Okay.
21    Q    "Corn stalk bales delivered."  Do you see
22  that?
23    A    Yep.
24    Q    All right.  And then there's also, "Corn stalk
25  bales to be baled," you see that?

Page 83

1     A    Correct.  Yep.
2     Q    All right.  So is this -- were these bales
3  that were essentially, you know, delivered and-or to be
4  baled in 2019, but in 2020 you just hadn't received the
5  income yet?
6     A    Correct.
7     Q    And you would agree with that?
8     A    Yes.
9     Q    Is that correct?  Okay.
10    A    But some of the information is false, like --
11    Q    Okay.
12    A    -- the Syngenta payment.
13    Q    Yes.
14    A    That was for that lawsuit.  Supposedly it was
15  going to be that amount, but since it was such a large
16  class action, the payment was far less than that.  So
17    Q    Is it possible, sir, that at the time these
18  schedules were put together, you thought you were going
19  to receive the 154,000?
20    A    Say that one more time.
21    Q    Is it possible, sir, that at the time these
22  schedules were put together, you believed you were --
23    A    Yeah.  Way back in 2019, yes.
24    Q    You thought you were going to receive --
25    A    Correct.

Page 84

1     Q    -- 154,000?  Okay.  So in other words, while
2  the payment may not have come in, it wasn't false that
3  this was the amount you were anticipating?
4     A    Yes.  Correct.
5     Q    All right.  "Government payment in October of
6  $46,000."  Do you see that?
7     A    Yes.
8     Q    This government payment, is this a payment
9  that you were getting on an annual basis?
10    A    Correct.
11    Q    And in -- well, strike that.  In October of
12  2019, was that payment due in '19?
13    A    They're always -- in the government payment
14  system, they're always a year behind.
15    Q    Okay.  So --
16    A    So the crops that you have made in 2019, you
17  would've not got paid for them until the 2020 season.
18    Q    Got it.  So this payment of $46,000, you were
19  anticipating this payment --
20    A    Yeah.
21    Q    -- to be paid in October of '19, but it was
22  actually related to crops in 2018; is that correct?
23    A    Okay.  No.  My belief is that this was the
24  2019 crop and this payment will be made in October of
25  2020 for the 2019 crop.

Page 85

1     Q    Okay.  So in previous years you had received a
2  similar payment, correct?
3     A    I believe so, correct.
4     Q    Okay.
5     A    Not always the same amounts, different varying
6  amounts.
7     Q    Sure.  So in October of '19, when did you
8  receive the payment for that year?
9     A    I wouldn't recall.  I don't know.
10    Q    So you don't -- sitting here today, you can't
11  tell me that the payment for 2019, you don't know when
12  you received that?
13    A    I don't.  No.
14    Q    Is it possible, sir, that as of March of 2020
15  you still hadn't received your government payment for
16  the prior year?
17    A    I wouldn't know.
18    Q    Well -- but the payment was issued to you,
19  correct?
20    A    Some payments were issued, yes.  When?  I
21  don't know.
22    Q    And to figure that out, you would have to look
23  at your bank statements, correct?
24    A    Or --
25    Q    Is that fair?

Great Plains Reporting Company
1299 Farnam Street, Ste. 300
Omaha, NE 68102

GREAT PLAINS
REPORTING
YOUR PATH THROUGH LITIGATION

Phone: 1-402-303-3399
Fax: 502-584-0119
schedule@yourdepositions.com
www.yourdepositions.com

Page 86

```
 1     A    -- correct.
 2     Q    Is it -- sir, the payments that are issued by
 3  the government and do -- I assume this is the USDA
 4  payment?
 5     A    Yes.
 6     Q    Okay.  These payments, are they -- do you
 7  always get them at a certain time of the year?
 8     A    No.
 9     Q    In years -- say in 2019, you don't -- sitting
10  here today, you don't recall when you received that
11  payment in 2019?
12     A    No.  There's different programs, different
13  payments and they all happen different times.  There's
14  like pasture programs and row crop programs, and
15  sometimes they end, begin.  I mean, you always go and
16  file for the programs in hopes that you get something,
17  but it's never -- the government is goofy that way.  I
18  apologize.
19     Q    So in other words, you never know at any given
20  time when you're going to get this payment from the
21  USDA?
22     A    This particular payment, there was some sort
23  of a program where -- because of -- oh, what was the
24  program?  This particular program had something to do
25  with some price losses and stuff like that.  So we had
```

Page 87

```
 1  to calculate, you know, our average yields and the whole
 2  nine yards.  This payment was a guaranteed payment,
 3  supposedly in October.  But because of COVID, it
 4  happened later.
 5     Q    Okay.  All right.  So -- and you don't recall
 6  in previous years when those payments come in?
 7     A    I do not.
 8     Q    All right.  Do -- as a -- as a matter of
 9  practice, in previous years when you were expecting
10  these payments, did you feel as though they'd come in
11  when expected?
12     A    Yes, they did.
13     Q    Okay.  And what indication did you have that
14  this particular payment was going to come in October?
15     A    I contacted the USDA and I believe Mr. Stehlik
16  had the piece of paper.  I got it in writing that it
17  should come at this date because of the bankruptcy,
18  because we needed to know things like that.  And so --
19  but then because COVID happened, it was substantially
20  later.
21     Q    Okay.  Well, this is -- again, this
22  information was prepared, I think, in connection with
23  your bankruptcy filing in March of 2020.
24     A    Right.  And --
25     Q    And it says --
```

Page 88

```
 1     A    -- they would've -- they would've stated, you
 2  know, when you're expected to have the payment.
 3     Q    So my question is, sitting -- in March or
 4  prior to that time of 2020, you believed that you were
 5  getting a payment of $46,000?
 6     A    Correct.
 7     Q    And your belief for receiving that payment
 8  was, according to you, a piece of paper from the
 9  government saying the payment's coming in October?
10     A    Correct.
11     Q    Okay.  And sitting here today though, you
12  don't have a copy of that document?
13     A    Not sitting here today, no.
14     Q    Do you have a copy of that document at home?
15     A    Maybe.
16     Q    Okay.  And if I ask you to check, will you?
17     A    Yes.
18     Q    All right.  All right.  And so with regard to
19  -- out of these one time 2019 additional income not yet
20  received, how many -- how much of this income actually
21  was received?
22     A    All of it except for the Helen Greenwalt ones.
23     Q    And was it received in all of those amounts or
24  some varying amount?
25     A    No, the -- the Syngenta amount was like --
```

