```
 1            IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF NEBRASKA
 2

 3  RICHARD D. MYERS,        ) CASE NO. 4:22CV3039
                             )
 4        PLAINTIFF,         ) MOBILE VIDEOCONFERENCE
                             ) DEPOSITION OF
 5     VS.                   ) PATRICK M. PATINO
                             )
 6  GALEN STEHLIK and        )
    STEHLIK LAW FIRM,        )
 7                           )
          DEFENDANTS.        )
 8                           )
    - - - - - - - - - - - - -

 9

10           MOBILE VIDEOCONFERENCE DEPOSITION OF

11  PATRICK M. PATINO, taken before Brianne L.

12  Starkey, RPR, CRR, Online Notary Public within

13  and for the State of Nebraska, beginning at

14  1:35 p.m., on March 22, 2023, at the Law Offices

15  of McGrath North Mullin & Kratz, PC, LLO, First

16  National Tower, Suite 3700, 1601 Dodge Street,

17  Omaha, Nebraska, pursuant to the within

18  stipulations.

19

20

21

22

23

24

25
```

```
 1                    A P P E A R A N C E S

 2    (Appearing Remotely)
      THE WITNESS:
 3    PATRICK M. PATINO

 4
      (Appearing Remotely)
 5    FOR THE PLAINTIFF:
      MS. DIANA J. VOGT
 6    SHERRETS BRUNO & VOGT LLC
      260 Regency Parkway Drive, Suite 200
 7    Omaha, Nebraska 68114
      (402)390-1112 FAX (402)390-1163
 8
      dvogt@sherrets.com
 9

10    FOR THE DEFENDANTS:
      MS. LAUREN R. GOODMAN
11    MCGRATH NORTH MULLIN & KRATZ, PC, LLO
      First National Tower, Suite 3700
12    1601 Dodge Street
      Omaha, Nebraska 68102
13    (402)341-3070 FAX (402)341-0216

14    lgoodman@mcgrathnorth.com

15
      (Appearing Remotely)
16    FOR THE WITNESS:
      MR. DAVID J. SKALKA
17    CROKER, HUCK, KASHER, DEWITT,
      ANDERSON & GONDERINGER, P.C.
18    2120 South 72nd Street, Suite 1250
      Omaha, Nebraska 68124
19    (402)391-6777 FAX (402)390-9221

20    dskalka@crokerlaw.com

21

22                    A L S O   P R E S E N T

23    Ms. Erin Sullivan

24

25
```

```
 1                     I N D E X

 2    CASE CAPTION ....................... Page      1
      APPEARANCES ........................ Page      2
 3    INDEX .............................. Page      3
      EXHIBITS ........................... Page      4
 4    TESTIMONY .......................... Page      7
      REPORTER CERTIFICATE ............... Page    146
 5

 6    DIRECT EXAMINATION:
          By Ms. Goodman ............... Page      7
 7
      CROSS-EXAMINATION:
 8        By Ms. Vogt .................. Page    142

 9    REDIRECT EXAMINATION:
          By Ms. Goodman ............... Page    144
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Patrick Patino                                                                                    4 (4)
3/22/2023

```
 1                    E X H I B I T S

 2   EXHIBIT NO.                                   MARKED

 3   Exhibit 1.     Subpoena                          7

 4   Exhibit 2.     Email Correspondence with        27
                    Attachments
 5
     Exhibit 3.     Email Dated March 31, 2021       33
 6
     Exhibit 4.     Email Dated March 31, 2021       38
 7
     Exhibit 5.     Email Dated March 31, 2021       51
 8
     Exhibit 6.     Notice of Default Dated          52
 9                  December 4, 2020

10   Exhibit 7.     Order                            70

11   Exhibit 8.     Email Correspondence             77

12   Exhibit 9.     Limited Motion to Modify         92
                    Confirmed Chapter 12 Plan Nunc
13                  Pro Tunc