Page 89

```
 1  only like 27 or 30,000.  It was nowhere near that
 2  amount.
 3     Q    And when did that amount come in?
 4     A    I don't recall.
 5     Q    Okay.  What about the other amounts?
 6     A    Corn stalk bales, that should have came in
 7  just like it was.  And earlage, yeah, that came in like
 8  it should have been.
 9     Q    Okay.  Sir, I've handed you -- strike that.  I
10  -- taking a look at Exhibit 49 and 50, if you look at
11  the second page of each of those documents --
12     A    Okay.
13     Q    -- would you agree with me, sir, that these
14  pages reflect all the income that you received during
15  the time periods of July of 2020 through December of
16  2020?
17     A    State your question one more time.  Sorry, I
18  was just reading.
19     Q    Yep.  With regard to the operating reports
20  that were filed in connection with your bankruptcy case,
21  I just want to know and get you to confirm that the
22  income with respect to your farming operations, the
23  revenue that you received is reflected in its entirety
24  on page 2 of each of these two operating reports which
25  are marked -- have been marked as Exhibit 49 and 50?
```

Great Plains Reporting Company
1299 Farnam Street, Ste. 300
Omaha, NE 68102

GREAT PLAINS REPORTING
YOUR PATH THROUGH LITIGATION

Phone: 1-402-303-3399
Fax: 502-584-0119
schedule@yourdepositions.com
www.yourdepositions.com

4:22-cv-03039-JMG-MDN   Doc # 65-9   Filed: 11/20/23   Page 24 of 32 - Page ID #
1995
The Deposition of KURT KROEKER, taken on February 10, 2023
90..93
90..93

Page 90

1      A      I can't say with a absolute certainty that it
2   was the entirety.  I don't know that.
3      Q      You think there was other income that's not
4   listed here?
5      A      I don't know.
6      Q      Okay.  Sir, I want you to turn now, on each
7   one of these documents, on page 5.  Each of these
8   documents.  Right there.  And confirm for me that that
9   is your signature on each of these documents?
10      A      Yes.
11      Q      Okay.  You understand, sir, that your
12   signature -- above your signature it says, "The debtor
13   name -- debtor's named here under verify that the
14   information is true, correct, and complete."  Do you see
15   that?
16      A      Yes.
17      Q      Okay.  So is it your still your testimony,
18   sir, that the -- you don't know whether or not the
19   revenue listed on page 2 of each of these operating
20   reports is accurate and complete?
21      A      This is for Kurt and Kathy, H&M Farms.  I had
22   other things going on too, so I don't know.
23      Q      Your testimony sitting here today is you don't
24   know; is that correct?
25      A      Well, if you can tell me that this was for

Page 91

1   Kurt and Kathy, and I think there was a separate one for
2   H&M Farms as well.  I think.
3      Q      Who is the owner of H&M Farms?
4      A      Me.
5      Q      Okay.  So you're the owner of H&M Farms,
6   correct?
7      A      I am.
8      Q      All right, let's continue on here.  If we
9   could go back -- seriously, this is -- all right.  Sir,
10   I've handed you again what's been marked as Exhibit 48,
11   and I'm specifically focused on page 593.
12      A      Okay.
13      Q      I'm sorry, 595.  If you could turn to --
14      A      Okay.
15      Q      Is this your signature on 595?
16      A      Yes.
17      Q      And it's dated March of 16, 2020, correct?
18      A      Correct.
19      Q      And sir, does this now refresh your
20   recollection that you completed these documents?  This
21   document that we've just discussed here?
22      A      Yes.
23      Q      Okay.  And on this document on 595 -- or on
24   this page, excuse me, it shows that you were
25   anticipating a total income from your farming operations

Page 92

1   of around 1.8 million.  Do you see that?
2      A      Correct.
3      Q      All right.  Did you receive 1.8 million in
4   connection with your farming operations in --
5      A      No.
6      Q      -- calendar year 2020?
7      A      No.
8      Q      Okay.  Do you know how much income you -- or
9   revenue you did in fact receive --
10      A      I do not.
11      Q      -- from your farming operations?  Sir, if we
12   could go to -- of the same document, go to pages -- or
13   page 6299.  Is this your handwriting, sir?
14      A      Yes.
15      Q      Okay.  And if you flip to the next page, is
16   that your handwriting?
17      A      Yes.
18      Q      All right.  And if you go two pages past there
19   -- one -- sorry, one more.  There it is.  From that
20   point forward, if you could just shuffle through, the
21   handwriting that is on those pages is -- on the pages
22   that follow from STE6303, is that your handwriting?
23      A      Yes.
24      Q      Okay.  Going back to 49 and 50 here, I just
25   want to be clear, I don't see in these schedules that

Page 93

1   any payment -- other than some payments to CH Brown, I
2   don't see any payments to any other equipment dealers,
3   whether it be John Deere, AGCO.  I just want to make
4   sure I'm reading that right.
5      A      Where would you find that?
6      Q      I think it's on page 4.  It would be there if
7   it was --
8      A      Looks like there was a payment.
9      Q      Yep, to CH Brown.  But I'm -- other than CH
10   Brown.
11      A      Okay.
12      Q      Did you make any other loan payments during
13   dependency of your bankruptcy to any other equipment
14   dealers?
15      A      I believe.  I don't see it, sitting here, in a
16   payment, but a John Deere 8130 was given back to --
17   because I owed money on it, to John Deere Financial to
18   help offset some of the payments.
19      Q      Okay.  And sir, I just want to make clear --
20      A      So no cash.
21      Q      Okay.
22         COURT REPORTER:  I'm sorry.  What was that?
23         THE WITNESS:  No cash.
24      Q      No cash.  Okay.  And other than -- and you
25   understood that in order to retain your collateral and

Great Plains Reporting Company
1299 Farnam Street, Ste. 300
Omaha, NE 68102

Phone: 1-402-303-3399
Fax: 502-584-0119
schedule@yourdepositions.com
www.yourdepositions.com

4:22-cv-03039-JMG-MDN  Doc # 65-9  Filed: 11/20/23  Page 25 of 33 - Page ID #
1996
The Deposition of KURT KROEGER, taken on February 17, 2023
94..97