14   Exhibit 10.    Email Dated May 6, 2021          99

15   Exhibit 11.    Irrigation Rights               107

16   Exhibit 12.    Spreadsheet                     112

17   Exhibit 13.    Schedules                       116

18   Exhibit 14.    Email Correspondence            125

19

20

21

22

23

24

25
```

Patrick Patino
3/22/2023

5 (5 - 8)

**Page 5**

1   (Whereupon, the following proceedings
2   were had, to-wit:)
3         MR. SKALKA:  First one is in
4   regards to conversations that would normally be
5   privileged with the Kroegers, Mr. Patino feels
6   comfortable with the Kroegers have waived
7   privilege.
8         To the extent -- my understanding is,
9   Ms. Vogt, to the extent that Mr. Myers as
10  trustee would assert privilege, I don't have to
11  worry about that.  Mr. Patino can answer the
12  questions.  If you don't object, then we're fine
13  and we're going to handle that.
14        MS. VOGT:  Yes, because our
15  position is that he has not waived privilege,
16  but we find no reason to assert it.
17        MR. SKALKA:  Okay.  And then the
18  second thing for the record is that in
19  scheduling this deposition, Mr. Patino's
20  profession is an attorney.  He gives legal
21  opinions for money.
22        And I had suggested to counsel for the
23  plaintiff that we treat this as -- that he is an
24  expert and that he be paid his hourly fee for
25  this time.  That proposal was rejected.

**Page 6**

1         And Ms. Goodman has asserted that
2   Mr. Patino is here for the sole purpose as a
3   fact witness, and so I intend to proceed on that
4   basis.  That's all I have.
5         MS. GOODMAN:  Thank you.  And in
6   response to that, I just want to be clear for
7   the record that we have not -- with regard to
8   the request for payment, I saw no basis of that
9   under the federal rules.
10        I did issue a subpoena on Mr. Patino
11  to appear here today and he has done that and
12  that is what brings him here to provide his
13  testimony.
14        MR. SKALKA:  Together with your
15  assertion to me in an email that he's here
16  appearing as a fact witness, correct?  You
17  agreed.
18        MS. GOODMAN:  He's here pursuant
19  to the subpoena, yes.
20        And, again, I don't know what he's
21  going to say.  I think we just get into the
22  testimony here today.
23        And we can take up this issue later,
24  but I'm not waiving any rights here today with
25  regard to his testimony because I don't know

**Page 7**

1   what it is, to be fair.
2         PATRICK M. PATINO
3         having been first duly sworn,
4         was examined and testified as follows:
5         DIRECT EXAMINATION
6   BY MS. GOODMAN:
7     Q.  Please state your name for the record.
8     A.  Patrick M. Patino.
9     Q.  All right.  And, Mr. Patino, what is
10  your current mailing address?
11    A.  My personal mailing address?
12    Q.  Yes.
13    A.  Is 2205 Troy Lane North, Plymouth,
14  Minnesota 55447.
15    Q.  Okay.  And, sir, have you ever been
16  deposed before?
17    A.  No.
18        MS. GOODMAN:  I'd like to mark as
19  Exhibit 1 the subpoena to testify in a
20  deposition.  Can we pull that up on the screen?
21        (Exhibit 1
22        marked for identification.)
23  BY MS. GOODMAN:
24    Q.  Sir, I've pulled up on the screen what
25  I've marked as Exhibit 1.  This is a subpoena to

**Page 8**

1   testify at a deposition in a civil action.
2         Do you see that?
3     A.  No.
4         MS. VOGT:  Not yet.
5   BY MS. GOODMAN:
6     Q.  Do you see that?
7     A.  Yes.
8     Q.  Okay.  Perfect.
9         All right, sir, this is a subpoena.
10  Is this the subpoena pursuant to which you are
11  appearing here today to give testimony?
12    A.  Yes.
13    Q.  All right, sir.  Obviously, as I
14  understand it, you are a lawyer, so I assume
15  you've sat in on depositions before; is that
16  correct?
17    A.  No.
18    Q.  Oh, okay.
19    A.  I'm not a litigator.
20    Q.  Not a litigator.
21        Okay.  Well, then I'll go over just
22  some ground rules here.
23        First and foremost, we have a court
24  reporter here in the room with me who is taking
25  down everything that's being said.  If you

Patrick Patino
3/22/2023

6 (9 - 12)

Page 9

1  could, just please wait until I finish my
2  question before you answer so that the record is
3  clear.
4        Also, if you don't understand a
5  question, please make sure to let me know;
6  otherwise, I'm going to assume that you
7  understand my questions.  Okay?
8      A.  Understood.
9      Q.  Okay.  With regard to today, I'm going
10 to move this along as fast as I can; but to the
11 extent you do need a break, just let me know.
12       Otherwise, I'll proceed on the
13 assumption that you don't need a break.  All
14 right?
15     A.  Understood.
16     Q.  All right.  Sir, who is your current
17 employer?
18     A.  My current employer?  Well, I'm an
19 attorney at Patino King, LLC.
20     Q.  And do I assume that you are an owner
21 of Patino King?
22     A.  Through an underlying LLC, but yes.
23 Not directly, not personally.
24     Q.  All right.  Who owns Patino King?
25     A.  Who holds my membership interest in

Page 10

1  Patino King?
2      Q.  Yes.
3      A.  Is Patino Law Office, LLC.
4      Q.  Are there any other -- any other
5  entities or people who hold ownership interest
6  in Patino King?
7      A.  Yes.
8      Q.  And who are they?
9      A.  It's attorneys Sam King, Colin
10 Kastrick, and Shelby Yost.  None of them are
11 held personally.  It's all held by LLCs.
12     Q.  Okay.  So as I understand it, there's
13 four LLCs that own Patino King?
14     A.  That is correct.
15     Q.  How long have you been an owner or
16 your -- how long has your entity been an owner
17 in Patino King?
18     A.  Since January of 2022.
19     Q.  Okay.  And prior to January of 2022,
20 where did you work?
21     A.  I was a sole practitioner through
22 Patino Law Office.
23     Q.  And how long were you a sole
24 practitioner through Patino Law Office?
25     A.  I started that and started operating

Page 11

1  through it April 1st of 2020.
2      Q.  All right.  And prior to April 1st of
3  2020, who were you employed by?
4      A.  Koenig|Dunne, PC, LLO.
5      Q.  And how long did you work for
6  Koenig|Dunne?
7      A.  I started there in November of 2016.
8      Q.  And prior to November of 2016, who did
9  you work for?
10     A.  Duncan Law Office.
11     Q.  And were you employed by Duncan Law
12 Office?
13     A.  Yes.
14     Q.  And when did you start at Duncan Law
15 Office?
16     A.  September of 2014.
17     Q.  And then prior to September of 2014,
18 who were you employed by?
19     A.  I was in law school.
20     Q.  Okay.  And where did you go to law
21 school?
22     A.  University of Illinois in
23 Urbana-Champaign.
24     Q.  All right.  And did you take any time
25 off from a work perspective between law school

Page 12

1  and undergrad?
2      A.  I mean, between -- I worked.  I took a
3  break between undergrad and law school.
4      Q.  Okay.
5      A.  I did not go straight from undergrad
6  to law school.
7      Q.  Thank you.  That was my question.
8        What did you -- it was a bad question,
9  but you got there in the end.
10     A.  That's okay.
11     Q.  What was your career -- I guess where
12 did you work in between undergrad and law
13 school?
14     A.  Primarily I was an admission counselor
15 at Roosevelt University in Chicago.
16     Q.  And what year did you graduate
17 undergrad?
18     A.  2009.
19     Q.  And what year did you start law
20 school?
21     A.  I started law school in 2011.
22     Q.  Okay.  Were you an admission counselor
23 for those two years?
24     A.  Not fully, no.
25     Q.  Did you have any other employment

Patrick Patino
3/22/2023

7 (13 - 16)

Page 13

1  during those two years?
2      A.   Yes.
3      Q.   What did you do?
4      A.   I worked as a bouncer at a bar in
5  Wrigleyville, and I worked as back room delivery
6  manager for a furniture store.
7      Q.   And I assume that immediately after
8  high school, you went to undergrad?
9      A.   That is correct.
10     Q.   And I'm sorry.  Where did you go to
11 undergrad?  I don't think I asked.
12     A.   University of Illinois in
13 Urbana-Champaign.
14     Q.   Got it.
15         All right.  Sir, have you ever worked
16 in the agricultural industry at all?
17     A.   I have not.
18     Q.   Have you ever done any work that you
19 would characterize as farming?
20     A.   No.
21     Q.   With regard to your law practice, as I
22 understand it, sir, you started your law
23 practice in September of 2014; is that correct?
24     A.   Yes.
25     Q.   And what did that -- describe for me

Page 14

1  the type of practice -- law practice that you
2  engaged in.
3      A.   At that time, I was doing primarily
4  debtor Chapter 7 and Chapter 13 work when I
5  first started.
6      Q.   And at some point, did that change?
7      A.   It evolved, yes.
8      Q.   Okay.  And tell me about that
9  evolution.
10     A.   So over the course of my career, I've
11 represented both debtors and creditors in
12 Chapter 11 bankruptcies, Chapter 12 bankruptcies
13 for farmers, Chapter 7s and 13s.
14     Q.   With regard to your practice in
15 representing debtors in Chapter 12 bankruptcies,
16 how many Chapter 12 debtors do you believe you
17 represented over the course of your career?
18     A.   Either directly or as support in
19 bankruptcy, probably five.
20     Q.   How many have you directly represented
21 as debtor's counsel in connection with a
22 Chapter 12 case?
23     A.   Two cases.
24     Q.   And what were those cases?
25     A.   It was the Blau case and the Hitchcock

Page 15

1  case.
2      Q.   And were both these cases filed in
3  Nebraska?
4      A.   That is correct.
5      Q.   Did both result in a confirmed plan?
6      A.   One of them did.
7      Q.   What happened to the other one in
8  terms of the disposition of the case?
9      A.   It was dismissed and then refiled
10 later.
11     Q.   Refiled under Chapter 12?
12     A.   That is correct.
13     Q.   Which one of the two was dismissed and
14 refiled under Chapter 12?
15     A.   The Hitchcock case.
16     Q.   All right.  And ultimately when the
17 case was refiled, were you able to obtain a
18 confirmed plan?
19     A.   It's currently -- it's a big case.
20 It's currently pending.
21     Q.   Okay.  And you remain as debtor's
22 counsel in that matter?
23     A.   I do, in addition to Sam King.
24     Q.   Okay.  Now, there were two cases where
25 you served as debtor's counsel in connection

Page 16

1  with a Chapter 12 case.  You said there were
2  about three others I think that you provided
3  some other service in connection with the case.
4  Can you describe that?
5      A.   Yes.  So previously there was another
6  case that I supported Howard Duncan on.  It was
7  the Trausch case filed in Nebraska.
8          There was another case that I've
9  helped Sam King with that's Allen Roland.
10         And I have assisted -- there's an Iowa
11 case that Sam King is lead on.  The debtor is
12 Ricky Moore.
13     Q.   Okay.  So in those cases, the firm --
14 your firm of Patino King is debtor's counsel,
15 but you aren't playing the lead role, is that
16 correct, as an attorney?
17     A.   In the Roland case and the Moore case,
18 that is correct.
19     Q.   Okay.  But in the Trausch case, you
20 are playing lead?
21     A.   That case was dismissed several years
22 ago, and that was -- yeah, with Koenig|Dunne.
23     Q.   Okay.  Have you ever represented, sir,
24 a client in connection with a malpractice claim
25 against an attorney?

Thomas & Thomas Court Reporters
and Certified Legal Video, LLC

Tel: (402) 556-5000 | Fax: (402) 556-2037
www.ttcrs.com

Patrick Patino
3/22/2023

8 (17 - 20)

Page 17

1    A.   No.
2    Q.   All right.  I want to switch gears now
3   and discuss your relationship with Kurt and
4   Kathy Kroeger.
5        When I say Kurt and Kathy Kroeger, do
6   you know who I'm referring to?
7    A.   Yes.
8    Q.   Can you tell me -- I want to start
9   with your first interaction.  How did you make
10  contact with Kurt and Kathy Kroeger in
11  connection with their bankruptcy case?
12   A.   They reached out to me.
13   Q.   And how did they reach out?  Was it by
14  phone, by email?
15   A.   I don't recall.
16   Q.   Do you recall the date that they
17  reached out?
18   A.   I do not.
19   Q.   Do you have reason to believe it was
20  before March of 2021, March 1st of 2021?
21   A.   Like I said, I don't recall the
22  specific date.
23   Q.   Okay.  If I told you that the first
24  filing you made on their behalf was on April 1st
25  of 2021, would that help to refresh your memory

Page 18

1   as to the first time they reached out to you?
2    A.   Probably a couple weeks before then,
3   within those two weeks before that filing.  It
4   was very quick.
5    Q.   Did you know the Kroegers prior to
6   them reaching out?  Had you met them before?
7    A.   No.
8    Q.   All right.  And when Mr. Kroeger --
9   who reached out to you?  Was it Mr. Kroeger,
10  Mrs. Kroeger?
11   A.   Mr. Kroeger.
12   Q.   Mr. Kroeger.
13       And do you know, was Mrs. Kroeger on
14  the phone or on the communication?
15   A.   I do not recall.
16   Q.   When Mr. Kroeger reached out, what did
17  he tell you about his case?
18   A.   Generally, without remembering
19  specifically what he told me, is that he was a
20  debtor in a Chapter 12 bankruptcy with a
21  confirmed plan that was in default and he needed
22  help.
23   Q.   And what type of help did he say he
24  needed?
25   A.   Trying to get the bank to not move

Page 19

1   forward with a foreclosure.
2    Q.   Did he give you any specifics in that
3   communication what specifically he wanted you to
4   do?
5    A.   He wanted -- he asked if I would file
6   something with the Court to bring to the Court's
7   attention of what was going on.
8    Q.   And what did -- in his mind, what was
9   going on that required the Court's attention?
10       MR. SKALKA:  Objection to form.
11       Go ahead.
12       THE WITNESS:  Is that -- like I
13  said, there was a confirmed plan, that plan was
14  in default, and he had informed me that he had
15  been contacting Galen Stehlik to do something
16  and nothing was happening, which is why he
17  reached out to me.
18  BY MS. GOODMAN:
19   Q.   Did he give you any idea during that
20  initial conversation with respect -- did he give
21  you any idea as to the state of his relationship
22  with the bank at that time?
23   A.   Not that I recall in that initial
24  conversation, no.
25   Q.   Other than indicating that he had

Page 20

1   reached out to Galen Stehlik to do something and
2   wasn't getting a response, did he say anything
3   else on that initial call with regard to Galen
4   Stehlik?
5    A.   Not that I recall in the initial call,
6   no.
7    Q.   And did he mention on that initial
8   call any particular issues that he was having --
9   Mr. Kroeger was having with BankFirst?
10   A.   Once again, in that initial call, I
11  don't recall if it was in the initial call or
12  later.
13   Q.   Okay.  In that initial call, did he
14  tell you that he was -- strike that.
15       To be clear, during that initial call,
16  he did tell you that there was a plan that was
17  confirmed, correct?
18   A.   Yes.
19   Q.   Did he tell you in that initial call
20  how much was currently owed to the bank?
21   A.   I do not recall; however, that's a
22  standard question that I ask.
23   Q.   Okay.  Did he -- did Mr. Kroeger tell
24  you during that initial call that he was not
25  aware that there was a drop-dead clause in the

Patrick Patino
3/22/2023

9 (21 - 24)

Page 21

1 confirmed plan?
2    A.  I do not recall if it was in that
3 initial call.
4    Q.  Okay.  In that initial call, did you
5 discuss the scope of your engagement?
6    A.  Yes.
7    Q.  And tell me, what was the scope of
8 your engagement?
9    A.  At that time, it was just to file
10 something with the Court to get a hearing.
11    Q.  And what was the goal of the hearing?
12    A.  I was trying to get the bank to see if
13 they could come to the table to get more time
14 for the Kroegers to sell the assets.
15       And in the alternative, if not, to try
16 to see if the Court would modify the plan.
17    Q.  Okay.  And sell the assets, tell me
18 more about that.  Was selling the assets
19 something that Mr. Kroeger in that initial call
20 told you that he was interested in doing?
21    A.  I do not recall.
22    Q.  How did the idea of selling the
23 assets -- I guess how did that become part of
24 your engagement?
25    A.  I don't understand.

Page 22

1    Q.  Yeah.
2       I guess I'm wondering, was selling the
3 assets something that you as an attorney
4 suggested that he do, or was it something that
5 Mr. Kroeger came to you and said I want to sell
6 assets?
7    A.  I don't recall specifically, but in
8 terms of coming up with trying to find a
9 solution to deal with a defaulted confirmed
10 plan, I believe that is a solution I had come up
11 with.
12    Q.  Okay.  And what assets were you going
13 to -- what assets did you advise Mr. Kroeger to
14 sell?
15    A.  Well, I didn't advise him to sell
16 anything.
17    Q.  Okay.
18    A.  There was no Court order that would
19 allow a sale.
20    Q.  All right.  I guess I'm just trying to
21 understand, as part of the scope of your
22 engagement, you were trying to either get a
23 hearing, that was one, in order to, what it
24 sounds like, get some leverage to either sell
25 some assets and pay down debt or otherwise

Page 23

1 modify the plan to allow Mr. Kroeger to continue
2 farming.
3       Is that what I understand as part of
4 the engagement?
5    A.  I don't have the engagement agreement
6 in front of me.
7       I'm trying to say in a general sense,
8 I was hired to try to deal with the defaulted
9 plan, and it was that specific -- I mean, I
10 guess that general.
11       In terms of how you go about dealing
12 with a defaulted plan, there's a whole host of
13 options that you can engage.
14       One is under the rules you can seek to
15 modify the plan.  One of them is you approach
16 the creditor and say, hey, the confirmed plan,
17 the terms of it, is there any opportunity that
18 we can do a sale, you're the primary lender, and
19 pay off debt, liquidate everything, and see, you
20 know, where we're at at that point.
21       These are common solutions that you
22 engage in even prior to a plan being confirmed.
23    Q.  Okay.  These two solutions, modify the
24 plan and/or otherwise approach a creditor, are
25 there any other solutions?

Page 24

1    A.  I mean, with a confirmed plan, it's
2 hard to get a confirmed plan in a Chapter 12 as
3 it is, so your options are very limited at that
4 point.
5    Q.  Okay.  And when you say your options
6 are very limited, just so I understand, do you
7 mean that once a plan is confirmed, there are
8 limited options in terms of any sort of
9 flexibility after a plan is confirmed with
10 regard to payment options?
11    A.  Yes.  Like I said, you can modify the
12 plan, so you can do that.  You could dismiss the
13 case.  You can convert the case.  You could
14 reach out to the main secured creditor and try
15 to work out an alternative.
16       But with a drop-dead provision in a
17 confirmed plan, it makes it very difficult.