Page 94

1   the equipment in general, you had to make payments on
2   the debt?  You understood that, didn't you, sir?
3       A    Once we had the plan in place, if that was
4   part of the plan, then yes.
5       Q    Okay.  In general, sir, you know, just as a
6   matter of a business owner, that if you're going to
7   borrow money from a bank or from an equipment dealer,
8   you have to repay that money, don't you?
9       A    Correct.
10      Q    And if you don't repay it, you also know, and
11  you knew prior to filing bankruptcy, that the equipment
12  could be repossessed?
13      A    Correct.
14      Q    All right.  It is a little after 1:00.  Can we
15  just go off the record?
16          COURT REPORTER:  Yep.  We're off the record.
17  The current time is 1:07 p.m.
18          (OFF THE RECORD)
19          COURT REPORTER:  We're back on the record for
20  the deposition of Kurt Kroeger.  My name is Sarha
21  Buzi.  Today is February 17, 2023.  The current time
22  is 1:27 p.m.
23  BY MS. GOODMAN:
24      Q    Mr. Kroeger, could we pull out Exhibit, I
25  think it's 48, one last time?  All right.  We've talked

Page 95

1   a little bit about whether or not your handwriting was
2   found on some of the pages in Exhibit 48.  Do you recall
3   that?
4       A    Yes.
5       Q    All right.  And -- in the prior deposition, we
6   had discussed that there were some pages -- or some
7   handwritten notes that you had given Mr. Stehlik?
8       A    Correct.
9       Q    Are those handwritten notes found within
10  Exhibit 48?  Thank you.  I think you're thinking of
11  another exhibit.  Yeah, I think --
12      A    No, sorry.  I'm sorry.  I don't see any
13  handwritten notes.  Oh, there you go.  One page.
14      Q    Okay.  That is -- so, I'm sorry.  That is --
15  you're looking at page 6290.
16      A    90.
17      Q    That is your handwriting?
18      A    No.
19      Q    Oh.
20      A    That is not my handwriting.
21      Q    Okay.  So --
22      A    I don't write that neat.
23      Q    The handwritten notes that you were --
24      A    And these are not mine or Kathy's handwriting.
25      Q    Okay.  So the handwritten notes that you were

Page 96

1   referring to in the prior deposition, your testimony
2   here today is that they are not found within Exhibit 48?
3       A    No.
4       Q    All right.  And do you remember any other
5   details with regard to those notes?  In other words,
6   what was included on them?
7       A    It depends on what you're referring to.  I
8   mean, I wrote lots of notes for Mr. Stehlik.
9       Q    I guess I'm thinking in preparation to file
10  the bankruptcy case and prepare your schedules?
11      A    There were lots of different notes that I
12  handed Mr. Stehlik.
13      Q    Okay.  And what were the -- describe them for
14  me.
15      A    Oh gosh.  Just how I calculated hay bale money
16  and how I -- I mean, it was just multitude of different
17  notes.  I mean, we would talk here for hours.  I don't
18  think you want to do that.
19      Q    I don't, but I do want to try to provide
20  enough description with regard to the handwritten
21  documents so that we can identify them.  And --
22      A    Yeah.
23      Q    -- for the purposes of selling
24      A    There were calculations for hay bales and how
25  I come up with earlage and what -- is all handwritten

Page 97

1   notes.
2       Q    Okay.  So other than your calculations, any
3   other notes that you can think of in terms of -- with
4   regard to the filing of the bankruptcy?  So preparing
5   the schedules and filing the bankruptcy.  Anything else
6   that you can think of in terms of information you
7   provided to Mr. Stehlik?
8       A    Whatever he needed, I wrote it down and gave
9   it to him.
10      Q    Okay.  But sitting here today, other than
11  calculations, you can't remember anything specific other
12  than the calculations that you provided Mr. Stehlik?
13      A    I said there's lots of specifics.  I mean,
14  inventory, machinery, other documents, all that stuff
15  was handwritten and given to Mr. Stehlik.  Tons of
16  information.  We could sit here for hours if that's what
17  you really want to do.
18      Q    Sir, I guess I'm just looking for an answer to
19  my question, which is --
20      A    Yes, I've written a lot of information to
21  Mr. Stehlik and he has them.
22      Q    Okay.  And the information you provided were
23  calculations, information about your inventory,
24  information about equipment --
25      A    Equipment, values of machinery at the current

Great Plains Reporting Company
1299 Farnam Street, Ste. 300
Omaha, NE 68102

GREAT PLAINS
REPORTING
YOUR PATH THROUGH LITIGATION

Phone: 1-402-303-3399
Fax: 502-584-0119
schedule@yourdepositions.com
www.yourdepositions.com

Page 98

1  time, land appraisals, communications back and forth
2  saying, "Hey, I can't get Mr. Galen to -- to answer his
3  phone. Hey, what -- " I had questions for Mr. Stehlik.
4  You know, if I had questions throughout the week, I
5  would write them down and then hand it to him so I would
6  remember to ask these questions. Like I said, we could
7  go on for hours --
8      Q    Okay.
9      A    -- if you really want me to.
10     Q    Did you -- I'm -- again, I'm just looking for
11 answers to my questions. Did you, sir, ever retain any
12 copies of any of the notes that you gave Mr. Stehlik?
13     A    Handed -- they were handwritten copies
14 firsthand and given to Mr. Stehlik.
15     Q    So you have no written -- you have -- you have
16 nothing in writing to show what you provided
17 Mr. Stehlik?
18     A    It was all given to him.
19     Q    All right. Sir, we had talked last time, with
20 regard to the hay bales, did the bank have an interest
21 in the hay bales that you were generating from your
22 property?
23     A    Yes.
24     Q    They had a security interest in those hay
25 bales?

Page 99

1      A    Yes.
2      Q    All right. And were --
3      A    Any growing crop.
4      Q    And when those hay bales were sold and cash
5  was received, was that money then given to BankFirst?
6      A    If you say it did, then it did. I don't know.
7  It'd have to be in the documents. Whatever happened to
8  the money is right there.
9      Q    As a matter of practice -- as a matter of your
10 practice and your farming operation, when you received
11 cash from hay bales, where would that cash go?
12     A    Into the bank account.
13     Q    Okay. And we've seen with regard to the third
14 and fourth quarter of 2021 -- of 2020, we've seen an
15 accounting, correct -- of the cash that came in and out
16 of your farming operations, correct?
17     A    Somewhat, yes.
18     Q    Well, it's -- somewhat? What isn't?
19     A    I don't know. Like I said, I don't think both
20 of it is included.
21     Q    Both of it is included -- what do you mean?
22     A    This is either Kurt and Kathy, or H&M Farms. I
23 don't believe it's both.
24     Q    Well, it's H&M Farms.
25     A    Okay.