18    Q.  All right.  Incidentally, in the
19 Chapter 12 cases where you have served as lead
20 debtor's counsel, is it common to see the
21 drop-dead clauses in confirmed plans?
22    A.  So in the cases I've been involved
23 in -- I'll go to Blau.  Blau we did a plan of
24 liquidation, so there is no drop-dead provision.
25    Q.  Right.

Patrick Patino
3/22/2023

10 (25 - 28)

Page 25

A. The other -- so that's the only one I've ever gotten to a confirmed plan.

Q. Okay. Because getting to a confirmed plan in a Chapter 12 case is difficult, correct?

MR. SKALKA: Objection to form. Go ahead.

THE WITNESS: In my experience and what I know about Chapter 12s, yes, that is correct.

BY MS. GOODMAN:

Q. Got it.

With regard to the engagement, did you have a written engagement letter with the Kroegers?

A. Yes.

Q. All right. I did not see that in your production. Is that something you still have a copy of?

A. Yes.

Q. Is that something you'd be willing to produce?

A. I don't have any issue with that.

Q. Okay. Great.

With regard to the engagement, how much were you paid for your services?

Page 26

A. I'd have to go back and look. I don't recall.

Q. Was the engagement on a flat fee or hourly basis?

A. Hourly rate basis.

Q. And, in general, what is your hourly rate?

A. Then I think it was -- I'd have to look. It's changed. So I don't know what it was at that time.

Q. Okay. Now, I noticed in the bankruptcy case that you didn't file a notice of appearance or otherwise seek retention through the bankruptcy court with regard to your representation of the Kroegers.

Is there some reason for that?

MR. SKALKA: Object to foundation.

Go ahead and answer, if you can.

THE WITNESS: Don't think it's required in a Chapter 12 case for individuals.

BY MS. GOODMAN:

Q. Okay. After the first interaction with the Kroegers, what did you do next in terms of your representation of them?

Page 27

A. What did I do next?

Q. Yeah.

So they sign the engagement letter. What's next?

A. I mean, I review everything that's been filed. I review the docket. I get a sense of what's going on to try to get a grasp of the situation, that sort of thing.

MS. GOODMAN: Erin, let's go to No. 2.

(Exhibit 2 marked for identification.)

BY MR. SKALKA:

Q. Mr. Patino, I have put up on the screen here what's been marked as Exhibit 2 to your deposition.

Can you see that?

A. Uh-huh.

Q. Okay.

A. Yes.

Q. This appears to be an email sent from Mr. Kroeger to you on March 31st, 2021.

Do you see that?

A. Yes.

Q. And it says, "Patrick, Here are a lot

Page 28

of documents to get you started. Please let me know if you have any questions. Your friend, Kurt."

Do you see that?

A. Yes.

Q. And I just want to be clear, it says, "Your friend, Kurt."

Do I understand, though, you had not met Mr. Kroeger prior to this -- your representation of him, correct?

A. That is correct. We were not friends in that sense.

Q. Okay. Got it.

A. It's just the way Kurt talks.

Q. I hear you.

All right. So with regard to Exhibit 2, this is one email, and it includes some attachments to it.

And I would like -- if you would, just go through this document and confirm for me that, in fact, the attachments included with Exhibit 2 were, in fact, sent with that email.

And I will tell you, the way the documents were produced, it did not -- we did not have the attachments kind of lined up, so to

Patrick Patino
3/22/2023

11 (29 - 32)

Page 29

1  speak, with the communications.
2      A.  Understood.
3      Q.  So I just want to make sure that this
4  was an email that, in fact, you did receive from
5  Mr. Kroeger in its entirety.  So we'll just go
6  ahead and page through.
7          So, Mr. Patino, having reviewed that,
8  is this now a complete set of attachments with
9  this particular email?
10     A.  It would appear so, yes.
11     Q.  Okay.  And upon receiving this email
12 with these attachments, did you review the
13 attachments?
14     A.  Yes.
15     Q.  I want to turn to the first
16 attachment, which is "Defense Arguments."
17         Do you see this?
18     A.  Yes.
19     Q.  Who drafted this document?  Do you
20 know?
21     A.  I have no idea.
22     Q.  Okay.
23     A.  I would presume Kurt because he sent
24 it to me.
25     Q.  Okay.  But you didn't draft this

Page 30

1  document, correct?
2      A.  I did not.  It came from him to me.
3      Q.  Got it.
4          All right.  I want to just go through
5  a few things here.  Under Paragraph 1 there that
6  starts, "President Biden."
7          Do you see that?
8      A.  Yes.
9      Q.  If you go down to ii, two romanette
10 Is, it says, "The $100,000 payment to the bank
11 due ten days after plan confirmation would have
12 been made on time if this would not have been
13 late due to COVID."
14         Do you see that?
15     A.  Yes.
16     Q.  Okay.  So was it your understanding
17 that as of March 31st of 2021, Mr. Kroeger knew
18 that an initial $100,000 payment was due within
19 ten days of confirmation?
20     A.  Yes.
21     Q.  Okay.  I'd like to now go down to
22 Paragraph 9 on this document.
23     A.  Yes.
24     Q.  It says, "Minerals and certified
25 irrigation acres rights are not included in the

Page 31

1  loan documents."
2          Do you see that?
3      A.  Yes.
4      Q.  Do you, sir -- I understand that
5  there's been some discussion, we'll talk in more
6  detail later about it, but with regard to the
7  minerals and certified irrigation rights.
8          Did you do any sort of analysis to
9  determine whether or not those rights were, in
10 fact, included in the loan documents?
11     A.  Yes.
12     Q.  And what was your -- the conclusion of
13 your analysis?
14     A.  It didn't appear that it included
15 those --
16     Q.  Okay.
17     A.  -- if I recall correctly.  It's been a
18 while since I looked or thought about it.
19     Q.  Okay.  I want to turn now to the next
20 page of this document.  And do you see halfway
21 down the page, it says, "Questions for Patrick"?
22         Do you see that?
23     A.  Yes.
24     Q.  Question 3 says, "Land sale -
25 everything sells or just to [dollar signs] to

Page 32

1  satisfy what is owed to bank."
2          Do you see that?
3      A.  Yes.
4      Q.  And then under there, little A says,
5  "Save were we and Jeremy live?"
6          And then little B says, "Since Home
7  Federal Bank has first lien on our house, can it
8  be sold by BankFirst?"
9          Do you see that?
10     A.  I do.
11     Q.  Does this refresh your memory, sir,
12 that Mr. Kroeger came to you wanting to sell
13 some property?
14         MR. SKALKA:  Objection:
15 Foundation.
16         Go ahead.
17         THE WITNESS:  I took this to mean
18 with the foreclosure sale --
19 BY MS. GOODMAN:
20     Q.  Okay.
21     A.  -- if I recall correctly.
22     Q.  So what were your answers to these two
23 questions?
24     A.  I don't recall specifically.  The save
25 were we and Jeremy live, I believe he was

Patrick Patino
3/22/2023

12 (33 - 36)

Page 33

1  referring to the townhouse in Lincoln.
2      Q.  Okay.
3      A.  And the other -- I mean, bank that
4  has, like -- I can't remember if BankFirst had a
5  second lien on their house; but if it could be
6  included in foreclosure, a second lienholder can
7  foreclose.
8      Q.  So you took this -- just so I
9  understand, you took this to mean that
10  Mr. Kroeger was really just wondering what would
11  happen if, in fact, the bank was successful with
12  its foreclosure, what would happen to those two
13  parcels?
14      A.  That is correct.
15      Q.  Okay.  Sir, I want to switch now to
16  what I'm going to mark as Exhibit 3 to your
17  deposition.
18              (Exhibit 3
19               marked for identification.)
20  BY MS. GOODMAN:
21      Q.  Can you see Exhibit 3?
22          MR. SKALKA:  Give me just a
23  second.  For some reason your file decided to
24  keep me stuck in this one exhibit.  I'm blaming
25  the exhibit.

Page 34

1          MS. GOODMAN:  Okay.
2          MR. SKALKA:  Just one second.
3          MS. GOODMAN:  No problem.
4          (Discussion had off the record.)
5  BY MS. GOODMAN:
6      Q.  All right, Mr. Patino, what's been
7  marked Exhibit 3 appears to me to be another
8  email sent from Kurt Kroeger to you on
9  March 31st of 2021.
10          Do you see that?
11      A.  Yes.
12      Q.  So same as last time.  If you would --
13  well, let me ask you, when you received this
14  email with these attachments, did you review the
15  attachments?
16      A.  Yes.
17      Q.  Okay.  And did you review these
18  attachments before you filed your motion to
19  modify with the Court?
20      A.  I would have.  I presume I would have,
21  yes.
22      Q.  All right.  If you could -- same as
23  with Exhibit 2, if you could go through and just
24  confirm that, in fact, these attachments belong
25  with this email, that'd be helpful.

Page 35

1          So let me know when you're done.
2      A.  That looks familiar.
3      Q.  Okay.  So, in fact, do you believe
4  that these attachments belong with this email?
5      A.  Yes.
6      Q.  Okay.  I'd like you to turn, sir,
7  to --
8          MS. GOODMAN:  Erin, I'd like to
9  go to Page 8 of this.  Yeah, the affidavits.
10  BY MS. GOODMAN:
11      Q.  Sir, do you recognize this document?
12      A.  Yes.
13      Q.  Do you know who drafted this document?
14      A.  I'm not aware.  It was not our office.
15      Q.  Do you know why this document was
16  drafted?
17      A.  I do not know specifically, no.
18      Q.  Okay.  The document is dated
19  March 18th of 2021.  Do you believe that this
20  document was executed prior to or after your
21  office being retained to represent the Kroegers?
22      A.  Prior to.
23      Q.  So do I understand, sir, that this
24  document wasn't a document that your office
25  directed Mr. Kroeger to execute?

Page 36

1      A.  That is correct.
2      Q.  Did you read this affidavit prior to
3  filing your motion to modify?
4      A.  I did.
5      Q.  Okay.  Sir, before we move on, I've
6  got one question with regard to Exhibit 2.
7      A.  Okay.
8      Q.  Exhibit 2 includes a cash lease on
9  farmland.  It's 14.
10          MS. GOODMAN:  If you'd go to the
11  next page, Erin.
12  BY MS. GOODMAN:
13      Q.  This is a cash lease.  And this
14  exhibit is -- although it's dated in January of
15  2021 -- well, strike that.
16          Did your office draft this lease?
17      A.  No.
18      Q.  All right.  Now, although the document
19  is dated as of January 5th of 2021, if you go to
20  the signature page, it actually was executed on
21  March 19th of 2021.
22          Do you see that?
23      A.  Yes.
24      Q.  Was this lease executed at your
25  direction?

Thomas & Thomas Court Reporters
and Certified Legal Video, LLC

Tel: (402) 556-5000 | Fax: (402) 556-2037
www.ttcrs.com

Page 37

1  A.  No.
2  Q.  Do you know sitting here today why
3 this lease was executed on March 19th, 2021?
4  A.  No.
5  Q.  Did you ever ask Kurt why this lease
6 was executed on that date?
7  A.  I do not recall.
8  Q.  And you would agree with me, would you
9 not, that the bank was in the process of
10 foreclosing on this property in March of 2021,
11 correct?
12  A.  I believe so, yes.
13  Q.  Okay.  And you didn't find it odd that
14 this lease was executed during that time period?
15       MR. SKALKA:  Object to form.
16   Go ahead.
17       THE WITNESS:  I don't recall my
18 reaction to this particular document, no.
19 BY MS. GOODMAN:
20  Q.  Okay.  Do you remember talking to
21 Mr. Kroeger about that particular document?
22  A.  I do not recall, no.
23  Q.  All right.  I'd like to move on to
24 Exhibit 4.
25

Page 38

1       (Exhibit 4
2       marked for identification.)
3 BY MS. GOODMAN:
4  Q.  What I've marked as Exhibit 4 appears
5 to be like Exhibits 2 and 3, an email from
6 Mr. Kroeger to you that includes some
7 attachments.
8       Do you see that?
9  A.  Yes.
10  Q.  And this is an email that you would
11 agree was received on March 31st by you?
12  A.  Yes.
13  Q.  All right.  And if we could, let's
14 just go through this and have you confirm that,
15 in fact, you did -- all these attachments
16 actually do go with this email.
17  A.  Understood.
18  Q.  Having reviewed the attachments, would
19 you agree, Mr. Patino, that those attachments
20 do, in fact, go with this email?
21  A.  Yes.
22  Q.  And did you review those attachments
23 prior to filing your motion to modify plan?
24  A.  Yes.
25  Q.  All right.  I want to turn

Page 39

1 specifically now to the Chapter 12 plan.
2       MS. GOODMAN:  Erin, it's 3.16.
3 Actually, let's start with 3.13.
4 BY MS. GOODMAN:
5  Q.  All right, sir.  This is a page from
6 the chapter -- the second-amended plan, which
7 was confirmed by the Court in the Kroegers'
8 case.
9       Can you see that?
10  A.  Yes.
11  Q.  And what I've provided to you or what
12 is up on the screen is what's called "Condensed
13 Cash Flow Sheet."
14       Do you see that?
15  A.  Yes.
16  Q.  And it's "Proforma Crop Year 2020"?
17  A.  Uh-huh.
18  Q.  All right.
19  A.  Yes.
20  Q.  Are you familiar with this document?
21  A.  I have seen it, yes.
22  Q.  All right.  Are you familiar with this
23 type of document that's often included with
24 Chapter 12 plans?
25  A.  I am, yes.

Page 40

1  Q.  At the time or during your -- strike
2 that.
3       During your representation of the
4 Kroegers, at any point in time did you discuss
5 with Mr. Kroeger whether these proforma amounts
6 included on P3.13 did, in fact, come to reality
7 in terms of his operations?
8  A.  I do not recall if we had that
9 specific conversation, no.
10  Q.  Did you ever ask him if his farming
11 operation was performing as intended during year
12 2020?
13  A.  I don't recall if I asked him that
14 specifically, no.
15  Q.  Well, did you ask him generally?
16  A.  We would've talked about that, yes.
17  Q.  Okay.  All right.  And what do you
18 remember generally with regard to your
19 discussions about Mr. Kroeger's farming
20 operations?
21  A.  That, I mean, they couldn't comply
22 with the confirmed plan.
23  Q.  Okay.  And did he tell you what
24 specifically was preventing him from complying
25 with the confirmed plan?

Patrick Patino
3/22/2023

14 (41 - 44)

Page 41

1  A.  No, other than the practicality of the
2  time lines of the initial payments and whether
3  or not that could have been followed.  That was
4  his main issue with the plan is the timing of
5  the payments.
6  Q.  Okay.  And so Mr. Kroeger -- as I
7  understand what you're saying, Mr. Kroeger
8  expressed to you some concern with regard to
9  when the -- I guess, when the payments were due
10  or the amount of the payments?  Can you be more
11  specific?
12  A.  If I recall correctly, it was -- the
13  main issues with the plan were the drop-dead
14  provision and the timing of the initial
15  payments.
16  And the source, as I understand it,
17  was coming from the government, and so there was
18  a -- I guess it was out of his control --
19  Q.  Okay.
20  A.  -- in terms of when he received it and
21  had the ability to make those initial payments.
22  Q.  And do you recall whether or not you
23  ever asked him whether or not -- again, aside
24  from the government payment that you just
25  mentioned, that the income he was anticipating

Page 42

1  in 2020 whether or not that, in fact, came in as
2  he anticipated?
3  A.  I do not recall.
4  Q.  Did you ever do any analysis with
5  regard to what Mr. Kroeger was expecting to
6  bring in in terms of revenue versus what he
7  actually brought in in terms of revenue in 2020?
8  A.  We didn't get to that point, no.
9  Q.  Let's go now to 3.16.
10  All right, Mr. Patino, I'd like to
11  direct your attention still to Exhibit 4, but
12  we're at P3.16.
13  This is a document entitled
14  "Assumptions and Sources, 2020 Cash Flow
15  Income."
16  Do you see that?
17  A.  Yes.
18  Q.  First off, halfway through the --
19  halfway down the page, there's some kind of what
20  I'll call handwritten notes.
21  Are those your notes?
22  A.  No.
23  Q.  Okay.  Did you -- in connection with
24  your representation of the Kroegers, did you
25  ever review this page specifically?

Page 43

1  A.  I mean, I've reviewed the plan.
2  Q.  Okay.
3  A.  And that includes all the associated
4  documents attached to the plan.
5  Q.  Did you ever discuss with Mr. Kroeger
6  whether or not the assumptions and sources
7  contained within his plan, in fact, did become
8  true?
9  A.  We never got to that point, no.
10  Q.  And you say you never got to that
11  point.  Is there a reason why you never got to
12  that point?
13  A.  Well, there was a confirmed plan with
14  an order.
15  Q.  Understood.
16  And, sir, you moved to modify that
17  plan, and I guess I'm wondering in connection
18  with your motion to modify the plan if you
19  would've had occasion to ask Mr. Kroeger whether
20  or not these assumptions and sources that form
21  the basis of his plan did, in fact, become
22  reality?
23  MR. SKALKA:  Objection:  Form,
24  asked and answered, argumentative.
25  Go ahead.

Page 44

1  THE WITNESS:  Had the Court
2  approved the motion to modify, we would've gone
3  through that entire process, not prior to.
4  BY MS. GOODMAN:
5  Q.  And is there some reason why you
6  wouldn't have done it prior to?  I'm just trying
7  to understand your thinking on this.
8  MR. SKALKA:  Objection:  Form.
9  THE WITNESS:  Limited time.
10  BY MS. GOODMAN:
11  Q.  Other than limited time, any other
12  reason?
13  MR. SKALKA:  Objection:  Form.
14  THE WITNESS:  Can you repeat the
15  whole question?
16  BY MS. GOODMAN:
17  Q.  Sure.
18  Other than limited time, is there any
19  other reason why, in connection with filing your
20  motion to modify, you didn't review with
21  Mr. Kroeger whether or not the assumptions and
22  sources set forth in his 2020 cash flow income
23  statement here, in fact, occurred?
24  MR. SKALKA:  Same objection.
25  THE WITNESS:  Incident to the

Patrick Patino
3/22/2023

15 (45 - 48)

Page 45

1  work that I was doing and what we sought to
2  accomplish, that wasn't the reason for the
3  default. So it wasn't relevant at that time for
4  what we were trying to do.
5  BY MS. GOODMAN:
6      Q. And the reason for the default, sir,
7  would you agree is that, simply put, Mr. Kroeger
8  didn't have the money to make his initial plan
9  payment? Isn't that correct?
10     MR. SKALKA: Objection: Form.
11     THE WITNESS: As I understand it
12 from Mr. Kroeger, the reason why the payment --
13 so let me back up.
14     Yes. The default was for nonpayment.
15 BY MS. GOODMAN:
16     Q. Okay. And I guess I'm just wondering,
17 part of the nonpayment was Mr. Kroeger didn't
18 have the money, did he?
19     MR. SKALKA: Objection: Form,
20 foundation.
21     Go ahead.
22     THE WITNESS: I don't know
23 whether or not he did or did not have the money.
24 BY MS. GOODMAN:
25     Q. Did he tell you, Mr. Patino, whether

Page 46

1  or not he had the money to make the initial
2  payment in December of 2020?
3      A. As I understand from Mr. Kroeger at
4  the time the first payment was due, he did not
5  have the money.
6      Q. Within this same document, I'd like to
7  go to P22.
8      Sir, this is also contained within the
9  documents that Mr. Kroeger initially sent you,
10 and it appears to be a letter of interest from
11 Ashton State Bank.
12     Do you see that?