Page 100

1      Q    Okay. So -- and you're the sole owner of H&M
2  Farms, correct?
3      A    Correct.
4      Q    Does H&M Farms have any other officers other
5  than you?
6      A    Kathy.
7      Q    Kathy's an officer. What's her title with H&M
8  Farms?
9      A    Secretary.
10     Q    Okay. And what's your title with H&M Farms?
11     A    President.
12     Q    Other than Kathy, any other officers?
13     A    No.
14     Q    All right. So is the accounting for H&M Farms
15 and its farming operations in Exhibits 50 -- 49 and 50,
16 is that true and correct to the best of your knowledge?
17     A    To the best of my knowledge.
18     Q    Okay. And so we've looked at the accounting
19 with regard to the time period of July of '20 through
20 the end of 2020. I'm wondering, where would I look to
21 figure out how much income H&M Farms or you personally
22 earned with regard to your farming operation, from
23 January of 2021 through April of 2021? Where would I
24 look?
25     A    I don't know. Whatever I made or whatever got

Page 101

1  sold at that time, I mean, that would've been BankFirst.
2  A lot of the property and everything was gone. I didn't
3  have anything at that time to sell.
4      Q    Well, I'm -- we just looked earlier today,
5  sir, that there was a trustee sale held on April 15th,
6  or I think it was -- actually, I think it was May of
7  2021. Does that ring a bell? A trustee sale with
8  regard to the property?
9      A    Yes.
10     Q    So is it fair to say that you were in
11 possession of the land, from January of 2021 through
12 that trustee sale?
13     A    Correct.
14     Q    So any income that you derived from that land,
15 where would I have to look in order to determine --
16     A    From January to when?
17     Q    To May of 2021?
18     A    There would've been no income.
19     Q    So no income from hay bales, no income from
20 January '21 to May of 2021?
21     A    Well, yeah, it would've been -- the only thing
22 would've been -- at that time would've been, yes, maybe
23 some hay bales or anything of that nature, and possibly,
24 we -- we paid -- I forget what time we paid BankFirst.
25 We paid BankFirst in that time frame.

Great Plains Reporting Company
1299 Farnam Street, Ste. 300
Omaha, NE 68102

GREAT PLAINS
REPORTING
YOUR PATH THROUGH LITIGATION

Phone: 1-402-303-3399
Fax: 502-584-0119
schedule@yourdepositions.com
www.yourdepositions.com

4:22-cv-03039-JMG-MDN   Doc # 65-9   Filed: 11/20/23   Page 27 of 33 - Page ID #
1998
The Deposition of CURTIS KROESER, taken on February 17, 2023                    102..105

Page 102

1    Q    Uh-huh.
2    A    Gave them a sizable check.
3    Q    Okay.  With regard to the hay bale revenue
4  during that time frame, where would I have to look to
5  determine how much was earned?
6    A    In the documents.
7    Q    What documents?
8    A    Whichever ones that Galen would've provided,
9  or Patrick.
10   Q    What documents?  You're owner of this
11  business, sir.  What documents?  If you wanted to find
12  out, as owner of this business, how much did I earn
13  during this time period, where would you look?
14   A    In the documents.
15   Q    What documents?
16   A    I just told you.
17
18
19   Q    No, you didn't.  You told me some -- about
20  something you gave to somebody.  I want to know what
21  document?  Would you look at a bank statement?  Where --
22  a financial statement?  What would you have to look at
23  to determine how much income --
24   A    I'm sure, yes.  A bank statement or a
25  financial statement.  Yes, correct.

Page 103

1    Q    Bank statement.  Did you bank at BankFirst
2  during that time period?
3    A    No.
4    Q    Where'd you bank?
5    A    Home Federal.
6    Q    We talked, sir, at the prior deposition, of
7  some hay bales sitting on some property in December of
8  2020.  Do you remember that?
9    A    Correct.
10   Q    I would assume those hay bales were inevitably
11  delivered and sold.  Is that a safe assumption?
12   A    Yes.
13   Q    Okay.  What was the timing of those getting
14  delivered and sold?
15   A    I wouldn't have any idea unless I looked at
16  the records.
17   Q    What records?
18   A    Records that I provided to Mr. Stehlik.
19   Q    Sir, I'm not interested in what you provided
20  to Mr. Stehlik.  I'm interested in what records as you
21  as owner would look at in order to determine how much
22  you earned from those hay bales that were purportedly
23  sitting on your property, in December of 2020.
24   A    I wrote down how many hay bales were sitting
25  on each property and gave them to Mr. Stehlik.

Page 104

1    MS. GOODMAN:  Okay.  I'm going to move to
2  strike that as non-responsive.  Let's read it back.
3    COURT REPORTER:  Do you want the question or
4  the answer?
5    MS. GOODMAN:  The question.
6    COURT REPORTER:  Okay.
7    (REPORTER PLAYS BACK QUESTION)
8    A    Tax returns.
9  BY MS. GOODMAN:
10   Q    I'd look at your tax returns?
11   A    Tax returns and whatever information was
12  provided with those.
13   Q    Okay.  And sir, will you -- are you willing to
14  provide to me your tax returns for 2021?  Or -- I'm
15  sorry, 2020?
16   A    They're in the bankruptcy.  You have them.
17   Q    Okay.  If they're not in the bankruptcy, are
18  you willing to provide those?
19   A    I don't have that information.  It's in the
20  bankruptcy paperwork.
21   Q    So would Mr. Patino have those then?
22   A    2020, Mr. Stehlik would've had those.
23   Q    2020, sir -- your bankruptcy was filed in
24  2020.
25   A    Bankruptcy's filed in 2020, yes.