13     A. Yes.
14     Q. Was this a financing opportunity that
15 you assisted Mr. Kroeger in procuring?
16     A. No.
17     Q. Do you know whether or not this
18 particular opportunity ever resulted in credit
19 being extended? Bad question.
20     Do you know whether this particular
21 opportunity ever resulted in new financing for
22 Mr. Kroeger and Mrs. Kroeger?
23     A. No, not that I'm aware of, no. I
24 don't think it came to fruition.
25     Q. Okay. And do you know why not?

Page 47

1      A. I would not know the reasoning, no.
2      Q. Did you ever have any communications
3  with anybody from Ashton State Bank with regard
4  to the Kroegers?
5      A. No.
6      Q. At the time that Mr. Kroeger
7  retained -- Mr. and Mrs. Kroeger retained you to
8  assist them in connection with the Chapter 12
9  case, had this financing opportunity, had it
10 essentially died on the vine already?
11     A. It's dated March 18th. The letter of
12 interest expires one week from issuance, so that
13 would have been March 25th. Yes, this would
14 have been dead before they got to me.
15     Q. Okay. I want to turn to the next
16 page. This is another document. This one's
17 from Kennedy Funding Financial.
18     Do you see that?
19     A. Yes.
20     Q. Okay. Is this a financing opportunity
21 that you assisted the Kroegers in procuring?
22     A. No.
23     Q. At the time they retained you to
24 assist them in connection with their Chapter 12
25 case, was this opportunity still in play, or had

Page 48

1  this relationship ended?
2      A. Same as the last one is my
3  recollection.
4      Q. Okay. Other than these two
5  opportunities, do you know whether or not the
6  Kroegers were pursuing -- or excuse me. Strike
7  that.
8      As of the time they retained your firm
9  to assist them in connection with their
10 Chapter 12 case, did they have any financing
11 opportunities that were still open for
12 discussion?
13     A. Not that I recall.
14     Q. Other than these two opportunities
15 with Ashton State Bank and Kennedy Funding, are
16 you aware of any other financing opportunities
17 that the Kroegers had in the time period that
18 you were representing them?
19     A. Not that I recall, no.
20     Q. All right. I'd like to move on now
21 to -- oh, one quick question before we move on.
22     In connection with your filing of the
23 motion to modify, did you ever review the
24 operating reports that were filed by the
25 Kroegers in connection with their Chapter 12

Page 49

case?

A. I don't recall specifically. Like I said, I reviewed the entire docket. It was a time crunch, so I had to -- I don't recall specifically if I did.

Q. Sir, had you learned that the Kroegers had, in fact, collected significantly less income than they had originally anticipated in their Chapter 12 plan, would you have proceeded with filing the motion to modify?

MR. SKALKA: Objection: Form, foundation.

So this is -- you're asking him to speculate and give a legal opinion on something that didn't happen.

Mr. Patino, if you feel comfortable answering, fine; otherwise, per what we discussed before, this is not asking you a fact question.

MS. VOGT: I'm joining in on speculation.

You can answer, if you can.

THE WITNESS: Okay. Can you re-ask the question?

MS. GOODMAN: Can you read it

Page 50

back?

(Whereupon, the pending question was read back by the court reporter.)

THE WITNESS: So at the time they came to me, there was a confirmed plan. There are limited options. I would have still proceeded in the same way.

BY MS. GOODMAN:

Q. Okay. I want to go to Exhibit 5.

MS. VOGT: Lauren, can we take just a very short break before we switch exhibits?

MS. GOODMAN: Sure, yeah.

MS. VOGT: Okay. Five minutes?

MS. GOODMAN: Yeah, perfect.

(2:35 p.m. - Recess.)

Page 51

(At 2:39 p.m., with parties present as before, the following proceedings were had, to-wit:)

MS. GOODMAN: I'd like to mark Exhibit 5.

(Exhibit 5 marked for identification.)

BY MS. GOODMAN:

Q. Mr. Patino, I've shown you what is now marked as Exhibit 5. This is the last email that Mr. Kroeger sent to you on March 31st.

And, again, same drill as the last time. I just want to make sure that, in fact, these attachments do go -- did go with this email.

Sir, do you believe that those were the proper attachments to that email?

A. I didn't see them. I still just see the folder with the different PDFs.

Q. Sorry about that.

A. That's okay. I see it now.

Q. Okay. Were those the attachments that went with that communication, sir?

A. That's what it would appear, yes.

Q. And did you, in fact, receive that

Page 52

communication on March 31st of 2021?

A. That's how it appears, yes.

Q. Okay. And did you review those attachments in connection with filing your motion to modify?

A. Yes.

Q. All right, sir. Have you seen the notice of default that was stated December 4th, 2020, and sent to Kurt and Kathy Kroeger?

You know what? For the efficiency here, we can just put it up.

A. I think I saw it in there.

Q. Yeah. Let me just mark it as Exhibit 6.

(Exhibit 6 marked for identification.)

BY MS. GOODMAN:

Q. Have you seen this document before?

A. Yes.

Q. Okay. Did you review this document prior to filing your motion to modify?

A. Yes.

Q. Did you discuss this letter at all with Mr. Kroeger?

A. Yes.

Patrick Patino
3/22/2023

17 (53 - 56)

Page 53

1    Q.  And tell me about that discussion.
2    A.  I don't recall the specifics of it,
3  but we would've discussed this letter.
4    Q.  All right.  And just generally
5  speaking, do you recall any discussion between
6  the two of you with regard to the letter?
7    A.  Is that these payments as set forth
8  here, this was the first notice he even was
9  aware there was a plan.
10   Q.  Okay.
11   A.  And that complying with these
12  payments, had he known of the plan, he could not
13  have complied with.
14       That's generally the conversations
15  that Kurt and I had about the plan, the
16  payments, his knowledge of it, and the default.
17   Q.  And when did you have that discussion
18  with Mr. Kroeger?  Do you recall the timing of
19  it?
20   A.  That would have been right -- sometime
21  around when he retained me, he and his wife.
22   Q.  Do you believe that that discussion
23  was had before or after you filed the motion to
24  modify?
25   A.  That was before.

Page 54

1    Q.  Okay.  And after you were retained,
2  did you at any point reach out to Galen Stehlik
3  with regard to this case?
4    A.  He reached out to me.
5    Q.  Tell me about that conversation.
6    A.  Galen called me one time and basically
7  asked if I was taking over the case.  It was a
8  very short conversation.  We didn't get into any
9  specific conversation about anything.  It must
10  have lasted less than, I don't know, 60 seconds.
11   Q.  And what did you tell him with regard
12  to your representation of the Kroegers?
13   A.  I told him that I was hired, if I
14  recall correctly, to do what I did.  It's all
15  court record, and he got notice of everything.
16   Q.  Okay.  Did you ask at all during that
17  conversation for Galen's assistance with regard
18  to your efforts to modify the plan?
19   A.  No.
20   Q.  Why not?
21   A.  Why did I not ask for his assistance?
22   Q.  Right.
23   A.  My understanding is that the clients
24  had fired him.
25   Q.  And what was that understanding based

Page 55

1  on?
2    A.  What Kurt had told me.
3    Q.  So your testimony here today is that
4  Kurt had told Mr. Stehlik that he had been
5  terminated with regard to the representation of
6  the Kroegers?
7       MR. SKALKA:  Objection:  Form.
8       Go ahead, if you can.
9       THE WITNESS:  That's what I
10  understood.
11  BY MS. GOODMAN:
12   Q.  And your understanding, again, was
13  based on what Mr. Kroeger had told you?
14   A.  That is correct.
15   Q.  Did you ask Mr. Stehlik whether or not
16  Mr. Kroeger had spoken with him concerning the
17  representation -- the termination?
18   A.  No.
19   Q.  Did you ask Mr. Stehlik for any
20  background about the case?
21   A.  No.
22   Q.  And is there some reason, sir, why you
23  didn't ask him for some case background?
24       MR. SKALKA:  Objection:  Form.
25       Go ahead.

Page 56

1       THE WITNESS:  I mean, any reason
2  I would have to reach out to a former attorney
3  that the client is dissatisfied with, I wouldn't
4  take that step, no.
5  BY MS. GOODMAN:
6    Q.  Did you ask Mr. Stehlik what
7  communications he had recently had with
8  BankFirst?
9    A.  I was aware of those from what Kurt
10  knew, what had been provided to Kurt about those
11  communications but not directly from
12  Mr. Stehlik.
13   Q.  And what did Mr. Kroeger tell you with
14  regard to Mr. Stehlik's communications with
15  BankFirst?
16   A.  If I -- like I said, I'm speaking kind
17  of in summary.  I don't know -- recall
18  specifically, but I believe that there was some
19  issue with the responsiveness of BankFirst's
20  attorney, Jeff Galyen --
21   Q.  Okay.
22   A.  -- being nonresponsive or hard to get
23  ahold of, something along those lines.
24   Q.  Okay.  Did Mr. Kroeger tell you that
25  Mr. Stehlik had made numerous attempts to get

Page 57

1  ahold of Mr. Galyen?
2      A.  What Mr. Kroeger had told me is that
3  Mr. Stehlik had made efforts to contact
4  Mr. Galyen, yes.
5      Q.  After you were retained by the
6  Kroegers, did you make efforts to reach out to
7  Mr. Galyen?
8      A.  Yes.
9      Q.  And tell me about those efforts.  Were
10 you successful in getting ahold of him?
11     A.  Sporadically, yes.
12     Q.  And when you did get ahold of him,
13 what was discussed?
14     A.  I had -- the primary discussion was
15 could we have more time to try to work something
16 out to reach a resolution.  That was the main
17 driver of reaching out to him was seeing if we
18 could work something alternatively out.
19     Q.  And what was Mr. Galyen's response to
20 those requests?
21     A.  My last request, if I recall
22 correctly, I sent him an email and he didn't
23 respond to it.
24         I also recall something along the
25 lines of the bank's response is, well, there's a

Page 58

1  Court order, so we really don't have to respond
2  because there's already a Court order in place.
3      Q.  And what Court order were they --
4      A.  Well --
5      Q.  -- referring to?
6      A.  You go.
7      Q.  Yeah.
8         What Court order are you referring to?
9      A.  The one confirming the plan.
10     Q.  Is it a fair characterization that
11 from the time you took over as counsel for the
12 Kroegers until the time the case was converted,
13 is it fair to characterize that BankFirst was
14 not willing to negotiate with Mr. Kroeger?
15     A.  In the moment, my last email to Jeff
16 Galyen references I believe a conversation he
17 and I had about the bank potentially agreeing to
18 continue the hearing.
19         And so it appeared as maybe the bank
20 was at least somewhat open to talking about it;
21 but, ultimately, it didn't look like that was
22 the case in terms of their behavior.
23     Q.  Okay.  So your impression of the bank
24 as counsel for the debtors was that BankFirst
25 was not willing to negotiate with Mr. Kroeger

Page 59

1  with regard to the amount owed?
2      A.  My assessment of the interactions with
3  BankFirst is that it was -- like I said, Jeff
4  Galyen was not super responsive.
5         And so it's hard to say if it was Jeff
6  Galyen or the bank or whose position it was as
7  to why they were doing what they were doing.
8      Q.  Let me ask this:  Did you make any
9  proposals to the bank while you were counsel for
10 the Kroegers with regard to satisfying the
11 amount owed?
12     A.  I proposed to them that the
13 foreclosure sale be continued to provide the
14 Kroegers an opportunity to work with the bank to
15 sell the properties, to pay off the bank.  I did
16 propose that.
17     Q.  Okay.  And what was the bank's
18 response to that proposal?
19     A.  They ghosted me.
20     Q.  They didn't respond?
21     A.  That is correct.
22     Q.  Other than that proposal, did you make
23 any other proposals to the bank with regard to
24 the Kroegers' debt?
25     A.  Not that I recall, no.

Page 60

1      Q.  And when you made that proposal, did
2  you do it in writing or was it over the phone?
3      A.  It was in writing.  I sent an email to
4  Jeff Galyen.
5      Q.  Okay.  Do you recall the timing of
6  that email?
7      A.  It was before the hearing took place,
8  but I don't recall the specific time.  But it
9  was before the hearing took place because I
10 recall referencing the hearing and continuing it
11 in the foreclosure sale.
12     Q.  Did you ever ask Mr. Stehlik if he
13 made any proposals to the bank with regard to
14 the amount that the Kroegers owed?
15     A.  No.
16     Q.  Getting back to this letter here,
17 which has been marked as Exhibit 6, did
18 Mr. Kroeger ever mention to you that he had
19 property he could sell to cure the default of
20 the second amended plan?
21     A.  I don't quite understand the question.
22 Can you --
23     Q.  Sure, sure.
24         After Mr. Kroeger -- after the
25 Kroegers defaulted on their second-amended plan,

Page 61

1 there was a period of time between the default
2 and when the bank filed its affidavit of default
3 with the bankruptcy court.
4     A.   Yes.
5     Q.   Okay.  During that period of time,
6 which largely comprised the month of December of
7 2020, did Mr. Kroeger at any time ever mention
8 to you that he had property he could have sold
9 in order to cure the default during that time
10 period?
11     A.   As in something less than selling
12 everything, or just selling a portion of it?
13     Q.   Yeah.
14     A.   Like, prior to coming to me, is this a
15 solution he had come up with with Galen?  Is
16 that --
17     Q.   No.
18          I guess when you were representing --
19 I'll be more clear.  I'm not trying to trick you
20 here.
21          When you were representing the
22 Kroegers, did Mr. Kroeger at any point ever say
23 to you I had money I could have used to cure the
24 default in December of 2020?
25     A.   Okay.  I recall conversations with

Page 62

1 Kurt, and I can't recall specifically or when it
2 took place, of his understanding of what he
3 could and could not do in the bankruptcy.
4          And he was under the impression --
5 like I said, if I recall correctly, that he
6 couldn't sell anything, and it was kind of this
7 all-or-nothing type scenario.
8     Q.   Okay.  Did Mr. Kroeger ever tell you
9 he had cash available to cure the defaults in --
10 that he could've used to cure the default in
11 December of 2020?
12     A.   He had -- as far as I know, I mean, I
13 wasn't around at that time to know specifically
14 what the facts were at that time.
15          But my understanding is that he then
16 did, in fact, have money to make these payments
17 and attempted to make the payments at some point
18 later in time.
19     Q.   Okay.  But not during -- he did not
20 have the money, it was your understanding, in
21 December of 2020?
22     A.   That's my understanding.  Well, when
23 the payments were due, so whenever December --
24 November and by December 1st as stated in the
25 exhibit that you're showing me right now.

Page 63

1     Q.   Okay.  Did you ever do anything, sir,
2 in connection with your representation of the
3 Kroegers to analyze the amount of equity that
4 Mr. and Mrs. Kroeger had in their real property?
5     A.   I did that with Kurt, yes.
6     Q.   And how did you do that?
7     A.   Through discussions with Kurt.
8     Q.   Other than discussions with Kurt, did
9 you review any documents or look at any other --
10 talk to anybody else to determine whether or not
11 there was equity in the real property that was
12 owned by the Kroegers?
13     A.   It is common in these scenarios to
14 initially rely upon what the farmer is telling
15 you.  They can be seen as experts -- their own
16 experts to be able to testify as to the values
17 of things.
18     Q.   So your sole basis for determining the
19 amount of equity in Mr. Kroeger's real property
20 was based on Mr. Kroeger's opinion; is that
21 correct?
22          MR. SKALKA:  Objection:  Form and
23 foundation.
24          Go ahead.
25          THE WITNESS:  I believe

Page 64

1 Mr. Kroeger had also spoken with at least one
2 Realtor who specializes in kind of these kinds
3 of sales.
4 BY MS. GOODMAN:
5     Q.   Okay.  Do you know the Realtor you
6 spoke with?
7     A.   I think.  So commonly in this space,
8 it's -- the Realtor's name is Don Kracke.
9     Q.   Okay.
10     A.   He's based in Nebraska.  He helps
11 farmers in these situations.
12     Q.   And when you say "in these
13 situations," what do you mean by that?
14     A.   Financially distressed situations.
15     Q.   And is it your understanding that
16 Mr. Kracke -- I guess what did he do for
17 Mr. Kroeger?  Do you know?
18     A.   I believe they had some conversations.
19     Q.   Okay.  And did the conversations
20 center around the value of the land?
21     A.   I don't know specifically, but it
22 would've involved if there was any opportunity
23 to do what's called a sale leaseback, which is
24 common in these situations.
25     Q.   And do you know what specifically

Patrick Patino
3/22/2023

20 (65 - 68)

Page 65

1 Mr. Kroeger learned from Mr. Kracke?
2     A.  Not specifically, no.
3     Q.  Generally?
4     A.  I don't recall.
5     Q.  Okay.
6     A.  If I recall correctly, Mr. Kracke was
7 interested.
8     Q.  Was interested in a sale leaseback?
9     A.  Some kind of situation like -- yeah,
10 or a solution like that, yes.
11     Q.  Do you know whether Mr. Kracke ever
12 executed any sort of offer to purchase the land?
13     A.  No.
14     Q.  He did not?
15     A.  It never reached that point.  It did
16 not reach that point, no.
17     Q.  Do you know the amount that Mr. Kracke
18 offered -- excuse me.  Strike that.
19       Do you know the amount that Mr. Kracke
20 was contemplating offering for the land?
21     A.  He's not a purchaser.  He's like a
22 real estate broker.
23     Q.  Do you know whether Mr. Kracke
24 gave Mr. Kroeger any idea as to the value he
25 might get for the land?

Page 66

1     A.  I do not know.  I was not privy to
2 those conversations between the two of them.
3     Q.  And so sitting here today, you don't
4 know whether Mr. Kracke and Mr. Kroeger
5 discussed any values with regard to the land?
6     A.  I cannot say for certain.
7     Q.  Okay.  So getting back to my initial
8 question, then, is it fair to say that
9 Mr. Kroeger's opinion of the value of the land
10 is what you were relying on in connection with
11 your analysis?
12       MR. SKALKA:  Objection:  Form,
13 foundation.
14       Go ahead.
15       THE WITNESS:  Partially, yes.
16 BY MS. GOODMAN:
17     Q.  I'm sorry.  You say --
18     A.  Partially.
19     Q.  Okay.
20     A.  Then we look at, you know,
21 tax-assessed values and that kind of stuff.
22     Q.  And other than tax-assessed values,
23 Mr. Kroeger's opinion, anything else you relied
24 on in determining the amount of equity
25 Mr. Kroeger might have in the land?

Page 67

1     A.  No.
2     Q.  Okay.  In connection with your
3 analysis of the real property that was owned by
4 the Kroegers, what amount of equity did you
5 believe the Kroegers had in the land?
6     A.  I don't remember specifically.  I