Page 105

1    Q    Right.  So your tax returns for 2020 generally
2  aren't prepared until 2021.  So I'm looking for --
3    A    Oh, got you.  I see what you're saying.  I
4  don't know.  I'll have to have --
5    Q    Do you -- go ahead.
6    A    I do not prepare them, no.
7    Q    Who prepares them?
8    A    My accountant.
9    Q    Who's your accountant?
10   A    Jennifer.
11   Q    Jennifer from where?
12   A    Saint Paul.
13   Q    Saint Paul, Minnesota?
14   A    Nebraska.
15   Q    Nebraska.  Okay.  And is Jennifer with an
16  accounting firm?
17   A    She is an accounting firm.
18   Q    And what's her last name?
19   A    Smydra.
20   Q    Can you spell that?
21   A    I have no idea.
22   Q    Smydra.  And does she operate just --
23   A    She's a sole accountant.
24   Q    Sole accountant.  All right.  And she prepared
25  your account -- your tax returns for 2020; is that

Great Plains Reporting Company
1299 Farnam Street, Ste. 300
Omaha, NE 68102

GREAT PLAINS
REPORTING
YOUR PATH THROUGH LITIGATION

Phone: 1-402-303-3399
Fax: 502-584-0119
schedule@yourdepositions.com
www.yourdepositions.com

Page 106

1  correct?
2      A   All throughout the bankruptcy, and prior.
3      Q   And prior.  And does she also -- was she also
4  your bookkeeper?
5      A   No.
6      Q   Who, if anyone, served as your bookkeeper for
7  your farming operations?
8      A   We did.
9      Q   And how did you track your disbursements and
10  revenue?
11     A   QuickBooks.
12     Q   And the QuickBooks file served for this time
13  period, do you -- are you still in possession of that?
14     A   No.
15     Q   What happened to it?
16     A   We just changed computers.  I have no idea.
17     Q   Okay.  So your testimony is here today that
18  you no longer have the QuickBooks file for this time
19  period?
20     A   No, don't have it.
21     Q   You don't have it?
22         COURT REPORTER:  I'm sorry.  Is that a no?
23     A   No, I do not have it.
24     Q   All right.  I want to be sure on one other
25  item here.  As I'm pulling this out, sir, do you recall

Page 107

1  -- with regard to the John Deere property that you
2  surrendered in order to pay down some of the debt, do
3  you recall around what time frame that was --
4      A   No.
5      Q   Surrendered?  And who did you surrender that
6  to?
7      A   At the time, I don't know what it was called.
8  It was either the Green Line Equipment or AKRS
9  Equipment.  I don't know when they changed their name.
10     Q   Okay.  And is that a John Deere dealer?
11     A   Yes.  I think John Deere asked them to come
12  pick it up.
13     Q   Okay.  Sir, I'm going to hand you what's been
14  previously marked as Exhibit 34.  And for the record,
15  I'm going to pages -- it's Exhibit A of 34.  Here we go.
16  Oh.  No, you don't -- you don't have it.
17     A   Oh, okay.
18     Q   It's from a previous -- so I'm looking at
19  Exhibit A to Exhibit 34.
20     A   Yep.
21     Q   Did you -- if you could just look through
22  Exhibit A, did you provide that information to
23  Mr. Stehlik?
24     A   Yes.
25     Q   In connection with your bankruptcy?  And on

Page 108

1  the next page?
2      A   Yes.
3      Q   Turn to the next page after that.
4      A   Yes.
5      Q   And next page after that.
6      A   Yes.
7      Q   Okay.  So these were all -- this was all
8  information that to your knowledge, sitting here today
9  is true and correct?
10     A   Assumption and sources, it may not have
11  happened in that way, so no, I don't know if it's true
12  and correct.
13     Q   Okay.  But nevertheless, you --
14     A   And these are cash flow sheets, not actual
15  cash.  So if something happened or something happened,
16  it -- it might not be true and correct of what you
17  produced.
18     Q   Okay.  So not withstanding whether or not
19  reality is consistent with what's in these statements,
20  or what actually happened is consistent, it's your
21  testimony that the information provided on Exhibit A, is
22  in fact what you provided to Mr. Stehlik?
23     A   Correct.
24     Q   Okay.
25     A   Oh, can I have this for one second?

Page 109

1      Q   Yeah.
2          THE WITNESS:  Sorry, you asked about that.
3  That's how you spell it.
4          COURT REPORTER:  Oh, thank you.
5          THE WITNESS:  Sorry.
6          COURT REPORTER:  It's all right.
7      A   You got it?
8  BY MS. GOODMAN:
9      Q   Yep.  Thank you.
10     A   Sorry about that.
11     Q   No problem.
12     A   Here you go.
13     Q   All right, thanks.  One other question.  With
14  regard to the hearing that occurred before the Court, in
15  April of 2021, do you recall that?
16     A   Yes.
17     Q   I just -- and this is my memory, and we may
18  have covered this again, but -- or covered this
19  previously, but did you at any point ask Mr. Stehlik to
20  appear on your behalf at that hearing?
21     A   No, I did not ask him to appear.
22     Q   Sir, we had looked at some projections with
23  regard to what you anticipated your farming operation
24  was going to earn in 2020; do you recall?
25     A   Okay.

Great Plains Reporting Company
1299 Farnam Street, Ste. 300
Omaha, NE 68102

GREAT PLAINS
REPORTING
YOUR PATH THROUGH LITIGATION

Phone: 1-402-303-3399
Fax: 502-584-0119
schedule@yourdepositions.com
www.yourdepositions.com

Page 110

```
 1      Q    Do you recall the Exhibit 48 that we looked
 2  at?
 3      A    Okay.
 4      Q    Is that a yes?
 5      A    Yes.
 6      Q    Okay.  The hay bales that you were
 7  anticipating generating throughout the pendency of your
 8  bankruptcy, did some of those hay bales come from the
 9  Golf course?
10      A    Yes.
11      Q    So in other words, was the Golf Course needed
12  in your farming operation?
13      A    No.
14      Q    Wasn't needed?
15      A    It didn't produce that many hay bales.
16      Q    Okay.  How many hay bales did that produce in
17  a given year?
18      A    Like only -- gosh -- 100-to-200.
19      Q    Did the Golf Course have any other, I guess,
20  usage?  Did you use the Golf Course for any other
21  purpose other than hay bales?
22      A    No.
23      Q    All right.  So 100-to-200 hay bales.  And I
24  believe, I think I saw an estimate for the unit price
25  per hay bale in the documents you provided.  Do you --
```

Page 111

```
 1  do you recall offhand what a hay bale usually is sold
 2  for?
 3      A    It's like 100 and -- $100 a ton or something
 4  like that, at that time frame -- 120, something like
 5  that.
 6      Q    Okay.
 7      A    And a hay bale weighs roughly around 1500
 8  pounds, so it's not $120 a bail.  It's per ton.
 9      Q    Okay.  When did you acquire the golf course?
10      A    When my dad passed away.
11      Q    Was -- did you inherit that golf course from
12  your father?
13      A    Correct.
14      Q    Okay.  When did your dad pass away?
15      A    2017.
16      Q    Okay.  All right.  Other than that golf
17  course, did you inherit anything else -- any other land
18  from your father?
19      A    Yes.
20      Q    What other property?
21      A    Basically, the rest of the shares of H&M
22  Farms, everything that H&M Farms had in its entirety,
23  and like Alex's part of that pasture -- part of the
24  pasture next to the golf course or the hay meadows.  So
25  yes, a few pieces of land.
```