7 believe there's an email that I sent to Rick
8 Myers that spells that out in a broad sense, and
9 that's based upon information Kurt had provided.
10     Q.  Okay.  With regard to the -- now, with
11 regard to the personal property, did you do any
12 sort of analysis to determine what equity the
13 Kroegers might have in their personal property?
14     A.  You mean totally all their personal
15 property?  Farm machinery, equipment, vehicles,
16 everything?
17     Q.  Yes, everything.
18     A.  I mean, that was part of the same
19 analysis of the real estate, same conversation I
20 had with Kurt.
21     Q.  Okay.  So any analysis you would've
22 done with regard to the equity and personal
23 property was based on Kurt's opinion?
24     A.  And the schedules and what he provided
25 the things -- what things were worth, yes.

Page 68

1     Q.  Okay.  Other than relying on Kurt and
2 the schedules, was there anything else that you
3 did to determine whether or not there was any
4 equity in the personal property?
5     A.  I do not recall.
6     Q.  All right.  Did you at any point
7 review any appraisals in connection with the
8 real estate?
9     A.  Not that I recall, no.
10     Q.  Incidentally, with regard to the
11 personal property, what advice -- I
12 understand -- well, strike that.
13       As I understand it, after the case was
14 converted, BankFirst came in and I guess took
15 possession of the personal property.  Do you
16 recall that?
17     A.  They were granted relief from the
18 automatic stay to go pursue their collateral
19 under state law --
20     Q.  Okay.
21     A.  -- which would include a foreclosure
22 and there was a pending replevin action.
23     Q.  And in connection with the replevin
24 action, did you advise the Kroegers in terms of
25 how best to turn over the items that were

Page 69

1 subject to the replevin order?
2      A.   I was not the attorney of record in
3 the state court action.  Galen was.
4      Q.   My question is a little different.
5          The replevin order was entered.  And
6 then, ultimately, at some point in time, the
7 property was turned over from the Kroegers to
8 BankFirst.
9      A.   Yes.
10      Q.   Were you counsel for the Kroegers at
11 the time that the property was turned over?
12      A.   Well, it would've happened after --
13 well, much of the personal property was on the
14 land.  So when the foreclosure took place, they
15 took possession of the personal property because
16 it was all there on site --
17      Q.   Okay.
18      A.   -- is how I understand it.  So it
19 wasn't like the Kroegers delivered property.  It
20 was all left on site --
21      Q.   Okay.
22      A.   -- on the land that was foreclosed on.
23      Q.   Did you advise Mr. and Mrs. Kroeger to
24 essentially leave the personal property that was
25 subject to the replevin order on site when they

Page 70

1 left the house and real property?
2      A.   I mean, I would've advised them not to
3 remove --
4      Q.   Okay.
5      A.   -- any property subject to a valid
6 security interest.
7      Q.   Okay.  With regard to the foreclosure
8 proceeding -- the replevin proceeding that was
9 filed by BankFirst, have you had the occasion to
10 review the order that was entered on the bank's
11 replevin?
12          MR. SKALKA:  Objection:
13 Foundation just in regards to -- and maybe there
14 was.  You said a foreclosure action.  I don't
15 know if you meant a deed of trust action.
16          MS. GOODMAN:  Good point, David.
17      Let's go ahead and pull up 9.  I
18 should have been more specific.
19          (Exhibit 7
20          marked for identification.)
21 BY MS. GOODMAN:
22      Q.   All right.  Sir, I've put up on the
23 screen here an order in replevin.
24          Do you see that?
25      A.   Yes.

Page 71

1      Q.   Okay.  If you --
2          MR. SKALKA:  What exhibit is this
3 from?
4          MS. GOODMAN:  I'm sorry?
5          MR. SKALKA:  What exhibit is
6 this?
7          MS. GOODMAN:  This is
8 Exhibit 7 -- I'm sorry.  Exhibit 7.  I'm
9 previously skipping what was previously 7 and 8.
10 BY MS. GOODMAN:
11      Q.   All right.  Sir, I've showed you what
12 is marked as Exhibit 7.  This is an order that
13 was entered in connection with the replevin case
14 brought by BankFirst against H&M Farms and the
15 Kroegers.
16          Can you see that?
17      A.   I can.
18      Q.   Okay.  And were you aware at the time
19 you took the representation of the Kroegers
20 that, in fact, there had been an order in
21 replevin entered?
22          MR. SKALKA:  Object to
23 foundation.
24          Go ahead and answer.
25          MS. GOODMAN:  I'm asking if he

Page 72

1 was aware of it at the time he represented the
2 Kroegers.
3          MR. SKALKA:  Well, your question
4 said a couple other things; and I won't get into
5 it, but I just object to foundation.
6          Go ahead.
7          THE WITNESS:  I don't recall
8 specifically whether or not they informed me of
9 the replevin order, no.
10 BY MS. GOODMAN:
11      Q.   Did you at any point, sir, ever review
12 the order that's on the screen here and marked
13 Exhibit 7?
14      A.   I would have, yes, eventually.
15      Q.   Okay.  And did you do anything --
16          MS. GOODMAN:  If you go to the
17 fourth page of this, Erin.
18 BY MS. GOODMAN:
19      Q.   On the fourth page, it's a list of the
20 collateral that BankFirst was claiming.
21          Do you see that?
22      A.   Yes.
23      Q.   At any point, did Mr. Kroeger ever
24 tell you that this was an improper list of the
25 bank's collateral?

Patrick Patino
3/22/2023

22 (73 - 76)

---

Page 73

1    A.   What do you mean by "improper list"?
2    Q.   Yeah.
3        Did Mr. Kroeger ever dispute with you
4 that this list wasn't accurate, the list of
5 collateral that the bank was claiming?
6    A.   I don't recall.
7    Q.   Do you think he may have or...
8    A.   It's possible.
9    Q.   Okay.
10    A.   I don't remember specifically.  That
11 kind of rings a bell, but I don't recall
12 specifically, no.
13    Q.   Did you ever take any action in
14 connection with your representation of the
15 Kroegers to determine whether this list was
16 accurate?
17    A.   As provided, I was not hired to do
18 anything in state court, including this replevin
19 action.
20    Q.   Okay.  So your testimony here today is
21 that you were not retained to determine whether
22 or not the bank indeed had a security interest
23 in the property listed on Exhibit 1?
24        MR. SKALKA:  Objection to form.
25    Go ahead.

---

Page 74

1        THE WITNESS:  At the time I was
2 retained, relief from state had already been
3 granted.  This property was not property of the
4 bankruptcy estate -- well, so the bank was free
5 to pursue this replevin.  I was not hired to
6 handle this replevin.
7 BY MS. GOODMAN:
8    Q.   Okay.  Do you know -- as I understand
9 it, though -- well, strike that.
10        Did the bank pursue the possession of
11 the property listed on Exhibit 1 while you were
12 representing the Kroegers?
13    A.   Like I previously said, to the extent
14 they recovered personal property collateral,
15 these items were left on the real property that
16 was foreclosed on.
17        The Kroegers -- like I said, I would
18 have instructed the Kroegers to not remove any
19 of the bank's collateral from the property from
20 the real property.
21    Q.   So just so that I'm clear, sitting
22 here today, sir, you don't know whether any of
23 the property listed on Exhibit 1 of this order
24 is property listed in the sense that the bank
25 has a security interest in it or not?  You don't

---

Page 75

1 take a position?
2    A.   Yeah.  I do not.
3    Q.   As I understand it, sir, there is a
4 trustee sale that was scheduled for April 19th
5 of 2021 in connection with the bank's
6 foreclosure on the land; is that correct?
7    A.   That's my understanding of it, yes.
8    Q.   Did you attend that sale?
9    A.   No.
10    Q.   Did you instruct Kurt Kroeger to
11 attend?
12    A.   Did I instruct him to attend?
13    Q.   Yes.
14    A.   I don't know if I gave him direct
15 instructions to attend.
16    Q.   Did you advise him to attend?
17    A.   I think he asked whether or not he
18 could attend or -- if I recall correctly.
19    Q.   Okay.  Do you know whether or not
20 Mr. Kroeger made any efforts to purchase the
21 property at that trustee sale?
22    A.   I'm not aware.
23    Q.   Do you know at the time Mr. and
24 Mrs. Kroeger retained you to assist them as
25 counsel whether they were current with their

---

Page 76

1 loan to BankFirst?
2    A.   What do you mean by "current"?
3    Q.   Well, in other words, had they made
4 all the plans -- all the payments they promised
5 to make in connection with the second-amended
6 plan as of the date they retained you?
7    A.   My understanding is they had not
8 abided by the terms of the confirmed plan.
9    Q.   Okay.  At the time they retained you?
10    A.   Yes.
11    Q.   Okay.
12    A.   At that time, yes.
13    Q.   All right.  I want to go back to
14 something you said a little bit ago with regard
15 to the second-amended plan.
16        When did you learn that Kurt Kroeger
17 was taking the position that he was not aware a
18 second-amended plan had been confirmed?
19    A.   He told that to me I believe, like,
20 initially when he first reached out to me.
21    Q.   And did Mr. Kroeger tell you in that
22 initial conversation that he was never aware
23 that $100,000 was due under the plan?
24    A.   He didn't get into specifically that,
25 if I recall correctly.  It was that he didn't

---

Patrick Patino
3/22/2023

23 (77 - 80)

---

Page 77

1 even know the plan had been filed and didn't
2 agree to it.
3    Q.   Okay.  And what, in particular, did
4 Mr. Kroeger not agree to with regard to the
5 plan?
6            MR. SKALKA:  Object to
7 foundation.
8        Go ahead.
9 BY MS. GOODMAN:
10    Q.   What did he tell you?  Excuse me.
11 I'll withdraw that question.
12        What did Mr. Kroeger tell you that he
13 did not agree with in connection with the plan?
14    A.   I recall this pretty clearly, that he
15 told me -- he held out to me that he would never
16 have agreed to a plan with a drop-dead
17 provision.
18        And his other issue with it was the
19 timing of the payments, like I previously
20 testified to.
21    Q.   Okay.  Sir, I want to turn now, if we
22 could, pull up Exhibit 8, which is No. 10.
23            (Exhibit 8
24            marked for identification.)
25

---

Page 78

1 BY MS. GOODMAN:
2    Q.   Sir, can you see what I've marked as
3 Exhibit 8 which is a communication from you to
4 Jeff@gbblawgroup.com?
5    A.   Yes.
6    Q.   Okay.
7            MR. SKALKA:  Where is that?  It's
8 not been marked No. 8.  What is it?
9            MS. GOODMAN:  No.  It's No. 10.
10 So for Mr. Skalka, you can ignore what was
11 previously marked as 7 and 8 because I didn't --
12 I'm not going to use those.
13            MR. SKALKA:  Okay.  Thank you.
14            MS. GOODMAN:  Yep.
15 BY MS. GOODMAN:
16    Q.   Sir, do you recognize this email?
17    A.   Yes.
18    Q.   And is this an email you sent to
19 Jeff@gbblawgroup.com?
20    A.   Yes.
21    Q.   Okay.  And, in fact, sir, was this the
22 first email that you sent on behalf of the
23 Kroegers?
24    A.   Yes.
25    Q.   And I just want to be clear here.

---

Page 79

1 This email came through or was sent by you at
2 11:26 a.m. on the 31st, right?
3    A.   Yes.
4    Q.   All right.  So I just want to go
5 through a couple of these items.
6    A.   Okay.
7    Q.   You say here in the second paragraph,
8 "I am reaching out to see if your client,
9 BankFirst, would agree to continue the trustee's
10 sale for 60 days to provide the parties an
11 opportunity to work this out."
12        Did you see that?
13    A.   Uh-huh, yes.
14    Q.   What response did you get from Jeff
15 Galyen, if any, with regard to that request?
16    A.   I think the -- if I recall correctly,
17 from the email, I keep emailing him to see if
18 he'll respond.
19        I even went so far as to include other
20 attorneys in his law firm that I knew to see if
21 that would get him to respond because he -- like
22 I said, I don't recall if they ever responded
23 specifically to that request.
24    Q.   Got it.
25        But it's your understanding -- well,

---

Page 80

1 it's true, though, sir, that they did not
2 agree -- the bank did not agree to continue the
3 trustee sale; is that correct?
4    A.   That is correct.
5    Q.   Then in the text paragraph, you say,
6 "From what I can tell, the Kroegers have cured
7 any defaults of the confirmed Chapter 12 plan
8 when payments were made early this month."
9        Do you see that?
10    A.   Yep.
11    Q.   What are you basing that statement on?
12    A.   They sent me copies of the checks --
13    Q.   Okay.
14    A.   -- that they had delivered to
15 BankFirst.  And how Kurt explained it, it looks
16 like they had cured the default.
17    Q.   Okay.
18    A.   At that time, that's what I
19 understood.  It was happening pretty fast.
20    Q.   So Kurt told you that he had cured the
21 defaults, and that's what you're basing this
22 statement on; is that true?
23            MR. SKALKA:  Objection.  That's
24 not what he testified to.  Foundation, form.
25        Go ahead.

---

Patrick Patino                                                    24 (81 - 84)
3/22/2023

Page 81

1    THE WITNESS:  I'm saying that
2  Kurt had provided information.  We had talked
3  about it, and that was the basis of my email,
4  then, to Jeff.
5  BY MS. GOODMAN:
6    Q.  Okay.  And did you believe, sir, at
7  that time that, in fact, the Kroegers had cured
8  the defaults under the Chapter 12 plan?
9    A.  I must have at that time to write that
10  email.
11    Q.  Sitting here today looking at this
12  email, would you agree with that statement?
13    A.  That they, in fact, had defaulted the
14  cure?
15    Q.  That they had cured the default?
16    A.  I can't say whether or not I changed
17  my position as to, you know, whether or not they
18  did or not.
19    At that time I believe they had based
20  upon the information I had at that time.
21    Q.  Okay.  But sitting here today, your --
22  sitting here today, do you still believe that
23  that statement is accurate?
24    A.  I haven't reviewed this information in
25  depth in months, so --

Page 82

1    Q.  So your testimony here today is you
2  don't know?
3    A.  Yeah.  I'm not sure.
4    Q.  Okay.  Next sentence, it says -- the
5  next sentence I want to direct your attention
6  to, it says, "The Kroegers have also provided me
7  with information regarding financing that they
8  lined up to take out BankFirst."
9    Do you see that?
10    A.  Yes.
11    Q.  What information had they provided to
12  you that gave you the impression that they had
13  it lined up to take out BankFirst?
14    A.  It was those letters of intent.
15    Q.  Okay.  And based on your previous
16  testimony, those letters of intent, in fact,
17  were no longer real opportunities at the time
18  that you took on this representation, correct?
19    A.  Now that I see those, yes.
20    Q.  Okay.  So that sentence is false,
21  correct?
22    A.  It's not false.  They had provided me
23  with information.
24    Q.  Information --
25    A.  They had.

Page 83

1    Q.  They had --
2    A.  That's what Kurt held it out to be.
3    Q.  Okay.  But sitting here today now, you
4  realize that, in fact, that wasn't -- those --
5  I'm sorry.  Go ahead.
6    A.  Well, on its face, the one letter, it
7  appears to have expired unless renewed, and I
8  didn't get that renewal.
9    Q.  Okay.  And other than those two
10  opportunities, you're not familiar of any other
11  financing opportunities that were in play as of
12  the time you took on the representation of the
13  Kroegers?
14    A.  Not that I recall.
15    Q.  All right.  Then you say here, "I am
16  unsure if Mr. Stehlik had provided you with that
17  information previously."
18    Do you see that?
19    A.  Yep.
20    Q.  What basis did you have to even
21  suggest that Mr. Stehlik had the information
22  regarding financing opportunities?
23    A.  That's why I say I'm unsure.
24    Q.  But what you're unsure of is whether
25  Mr. Stehlik provided it to BankFirst.

Page 84

1    What I guess I'm wondering is, was
2  there something that you learned of that
3  established that Mr. Stehlik, in fact, had those
4  financing opportunities to provide BankFirst?
5    A.  I don't recall.
6    Q.  Did Mr. Kroeger ever tell you that he
7  had discussed those financing opportunities with
8  Mr. Stehlik?
9    A.  I believe so, yes.
10    Q.  And tell me about that conversation.
11    A.  It would've happened when he was
12  talking about all of what had transpired leading
13  up to him reaching out to me.  I don't recall
14  the specifics.
15    Q.  And when you say "all that had
16  transpired," can you be any more specific?
17    A.  Well, what had transpired from the
18  time Kurt was notified from Jeff Galyen that the
19  plan was in default until the time that Kurt
20  reached out to me.
21    Q.  At the time you wrote this
22  communication on March 31st, 2021, had you
23  spoken with Galen Stehlik at all with regard to
24  this case?
25    A.  No.

Patrick Patino
3/22/2023

25 (85 - 88)

Page 85

1  Q.  Did you ever advise Mr. Kroeger that
2  it was more beneficial to him and his wife to
3  try and refinance the debt with BankFirst rather
4  than file a motion to modify?
5      A.  There was a confirmed plan that said
6  what was going to happen.
7      So BankFirst, if they weren't willing
8  to even talk about any kind of solution would
9  have been -- talk about that solution, no.
10     Q.  Okay.  So your assumption was that
11 BankFirst wouldn't be interested in a refi; is
12 that correct?
13     MR. SKALKA:  Objection:
14 Foundation.
15     Go ahead.
16     THE WITNESS:  Based upon my
17 experience in working in the distressed ag loan
18 space, the bank would not have been amenable to
19 something like that, no.
20 BY MS. GOODMAN:
21     Q.  Okay.  Your experience in the
22 distressed loan space, is that something other
23 than representing debtors in bankruptcy matters?
24     A.  Are you asking do I represent debtors
25 in nonbankruptcy workouts before --

Page 86

1      Q.  No.  I'm asking -- I didn't mean to
2  interrupt.
3      I'm asking whether or not you've got
4  experience in the distressed loan space, as you
5  call it, other than as an attorney?  I'll
6  withdraw the question.
7      What is your experience in the
8  distressed loan space?
9      A.  As an attorney.
10     Q.  Okay.
11     A.  I mean, my experience that I outlined
12 at the beginning of this.  I've been an attorney
13 for eight-and-a-half, nine years.  I specialize
14 in distressed -- financially distressed
15 consumers and businesses.
16     Q.  Okay.  Had you ever advised -- did you
17 advise Mr. Kroeger in connection with your
18 representation to make a proposal to the bank
19 that allowed the Kroegers to sell some property
20 in order to pay the bank's debt down?
21     A.  That's -- like this email suggests
22 here right in front of us, I tried to open up
23 the line of communication with BankFirst to see
24 what we could work out.
25     Q.  Okay.  But other than the proposal you

Page 87

1  already discussed earlier today in your
2  deposition, there were no proposals that --