Page 112

```
 1      Q    And when you inherited that land, was it --
 2  was there a lien against it?
 3      A    Yes.
 4      Q    And was that lien with BankFirst?
 5      A    No.
 6      Q    Okay.  Who -- so who -- I guess, what bank had
 7  the lien against the land that you inherited from your
 8  father?
 9      A    I'd have to look at the documents.  I don't
10  remember what bank.
11      Q    Okay.  Was there equity in the property you
12  inherited?
13      A    Yes.
14      Q    Do you recall how much?
15      A    $10 million worth of property, and we only
16  owed half, so five -- 5 million bucks.
17      Q    Okay.  So wait a minute.  The -- do I
18  understand that all the property that's -- we went over
19  earlier today --
20      A    It's just a rough guess.  You asked for a
21  guess.
22      Q    Hang on.  Let me ask my question.  All the
23  property that we discussed earlier today, and in the
24  prior deposition of the land, was all of that inherited
25  from your father?
```

Page 113

```
 1      A    No.
 2      Q    Okay.  So it was -- and when you inherited,
 3  there was debt against it, correct?
 4      A    Correct.
 5      Q    And so I guess what I'm -- my question was, is
 6  how much equity did you inherit in 2017, with regard to
 7  just that -- I'm not talking about the whole --
 8      A    Oh, I -- I would have to sit down and
 9  calculate that.
10      Q    Okay.
11      A    It would take a while.
12      Q    Okay.  Let's mark -- this is the final exhibit
13  here.  I promise.  All right.  Sir, I want to ask, have
14  you had any communications with Rick Myers, ever?
15           (EXHIBIT 51 MARKED FOR IDENTIFICATION)
16      A    I -- can we go off the record for one second?
17      Q    No, not with a -- no.
18      A    Okay.  Is Rick Myers the same trustee as the
19  first trustee?  I don't remember.
20      Q    Rick Myers is the Chapter 7 trustee.
21      A    Who is the -- who is the Chapter 12 or the
22  Chapter -- yeah, 12 trustee.  What was his name?
23      Q    Overcash.  James Overcash.
24      A    Oh.  I had communications with Overcash.  I
25  don't know -- if I did, it'd be very, very brief.  I
```

Great Plains Reporting Company
1299 Farnam Street, Ste. 300
Omaha, NE 68102

GREAT PLAINS REPORTING
YOUR PATH THROUGH LITIGATION

Phone: 1-402-303-3399
Fax: 502-584-0119
schedule@yourdepositions.com
www.yourdepositions.com

4:22-cv-03039-JMG-MDN   Doc # 65-9   Filed: 11/20/23   Page 30 of 32 - Page ID #
2001
The Deposition of KURT KROEGER, taken on February 01, 2023        114..117

Page 114

1   don't recall hardly talking to him at all.
2       Q    Did you ever -- well, let me ask this then.
3   Did you -- in whatever communications you had -- may
4   have had with Rick Meyers, did you recall discussing
5   this malpractice claim?
6       A    No.
7       Q    With him?  Okay.  Have you had communications
8   with Diana Vogt?
9       A    Yes.
10      Q    What -- can you just describe when those
11  communications occurred?  When was the first
12  communication?  Let me ask that.  It's a better
13  question.
14      A    Gosh -- I don't recall.  It was just probably
15  a brief phone conversation just to ask some basic
16  questions.
17      Q    Okay.  Have you ever had any in-person
18  meetings with Ms. Vogt?
19      A    Once.
20      Q    Okay.  And about what time was that?
21      A    I don't recall.
22      Q    Was it this fall?
23      A    I don't remember.
24      Q    Okay.  And what was discussed at the in-person
25  meeting?

Page 115

1       A    She just had questions over what was being
2   filed back and forth, so I could clarify some things.
3       Q    Okay.  Do you remember anything specific
4   regarding the meeting?
5       A    Nope.
6       Q    When were you first aware that this
7   malpractice claim was going to get filed against
8   Mr. Stehlik?
9       A    When Patrick told me about it.
10      Q    And you don't recall when that --
11      A    Nope.
12      Q    -- communication was?  Has anybody ever told
13  you to preserve all the documents related to your
14  bankruptcy case or your relationship with Mr. Stehlik?
15  Both topics.
16      A    I believed at the time every document that I
17  gave Mr. Stehlik would've been preserved by Mr. Stehlik.
18      Q    My question was different.  Has anybody ever
19  told you to preserve all of the documents and
20  communications that you had with Mr. Stehlik, in
21  connection with your bankruptcy case?
22      A    No.
23      Q    And it sounds as though you haven't preserved
24  some of the documents with regard to your -- your
25  interactions with Mr. Stehlik; is that correct?

Page 116

1       A    I handed them all to him.  And no, I have not.
2       Q    You have not preserved them?  Thank you.  And
3   have you -- no, strike that.  All right, sir, I've
4   handed you what's been marked as Exhibit 50 --
5           COURT REPORTER:  Last one was 51.
6       Q    51?  51.  Have you ever reviewed the complaint
7   that was filed in connection with this lawsuit?
8       A    No.
9       Q    Okay.  Has anybody ever discussed with you the
10  allegations that were being made against Mr. Stehlik, in
11  connection with this lawsuit?
12      A    Discussed with me, the allegations?
13      Q    Yeah.
14      A    No.
15      Q    Okay.  Sir, I want you to look at page 8 of
16  this document, and specifically Paragraph 33.  Do you
17  see that?
18      A    Yes.
19      Q    So it says, "As beginning with the debtor's
20  receipt of the December 4, 2020 letter, debtor's made
21  numerous attempts to contact Mr. Stehlik, asking him to
22  take some action to prevent BankFirst from foreclosing
23  in the sale of debtor's assets as allowed by the plan in
24  case of a default."  Do you see that?
25      A    Yes.