3  concrete proposals that were made to the bank
4  that would allow the Kroegers to sell property
5  in order to pay the debt down?
6      MR. SKALKA:  Object to form,
7  foundation.
8      Go ahead.
9      THE WITNESS:  Not that I recall,
10 no.
11 BY MS. GOODMAN:
12     Q.  Okay.  Sir, with regard to BankFirst's
13 claim, did you ever have occasion to review the
14 proof of claim that it filed in connection with
15 the Chapter 12 case?
16     A.  I would have, yes.
17     Q.  Okay.  Did Mr. Kroeger ever tell you
18 that he believed that the amount the bank was
19 claiming as owed was incorrect?
20     A.  I mean, by the time I got retained,
21 there was a plan confirmed, and the claim had
22 been on file with no objections.
23     Q.  I understand, but my question is a
24 little different.
25     Did he ever tell you that he thought

Page 88

1  that the amount the bank was claiming in its
2  proof of claim as being owed was incorrect?
3      A.  Not that I recall.  He could have, but
4  I don't recall that specifically.  He had a lot
5  of issues with the bank.
6      Q.  Did you have any reason as the
7  Kroegers' counsel to question or dispute the
8  amount that the BankFirst was claiming was owed?
9      A.  Can you restate the question?
10     Q.  Yeah.
11     Did you have any reason as counsel for
12 the debtors, Kurt and Kathy Kroeger, to question
13 or dispute the amount that the bank was claiming
14 it was owed?
15     A.  There was a confirmed plan that
16 provided the allowed amount of the claim.  So by
17 the time it got to me, it's res adjudicata.
18     Q.  Okay.  And that's your -- that's your
19 opinion as a lawyer, correct?
20     A.  That is my opinion as a lawyer that
21 the confirmed plan says here's the allowed
22 amount that's going to be paid.  Hard to combat
23 that.
24     Q.  Okay.  Sir, did you ever take any
25 efforts to identify what collateral -- strike

Patrick Patino
3/22/2023

26 (89 - 92)

Page 89

1  that.
2      Sir, after the hearing on the motion
3  to modify --
4      A.  Yes.
5      Q.  -- the audio recording suggested that
6  there was some discussion between the Kroegers
7  and yourself and the bank.
8      Did those discussions, in fact, occur?
9      A.  After the hearing?
10     A.  Yes, immediately after the hearing.
11     A.  Did me, the Kroegers, and the bank
12  have a discussion immediately after the hearing?
13     Q.  Correct.  That's my question.
14     A.  No.
15     Q.  Okay.
16     A.  I don't recall having a discussion
17  with the bank and the Kroegers at the hearing.
18     Q.  Perhaps --
19     A.  I appeared -- I wasn't in the
20  courtroom, so...
21     Q.  Okay.  Perhaps not immediately after
22  the hearing, but later on after the motion to
23  modify was denied, do you know -- did you have
24  any further discussions with the bank?
25     A.  Not that I recall, no.

Page 90

1      Q.  Sir, has the bank's claim in
2  connection with the Chapter 7 case been fully
3  satisfied through the sale of the collateral?
4  Do you know?
5          MR. SKALKA:  Objection.  Does he
6  know?
7          THE WITNESS:  Do I know whether
8  or not BankFirst had been satisfied in full?
9  BY MS. GOODMAN:
10     Q.  Correct.
11     A.  I do not know that.
12     Q.  Okay.  So just sitting here today, you
13  don't know whether BankFirst is pursuing some
14  sort of deficiency in connection with the
15  Chapter 7 plan filed by the Kroegers, do you?
16     A.  I do not believe that they are, but I
17  don't know for sure.
18     Q.  Okay.  All right, sir.  In connection
19  with the motion to modify that was filed in
20  early April on behalf of the Kroegers, I would
21  like to just understand generally what analysis
22  you did at that point to determine that that was
23  the most appropriate course of action.
24     A.  Like I said previously, when you have
25  a court order confirming a plan and there's been

Page 91

1  a default of that plan that has occurred prior
2  and the bank has taken action to get relief from
3  stay, there are very limited options at that
4  point in time.  So one option is you can seek to
5  modify the plan.
6      There's, like I said, very few other
7  options at that point.
8      So when I was looking at the options
9  of how to deal with the situation, that was, to
10  me, the best option to pursue given all the
11  facts and circumstances and where the case was
12  at at that point because, like I said, in light
13  of the fact that there was a confirmed plan.
14     Q.  Got it.
15     And just to make sure I have
16  everything, the options that were considered at
17  this juncture were file a motion to modify,
18  approach BankFirst and try to work something
19  out, dismiss the Chapter 12 case, and/or convert
20  the case to a Chapter 7.
21     Are those the four options?
22     A.  Yeah.  Those would be the options at
23  this juncture of a case.
24     Q.  And in connection with filing the
25  motion to modify the confirmed plan, I guess

Page 92

1  would you agree with me that it's important to
2  list all relevant facts of a particular case in
3  the motion to modify?
4          MR. SKALKA:  Object to form.
5          THE WITNESS:  Say that again.
6  BY MS. GOODMAN:
7      Q.  Yeah.
8      I guess was it your approach in
9  connection with the motion to modify to include
10  all facts that you believe were relevant with
11  regard to the default by Kurt and Kathy Kroeger?
12         MR. SKALKA:  Same objection.
13         THE WITNESS:  At the time, given
14  the limited amount of time and the speed at
15  which this occurred, I did the best with the
16  information I had at the moment.
17         MS. GOODMAN:  Okay.  Erin, let's
18  pull up the motion to modify.
19         (Exhibit 9
20          marked for identification.)
21  BY MS. GOODMAN:
22     Q.  Sir, I've put up on the screen here
23  the limited motion to modify confirmed --
24         MS. VOGT:  Not quite yet.
25         MS. GOODMAN:  It's coming.

Page 93

1  Sorry.
2          THE WITNESS:  No.  It's okay.
3  BY MS. GOODMAN:
4      Q.  If we go to the second page of this, I
5  want to direct your attention to Paragraph 16.
6          Do you see that?
7      A.  Can you make it -- there you go.
8      Q.  All right.  So in Paragraph 16, you
9  say, "The Debtors, through counsel, should have
10 moved to modify the confirmed Plan pursuant to
11 11 USC 1229(a)(2)."
12         Do you see that?
13     A.  Yes.
14     Q.  And then it goes on to say, "However,
15 Debtors were unaware that they had the ability
16 to seek such a modification to extend the time
17 to make the payments, which is why Debtors are
18 now filing this motion."
19         Do you see that?
20     A.  I do.
21     Q.  All right.  Did you at any point in
22 time ask Mr. Stehlik why he did not move to
23 modify the plan upon the debtors' default?
24     A.  No.
25     Q.  Okay.  So when you say, "The Debtors,

Page 94

1  through counsel, should have moved to modify the
2  plan," do I understand, sir, that that's your
3  opinion?
4          MR. SKALKA:  Objection:  Form,
5  foundation.  I don't know where you're going,
6  counsel.
7  BY MS. GOODMAN:
8      Q.  Mr. Patino, do you know the answer to
9  my question?
10     A.  My opinion at that time is they
11 should've moved to modify the plan.
12     Q.  Okay.  But that opinion, sir, was made
13 without speaking with Mr. Stehlik regarding why
14 or why not -- why he didn't file the motion to
15 modify on behalf of the debtors, correct?
16     A.  That is correct.  I spoke with Kurt
17 who asked Mr. Stehlik, based upon my
18 conversation with Kurt, if anything could be
19 done, if anything could be filed with the Court.
20         And based upon the fact that nothing
21 had, I didn't see anything in the court record
22 that anything had been filed.
23     Q.  Okay.  And I guess what I'm just
24 wondering here is, did you speak with
25 Mr. Stehlik about whether or not he moved to

Page 95

1  modify the plan?
2      A.  No.
3      Q.  And did you know, Mr. Patino, that
4  prior to the -- did you know prior to the
5  hearing on April 14th of 2021 that Mr. Kroeger
6  was going to take the position that he didn't
7  know that the $100,000 payment was due?
8      A.  His position to me prior to all of
9  this is that the first he knew of the plan was
10 when he received the letter from Jeff Galyen.
11     Q.  Okay.  And, to be clear, you never
12 reached out prior to the April 15th hearing to
13 Mr. Stehlik to understand what his side of the
14 story was, correct?
15     A.  That is correct.
16     Q.  And, to be fair, you also did not ask
17 Mr. Stehlik to participate in the April 15th,
18 2021, hearing on the motion to modify, correct?
19         MR. SKALKA:  Object to form and
20 foundation.
21         Go ahead.
22         THE WITNESS:  No, I didn't.
23 BY MS. GOODMAN:
24     Q.  You did not ask him to participate,
25 correct?

Page 96

1          MR. SKALKA:  Object to form and
2  foundation.
3          THE WITNESS:  He would've
4  received notice of these filings and the
5  hearing, so I didn't think I needed to.
6  BY MS. GOODMAN:
7      Q.  Was it your expectation going into the
8  April 15th, 2021, hearing that Mr. Stehlik was
9  going to participate in counsel in that hearing?
10     A.  As counsel?
11     Q.  Yes.
12     A.  I didn't have that expectation, no.
13     Q.  Okay.  Did you talk to Mr. Stehlik
14 about whether or not he planned to appear at
15 that hearing?
16     A.  No.
17     Q.  Did you advise Kurt and Kathy Kroeger
18 regarding the likelihood of success with regard
19 to the motion to modify?
20     A.  I did.
21     Q.  And what did you tell them?
22     A.  I said it had a low chance of success.
23     Q.  And why did you believe it had a low
24 chance of success?
25     A.  Because there was already a confirmed

Patrick Patino
3/22/2023

28 (97 - 100)

Page 97

1  plan that had been in default for quite a long
2  time, and the bank had already obtained relief
3  from stay.
4      Q.  Did you advise Kurt and Kathy Kroeger
5  what would happen if the Court denied the motion
6  to modify?
7      A.  I did.
8      Q.  And what did you tell them in regards
9  to that?
10     A.  That this case -- that the case at
11 that point, then, was dead.  There's nothing to
12 reorganize.  If their whole point was to
13 reorganize, then all the property is going to go
14 to the bank.  There's nothing further to do.
15     Q.  Sir, did you characterize the motion
16 as something akin to, quote, "throwing a hail
17 Mary," end quote?
18     A.  Yes.
19     Q.  Do I understand, sir, based on your
20 prior testimony that your only communication
21 with Mr. Stehlik in regards to the Kroegers'
22 bankruptcy case was that initial conversation
23 when Mr. Stehlik called you?
24     A.  That is correct.
25     Q.  And you believe that call lasted less

Page 98

1  than 60 seconds?
2      A.  Yes.
3      Q.  And did Mr. Stehlik call your cell
4  phone?
5      A.  I don't have a cell phone.
6      Q.  Okay.
7      A.  I have --
8      Q.  Go ahead.  I'm sorry.
9      A.  Our office uses Google Voice --
10     Q.  Google Voice.
11     A.  -- which is kind of like a voiceover
12 IP system.
13     Q.  Okay.  And is the number associated
14 with that Google voice (402)401-4050?
15     A.  That is correct.
16     Q.  All right.  Sir, at some point, you --
17 the decision was made to convert the case to a
18 Chapter 7; is that correct?
19     A.  That is correct.
20     Q.  Did the Kroegers agree with the
21 decision to convert the case?  Do you know?
22     A.  Yes.
23     Q.  And was that a recommendation that you
24 made to them as your clients?
25     A.  Yes.  I gave -- I always give clients

Page 99

1  their menu of options and pick the one they're
2  comfortable with.
3      Q.  Okay.  Let's go ahead and put up what
4  was marked as Exhibit 12.
5          (Exhibit 10
6          marked for identification.)
7  BY MS. GOODMAN:
8      Q.  Sir, I've put up on the screen what
9  has been marked as Exhibit 10.
10     All right.  And, sir, this appears to
11 be an email dated May 6th of 2021 --
12     A.  Yep.
13     Q.  -- between you and Kurt Kroeger.
14     Do you see that?  I'm sorry, sir.  Do
15 you see that?
16     A.  Yes.
17     Q.  All right.  It says, "Kurt, I tried
18 calling and got your voice mail, so I thought
19 I'd send a quick/brief email."
20     And if you go down to the second
21 paragraph -- skip a paragraph, the next
22 paragraph reads, "You are at the stage in the
23 process where you throw your cards on the table
24 and let the chips fall where they may.  The
25 opportunity for fairness or a 'good outcome'

Page 100

1  have long since passed."
2      Do you see that?
3      A.  I do.
4      Q.  All right.  What do you mean by "an
5  opportunity for fairness or a good outcome"?
6  Can you just describe what you mean by that?
7      A.  Kurt Kroeger felt like he had been
8  screwed by the process and thought it had gone
9  unfairly.
10     Q.  Okay.  And tell me about that.  How
11 did he believe he had been screwed that you
12 understood?
13     A.  That between the bank and his
14 representation, he wasn't provided all the
15 options.
16     Q.  And was that -- was that an opinion or
17 position that he told you, Patrick?
18     A.  The position that he told me?
19     Q.  Yeah.
20     A.  Yeah, in a general sense, yeah.
21     Q.  Okay.  And so he thought --
22         MS. GOODMAN:  Should we take a
23 break?
24         MR. SKALKA:  No.  I just need to
25 stand.  You're good.

Patrick Patino                                                    29 (101 - 104)
3/22/2023

Page 101

1      MS. GOODMAN:  No problem.
2  BY MS. GOODMAN:
3      Q.  Okay.  So the fairness or a good
4  outcome that -- I guess I understand the
5  fairness component of it.
6      What good outcome was Kurt Kroeger --
7  what good outcome did he not get that he
8  believed he should have gotten?
9      MR. SKALKA:  Object to
10 foundation.
11     Go ahead.
12 BY MS. GOODMAN:
13     Q.  That he told you.  That he told you.
14     A.  Through conversations with Kurt.  So
15 one of the things in these Chapter 12 cases that
16 I advise clients from the front end is what
17 happens if you just sell everything.
18     And he expressed that Galen never had
19 that conversation with him to know that
20 potential outcome was just sell everything, pay
21 off all your creditors if you can, if you have
22 equity, and move on with your life.  To me, in a
23 farm case, that could be a good outcome.
24     Reorganization in a farm case is
25 difficult.  It's the old adage or asset rich,

Page 102

1  money poor.  And I'm saying that in a general
2  sense, not necessarily specifically about this
3  case.
4      So once you reach a point where
5  everything you've worked for is gone and taken
6  by the bank, there is really not an opportunity
7  more for a good outcome either of reorganization
8  or a liquidation that puts you in a position to
9  move forward.
10     Q.  Okay.  So the good outcome, in quotes,
11 would be the complete reorganization in the form
12 of a confirmed plan.  Is that what you mean?  I
13 guess I -- I'll withdraw that.
14     I'm trying to understand what you mean
15 by a "good outcome."
16     A.  What I mean by a "good outcome" is
17 something the debtor wants to achieve.  That
18 could be a liquidation, that could be getting
19 out of the farming, that could be reorganization
20 and being afforded an opportunity to act on that
21 with good counsel --
22     Q.  Okay.
23     A.  -- understanding the options.
24     And that can run the gamut.  Some
25 farmers, when you tell them, hey, you can get

Page 103

1  out of all this, do a liquidation, sell
2  everything, and then do a plan to just make
3  payments over three years, that's what I did in
4  the Blau case and that worked.  So, you know, a
5  good outcome can kind of run the gamut.
6      In a situation like this, what Kurt
7  wanted was a good outcome or reorganization or
8  to be able to let's say, like, retain the
9  townhouse that his son-in-law and deceased
10 daughter owned in Lincoln was just not possible
11 at this point that I sent this email.
12     Q.  Did you ask Kurt at the -- did you ask
13 him what his goal was from the start of the case
14 during the time you were representing him?
15     A.  Did I ask him what his goal was when
16 he initially --
17     Q.  Filed the case?
18     A.  -- filed the bankruptcy with Galen?
19     Q.  Correct.
20     A.  I don't believe I specifically asked
21 that.  He informed me that he thought his only
22 option was to attempt to reorganize.
23     Q.  Okay.  You would agree with me, would
24 you not, though, that in connection with the
25 Chapter 12 case, a good outcome is indeed

Page 104

1  getting a confirmed plan, correct?
2      MR. SKALKA:  Objection:  Form,
3  foundation.
4      Go ahead.
5      THE WITNESS:  I would agree that
6  a good outcome is getting a feasible confirmed
7  plan.
8  BY MS. GOODMAN:
9      Q.  And you would agree with me, sir, that
10 one of the elements to get a confirmed plan is
11 feasibility, correct?
12     A.  Technically, yes.  That's what the
13 bankruptcy code provides.
14     Q.  And is there some other code that
15 governed this Chapter 12 plan, sir?
16     MR. SKALKA:  Objection:  Form.
17     THE WITNESS:  Chapter 12s are a
18 unique bankruptcy beast.  Farm debtors and what
19 is deemed feasible and what is, in fact,
20 feasible, you know, is kind of an unwritten
21 rule.  You give a farmer an opportunity.
22 BY MS. GOODMAN:
23     Q.  Sir, you would agree with me that the
24 bankruptcy code governed the plan that was
25 confirmed in this case, correct?

Patrick Patino
3/22/2023

30 (105 - 108)

Page 105

1    A.   I would, yes.
2    Q.   And you have no reason to dispute that
3  there wasn't a confirmed plan in this case,
4  correct?
5    A.   That is correct.
6    Q.   All right. Let's go ahead and look
7  at -- well, before we move to another exhibit
8  here, I want to ask about a claim against Helen
9  Greenwalt. Does that ring a bell?
10    A.   Yes.
11    Q.   Okay.
12    A.   It does.
13    Q.   In connection with a Chapter 7 case,
14  did you do any analysis to determine whether or
15  not that claim had any value to the estate?
16    A.   That's why I listed it in the
17  bankruptcy schedules.
18    Q.   Okay.
19    A.   It's up to, then, the Chapter 7
20  trustee to determine whether or not they're
21  going to pursue that claim.
22    Q.   Okay. Do you know whether Mr. Myers
23  opted to pursue that claim as Chapter 7 trustee?
24    A.   I believe the record -- I don't recall
25  seeing that on his notice of his intent to claim

Page 106

1  assets.
2    Q.   Okay. Do you recall offhand -- and I
3  can put these schedules up.
4        But just for the sake of time, do you
5  recall offhand what value you assigned to that
6  claim?
7    A.   It was an unknown value.
8    Q.   Did you have do any analysis to
9  determine whether or not the claim had any
10  value?
11    A.   I did. Kurt provided the information.
12    Q.   Okay. And based on the information
13  that you reviewed in connection with that claim,
14  what do you believe the value of that claim is?
15    A.   Schedules speak for themselves.
16    Q.   So your position is it has an unknown
17  value; is that correct?
18    A.   Yes. There's a reason why that's
19  allowed in the bankruptcy schedules.