Page 117

1       Q    Okay.  What attempt did you make to
2   communicate with Mr. Stehlik, during that time period?
3       A    Stopped in his office, made numerous phone
4   calls.
5       Q    Okay.  With regard to the phone calls, sir, do
6   you -- what cell -- what cell phone carrier do you
7   currently use?
8       A    Viaero.
9       Q    Viaero?  Okay.  And was that the same carrier
10  that you used in December '20?
11      A    Yes.
12      Q    Okay.  And what's your cell phone number?
13      A    (308) 750-6177.
14      Q    Okay.  All right.  Other than phone calls and
15  stopping in, any other attempts to contact Mr. Stehlik,
16  during that time period?
17      A    As you provided to me, there was e-mails, so
18  yes.  About every form of communication you could think
19  of.
20      Q    There was --
21      A    Stopping in and visit in person, attempting
22  phone conversations and e-mailing.
23      Q    Okay.  Sir, if -- I don't see any e-mails
24  during December 20th, to Mr. Stehlik.
25      A    Oh, you're asking for a specific date?

Great Plains Reporting Company
1299 Farnam Street, Ste. 300
Omaha, NE 68102

GREAT PLAINS
REPORTING
YOUR PATH THROUGH LITIGATION

Phone: 1-402-303-3399
Fax: 502-584-0119
schedule@yourdepositions.com
www.yourdepositions.com

4:22-cv-03039-JMG-MDN   Doc # 65-9   Filed: 11/20/23   Page 31 of 32 - Page ID #
2002
The Deposition of KURT KROEGER, taken on February 11, 2023                    118..121

Page 118

1    Q    No, I'm at -- looking -- I don't see in the
2  record any e-mails that you tried to e-mail him during
3  this time period.  So do you have -- do you have an
4  actual e-mail that you sent him that you can provide to
5  Ms. Vogt?
6    A    I don't know.  I'll have to look.
7    Q    Okay.
8    A    I don't know if I can look or not.  Like I
9  said --
10   Q    Yeah, you can look.  And I'll get a list here.
11  All right.  So other than e-mail, stopping in calls,
12  those were the ways that you attempted to contact
13  Mr. Stehlik, during this time period, correct?
14   A    Correct.
15   Q    And did -- were you able to reach him during
16  this time period?
17   A    Yes.
18   Q    All right.  And what was discussed?
19   A    Exactly what you just stated.
20   Q    Okay.
21   A    Attempts to stop the sale.
22   Q    And what was his response?
23   A    "I'm working on it.  I'm calling Mr. Galyen.
24  I'm calling this or I'm calling that.  I'm trying to get
25  a hold of him."

Page 119

1    Q    Okay.  Other than those responses, anything
2  else that you can recall from your communications?
3    A    Yeah.  "I -- I'm going to threaten him with a
4  motion," that, in my opinion never happened, that I saw.
5    Q    What motion was he going to threaten him with?
6    A    Well, like say the check that didn't clear and
7  he was holding onto it for -- he was going to file a
8  motion, but finally it -- after months, he finally
9  cashed it.  It just -- different things.  Yes, I
10  communicated with Mr. Stehlik a lot.
11   Q    And I'm just focused on the December 2020
12  period.  So I'm not --
13   A    Just -- just one month?
14   Q    Just one month.  Because I don't see any
15  e-mails that you sent him during this time period.  So
16  I'm --
17   A    I don't know about one month, sorry.
18   Q    Okay.  So you don't --
19   A    I apologize, I -- I thought you meant over the
20  entire time.
21   Q    No, no, no, no.  Just this one month.  So --
22   A    I -- I wouldn't know.
23   Q    Backing up, you -- you think you made
24  attempts to contact him during December 2020 or can you
25  not remember sitting here today?

Page 120

1    A    Yes, I made attempts to contact him.
2    Q    And those attempts were how?
3    A    What I just stated.
4    Q    Okay.
5    A    But I don't know about e-mail.  I'd have to --
6    Q    Okay.  All right.  And other than the details
7  you just provided, you can't remember anything else with
8  regard to discussions you had with Mr. Stehlik, during
9  that time period; is that correct?
10   A    Not a specific month, no.
11   Q    Okay.  All right.  Okay.  I want to look at
12  Paragraph 54, which is on page 14.  Sir, if you take a
13  look at Paragraph 54, it says, "Bank -- as a result of
14  the action set forth above, BankFirst acquired real
15  property worth approximately twice the amount of the
16  debt owed by the debtors."  Do you see that?
17   A    Yes.
18   Q    Okay.  Do you believe sitting here today that
19  that's a true statement?
20   A    That is a true statement.
21   Q    And what is your basis for concluding that
22  that's a true statement?
23   A    Just at that particular time, the recent land
24  values and the price of corn going up, that would've
25  been a true statement.

Page 121

1    Q    Okay.  But sitting here today, there were no
2  appraisals that you know of that were done of that
3  property, in May of 2021 or around that time period?
4    A    Just slightly before May.
5    Q    What was done slightly before May?
6    A    I told you before, Cy Tanny did that for some
7  of those investors we talked about because he had to
8  update the appraisal.
9    Q    Okay.  And I apologize, I must have
10  misunderstood that.  So Cy Tanny -- who --
11   A    Was the guy that appraised the land for
12  BankFirst.  He updated the appraisal, for me
13  specifically, so I could relay it to current investors
14  to say, if -- if -- if Investor J Smith, as an example,
15  "Hey, I want to give you $6 million, but is your
16  property really worth that?"  So I asked him and he gave
17  us a separate appraisal on a sheet of paper saying,
18  "This is what my current beliefs and values of your
19  current property is."
20   Q    And do you have that separate sheet of paper
21  to this day?
22   A    I -- I did and I gave it to him.
23   Q    Well -- but we're off on our time periods now,
24  because I'm talking about May of 2021.
25   A    Oh.