20    Q.   Okay. Let's go ahead and go to and
21  mark as Exhibit 11 No. 13.
22        MR. SKALKA:  Which one?
23        MS. GOODMAN:  It's what's No. 13,
24  David, in the file.
25

Page 107

1        (Exhibit 11
2          marked for identification.)
3  BY MS. GOODMAN:
4    Q.   All right, sir. This was part of what
5  Mr. Kroeger had sent to you in connection with
6  the representation, but I want to go through
7  this. These are some irrigation rights.
8    A.   Okay.
9    Q.   Can you just tell me what your
10  understanding of these rights are that the
11  Kroegers are claiming here? I'm just trying to
12  get a little background.
13    A.   Of them?
14    Q.   Yes.
15    A.   My understanding is that you can apply
16  for these lifetime water rights that run with
17  the land, and they're capped. There's only so
18  many of these that are provided. So it's, I
19  guess, special or valuable in that way.
20        That's my understanding of them based
21  upon my conversations with Kurt and what I
22  briefly looked into it. I'm not a water rights
23  attorney.
24        I directed Kurt that if he wanted to
25  know more about this to an attorney who

Page 108

1  specialized in this issue.
2    Q.   And do you know whether or not Kurt
3  has consulted with an attorney with regard to
4  these rights?
5    A.   I believe he did reach out to the
6  attorney that I found in Nebraska.
7    Q.   Okay. In the schedules you list,
8  1,000 certified irrigated acres, NRD estimated
9  1,500 to $3,500 an acre, which was about
10  750,000?
11    A.   Yes.
12    Q.   What is that estimate based on?
13    A.   The -- that is, like -- that is from
14  information that Kurt provided.
15    Q.   Okay. So other than the information
16  that Kurt provided, you have no independent
17  basis for the value?
18    A.   There is -- the best of my knowledge,
19  there is not, like, a market appraisal or
20  anything like that done, no.
21    Q.   Okay. Now, I saw a communication
22  between you and Mr. Myers with regard to his
23  intent to pursue these rights.
24        Do you recall that?
25    A.   Yes.

Page 109

1  Q. And, as I understand it, Mr. Myers did
2 not want to pursue those rights because he
3 viewed them as having no value. Is that your
4 recollection of the exchange?
5  A. Yes.
6  Q. As a result of his position, has the
7 debtor since gone, do you know, and pursued
8 these rights?
9  A. No. Now that we're talking, I seem to
10 recall maybe the response from the water rights
11 attorney was that these can't be pursued
12 separate from the land. They run with the land.
13 I seem to recall something along those lines.
14  Q. Okay.
15  A. But I don't remember for certain.
16 But, no, Kurt has not pursued these to the best
17 of my knowledge.
18  Q. Nevertheless, though, is it the
19 debtors' position that these particular rights
20 have been abandoned in connection with the -- by
21 the trustee. And, therefore, if Kurt wanted to
22 pursue them, he could?
23  MR. SKALKA: Object to
24 foundation.
25  Go ahead.

Page 110

1  THE WITNESS: I don't think
2 that -- my understanding is he hasn't claimed it
3 as an asset. I don't know whether or not he has
4 made any -- I can't recall if in that notice of
5 intent in there, he's also abandoned all other
6 assets.
7 BY MS. GOODMAN:
8  Q. Okay.
9  A. They sometimes do; they sometimes
10 don't.
11  Q. Understood.
12  But whatever value these rights have,
13 Mr. Kroeger is free to pursue them for his own
14 benefit. Is that your understanding?
15  A. At this point, do I believe that
16 Mr. Kroeger can pursue these water rights? No,
17 I do not.
18  Q. Okay. But that's from -- as a matter
19 of law, correct?
20  I guess I'm just saying is there
21 anything that -- aside from any legal
22 considerations, is there anything that would
23 prevent him from pursuing these rights if he
24 could under the law?
25  MR. SKALKA: Objection:

Page 111

1 Foundation.
2  Go ahead.
3  THE WITNESS: I don't know.
4 BY MS. GOODMAN:
5  Q. Okay. Under the bankruptcy code, sir,
6 are you familiar with anything that would
7 prevent Mr. and Mrs. Kroeger from pursuing these
8 rights at this juncture in the case?
9  MR. SKALKA: Objection: Form,
10 foundation.
11  So you're asking him, counsel, if he
12 had a conversation with the Kroegers about this,
13 or are you asking him to give you opinions?
14  MS. GOODMAN: Nope, not an
15 opinion. I'm just asking -- well, that's fine.
16 BY MS. GOODMAN:
17  Q. Have you told the Kroegers they're
18 free to pursue these rights?
19  A. No.
20  Q. Okay. Sitting here today, though, you
21 don't believe that they are doing so; is that
22 correct?
23  A. That is correct.
24  Q. Okay.
25  MS. GOODMAN: Let's pull up

Page 112

1 No. 14 and mark as -- we'll go ahead and mark
2 this as Exhibit 12.
3  (Exhibit 12
4  marked for identification.)
5 BY MS. GOODMAN:
6  Q. Mr. Patino, I have put up on the
7 screen a document that has been marked as
8 Exhibit 12.
9  Do you recognize this document?
10  A. Yes.
11  Q. And was this a document that your
12 office prepared?
13  A. Yes.
14  Q. All right. And what were you or your
15 office attempting to do through this document?
16  A. Rick Myers was appointed the Chapter 7
17 trustee. Rick likes getting information to
18 explain what has happened.
19  We thought that the best way to do
20 that would be in a spreadsheet that listed off
21 particular assets, how they were listed on
22 each -- from the original schedules to each
23 amended schedule and then what we provided when
24 we converted the case, who owned the asset, and
25 any notes.

Page 113

1  That was the thought process behind
2  creating this as an aide to the Chapter 7
3  trustee.
4      Q.   And is it your position, Mr. Patino,
5  that this list reflected in Exhibit 12 reflects
6  all pieces of property that were owned by the
7  Kroegers at the time the case was converted to a
8  Chapter 7?
9      A.   Are you saying that -- is this an
10  exhaustive list to everything we put in the
11  schedules?
12      Q.   No.
13      I'm wondering if this is an exhaustive
14  list of everything that the Kroegers owned in
15  terms of property at the time that they
16  converted the case to a Chapter 7?
17      A.   It's been a while since I compared
18  this to what the schedules say that we filed,
19  but -- so I'm unsure.  I don't have them side by
20  side to do a side-by-side analysis.
21      Q.   Okay.  Then is the best -- I guess is
22  the best information in terms of what the
23  Kroegers owned at the time the case was
24  converted to a Chapter 7, is the best source, in
25  your opinion, the schedules that were filed?

Page 114

1      A.   Yes.
2      Q.   But sitting here today, you have no
3  reason to, I guess, dispute or -- strike that.
4      Sitting here today, you have no reason
5  to believe that there isn't something listed in
6  Exhibit 12 that isn't in the schedules?
7      A.   Not that I'm aware of, no.
8      Q.   Okay.  All right.  Sir, if we look at
9  Exhibit 12, I've just got a few quick questions
10  on this.
11      A.   Sure.
12      Q.   There's these notes on the side of the
13  spreadsheet.  Who are those notes provided by?
14      A.   That information would have been
15  provided by Kurt and/or Kathy.
16      Q.   Down at the bottom here on Line 8,
17  let's just take this as an example,
18  "Collectibles of Value."
19      Do you see that?
20      A.   Yes.
21      Q.   All right.  And it says original
22  schedules is 20,000; amended schedules, 20,000;
23  amended Schedule 2, 1,000; and then converted
24  schedules, 650.
25      It says, "Prior values overstated at

Page 115

1  the direction of Galen Stehlik."
2      Do you see that?
3      A.   Yes.
4      Q.   Okay.  Did you discuss the values
5  included on the schedules that Galen Stehlik's
6  office prepared with Galen Stehlik at any point?
7      A.   No.
8      Q.   Okay.  Sir, at the end of the
9  schedules that were filed with the Court, there
10  is a list of property -- of the equipment and
11  machinery that was prepossessed.
12      In fact, why don't we just go ahead
13  and go there.  Let's mark -- I'm going to mark
14  as Exhibit 13 the bankruptcy schedules.
15          MS. GOODMAN:  Actually, let's
16  take a quick break.  There's been a request.
17          (4:08 p.m. - Recess.)
18
19
20
21
22
23
24
25

Page 116

1      (At 4:12 p.m., with parties present as
2  before, the following proceedings were had,
3  to-wit:)
4          (Exhibit 13
5          marked for identification.)
6  BY MS. GOODMAN:
7      Q.   Sir, I've put up what has been marked
8  as Exhibit 13, and this is I will represent a
9  copy of the schedules that I pulled from the
10  bankruptcy court docket that were filed in
11  connection with the Kroegers' Chapter 7 case.
12      A.   Okay.
13      Q.   I've got one question, and it really
14  just relates to this last exhibit here.
15      Okay.  Do you recognize this exhibit?
16      A.   Yes.
17      Q.   Okay.  Do you -- was this something
18  that your office put together?
19      A.   Yes.
20      Q.   And is it your understanding that this
21  is a complete list of the property that was
22  essentially foreclosed on by BankFirst or other
23  creditors?
24      A.   Based on the information that Kurt and
25  Kathy provided, yes.

Patrick Patino
3/22/2023

33 (117 - 120)

Page 117

1  Q.  Okay.  You're not aware of any -- I'm
2  sorry, Mr. Patino.  Go ahead.
3     A.  You can ask your question.
4     Q.  Yeah.
5        You're not aware -- I just want to
6  make sure, you're not aware of any other
7  property that's not included on this list,
8  correct?
9     A.  Not that I'm aware of.  We had Kurt
10 and Kathy review all of this.  I reviewed it
11 with them prior to filing it.
12    Q.  And do you know how these values were
13 determined on this schedule?
14    A.  This would have been based upon
15 information that Kurt provided, which is common
16 in the farm context.
17    Q.  Okay.  So he provided this
18 information.  You relied on it.  You don't know
19 how he came up with these values.  Is that a
20 fair statement?
21    A.  Other than his expertise in being a
22 farmer for decades; but, otherwise, no.
23    Q.  Okay.  Sir, there's been some
24 discussion about leases that were recorded
25 against the land records of the real property.

Page 118

1     Do you know what I'm referring to?
2     A.  Yes.
3     Q.  Okay.  Were those leases recorded at
4  your direction?
5     A.  No.
6     Q.  Do you know why those leases were
7  recorded?
8     A.  No.
9     Q.  How did you learn that the leases were
10 recorded?
11    A.  From the information we already went
12 over.
13    Q.  Okay.  Did you have any discussions
14 with Mr. Kroeger regarding the recording of
15 those leases?
16    A.  I seem to recall that we did.  We
17 would have -- Kurt and I talked quite frequently
18 about a lot of stuff related to this case,
19 but -- so I can't remember anything specific,
20 but we would have, I presume.
21    Q.  Okay.  But other than just knowing
22 that you had a conversation regarding these
23 recorded leases, you don't remember any other
24 detail; is that correct?
25    A.  Not specifically, no.

Page 119

1     Q.  And generally?
2     A.  No.
3     Q.  All right.  With regard to the
4  Chapter 7 case, do you have any idea sitting
5  here today whether there will be a distribution
6  to unsecured creditors in that case?
7     A.  Yes, I believe so.
8        MR. SKALKA:  Yes, you have an
9  idea, or yes, you're confirming there will be?
10       MS. GOODMAN:  Thanks, David.
11       THE WITNESS:  Sorry about that.
12       My understanding is that the Chapter 7
13 trustee, Rick Myers, sold the Lincoln townhouse
14 and has those proceeds because there was equity
15 in that property, and the debtors could not
16 claim any kind of exemption on it.
17       So my understanding, there are funds.
18 Whether or not there's funds to then be
19 distributed, I don't know the ultimate outcome
20 of that.
21 BY MS. GOODMAN:
22    Q.  Okay.  But your understanding is there
23 is proceeds from the sale of that townhouse that
24 may very well be available to unsecured
25 creditors?

Page 120

1        MR. SKALKA:  Objection:
2  Foundation, form as to "unsecured creditors."
3        THE WITNESS:  In a Chapter 7
4  case, if the trustee liquidates an asset with
5  equity and holds those moneys, it's always a
6  question as to whether or not there will be a
7  distribution.  I don't know for sure.
8  BY MS. GOODMAN:
9     Q.  Okay.  All right.  When did the -- as
10 I -- well, strike that.
11       Refresh my memory.  When did the topic
12 of Mr. Stehlik's conduct with regard to his
13 representation of Kurt and Kathy Kroeger first
14 come up in your representation of them?
15    A.  Immediately.
16    Q.  Okay.  And can I presume based on your
17 prior testimony that it was the Kroegers who, in
18 fact, raised that topic?
19    A.  Yes.
20    Q.  At any point in time, sir, did you
21 advise them they may have a malpractice claim
22 against Mr. Stehlik?
23    A.  Yes.
24    Q.  And at what point in time was that in
25 your representation of the Kroegers?

Patrick Patino
3/22/2023

34 (121 - 124)

Page 121

1    A.   I don't recall specifically.
2    Q.   Was it -- do you believe it was in
3  April of 2021?
4    A.   It was at some point in time between
5  the time they retained me and the time obviously
6  we filed the amended schedules listed in the
7  claim.  I don't recall specifically.
8    Q.   Okay.  And what did you believe -- or
9  what did you tell the Kroegers was the basis of
10  that malpractice claim?
11    A.   So my assessment of the situation in
12  looking at the schedules, that spreadsheet --
13  I'll just use an example.
14        Household goods and furnishings were
15  listed as a value of $200,000 in the original
16  schedules.  That's an indicator that goes to
17  support that Kurt and Kathy said they did not
18  review and sign the schedules before they were
19  filed.
20    Q.   Okay.
21    A.   Subsequently, there is an amended
22  schedule filed that shows that the household
23  goods and furnishings are worth $20,000.  That
24  indicates that the first schedules, I assume,
25  had a typo, and that typo needed to be

Page 122

1  corrected.
2        Once again, I asked the Kroegers, did
3  they review those amended schedules before they
4  were filed.  The answer was no.
5    Q.   Okay.
6    A.   And so that is just one example of --
7  in addition to the Kroegers telling me that they
8  didn't review and approve the plan before it was
9  filed, the fact that -- or what they provided to
10  me was -- Kurt provided to me that the plan as
11  filed and confirmed could never have been
12  complied with, that they weren't advised of what
13  was in the plan or what they were agreeing to.
14        They testified at their 341 meeting,
15  and obviously it was after the fact, Rick Myers
16  asked them if they ever signed any bankruptcy
17  schedules.  They said no.
18        So kind of the totality of all these,
19  I guess, issues that I advised listing a
20  potential malpractice claim against Galen.
21    Q.   Okay.  And that advice was based on,
22  as I understand it, your review of the court
23  file; is that correct?
24    A.   Yes.
25    Q.   And your discussion with the Kroegers?

Page 123

1    A.   Yes.
2    Q.   Anything else?
3    A.   I mean, I relied upon my experience of
4  having filed a lot of debtor's side bankruptcies
5  and the due diligence and knowing if you sit
6  down with someone and ask them questions or have
7  the conversation about, you know, what the
8  options are or different things.
9        For example, the Kroegers owned
10  H&M Farms.  That's listed as a d/b/a on the
11  voluntary petition.  That doesn't make H&M Farms
12  a debtor.  It doesn't protect H&M Farms.
13        It was disconcerting that in a case
14  like this where a lot of the assets are held by
15  the entities owned by the Kroegers, they don't
16  get -- those entities don't get the benefit of
17  the automatic stay.
18    Q.   Okay.  So I think what we've
19  established here, Mr. Patino, is that you would
20  do things differently had you filed the
21  Chapter 12 case on behalf of the Kroegers; is
22  that correct?
23        MR. SKALKA:  Objection to form.
24        Go ahead.
25        THE WITNESS:  Yes.

Page 124

1  BY MS. GOODMAN:
2    Q.   Okay.  But what I'm trying to
3  understand is what you reviewed and who you
4  spoke with to determine that there was a
5  potential malpractice claim against Mr. Stehlik.
6        And so far we've listed the court file
7  which included the schedules, and we've
8  discussed your discussions with the Kroegers.
9        Other than those two items, what else
10  did you review or who else did you speak with to
11  determine that there was a potential malpractice
12  claim here?
13    A.   Nothing.
14    Q.   Okay.  Did you do any legal research
15  on behalf of the Kroegers to determine whether
16  or not there was a malpractice claim here?
17    A.   I do not recall.
18    Q.   Had you done any legal research, would
19  it be, I guess, saved in a file or...
20    A.   Not necessarily, no.
21    Q.   Okay.  So is there any way to tell or
22  to confirm from your files whether or not there
23  was any legal research done here in connection
24  with a potential claim against Mr. Stehlik?
25    A.   No.

Page 125

1       MS. GOODMAN:  Okay.  Let's go
2 ahead and pull up No. 16, and we'll mark that as
3 Exhibit 14.
4       (Exhibit 14
5       marked for identification.)
6 BY MS. GOODMAN:
7   Q.  All right.  Sir, I have put up on the
8 screen what I've marked as Exhibit 14.
9     Do you recognize this communication?
10   A.  I do.
11   Q.  All right.  And let's start at the
12 top.  This is a communication between you --
13 Mr. Myers, Rick Myers sent you.
14   A.  Yes.
15   Q.  And he writes, "I would appreciate
16 your thoughts on the potential claim against
17 Stehlik.  If I presume that he messed up most of
18 the Chapter 12 case, I'm trying to figure out
19 what damages would be attributable that would
20 inure to the benefit of the BK estate and
21 creditors."
22    Do you see that?
23   A.  Yes.
24   Q.  "It appears to me that the debtors
25 never had any equity in their assets and a

Page 126

1 Chapter 12 case was likely never going to
2 succeed, so if that is true, I am trying to see
3 how filing a Chapter 12 and paying Stehlik hurt
4 creditors or hurt debtors in a way that
5 translates into a claim against Stehlik."
6    Do you see that?
7   A.  I do.
8   Q.  All right.  And it goes on to say,
9 "Can you share some facts that might help me
10 understand why a potential claim exists or
11 should be pursued by the Chapter 7 estate?"
12    Do you see that?
13   A.  Yes, I do.
14   Q.  All right.  So your response is found
15 at the bottom of this email.
16   A.  Uh-huh.
17   Q.  You say, "Rick, the value of the
18 assets of the Debtors, H&M Farms, and
19 Performance Crops, LLC, at the time of filing
20 were approximately 12 million."
21    And then you say in open parentheses,
22 "(This did not include the value of the water
23 rights or mineral rights) and the debt of
24 8 million."
25    Do you see that?

Page 127

1   A.  I do.
2   Q.  Okay.  What was your basis for
3 concluding that the value of the assets at the
4 time that the Chapter 12 case was filed was
5 $12 million?
6   A.  I confirmed that with Kurt.
7   Q.  Okay.  So other than confirming it