Great Plains Reporting Company
1299 Farnam Street, Ste. 300
Omaha, NE 68102

GREAT PLAINS
REPORTING
YOUR PATH THROUGH LITIGATION

Phone: 1-402-303-3399
Fax: 502-584-0119
schedule@yourdepositions.com
www.yourdepositions.com

4:22-cv-03039-JMG-MDN   Doc # 65-9   Filed: 11/20/23   Page 32 of 32 - Page ID #
2003
The Deposition of KURT KROEGER, taken on February 21, 2023          122..125

Page 122

```
 1      Q    And we've already talked about the fact that
 2  you weren't working with Mr. Stehlik, at that time
 3  period.
 4      A    Right, but --
 5      Q    So what -- I'm wondering what basis you have
 6  to conclude that the property that BankFirst acquired
 7  was worth twice the amount of the debt owed by you.
 8      A    An appraisal.
 9      Q    And that appraisal is a Cy Tanny appraisal,
10  and sitting here today, can you recall what date that
11  was provided to you?
12      A    Maybe February.
13      Q    Of 2021?
14      A    Uh-huh.
15      Q    What -- can you spell --
16           COURT REPORTER:  I'm so sorry.  Was that a yes?
17           THE WITNESS:  Yes.
18           COURT REPORTER:  Yes.
19  BY MS. GOODMAN:
20      Q    Can you spell Cy Tanny for me?
21      A    I think we looked it up.  I don't know how to
22  spell it.
23      Q    Okay.  Okay.  I will --
24      A    It's C-Y, and then --
25      Q    C-Y.
```

Page 123

```
 1      A    It -- it would be on the BankFirst appraisals
 2  that you have in all those loan documents and stuff, so.
 3      Q    So was a copy of that given to BankFirst?  The
 4  appraisal?
 5      A    Yes.
 6      Q    Okay.
 7      A    The original.
 8      Q    All right.  And that was something though that
 9  you personally requested, that appraisal?
10      A    No, no, no.  I did not personally request the
11  first one.  The bank did that --
12      Q    Right.
13      A    -- for their loan value.  I requested one for
14  these other creditors and it was just on a single sheet
15  of paper.
16      Q    Okay.
17      A    It was just updating that appraisal.
18      Q    And do you recall what that appraisal showed?
19      A    About $12 million.
20      Q    For just the land?
21      A    Uh-huh.
22           COURT REPORTER:  I'm so sorry.  Is that a yes?
23           THE WITNESS:  Yes.
24  BY MS. GOODMAN:
25      Q    Okay.  And who was that appraisal given to?
```

Page 124

```
 1      A    Like I said before, some of those investors
 2  that wanted to help me out.
 3      Q    Okay.  We had talked about one investor, an
 4  individual.
 5      A    Yep.
 6      Q    Now are there others?
 7      A    The one that I couldn't remember, and then
 8  that Dana Korosi, and --
 9      Q    Okay.
10      A    I had talked to several people trying to get
11  myself out of this predicament, so I don't know all of
12  them.
13      Q    So --
14      A    So I don't recall all of them.
15      Q    Dana Korosi and this individual that Patrick
16  Patino hooked you up --
17      A    At the last minute, yeah.
18      Q    -- with?  Okay.  And sir, I just want to make
19  sure I understand.  So from the time this bankruptcy was
20  filed through the time that the case was converted to a
21  Chapter 7, okay, so during that time period, so March of
22  2020 through May or June of 2021, were you conducting
23  farming operations during that entire time period?
24      A    Yes.
25           MS. GOODMAN:  I think that's all I have for Mr.
```

Page 125

```
 1  Kroeger.
 2           MS. VOGT:  I have a couple -- couple follow up
 3  questions.
 4           THE WITNESS:  Okay.
 5           CROSS EXAMINATION
 6  BY MS. VOGT:
 7      Q    Mr. Kroeger, did you carry out any farming or
 8  other income producing activities as an individual,
 9  outside of H&M Farms?
10      A    Yes.
11      Q    What were those?
12      A    A little truck hauling and just other things
13  like that, just some side work.
14      Q    And my other question was, did you happen to
15  have a landline during the bankruptcy?
16      A    Yes.  Yes.
17      Q    What was that number, and do you remember who
18  the carrier was?
19      A    It was -- I don't know, when we terminated, we
20  -- chip switched it over from a landline to Viaero
21  Wireless, but I don't know what time -- that was area
22  code (308) 226-2501, but we no longer have that line.
23           MS. VOGT:  That's all I have.  Sorry.  That's -
24  - I think that'll do.
25           COURT REPORTER:  Do you want to read and sign
```

Great Plains Reporting Company
1299 Farnam Street, Ste. 300
Omaha, NE 68102

GREAT PLAINS
REPORTING
YOUR PATH THROUGH LITIGATION

Phone: 1-402-303-3399
Fax: 502-584-0119
schedule@yourdepositions.com
www.yourdepositions.com

Page 126

1   your transcript, or waive your right?
2        MS. VOGT:  Yeah, you have the right to read and
3   sign this if you want to, or you can waive the right
4   and they will just send it to me again.
5        THE WITNESS:  What -- what would you suggest?
6        MS. VOGT:  I think we can probably waive it.
7        THE WITNESS:  Okay.
8        COURT REPORTER:  Okay.  And then before we go
9   off the record here, Lauren, do you know how you
10  want a copy of your transcript?
11       MS. GOODMAN:  E-Trans, please.
12       COURT REPORTER:  E-Tran?  Okay.
13       MS. GOODMAN:  Yeah.
14       COURT REPORTER:  And then Diana, do you know
15  how you want a copy of your transcript?
16       MS. VOGT:  E-Tran also.
17       COURT REPORTER:  E-Tran?  And do you want
18  Exhibits 1 through 39 attached to this transcript,
19  or just start from 39?
20       MS. VOGT:  You can start -- yeah.
21       COURT REPORTER:  Okay.
22       MS. VOGT:  From there, yeah.
23       COURT REPORTER:  Okay.  We're off the record.
24  The time is 2:06.
25       (DEPOSITION CONCLUDED AT 2:06 P.M. CT)

Page 127

1                 CERTIFICATE OF REPORTER
2                    STATE OF NEBRASKA
3
4   I do hereby certify that the witness in the foregoing
5   transcript was taken on the date, and at the time and
6   place set out on the Title page here of by me after
7   first being duly sworn to testify the truth, the whole
8   truth, and nothing but the truth; and that the said
9   matter was recorded digitally by me and then reduced to
10  type written form under my direction, and constitutes a
11  true record of the transcript as taken, all to the best
12  of my skill and ability. I certify that I am not a
13  relative or employee of either counsel, and that I am in
14  no way interested financially, directly or indirectly,
15  in this action.



GENERAL NOTARY
STATE OF NEBRASKA
SARHA BUZI
MY COMMISSION EXPIRES MAY 26, 2026

16
17
18
19
20
21
22  SARHA BUZI,
23  COURT REPORTER / NOTARY
24  MY COMMISSION EXPIRES ON: 05/26/2026
25  SUBMITTED ON: 02/28/2023

Great Plains Reporting Company
1299 Farnam Street, Ste. 300
Omaha, NE 68102



Phone: 1-402-303-3399
Fax: 502-584-0119
schedule@yourdepositions.com
www.yourdepositions.com