8 with Kurt, did you do anything else?
9   A.  No.
10   Q.  Okay.  And then you say and the debt
11 was $8 million.
12    Do you see that?
13   A.  I do.
14   Q.  Where did you get that number?
15   A.  A contact from Kurt.  And consider,
16 this is all three entities, although the debtors
17 are the only ones that filed.
18   Q.  Okay.  And I want to now go back to
19 that comment.
20    Performance Crops, LLC, what assets
21 did that entity own?
22   A.  I don't know specifically, but it did
23 own its own assets.
24   Q.  And why -- where do you get that -- or
25 what's your basis for saying that?

Page 128

1   A.  What is my basis for saying that
2 Performance Crops, LLC, owned its own assets?
3   Q.  Yeah.
4   A.  From Kurt Kroeger.
5   Q.  Okay.  I'm sorry.  $8 million debt
6 amount, you obtained that value from Kurt,
7 correct?
8   A.  That is correct.
9   Q.  Okay.
10   A.  I confirmed that with him.
11   Q.  Confirmed?
12   A.  Yep.  I didn't provide any information
13 or file anything in this case without Kurt
14 and/or Kathy Kroeger confirming it.
15   Q.  But beyond talking to Kurt and Kathy
16 Kroeger, it's my understanding you didn't do
17 anything else to determine whether that debt
18 amount was correct?
19   A.  I relied upon what Kurt -- the
20 information he provided.
21   Q.  Got it.
22    "The debtor and related entities could
23 have sold assets sufficient to pay off all of
24 the debt and downsize."
25    Do you see that?

Patrick Patino
3/22/2023

36 (129 - 132)

Page 129

1    A.  I do.
2    Q.  What assets could have been sold that
3  would've paid off all of the debt?
4    A.  What -- I mean, the assets they had:
5  Land, machinery, equipment, crops.
6    Q.  Is it your testimony, sir, that you
7  believe certain assets had equity in them?
8    A.  So these bank loans are
9  cross-collateralized.
10    Q.  Right.
11    A.  So you've got to look at it from the
12  totality or blanketly on everything.  So it's
13  not necessarily looking at each individual asset
14  whether or not it had equity, but the whole
15  portfolio.
16    Q.  Okay.
17    A.  So if everything were sold and paid
18  off all the debt, according to Kurt, there was
19  equity there.
20    Q.  Okay.  That statement, then, is that
21  your opinion based on the information you're
22  getting from Kurt?
23    A.  If, in fact, what Kurt was providing
24  me was true and accurate, that there's
25  $12 million of total assets, $8 million total

Page 130

1  debt, and everything were sold, my opinion is
2  that there would be enough to pay everyone off.
3    Q.  Okay.
4    A.  Every creditor, to be clear.
5    Q.  And if what Kurt was telling you was
6  incorrect, that would obviously affect your
7  conclusion here, correct?
8    A.  Yes.
9    Q.  Okay.  One -- it goes on to say, "One
10  of the issues is that Galen never discussed that
11  option with the Debtors and basically caused the
12  Debtor and related entities to lose all (or
13  mostly all) assets because a plan that the
14  Debtors never reviewed and approved prior to it
15  being filed and confirmed was dead on arrival."
16        Do you see that?
17    A.  I do.
18    Q.  Okay.  Now, what you're saying here,
19  as I understand it, is that one of the issues is
20  that Galen, according to you, and I assume you
21  received that -- the information that went into
22  that statement came from Mr. Kroeger, I assume,
23  correct?
24    A.  That is correct.  All the information
25  in this email came from Mr. Kroeger.

Page 131

1    Q.  Okay.  You say, "Galen never discussed
2  that option with the Debtors and basically
3  caused the Debtor and related entities to lose
4  all (or mostly all) of their assets"?
5    A.  Yes.
6    Q.  What did Galen do that specifically
7  caused them to lose all or mostly all of their
8  assets?
9    A.  Based on my conversations with Kurt,
10  there was never a discussion at any point in
11  time of doing a liquidation of any sort, a sale.
12    Q.  Okay.  And at any point, sir, did you
13  do any analysis as to the value of the property
14  in 2020 in relation to the debt to determine
15  whether there was any equity such that a sale
16  would allow Mr. Kroeger to retain any property?
17    A.  This discussion -- so these numbers
18  came out of that discussion that I had with
19  Kurt.
20    Q.  But my question was a little
21  different.
22        My question is whether or not you did
23  any analysis with regard to property that was
24  owned by Kurt and Kathy?
25    A.  I did not do a deep analysis, no.  I'm

Page 132

1  not a real estate expert or appraiser or
2  anything like that, so I relied upon what
3  Kurt -- the information he provided.
4    Q.  And that was the only information you
5  relied on in connection with this --
6        MR. SKALKA:  Objection:  Form,
7  foundation.
8  BY MS. GOODMAN:
9    Q.  I'm going to ask my question again
10  here.
11        The only source of information that
12  you relied on in connection with this email, I
13  just want to be clear, were your discussions
14  with Kurt and Kathy Kroeger, correct?
15    A.  That's correct.
16    Q.  Okay.  Then you go on and say that the
17  plan -- the confirmed plan was, quote, "dead on
18  arrival"?
19    A.  Yes.
20    Q.  What did you mean by that?
21    A.  Second was confirmed but couldn't be
22  performed.
23    Q.  And it couldn't be performed because
24  Kurt and Kathy Kroeger didn't have the money to
25  pay, correct?

Patrick Patino
3/22/2023

37 (133 - 136)

Page 133

1    A.  Because of the timing.  It was based
2  upon government checks.  So the timing,
3  according to Kurt, never could have been
4  complied with.
5    Q.  At the time -- I'm sorry.
6    A.  It was an impossibility.
7    Q.  Okay.  At the time that the initial
8  payment was due, I just want to be clear, your
9  understanding was that Kurt and Kathy Kroeger
10  didn't have the money to pay to make that
11  initial payment, correct, at that time?
12    A.  That is correct, because they were
13  relying upon a government check.  And it could
14  not have come in the time the payment was due is
15  my understanding.
16    Q.  And what's that understanding based
17  on?
18    A.  The information that Kurt provided.
19    Q.  Okay.  Did -- other than the
20  information -- and what information did Kurt
21  provide in that regard?
22    A.  I can't recall specifically other than
23  him telling me that the government payment would
24  never have been able to come in time to make
25  that initial payment --

Page 134

1    Q.  Okay.
2    A.  -- or those other payments.  One of
3  the sets of payments relied upon a government
4  check that could not have come in time for the
5  payment to be made.
6    Q.  Okay.  And just so I'm clear, you
7  didn't review any documents or see any
8  correspondence, did you?
9    A.  I don't recall -- I don't recall right
10  now.  I don't recall.
11    Q.  Sitting here right now, your belief is
12  that the only basis for the statement is that
13  the -- Mr. Kroeger told you?
14    A.  As I sit here today, that's all I can
15  testify to with certainty.
16    Q.  Had the Kroegers made that initial
17  payment consistent with the confirmed plan,
18  would the bank have been allowed to foreclose?
19    MR. SKALKA:  Objection:  Form,
20  foundation.
21    You're hiring him as your lawyer to
22  give an opinion, or are you going to ask him if
23  he advised the Kroegers that?
24    MS. GOODMAN:  To be fair, David,
25  he's given me a lot of opinions that I haven't

Page 135

1  asked for today.  This is one --
2    MR. SKALKA:  You're asking him to
3  give an opinion, and the way you phrased it is
4  something that he hasn't given to somebody else.
5  You're asking him to come up with something
6  today.
7    MS. GOODMAN:  I'm asking him
8  whether or not as a debtor's counsel with, as
9  Mr. Patino says, a lot of experience in this
10  area, whether or not he knows --
11  BY MS. GOODMAN:
12    Q.  Well, do you know, if the debtors had
13  made their payment, would the bank have been
14  allowed to foreclose?
15    A.  If you comply with the terms of the
16  plan, you comply with the terms of the plan.
17    Q.  Okay.
18    A.  If you don't comply with the terms of
19  the plan and there's default provisions of what
20  happens when you default, you have to abide by
21  the terms of the confirmed plan.
22    Q.  Got it.
23    You say in the next paragraph, you
24  say, "My understanding was that the farm ground
25  alone was valued at about $10 million."

Page 136

1    Do you see that?
2    A.  That is correct.
3    Q.  "The bank at the foreclosure sale only
4  credit bid the land note of approximately
5  5 million."
6    A.  That is correct.
7    Q.  Do you know whether or not the bank
8  has sold the land that the Kroegers had
9  previously owned?
10    A.  I haven't looked into that, no.
11    Q.  And so sitting here today -- or excuse
12  me.
13    As of July 31st of 2021, you don't
14  know whether or not the bank broke even with
15  regard to the sale of the collateral in relation
16  to the amount it was owed?
17    A.  No.
18    Q.  Then at the end, you say, "The Debtors
19  and other creditors would have been in a much
20  better position had Galen done things
21  differently."
22    Do you see that?
23    A.  I do.
24    Q.  All right.  Then -- I just want to be
25  fair.  That's your opinion at the end of that

Thomas & Thomas Court Reporters
and Certified Legal Video, LLC

Tel: (402) 556-5000 | Fax: (402) 556-2037
www.ttcrs.com

Page 137

1  paragraph, correct?
2      A.  Is that my opinion, or is that the
3  debtor's opinion that I'm just advocating for?
4      Q.  Well, my question to you is --
5      A.  It's not necessarily my opinion alone.
6  It's an advocacy of the Kroegers' opinion.
7      Q.  Okay.  But it is your opinion,
8  correct?
9      A.  I didn't say that.  I said it's Kurt
10  and Kathy's opinion.  I'm an advocate for my
11  clients.
12      Q.  Do you have an opinion, sir, different
13  than Kurt and Kathy's opinion?
14      A.  Do I have a -- I wouldn't say I
15  disagree with their opinion, if that's what
16  you're asking me.
17      Q.  You authored this note to Mr. Patino
18  correct -- I'm sorry, to Mr. Myers, correct?
19      A.  I sure did.
20      Q.  Okay.  Did you discuss this email with
21  them prior to sending it?
22      A.  I did.
23      Q.  Okay.  And I just want to be clear.
24  Your -- the last sentence of this email isn't --
25  it's Kurt and Kathy's opinion that the debtors

Page 138

1  and creditors would have been in a much better
2  position had Galen done things differently.
3          This is your opinion; isn't that
4  right?
5      A.  Are you asking me if it's an
6  independent opinion that -- a legal opinion I
7  have?
8      Q.  No.  I'm just --
9      A.  What are you --
10      Q.  I'm asking, is this an opinion you
11  told -- is this your opinion that you conveyed
12  to Mr. Myers, "The Debtors and other creditors
13  would have been in a much better position had
14  Galen done things differently"?
15      A.  Like I said, I spoke with Kurt, told
16  him the information that I was going to provide
17  to Rick Myers.
18          I believe that this situation could
19  have had a different outcome had things been
20  done differently.
21      Q.  Would you agree, sir, that's
22  speculation, though?
23      A.  Sure.
24      Q.  Okay.
25      A.  I wasn't there the whole time

Page 139

1  previously, so that's right.
2      Q.  And would you agree with me, sir, that
3  this entire email contains some speculation --
4  that this email that you wrote to Mr. Myers is,
5  in fact, containing speculation on your part?
6      A.  Certainly there's some speculation
7  that goes into these conversations.  Can't know
8  for certain.
9      Q.  Okay.  Thank you.
10          Sir, I want to talk to you -- what
11  communications -- other than the
12  communications -- well, strike that.
13          Have you produced to me -- in
14  connection with this subpoena that was served on
15  behalf of Mr. Stehlik's office, have you
16  produced all communications between you and
17  Mr. Myers with regard to this malpractice claim?
18      A.  Yes.
19      Q.  Other than those written
20  communications, have you had any communications
21  by phone with Mr. Myers?
22      A.  No.  I've only spoken with his
23  counsel.
24      Q.  And that was going to be my next
25  question.

Page 140

1          Have you had any communications with
2  Ms. Vogt?
3      A.  I have.
4      Q.  All right.  And how many have you had?
5      A.  A handful of emails and some phone
6  calls, I think.
7      Q.  What was discussed on those calls?
8      A.  Just generally about what we've talked
9  about here today with some specifics of what
10  we've talked about here today.
11      Q.  Okay.  And what specifics can you
12  recall?
13      A.  I don't recall what those specifics
14  are, but we would've talked about much of what
15  we've talked about today.
16      Q.  All right.  Sir, I want to understand
17  just briefly, because I've seen some
18  communications, which I won't mark -- but I've
19  seen some communications where you will
20  routinely check in with Mr. Myers with regard to
21  the malpractice claim?
22      A.  That's correct.
23      Q.  And I guess I'm curious, what
24  incentive do your clients have to pursue this at
25  this point?

Patrick Patino
3/22/2023

39 (141 - 144)

---

Page 141

1  A. What incentive do my clients -- what
2  incentive do the debtors have in -- well, like
3  we talked about before, if -- let's say, for
4  example, a trustee brings in $100 and the debt
5  is $8. There's $2 that can go to the debtors.
6  Q. Okay. So thank you very much for
7  that, and I like that you slowed your speech
8  pattern down too just to make sure I understood
9  it.
10  A. You're welcome. I'm losing steam
11  here, so...
12  Q. Okay.
13  A. So as I understand it, then, the hope
14  on your client's part is that any sort of claim
15  would exceed the amount owed to creditors such
16  that there would be a distribution to --
17        MR. SKALKA: Object to
18  foundation.
19        Go ahead.
20  BY MS. GOODMAN:
21  Q. -- the owners?
22  A. Potentially that would be a benefit,
23  yes.
24  Q. Okay. Have you been retained at all
25  to serve as an expert in this case?

---

Page 142

1  A. I have not been.
2  Q. Okay. Have you consulted as an expert
3  in this case?
4  A. I have not.
5        MS. GOODMAN: All right. Subject
6  to any follow-up that Ms. Vogt has, I think that
7  largely takes care of my questions.
8        Thank you very much for your time.
9        THE WITNESS: You're welcome.
10        MS. VOGT: I will be very short.
11        CROSS-EXAMINATION
12  BY MS. VOGT:
13  Q. The first one, as debtor's counsel,
14  you are not generally appointed by the Court; is
15  that correct?
16  A. That is correct.
17  Q. I just have one question about that
18  chart.
19        It was my understanding that the chart
20  was to address all the assets where there was a
21  difference between the schedules and not that it
22  was all of the assets?
23  A. That was our intent with that
24  spreadsheet, I believe, was to signify if
25  something changed or was removed from the

---

Page 143

1  schedules or was added to the schedules.
2  Q. So that chart itself is not
3  necessarily a comprehensive collection of all
4  the assets if they were the same on all the
5  schedules?
6  A. Like I previously said, without being
7  able to compare them side by side, the schedules
8  would speak for the totality of all of the
9  assets they then owed.
10        Upon conversion of the case, the
11  spreadsheet is an explanation tool of what
12  transpired from the time the case was initially
13  filed to explain the schedules, you know, on
14  their face from point of filing to when we filed
15  the amended schedules upon conversion.
16  Q. And I just wanted to clarify,
17  Ms. Goodman asked you a question about -- that
18  when he came to you, Mr. Kroeger knew that there
19  had been a plan and that there was a default,
20  correct?
21  A. Yes.
22  Q. But you do not know other than what
23  he's told you when he first learned that there
24  was a plan or that he was in default?
25  A. What I know is that letter from Jeff

---

Page 144

1  Galyen, my understanding is that's the first
2  Kurt knew that a plan had even been filed, so
3  whenever that is dated and he received it.
4        MS. VOGT: I have nothing
5  further.
6        MS. GOODMAN: I just have one
7  follow-up.
8        REDIRECT EXAMINATION
9  BY MS. GOODMAN:
10  Q. Mr. Patino, at the hearing, in your
11  communications with Mr. Myers or Ms. Vogt, did
12  you ever advise them that Judge Saladino at the
13  hearing on April 14th of 2021 made an express
14  finding that he did not believe Mr. Kroeger when
15  he said that he didn't know there was a
16  $100,000 payment due in plan confirmation.
17        Did you ever provide that information
18  to Ms. Vogt or Mr. Myers in connection with your
19  advocacy of the Kroegers in connection with the
20  malpractice claim?
21        MR. SKALKA: Objection:
22  Foundation.
23        Go ahead, Mr. Patino.
24        THE WITNESS: I did not.
25        MS. GOODMAN: Okay. I've got

---

Patrick Patino                                                    40 (145 - 145)
3/22/2023

Page 145

1  nothing further.
2         MR. SKALKA:  Do we have read and
3  sign?  I'm trying to remember in bankruptcy
4  court.  Does he have to waive notice?
5         MS. GOODMAN:  It's federal court.
6         MR. SKALKA:  Are you guys on some
7  expedited thing or --
8         MS. GOODMAN:  David, this is
9  actually in federal court, not bankruptcy court.
10         MR. SKALKA:  That's true.
11         MS. VOGT:  We're in regular
12  federal court.
13         MR. SKALKA:  Patrick, do you want
14  a chance to review your testimony for
15  corrections or -- this wasn't very technical, so
16  if you don't care, then just go ahead and waive
17  on the record.
18         THE WITNESS:  I waive it on the
19  record.  I don't need to review it.
20         COURT REPORTER:  (Requests
21  transcript orders.)
22         MS. VOGT:  E-Tran.
23         MS. GOODMAN:  The usual.
24         (4:50 p.m. - Adjournment.)
25              ** ** ** **

```
 1                    C E R T I F I C A T E

 2    STATE OF NEBRASKA      )
                             ) ss.
 3    COUNTY OF DOUGLAS      )

 4              I, Brianne L. Starkey, RPR, CRR, General

 5    Notary Public within and for the State of

 6    Nebraska, do hereby certify that the foregoing

 7    testimony of PATRICK M. PATINO was taken by me in

 8    shorthand and thereafter reduced to typewriting

 9    by use of Computer-Aided Transcription, and the

10    foregoing one hundred forty-five (145) pages

11    contain a full, true and correct transcription of

12    all the testimony of said witness, to the best of

13    my ability;

14              That I am not a kin or in any way

15    associated with any of the parties to said cause

16    of action, or their counsel, and that I am not

17    interested in the event thereof.

18              IN WITNESS WHEREOF, I hereunto affix my

19    signature and seal this 5th day of April, 2023.

20

21              _____

22              BRIANNE L. STARKEY, RPR, CRR
                GENERAL NOTARY PUBLIC

23

24    My Commission Expires:

25
```